IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TEVA BRANDED PHARMACEUTICAL PRODUCTS R&D, INC., TEVA RESPIRATORY, LLC, NORTON (WATERFORD) LIMITED, and NORTON HEALTHCARE LIMITED, | ) ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 12-1101-GMS |
| | ) | (Consolidated) |
| PERRIGO PHARMACEUTICALS CO., PERRIGO CO., and CATALENT PHARMA SOLUTIONS, LLC, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' OPENING CLAIM CONSTRUCTION BRIEF

OF COUNSEL:
David M. Hashmall
Ira J. Levy
Brian J. Prew
Andrew E. Riley
Timothy J. Rousseau
GOODWIN PROCTER LLP
The New York Times Building
New York, NY 10018
(212) 813-8800

Daryl L. Wiesen
Nicholas K. Mitrokostas
GOODWIN PROCTER LLP
Exchange Place
53 State Street
Boston, MA 02109
(617) 570-1000

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Stephanie E. O'Byrne (No. 4446)
David M. Fry (No. 5486)
SHAW KELLER LLP
300 Delaware Avenue, Suite 1120
Wilmington, DE 19801
(302) 298-0700
*Counsel for Plaintiffs Teva Branded Pharmaceutical Products R&D, Inc., Teva Respiratory, LLC, Norton Healthcare Limited, and Norton (Waterford) Limited*

## TABLE OF CONTENTS

Introduction ................................................................................................................1

Argument ..................................................................................................................3

    1.    Proposed Constructions for the Disputed Terms of the '152 Patent ........................3

        (a)    "No Surfactant" Should be Construed As "No Added Surface Active Agent" ........................................................................3

    2.    Proposed Constructions for the Disputed Terms of the '445 Patent ........................5

        (a)    "Pharmaceutical Suspension Aerosol Formulation" Should Be Construed To Mean "a Drug Formulation In Which the Drug Is In Particulate Form and Substantially Insoluble In The Propellant" ..............5

        (b)    "Substantially Free of Surfactant" Should Be Construed To Mean "Any Surface Active Agent, If Present, Is Not Present In an Amount Sufficient To Have an Effect On the Physical Properties of the Formulation" ........................................................................6

        (c)    "Substantially Completely Insoluble" Should Be Given Its Plain and Ordinary Meaning ....................................................................9

        (d)    The Terms "In the Amount of 11.4% w/w," "In the Amount of 0.4% w/w" and "In the Amount of 88.2% w/w" ........................................10

    3.    Proposed Constructions for the Disputed Terms of the '627 and '712 Patents ........................................................................................11

        (a)    The Actuator Terms Should Not Be Limited To "a Mechanical Device For Moving or Controlling the Drive Means" ..............................12

        (b)    The Rotary Gear Terms Should Not Be Limited as Perrigo Proposes ........................................................................13

        (c)    The '712 Patent Pawl Terms Should Be Construed As Proposed by Teva ........................................................................14

        (d)    The Terms of the '627 and '712 Patents Are Not Means-Plus-Function Terms ........................................................................16

            (i)    The Reverse Rotation Prevention Means Term of the '627 Patent is Not a Means-Plus-Function Term ..................................17

            (ii)    The Drive Means/Driver and Display/Display Means Terms Should Be Given Their Plain and Ordinary Meanings ........................................................................18

Conclusion ...............................................................................................................20

# TABLE OF AUTHORITIES

**CASES**

*Baldwin Graphic Systems, Inc. v. Siebert, Inc.*,
    512 F.3d 1338 (Fed. Cir. 2008)..............................................................................................15, 16

*Cree, Inc. v. SemiLEDs, Corp.*,
    No. 10-866-RGA, 2012 WL 975697 (D. Del. Mar. 21, 2012) ................................................8

*Globetrotter Software, Inc. v. Elan Computer Group, Inc.*,
    362 F.3d 1367 (Fed. Cir. 2004)..............................................................................................11, 13

*Home Diagnostics, Inc. v. LifeScan, Inc.*,
    381 F.3d 1352 (Fed. Cir. 2004)....................................................................................................20

*Laryngeal Mask v. Ambu A/S*,
    618 F.3d 1367, 1372 (Fed. Cir. 2010) ........................................................................................16

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc)............................................................................3, 5, 8

*Playtex Products, Inc. v. Procter & Gamble Co.*,
    400 F.3d 901 (Fed. Cir. 2005)........................................................................................................8

*Rodime PLC v. Seagate Technology, Inc.*,
    174 F.3d 1294 (Fed. Cir. 1999)....................................................................................................17

*SanDisk Corp. v. Kingston Technology Co.*,
    695 F.3d 1348 (Fed. Cir. 2012)....................................................................................................15

*Trinity Industries, Inc. v. Road Systems, Inc.*,
    121 F. Supp. 2d 1028 (E.D. Tex. 2000) ......................................................................................17

**STATUTES**

35 U.S.C. § 112, ¶ 6 ............................................................................................................................20

**INTRODUCTION**

Plaintiffs[1] brought this consolidated action for infringement of U.S. Patent

Nos. 7,105,152 (the "'152 patent"), 7,566,445 (the "'445 patent"), 6,446,627 (the "'627 patent"),

and 8,132,712 (the "'712 patent") (collectively, "the patents-in-suit") by Defendants'[2] ANDA

No. 203760 for a proposed generic version of ProAir® HFA. ProAir® HFA is the most widely-

prescribed albuterol sulfate metered-dose inhaler ("MDI") in the United States and generates

over one billion U.S. dollars in annual sales worldwide. ProAir® HFA is an asthma inhaler

indicated in patients four years and older for the treatment or prevention of bronchospasm with

reversible obstructive airway disease and for the prevention of exercise-induced bronchospasm.

ProAir® HFA was developed by scientists at Norton (Waterford) and received FDA approval in

2004, after more than a decade of research and development.

MDIs have a number of different components, principally (1) an actuator body (in some

cases with an integrated dose counter), (2) a canister, (3) a valve and (4) the pharmaceutical

formulation containing the active ingredient. All of the components of an MDI work in harmony

so as to deliver the drug substance in a plurality of uniform and therapeutically effective doses

(in the case of ProAir® HFA, 200 doses). Pharmaceutical aerosol formulations can exist in a

number of different forms, including as solution formulations and suspension formulations. In a

solution formulation, the active pharmaceutical ingredient is entirely dissolved. In contrast, in a

suspension formulation, the active pharmaceutical ingredient exists suspended in particulate

form, typically micronized to a size that would allow it to reach the target area of the lungs.

Formulating suitable suspension aerosol formulations poses particular problems. A drug may

---

[1] Teva Global Branded Research & Development Co., Teva Respiratory LLC, Norton
(Waterford) Co., and Norton Healthcare, Ltd. (collectively, "Teva").
[2] Perrigo Co., Perrigo Pharmaceuticals, Co., and Catalent Pharma Solutions LLC's (collectively,
"Perrigo").

"cream" or "flocculate" in a poor suspension.  In such circumstances, dose-content is not uniform, and a patient may receive either too much drug in some actuated doses, and no or too little drug in others.  In prior formulations that used chlorofluorocarbon ("CFC") as propellants, a surface active agent or surfactant, which helped suspend the drug particles and lubricate the MDI, was a necessary ingredient in order to create a homogeneous suspension aerosol formulation.

**The Formulation Patents:**  The '152 and '445 patents relate to novel CFC-free formulations and devices for use as MDIs.  The '152 patent claims are directed to pharmaceutical suspension aerosol formulations using a new propellant, hydrofluoroalkane ("HFA") 134a (also known as hydrofluorocarbon or HFC 134a).  The inventors of the '152 patent, scientists at 3M, Co., surprisingly discovered that suitable pharmaceutical aerosol suspension formulations could be made consisting of active pharmaceutical ingredients, HFA 134a (also known as 1,1,1,2-tetrafluoroethane), ethanol in an amount of 5-15% by weight, and without the addition of a surfactant.

The '445 patent claims are directed to a pharmaceutical aerosol product comprising an aerosol canister, a pharmaceutical suspension aerosol formulation substantially free of surfactant, and an actuator with a spray orifice aperture of from 100 to 300 microns.  The late Fiona Millar discovered the claimed drug product that became ProAir® HFA and the subject of the '445 patent.

**The Dose Counter Patents:**  The '627 and '712 patents relate to dose-counter devices that can be used with MDIs to account for the number of doses remaining in an MDI.  The mechanisms of the '627 and '712 patents provide for improved counting devices that decrease the risks of miscounting in the handling and actuation of MDIs, thus improving patient safety.

2

Each time the user depresses the canister in the inhaler to receive a dose of the medication, the display is updated to show that one fewer dose is available. The '627 and '712 patents claim mechanisms and methods for ensuring that the count of doses of medication remaining in the inhaler remains accurate, especially in view of the manufacturing tolerances that are involved in creating the inhaler and dose counter and the variations in the forces that users may apply when depressing the canister to receive a dose of the medication.

## ARGUMENT

*Phillips v. AWH Corp.*, sets forth a guide for claim construction. 415 F.3d 1303, 1312-19 (Fed. Cir. 2005) (en banc). A claim term is examined to determine whether it has an ordinary meaning to a person of skill in the technical field of the patent. Where a term has an ordinary meaning, it should be given that meaning unless the intrinsic evidence, the patent specification and prosecution history, provides an alternative meaning. *Id.* at 1312-13.

**1.    Proposed Constructions for the Disputed Terms of the '152 Patent**[3]

**(a)    "No Surfactant" Should be Construed As "No Added Surface Active Agent"**

| Claim Term | Teva's Proposed Construction | Perrigo's Proposed Construction |
|---|---|---|
| "no surfactant"<br>    '152 patent, claim 1 | "no added surface active agent" | *ordinary and customary meaning* |

A person of ordinary skill in the art[4] would understand that the phrase "no surfactant" means "no added surface active agent." The specification of the '152 patent makes clear that "no surfactant" in the formulations of the '152 patent means that no surface active agent[5] has been

---

[3] The parties' agreed-upon constructions for certain terms in the patents-in-suit are attached hereto as Exhibit 1.

[4] The person of ordinary skill in the art of the '445 and '152 patents would have at least an undergraduate degree, preferably a graduate degree, in pharmaceutical sciences and several years of experience working with MDIs and/or pharmaceutical aerosol formulations.

[5] Surface active agents are, generally, compounds that lower the surface tension between two substances. The term "surfactant" is a commonly used contraction for "surface active agent."

added to the claimed formulation.  The '152 patent is directed toward pharmaceutical aerosol suspension formulations, and describes certain methods of their manufacture.  The specification describes how to make the formulations disclosed in the '152 patent.  In some of the formulations disclosed in the '152 patent, a surface active agent is expressly added to the formulation.  *See* '152 patent at 6:18-20 (JA7)[6] ("When a surfactant and/or ethanol *are included* in the formulation, they can be *added* to the propellant along with the albuterol sulfate." (emphasis added)).

In other formulations with "no surfactant," no surface active agent is added to the formulation.  For instance, Example 2 and the Comparative Example describe how to make formulations where no surface active agent is added.  The specification states that the formulations in Example 2 "can be formulated in HFC 227 with *no surfactant* or other adjuvant." *id.* at 8:16-17 (JA8); *see also id.* at 8:23-24 (JA8) ("Albuterol sulfate was formulated in two propellant mixes A and B, with *no surfactant* or adjuvant." (emphasis added)).  Formulations had "no surfactant" because the applicants indicated that they were not *adding* any surfactant.

The use of "no surfactant" in the claims and specification of the '152 patent is also consistent with the applicants' use of that term during prosecution.  For example, the applicants distinguished formulations in the '152 patent with "no surfactant" from prior art references that taught that a surfactant was necessary.  *See* '152 Patent File History, Applicant Arguments/Remarks (Nov. 10, 1998) (JA1234-46) at 3-7 (JA1234-38).

Teva's proposed construction of "no surfactant" is consistent with how that term is used throughout the specification and prosecution history of the '152 patent, and how a person of

---

The specification of the '152 patent uses these terms interchangeably.  *Compare* '152 patent at 1:38-41 (JA5) ("a surfactant") *with* '152 patent at 1:51-54 (JA5) ("a surface active agent").  Perrigo has not contested that the terms are interchangeable.

[6] Citations to JA__ refer to the parties' Joint Appendix of Intrinsic Evidence.

ordinary skill in the art would understand that term in view of the claim language and the

intrinsic evidence.  *See Phillips*, 415 F.3d at 1315-17.

2.      **Proposed Constructions for the Disputed Terms of the '445 Patent**

(a)      **"Pharmaceutical Suspension Aerosol Formulation" Should Be Construed To Mean "a Drug Formulation In Which the Drug Is In Particulate Form and Substantially Insoluble In The Propellant"**

| Claim Term | Teva's Proposed Construction | Perrigo's Proposed Construction |
|---|---|---|
| "pharmaceutical suspension aerosol formulation" '445 patent, claims 1, 2, 11, 16 | "a drug formulation in which the drug is in particulate form and substantially insoluble in the propellant" | *ordinary and customary meaning* |

For the '152 patent, the parties agreed that the phrase "pharmaceutical suspension aerosol

formulation" means a "drug formulation in which the drug is in particulate form and

substantially insoluble in the propellant."  *See* Ex. 1.  Teva proposes that the Court construe the

same phrase in the claims of the '445 patent in the same way.  This construction is consistent

with the language of the claim, specification and prosecution history of the '445 patent.

The specification of the '445 patent makes clear that the claimed suspensions of the

invention have a drug "in particulate form" that is substantially insoluble in the propellants.

Columns 1 and 2 of the '445 patent describe the inventions as "a medicinal aerosol formulation

comprising a particulate medicament."  *See* '445 patent at 1:51-55, 1:66-2:2 (JA18).  The

specification further describes that:

> In all cases of the present invention the medicament consists of a particle size suitable for inhalation into the lung . . . .
>
> Medicaments which may be administered in aerosol formulations according to the invention include any drug useful in inhalation therapy which may be presented in a form which is substantially completely insoluble in the selected propellant.

*Id.* at 2:42-51 (JA18); *see also id.* at 3:9-12 (JA19) ("Preferred are those compounds which are

also substantially insoluble in the co-solvent.  Particularly preferred as medicament is salbutamol either as a base or as a salt and especially salbutamol sulphate.").  Thus, the specification makes clear that the claimed suspension formulations have a drug in particulate form which is substantially insoluble in the propellant.

Teva's proposed construction is further supported by the prosecution record.  During the prosecution of the '445 patent, applicants amended the claims to limit them to "suspension" aerosol formulations, as opposed to solutions, by adding the requirement that the drug be substantially completely insoluble in the propellant and by specifically reciting the word "suspension" in the claims.  *See* '445 Patent File History, Amendment/Request for Reconsideration (Nov. 25, 2008) (JA2509-22) at 4-5 (JA2512-13) (in new claims 39, 46, 47), 10-12 (JA2518-20).

Perrigo has pointed to nothing that would counsel against construing the term "pharmaceutical suspension aerosol formulation" to mean the same in the '445 and '152 patents and, in fact, the common meaning and intrinsic record support such a construction.  Teva's proposed construction of "drug formulation in which the drug is in particulate form and substantially insoluble in the propellant" should be adopted.

> **(b)**  **"Substantially Free of Surfactant" Should Be Construed To Mean "Any Surface Active Agent, If Present, Is Not Present In an Amount Sufficient To Have an Effect On the Physical Properties of the Formulation"**

| Claim Term | Teva's Proposed Construction | Perrigo's Proposed Construction |
|---|---|---|
| "substantially free of surfactant"<br>'445 patent, claims 1, 2, 11, 16 | "any surface active agent, if present, is not present in an amount sufficient to have an effect on the physical properties of the formulation" | *ordinary and customary meaning* |

Teva proposes that the Court construe the phrase "substantially free of surfactant" to mean "any surface active agent, if present, is not present in an amount sufficient to have an effect

on the physical properties of the formulation."  Teva's proposed construction is consistent with the specification and prosecution history of the '445 patent.

The specification of the '445 patent makes clear that the claimed formulations are made without a surfactant.  The specification states that "[a]ccording to a first aspect of the present invention there is provided a medicinal aerosol formulation comprising a particulate medicament, a fluorocarbon propellant and 6% to 25% w/w of the total formulation of a polar co-solvent, such formulation being substantially free of surfactant."  '445 patent at 1:51-55 (JA18).  The patent then identifies a non-limiting example formulation of the claimed invention containing salbutamol sulfate (also known as albuterol sulfate), tetrafluoroethane (HFA-134a), and ethanol.  *Id.* at 3:41-59 (JA19).  The specification contrasts the formulations of the invention from the prior art formulations with regard to the inclusion of a surfactant to assist with the physical properties of a suspension formulation.  For example, the specification states that "[h]istorically medicinal suspension aerosols have contained a surfactant e.g. U.S. Pat. No. 3,014,844, as it was considered that the use of a surfactant was necessary to prevent agglomeration of particles, to prevent adhesion to the sides of the canister, and to aid valve lubrication and prevent valve sticking."  *Id.* at 1:30-36 (JA18).

The intrinsic record further makes clear that the claimed formulations need only be free of surfactant such that any surfactant does not affect the physical properties of the formulation. The specification and prosecution history of the '445 patent distinguish the claimed formulations that are "substantially free of surfactant" from formulations in which surface active agent is present in amounts sufficient to affect the physical properties of the formulation.  For example, in remarks accompanying an amendment, the applicants distinguished the formulations of the '445 patent that are "substantially free of surfactant" from prior art formulations in which

surfactant was included in an amount sufficient to affect formulation stability and homogeneity.

The applicants stated:

> The invention of claims 1-22 differ from Purewal by virtue of their requirement that the formulation be *substantially free of surfactant*. In fact, Purewal (column 3, lines 5-9) indicates that the presence of increased amounts of solubilised surfactant allows the preparation of stable, homogenous suspensions of drug particles and assists in obtaining stable solution formulations of certain drugs. . . . Therefore, the requirement that the formulation be *substantially free of surfactant* is neither disclosed nor suggested by Purewal.

'445 Patent File History, Applicant Arguments/Remarks (Aug. 27, 1999) (JA2331-34, 37-39) at

6 (JA2338) (emphasis added). Similarly, the specification of the '445 patent states,

"[H]istorically medicinal suspension aerosols have contained a surfactant e.g. U.S. Pat.

No. 3,014,844, as it was considered that the use of a surfactant was necessary to prevent

agglomeration of particles, to prevent adhesion to the sides of the canister, and to aid valve

lubrication and prevent valve sticking." '445 patent at 1:30-36 (JA18).

Finally, this understanding of "substantially free of surfactant" is consistent with the

Federal Circuit's prior pronouncements with regard to the term "substantially." Federal Circuit

case law makes clear than "substantially" means "approximate" instead of "perfect." *See, e.g.,*

*Cree, Inc. v. SemiLEDs, Corp.*, No. 10-866-RGA, 2012 WL 975697, at *21 (D. Del. Mar. 21,

2012) ("Federal Circuit law is clear that 'substantially' is not prohibitively indefinite: 'the term

'substantially' is a meaningful modifier implying 'approximate,' rather than 'perfect.'" (*citing*

*Playtex Prods., Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 907 (Fed. Cir. 2005))).

Accordingly, it is clear from the specification and prosecution history of the '445 patent that

"substantially free of surfactant" means "any surface active agent, if present, is not present in an

amount sufficient to have an effect on the physical properties of the formulation," as Teva

proposes. *See Phillips*, 415 F.3d at 1315-17.

**(c)    "Substantially Completely Insoluble" Should Be Given Its Plain and Ordinary Meaning**

| Claim Term | Teva's Proposed Construction | Perrigo's Proposed Construction |
|---|---|---|
| "substantially completely insoluble"<br>'445 patent, claims 1, 2, 11, 16 | *plain and ordinary meaning* | *no plain, ordinary or customary meaning/indefinite* |

The term "substantially completely insoluble" has a plain and ordinary meaning to a person of ordinary skill in the art, as evidenced by the fact that others in fields related to the '445 patent, and even in other chemical arts, have used that term without further clarification. *See, e.g.*, EP0775484B1 (Ex. 2) at 3:33; EP2311793A1 (Ex. 3) at 4:53; WO1993/011744A1 (Ex. 4) at 3:1.

A person of ordinary skill in the art would understand that the term "substantially completely insoluble" is being used in the patent in accordance with its plain and ordinary meaning. The term "substantially completely insoluble," as used in the claims of the '445 patent, modifies salbutamol sulfate, which is suspended in a pharmaceutical aerosol formulation. A person of skill in the art would understand from the specification and the file history of the '445 patent that a drug which is "substantially completely insoluble" in a propellant has a low enough solubility so as to form a suspension as opposed to a solution. The specification of the '445 patent states that, "[the drug] may be used in the form of salts . . . to optimise the activity and/or stability of the medicament and/or *to minimise the solubility of the medicament in the propellant*." '445 patent at 3:3-8 (JA19) (emphasis added). The file history of the '445 patent clearly states that "[t]he present invention requires that the aerosol formulation is a suspension not a solution." '445 Patent File History, Notice of Allowability (May 29, 2009) (JA3931-37) at 2 (JA3935). The file history of the '445 patent also connects suspension formulations with drugs that have low solubility in a propellant: "To further highlight this distinction . . . the

bronchodilator is 'substantially completely insoluble' in the propellant. . . .  Thus, the present claims now clearly point out that the aerosol formulation is in the form of a suspension as opposed to a solution."  *Id.*, Amendment/Request for Reconsideration (Nov. 25, 2008) (JA2509-22) at 10 (JA2518).  A person of skill in the art would know that "substantially completely insoluble" is a solubility sufficiently low as to form a stable suspension, and the Court need not construe that term.[7]

    **(d)**     **The Terms "In the Amount of 11.4% w/w," "In the Amount of 0.4% w/w" and "In the Amount of 88.2% w/w"**

| Claim Term | Teva's Proposed Construction | Perrigo's Proposed Construction |
|---|---|---|
| "in the amount of 11.4% w/w" '445 patent, claims 3, 6, 7, 10, 12, 15, 17, 20 | "present in an amount equal to approximately 11.4%, by weight, of the formulation" | "in the amount of 11.4% w/w" |
| "in the amount of 0.4% w/w" '445 patent, claims 4, 6, 8, 10, 13, 15, 18, 20 | "present in an amount equal to approximately 0.4%, by weight, of the formulation" | "in the amount of 0.4% w/w" |
| "in the amount of 88.2% w/w" '445 patent, claims 5, 6, 9, 10, 14, 15, 19, 20 | "present in an amount equal to approximately 88.2%, by weight, of the formulation" | "in the amount of 88.2% w/w" |

The terms "in the amount of 11.4% w/w," "in the amount of 0.4% w/w" and "in the amount of 88.2% w/w" should be construed as in Teva's proposal above to mean "present in an amount equal to approximately" those percentages by weight of the formulation.  Such constructions are the only plausible readings of these claim terms in view of the intrinsic record.

The claim elements requiring a particular concentration of ingredients, such as ethanol, HFA-134a and salbutamol sulfate, were added in a November 25, 2008 amendment.  In that exchange with the PTO, the applicants made clear that the concentrations were derived from the example in the '445 patent.  *See* '445 patent at 3:39-59 (JA19).  The applicants divided each of

---

[7] Rather than offer a construction, Perrigo alleges that "substantially completely insoluble" has no plain, ordinary or customary meaning and is indefinite.  Perrigo concedes that indefiniteness is not appropriately decided during claim construction.  *See* Joint Claim Chart, D.I. 49 at B-4.  Accordingly, the Court need not address Perrigo's indefiniteness argument at this stage.

the stated amounts of ingredients by 8.5 g, representing the total amount in the formulation, and then "rounded":

> With regards to new claims 40 and 42-44, the percent amounts of concentration in mixture by weight (w/w) were calculated using the weights of the ingredients in the example in p. 5 and rounding to the nearest tenth for consistency. For example the recitation in claim 40 of '0.4%' salbutamol sulfate was derived by dividing the weight of salbutamol sulfate (0.03g) by the total weight of the ingredients, i.e., 0.03g/(0.03g + 0.97g + 7.5g) to arrive at 0.35%, which was rounded to 0.4%. Accordingly, no new matter has been added by these amendments. Applicant respectfully requests entry of these amendments.

'445 Patent File History, Applicant Arguments/Remarks (Nov. 25, 2008) (JA2509-22) at 6 (JA2514). Thus, as the intrinsic record makes clear, these percentage amounts were "approximates" and not intended to be exact.

Perrigo seeks to limit the percentage amounts in these claim terms to the exact number stated in the claim. Whether they seek such a construction to set up a non-infringement position or to argue that there is no written description for these claim elements is irrelevant, as there is no support for construing the claims to require the claimed amount precisely. Such an argument would read the example, which is a preferred embodiment, out of the claim, contrary to Federal Circuit precedent. *See Globetrotter Software, Inc. v. Elan Computer Grp., Inc.*, 362 F.3d 1367, 1381 (Fed. Cir. 2004) ("A claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct." (internal quotation marks omitted)). Perrigo's position is untenable in view of the clear statement made during prosecution that the support for these claimed percentages comes from the sole example in the specification of the '445 patent, and that these numbers were arrived at by "rounding."

3.      **Proposed Constructions for the Disputed Terms of the '627 and '712 Patents**

We next turn to the disputes over the claim terms in the dose counter patents. The dose counter patents are directed to the mechanical device that counts and displays the remaining

number of doses, and thus, the terms and issues are different than those presented by the '152 and '445 patents. Because Perrigo has proposed the same construction for a number of terms in the '627 and '712 patents, these terms are discussed together below.

> **(a)    The Actuator Terms Should Not Be Limited To "a Mechanical Device For Moving or Controlling the Drive Means"**

| Claim Term | Teva's Proposed Construction | Perrigo's Proposed Construction |
|---|---|---|
| "actuator means" '627 patent, claim 1 | *plain and ordinary meaning* | "a mechanical device for moving or controlling the drive means" |
| "actuator" '712 patent, claims 1, 18, 19 | *plain and ordinary meaning* | |

A person of ordinary skill in the art[8] would understand that the terms "actuator" and "actuator means" have a plain and ordinary meaning. To be clear, neither party proposes that the term "actuator means" in the '627 patent be construed as a means-plus-function claim term. Instead of giving the terms "actuator" and "actuator means" their plain and ordinary meaning, Perrigo wishes these terms be construed identically and be limited to "a mechanical device for moving or controlling the drive means." This construction improperly adds limitations that are found nowhere in the '627 or '712 patents.

The claim language alone sufficiently describes how the actuator/actuator means operate: to cause the driver/drive means to "driv[e] said rotary gear/rotary gear means in a step-wise fashion in response to displacement of the actuator/said actuator means." '712 patent at claims 1, 18, 19 (JA51); '627 patent at claim 1 (JA34). There is nothing in the claims to suggest that the actuator/actuator mean must interact mechanically with the driver/drive means or that the actuator/actuator means must directly move or control the driver/drive means. Perrigo's

---

[8] The person of ordinary skill in the art of the '627 and '712 patents would have an undergraduate in the mechanical arts or engineering and at least two years of experience designing or repairing mechanical devices, preferably dose counter devices.

proposed construction only adds ambiguity to the claims regarding what it means for an actuator/actuator means to be "a mechanical device" or to "control[] the drive means." The only requirements in the claims of the '627 and '712 patents are that there is an actuator/actuator means that can be displaced, and that in response to displacement of the actuator/actuator means, the driver/drive means drives the rotary gear/rotary gear means in a step-wise fashion. As the claims of '627 and '712 patents already clearly set out these requirements, there is no need for further construction of the "actuator" or "actuator means" terms.

Further, Perrigo's proposed constructions may improperly exclude embodiments that are described in the specifications of the '627 and '712 patents, such as the "breath-operated actuator" "which delivers a dose of drug through a mouthpiece in response to inhalation by the user." '712 patent at 1:66-2:1 (JA47); '627 patent at 1:49-51 (JA30). Because this "breath-operated actuator" may not be a "mechanical device" that directly "mov[es] or control[s]" the driver/drive means, it appears that Perrigo's proposed constructions improperly exclude it. *Globetrotter Software*, 362 F.3d at 1381. Thus, Perrigo's proposed constructions of actuator/actuator means should be rejected.

**(b)    The Rotary Gear Terms Should Not Be Limited as Perrigo Proposes**

| Claim Term | Teva's Proposed Construction | Perrigo's Proposed Construction |
|---|---|---|
| "rotary gear means having a wheel mounted on a spindle, said wheel having a plurality of ratchet teeth around a periphery of said wheel"<br>    '627 patent, claim 1 | *plain and ordinary meaning* | "a wheel mounted on a spindle, the wheel having a plurality of ratchet teeth around its periphery" |
| "a rotary gear . . . comprising a wheel mounted on a spindle which wheel having a plurality of ratchet teeth around its periphery"<br>    '712 patent, claims 1, 18, 19 | *plain and ordinary meaning* | |

A person of ordinary skill in the art would understand "rotary gear means" and "rotary

13

gear" to have a plain and ordinary meaning.  Once again, Perrigo contends that these terms be construed the same and in a manner that creates more ambiguity and is not faithful to the language of the claim or the intrinsic record.

The '627 patent describes the rotary gear means as "having," and the '712 patent describes the rotary gear as "comprising," "a wheel mounted on a spindle," the "wheel having a plurality of ratchet teeth around a periphery."  Neither patent states that the rotary gear can have no more than that component.  But Perrigo improperly seeks to limit the rotary gear/rotary gear means to just the wheel itself.  There is no reason to import this limit into the claims.

The specifications of the '627 and '712 patents describe that the rotary gear/rotary gear means may also include further structures that are separate from the wheel.  For example, the rotary gear is also described as comprising a spindle on which the wheel is mounted.  '712 patent at 5:39-40 (JA49) ("the rotary gear comprising a wheel 30 mounted on a spindle"), 6:41 (JA49) ("[t]he spindle *of the* rotary gear" (emphasis added)); '627 patent at 4:12-13 (JA31).  Indeed, claim 1 of the '627 patent specifically claims that in addition to a wheel, the rotary gear means also includes a spindle.  '627 patent at 10:56-57 (JA34) ("rotary gear means having a wheel mounted on a spindle").  Since the rotary gear/rotary gear means may also include a spindle on which the wheel is mounted, the rotary gear/rotary gear means cannot be limited to just the wheel itself as suggested by Perrigo.  Perrigo's proposed constructions of "rotary gear" and "rotary gear means" should therefore be rejected and these terms should be given their plain and ordinary meanings.

**(c)     The '712 Patent Pawl Terms Should Be Construed As Proposed by Teva**

| Claim Term | Teva's Proposed Construction | Perrigo's Proposed Construction |
|---|---|---|
| "a pawl to prevent reverse rotation of the rotary gear . . . | "a pawl [to prevent reverse rotation] . . . [wherein the | "a pawl" and "the pawl" should be given their ordinary and |

14

| | | |
|---|---|---|
| wherein the pawl comprises at least two ratchet teeth each for engaging with the ratchet teeth of the wheel to prevent reverse rotation of the rotary gear, the at least two ratchet teeth being radially spaced such that one of the at least two ratchet teeth of the pawl engages with the ratchet teeth of the wheel following each step of the step-wise rotary motion of the rotary gear"<br>    '712 patent, claims 1, 18, 19 | pawl comprises at least two ratchet teeth" should be construed as "one or more pawls [to prevent reverse rotation] . . . [wherein] one or more pawls [comprises at least two ratchet teeth]" | customary meaning<br><br>"A pawl having at least two ratchet teeth each for engaging with the ratchet teeth of the wheel to prevent reverse rotation of the rotary gear.  The at least two ratchet teeth of the pawl are radially spaced less than the distance between adjacent teeth on the wheel of the rotary gear such that one and the same tooth of the pawl engages with the ratchet teeth of the wheel of the rotary gear following each step of the step-wise rotary motion of the rotary gear." |
| "the pawl"<br>    '712 patent, claims 1, 2 | "one or more pawls" | *ordinary and customary meaning* |

The parties have two disputes regarding the "pawl" terms of the '712 patent: whether the "at least two ratchet teeth" may be found on one or more pawls and whether an additional limitation regarding the spacing of the ratchet teeth of the pawls should be imported to the claims through claim construction.  Each dispute is addressed in turn.

The Court should adopt Teva's proposed construction for "a pawl" and "the pawl."  First, as a matter of black-letter patent law, the use in a patent claim of "the indefinite articles 'a' or 'an' means 'one or more.'"  *See SanDisk Corp. v. Kingston Tech. Co.*, 695 F.3d 1348, 1360 (Fed. Cir. 2012).  This construction "is best described as a rule, rather than merely as a presumption or even a convention."  *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342-43 (Fed. Cir. 2008).  Moreover, "[t]he subsequent use of definite articles 'the' or 'said' in a claim to refer back to the same claim term does not change the general plural rule, but simply reinvokes that non-singular meaning."  *Id.* at 1342.  The exceptions to this rule are extremely limited: a patentee must evince a clear intent to limit 'a' or 'an' to 'one.'"  *Id.* (internal quotes and indication of omission omitted).  "An exception to the general rule that 'a' or 'an' means more than one only

arises where the language of the claims themselves, the specification, or the prosecution history necessitate a departure from the rule." *Id.* at 1442-43. Accordingly, under this "general plural rule," the terms "a pawl" and "the pawl" should be understood to mean "one or more pawls" and "the one or more pawls," respectively.

Second, despite the fact that the claim is open-ended and contemplates that "one or more pawls" comprise "the at least two ratchet teeth," Perrigo attempts to improperly limit the meaning of the claim terms "a pawl" and "the pawl" by requiring that the terms will be limited to a *single* pawl. But that is not all. Perrigo then tries to read in additional limitations about the spacing of the ratchet teeth. The claims of the '712 patent already describe how the "at least two ratchet teeth" must be spaced relative to each other: they must be "radially spaced such that one of the at least two ratchet teeth [] engages with the ratchet teeth of the wheel following each step of the step-wise rotary motion of the rotary gear." The claims plainly do not require that the ratchet teeth be "radially spaced less than the distance between adjacent teeth on the wheel of the rotary gear such that one and the same tooth of the pawl engages with the ratchet teeth of the wheel of the rotary gear following each step of the step-wise rotary motion of the rotary gear," as suggested by Perrigo. Importing these additional limitations from a preferred embodiment of the specification of the '712 patent would be improper. *See Laryngeal Mask Co. v. Ambu A/S*, 618 F.3d 1367, 1372 (Fed. Cir. 2010) ("We do not generally limit claims to the preferred embodiment.").

**(d)      The Terms of the '627 and '712 Patents Are Not Means-Plus-Function Terms**

Unlike with the terms "actuator means" and "rotary gear means" of the '627 patent, which Perrigo emphatically contends are *not* means-plus-function terms, Perrigo proposes that other terms in the '627 patent that also use the word "means" be construed as means-plus-function elements, without any explanation on how these differ. Perrigo's means-plus-function

16

constructions should be rejected.

In determining whether to construe a term of a patent claim as a means-plus-function term, courts look to whether a claim reciting a function "also recites sufficient structure or material for performing the claimed function." *Trinity Indus., Inc. v. Road Sys., Inc.*, 121 F. Supp. 2d 1028, 1036 (E.D. Tex. 2000) (citing *Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294, 1302 (Fed. Cir. 1999)).  While there is a presumption that a term using the word "means" is a means-plus-function term, this presumption is overcome if the claim term recites sufficient structure or material for performing the claimed function.  *Id.*

**(i)    The Reverse Rotation Prevention Means Term of the '627 Patent is Not a Means-Plus-Function Term**

| Claim Term | Teva's Proposed Construction | Perrigo's Proposed Construction |
|---|---|---|
| "reverse rotation prevention means to prevent reverse rotation of said rotary gear means . . . wherein the reverse rotation prevention means is a friction clutch"<br>    '627 patent, claim 1 | *plain and ordinary meaning* | This term is a means-plus-function term under 35 U.S.C. § 112, ¶ 6.<br><br>The function is "to prevent reverse rotation of said rotatory gear means."<br><br>The structures in the specification linked to this function are: (1) "wrap-spring clutch 64 surrounding the hollow axle 63 at one end thereof remote from ratchet toothed wheel 60"; (2) "friction clutch 364 [at the end of hollow axle 363]"; and/or (3) "coil spring 664". |

The term "reverse rotation prevention means to prevent reverse rotation of said rotary gear means . . . wherein the reverse rotation prevention means is a friction clutch" of the '627 patent is not a means-plus-function limitation as it plainly recites sufficient structure to prevent reverse rotation of the rotary gear means.  The claim specifically recites that the structure of the reverse rotation prevention means "is a friction clutch."  As there is no evidence that a person of ordinary skill in the art would have any difficulty understanding the structure of "a friction

17

clutch," this term should be given its plain and ordinary meaning.

> (ii)   **The Drive Means/Driver and Display/Display Means Terms Should Be Given Their Plain and Ordinary Meanings**

| Claim Term | Teva's Proposed Construction | Perrigo's Proposed Construction | Perrigo's Proposed Structure |
|---|---|---|---|
| "drive means for driving said rotary gear means in step-wise fashion in response to displacement of said actuator means"<br><br>'627 patent, claim 1 | *plain and ordinary meaning* | This term is a means-plus-function term under 35 U.S.C. § 112, ¶ 6. The function is "for driving said rotary gear means in step-wise fashion in response to displacement of said actuator means.<br><br>The structures in the specification linked to this function are: | (1) "a transverse hook element . . . mounted between two arms 52, 53 . . . the bases of which are conjoined to the boss portion 42 . . . [t]he transverse hook element [being] dimensioned and oriented to engage with ratchet teeth 61 formed around the periphery of ratchet wheel 60 to rotate it in a forward direction"; |
| "a driver for driving said rotary gear in a step-wise fashion in response to displacement of the actuator"<br><br>'712 patent, claims 1, 18, 19 | *plain and ordinary meaning* | | (2) "a transverse hook element 351 mounted between a pair of arms 352, 353 which are joined at their bases by a web . . . [t]he web [being] connected to the boss portion 342 of the actuator 341"; (3) "the ratchet tooth engaging element is supported at both ends by a support arm 752, 753"; (4) "drive pawl 451"; (5) "drive pawl hook element 551"; (6) "drive pawl 550"; (7) "drive pawl 650"; and/or (8) "drive pawl 751." |
| "display means coupled to said rotary gear means, said display means having a visible array of incrementing integers on a surface thereof | *plain and ordinary meaning* | This term is a means-plus-function term under 35 U.S.C. § 112, ¶ 6. The function is for displaying "a visible array of incrementing integers on a surface | (1) "a flexible tape 68 wound around the second hollow axle 67 which serves as a supply spool and passes to the first hollow axle 63 which serves as a take up spool |

18

| | | | |
|---|---|---|---|
| indexable by a single integer in response to each step of the step-wise motion of the rotary gear means"<br>    '627 patent, claim 1 | | thereof indexable by a single integer in response to each step of the step-wise motion of the rotary gear means."<br><br>The structures in the specification linked to this function are: | . . . [t]he surface of the tape 68 is marked with a progression of descending numbers which denotes the number of doses remaining in the aerosol canister"; and/or (2) "flexible tape display 368." |
| "display coupled to the rotary gear . . . having a visible array of incrementing integers on a surface thereof indexable by a single integer in response to each step of the step-wise rotary motion of the rotary gear"<br>    '712 patent, claims 1, 18, 19 | *plain and ordinary meaning* | | |

The "driver" and "display" terms of the '627 and '712 patents have a plain and ordinary meaning to the person of ordinary skill in the art and do not require further construction. Perrigo, however, proposes the same construction for the corresponding terms in each patent and, in doing so, seeks to limit these terms in a number of fundamentally flawed ways.

First, Perrigo contends that these terms have the same meaning in the '627 and '712 patents while at the same time contending that the claims of the '627 patent are in a means-plus-function format while the claims of the '712 patent are not. Perrigo fails to explain why one set of terms using the word "means" in the '627 patent are means-plus-function terms, whereas others are not. Here, the "drive means" and "display means" terms recite sufficient structure that they should not be construed as means-plus-function limitations. By conceding that the "driver" and "display" terms in the '712 patent are not means-plus-function terms, Perrigo concedes that they claim a structure; the similar claims in the '627 patent also have sufficient structure. Indeed, the patent discloses that in "known ratchet indexing mechanisms, a drive element is used

19

to engage a one-direction tooth form of a rack." '627 patent at 4:60-61 (JA31).  The "display means" term similarly recites a structure: "a visible array of incrementing integers on a surface thereof indexable by a single integer in response to each step of the step-wise rotary motion of the rotary gear."  Accordingly, a person of ordinary skill in the art would have no difficulty discerning the structure of drive means or display means.

Perrigo proceeds even further down the rabbit hole, however, to argue that terms it concedes are not means-plus-function terms, "driver" and "display" of the '712 patent, should be construed to be limited to the structure disclosed *in a separate patent*.[9]  Perrigo's proposed constructions for the '712 patent, which are limited to the structures described in the specification of the '627 patent, make no sense and are inappropriate.  The Federal Circuit has stated that a court should not read limitations from one patent into another patent absent clear disavowal of claim scope.  *Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1358 (Fed. Cir. 2004) ("Absent a clear disavowal or contrary definition in the specification or the prosecution history, the patentee is entitled to the full scope of its claim language.").  Perrigo has failed to make such a showing here.

## CONCLUSION

For all the foregoing reasons, the Court should adopt all of Teva's proposed constructions of the disputed claim terms.

---

[9] Indeed, Perrigo's proposed constructions of the "driver" and "display" terms of the claims of the '712 patent are in fact even narrower than its proposed constructions of the "drive means" and "display means" terms of claim 1 of the '627 patent.  Because Perrigo would have the "drive means" and "display means" terms construed as means-plus-function terms, its constructions would encompass the structure disclosed in the specification as performing the allegedly claimed functions *and any equivalents thereto*.  35 U.S.C. § 112, ¶ 6 ("such [means-plus-function term] shall be construed to cover the corresponding structure, material, or acts described in the specification *and any equivalents thereof*" (emphasis added)).  In contrast, since Perrigo concedes that the "driver" and "display" terms are not means-plus-function terms, its constructions would encompass only the structures identified by Perrigo, but not any equivalents.

OF COUNSEL:

David M. Hashmall

Ira J. Levy

Brian J. Prew

Andrew E. Riley

Timothy J. Rousseau

GOODWIN PROCTER LLP

The New York Times Building

New York, NY 10018

(212) 813-8800

Daryl L. Wiesen

Nicholas K. Mitrokostas

GOODWIN PROCTER LLP

Exchange Place

53 State Street

Boston, MA 02109

(617) 570-1000

Dated: November 15, 2013

*/s/ Stephanie E. O'Byrne*

John W. Shaw (No. 3362)

Karen E. Keller (No. 4489)

Stephanie E. O'Byrne (No. 4446)

David M. Fry (No. 5486)

SHAW KELLER LLP

300 Delaware Avenue, Suite 1120

Wilmington, DE 19801

(302) 298-0700

*Counsel for Plaintiffs Teva Branded*
*Pharmaceutical Products R&D, Inc., Teva*
*Respiratory, LLC, Norton Healthcare Limited,*
*and Norton (Waterford) Limited*

# EXHIBIT 1

<div align="center">

**PARTIES' AGREED-UPON CONSTRUCTIONS**

</div>

## I.    Constructions of Agreed Terms of the '152 Patent

The parties have agreed that the following constructions should be adopted by the Court for '152 patent:

| Claim Term | Parties' Joint Proposed Construction |
|---|---|
| "pharmaceutical suspension aerosol formulation" <br> '152 patent, claims 1, 2, 4, 8, 9 | "a drug formulation in which the drug is in particulate form and is substantially insoluble in the propellant" |
| "micronized" <br> '152 patent, claim 2 | "micronized, i.e., about 90 percent or more of the particles have a diameter of less than about 10 microns" |

## II.    Constructions of Agreed Terms of the '627 and '712 Patents

The parties have agreed that the following constructions should be adopted by the Court for '627 and '712 patents:

| Claim Term | Parties' Joint Proposed Construction |
|---|---|
| "a control surface to regulate a position of engagement between said drive means and said wheel" <br> '627 patent, claim 1 | *plain and ordinary meaning/ordinary and customary meaning* |
| "a control surface to regulate a position of engagement between the driver and the wheel" <br> '712 patent, claim 5 | *plain and ordinary meaning/ordinary and customary meaning* |

**EXHIBIT 2**



(19)    Europäisches Patentamt
European Patent Office
Office européen des brevets

(11)    **EP 0 775 484 B1**

(12)    **EUROPEAN PATENT SPECIFICATION**

(45)  Date of publication and mention
of the grant of the patent:
**03.09.2003  Bulletin 2003/36**

(51)  Int Cl.7: **A61K 9/00**, A61K 31/57

(21)  Application number: **97101101.0**

(22)  Date of filing: **30.07.1993**

(54)  **Surfactant free aerosol formulations containing beclomethsone dipropionate**

Oberflächenaktivmittelfreie Aerosolformulierungen enthaltend Beclomethasondipropionat

Formulations d'aerosol sans tensioactif contenant du propionate de beclométhasone

(84)  Designated Contracting States:
**AT BE CH DE DK ES FR GB GR IE IT LI LU MC NL PT SE**

(30)  Priority:  **31.07.1992  GB 9216381**
**31.07.1992  GB 9216382**

(43)  Date of publication of application:
**28.05.1997  Bulletin 1997/22**

(62)  Document number(s) of the earlier application(s) in accordance with Art. 76 EPC:
**93917708.5 / 0 658 101**

(73)  Proprietor: **GLAXO GROUP LIMITED**
**Greenford, Middlesex UB6 0NN (GB)**

(72)  Inventors:
• **Taylor, Anthony James**
**Ware, Herts SG12 0DP (GB)**
• **Neale, Philip John**
**Ware, Herts SG12 0DP (GB)**

(74)  Representative: **Quillin, Helen Kaye et al**
**GlaxoSmithKline**
**Corporate Intellectual Property (CN9.25.1)**
**980 Great West Road**
**Brentford, Middlesex TW8 9GS (GB)**

(56)  References cited:
**EP-A- 0 518 600          WO-A-92/06675**
**WO-A-92/22287**

• **Merck Index, 9th ed., 1025 beclomethasone**

EP 0 775 484 B1

Note: Within nine months from the publication of the mention of the grant of the European patent, any person may give notice to the European Patent Office of opposition to the European patent granted. Notice of opposition shall be filed in a written reasoned statement. It shall not be deemed to have been filed until the opposition fee has been paid. (Art. 99(1) European Patent Convention).

Printed by Jouve, 75001 PARIS (FR)

**EP 0 775 484 B1**

**Description**

[0001]    This invention relates to novel aerosol formulations for administering drugs, in particular for administration of a beclomethasone ester by inhalation.

[0002]    Beclomethasone dipropionate is 9α-chloro-16β-methyl-1,4-pregnadiene -11β, 17α,21-triol-3,20-dione 17α, 21-dipropionate and may be represented by the formula (I)



[0003]    The corticosteroid of formula (I) is known to exhibit topical antiinflammatory activity and is useful in the treatment of asthmatic conditions, particularly in the form of aerosol formulations. The use of such formulations is described in GB-1429184 where it is noted that micronised anhydrous beclomethasone dipropionate tends to display crystal growth, due to solvate formation, when incorporated into aerosol formulations containing chlorofluorocarbon propellants. Crystals having a particle size of more than 20 microns were shown to be too large to penetrate the bronchial system and prone to cause clogging of the metering valve making them unsuitable for administration by inhalation.

[0004]    A number of potential solutions to this problem have been proposed. These include the use of micronised solvates of beclomethasone dipropionate, for example chlorofluorocarbon solvates (GB-1429184), ethyl acetate solvate (DE-3018550OS), $C_{5-8}$ alkane solvates (EP-0039369), diisopropyl ether solvate (EP-0172672) and $C_{1-5}$ alcohol solvates (WO86/03750). GB-2076422A discloses a process for the preparation of chlorofluorocarbon aerosols which incorporates a low temperature (5 to -40°C) step which is also claimed to inhibit crystal growth.

[0005]    An alternative solution to the problem of crystal growth in aerosol formulations containing beclomethasone dipropionate has recently been disclosed in WO92/06675. This document describes the preparation of aerosol formulations containing solutions of beclomethasone diproprionate in ethanol, together with hydrofluorocarbon 134a (1,1,1,2-tetrafluoroethane) or hydrofluorocarbon 227 (1,1,1,2,3,3,3-heptafluoropropane) as propellant. Since a solution of beclomethasone dipropionate in ethanol is employed in the aerosols rather than a suspension of particulate beclomethasone diproprionate, elaborate process steps or the preparation of a solvate of the active ingredient prior to incorporation into the aerosol formulation is not required.

[0006]    Nevertheless, whilst ethanol is pharmaceutically acceptable and generally recognised as safe, it is associated with a number of disadvantages which may restrict use. In particular, administration of ethanol-containing products to teetotal or alcohol-dependent individuals or to children is undesirable.

[0007]    EP-0518600, WO92/22287 and WO92/22288 describe other aerosol formulations using 1,1,1,2-tetrafluoroethane or 1,1,1,2,3,3,3-heptafluoropropane as a propellant.

[0008]    A number of other patent applications describe the preparation of aerosol formulations containing drug and a fluorocarbon propellant, together with the addition of one or more adjuvants such as surfactants. Thus, for example WO91/14422 describes the preparation of aerosol formulations containing beclomethasone dipropionate in the form of its 1,1,1,2-tetrafluoroethane clathrate together with 1,1,1,2-tetrafluoroethane and various surface-active dispersing agents.

[0009]    We have now found that certain novel aerosol formulations containing particulate beclomethasone dipropionate are surprisingly stable without recourse to the use of any adjuvant or cosolvent in the composition.

[0010]    The present invention therefore provides a canister comprising an aluminium can optionally anodised, lacquer coated and/or plastic coated and closed with a metering valve which contains a pharmaceutical aerosol formulation which comprises particulate anhydrous beclomethasone dipropionate and 1,1,1,2,3,3,3-heptafluoro-n-propane as propellant, which formulation is substantially free of surfactant. By "substantially free of surfactant" is meant formulations which contain no significant amounts of surfactant, for example less than 0.0001% by weight of the beclomethasone dipropionate.

2

EP 0 775 484 B1

[0011]    The particle size of the particulate beclomethasone dipropionate may be reduced by conventional methods, for example by micronisation, fluid energy milling or ball milling and should be such as to permit inhalation of substantially all of the drug into the lungs upon administration of the aerosol formulation. Preferably the particle size of the beclomethasone dipropionate will be less than 20 microns, most preferably less than 10 microns, in particular in the range of 1 to 5 microns.

[0012]    It is desirable that the formulations of the invention contain no components which may provoke the degradation of stratospheric ozone. In particular it is desirable that the formulations are substantially free of chlorofluorocarbons especially non hydrogen-containing chlorofluorocarbons such as $CCl_3F$, $CCl_2F_2$ and $CF_3CCl_3$. As used herein "substantially free" means less than 1% w/w based upon the fluorocarbon or hydrogen-containing chlorofluorocarbon propellant, in particular less than 0.5%, for example 0.1% or less.

[0013]    The propellant may optionally contain an adjuvant having a higher polarity and/or a higher boiling point than the propellant. Polar adjuvants which may be used include (e.g. $C_{2-6}$) aliphatic alcohols and polyols such as ethanol, isopropanol and propylene glycol, preferably ethanol. In general only small quantities of polar adjuvants (e.g. 0.05 - 3.0% w/w) are required to improve the stability of the dispersion - the use of quantities in excess of 5% w/w may tend to dissolve the medicament. Formulations in accordance with the invention preferably contain less than 1% w/w, e.g. about 0.1% w/w or less, of polar adjuvants. Suitable volatile adjuvants include saturated hydrocarbons such as propane, n-butane, isobutane, pentane and isopentane and alkyl ethers such as dimethyl ether. In general, up to 50% w/w of the propellant may comprise a volatile adjuvant, for example 1 to 30% w/w of a volatile saturated $C_{1-6}$ hydrocarbon.

[0014]    However, it is preferable that the formulations of the invention are substantially free of other potential solvating species such as chlorofluorocarbons, ethyl acetate, alkanes, ethers, alcohols and water. In particular, the formulations are substantially free of water, for example containing less than 250ppm, preferably less than 200ppm, more preferably less than 100ppm, for example less than 50ppm water.

[0015]    A particularly preferred embodiment of the invention provides a pharmaceutical aerosol formulation which consists essentially of anhydrous beclomethasone dipropionate and 1,1,1,2,3,3,3-heptafluoro-n-propane as propellant.

[0016]    The final aerosol formulation desirably contains 0.005-10% w/w, preferably 0.005-5.0% w/w. especially 0.01-1.0% w/w, for example 0.01-0.5% w/w of beclomethasone dipropionate relative to the total weight of the formulation.

[0017]    It will be appreciated by those skilled in the art that the aerosol formulations according to the invention may , if desired, contain one or more additional active ingredients. Aerosol compositions containing two active ingredients (in a conventional propellant system) are known, for example, for the treatment of respiratory disorders such as asthma. Accordingly the present invention further provides aerosol formulations in accordance with the invention which contain one or more additional particulate medicaments. Additional medicaments may be selected from any other suitable drug useful in inhalation therapy and which may be presented in a form which is substantially completely insoluble in the selected propellant. Appropriate medicaments may thus be selected from, for example, analgesics, e.g. codeine, dihydromorphine, ergotamine, fentanyl or morphine; anginal preparations, e.g. diltiazem; antiallergics, e.g. cromoglycate, ketotifen or nedocromil; antiinfectives e.g. cephalosporins, penicillins, streptomycin, sulphonamides, tetracyclines and pentamidine; antihistamines, e.g. methapyrilene; anti-inflammatories, e.g. fluticasone, flunisolide, budesonide, tipredane or triamcinolone acetonide; antitussives, e.g. noscapine; bronchodilators, e.g. salmeterol, salbutamol, ephedrine, adrenaline, fenoterol, formoterol, isoprenaline, metaproterenol, phenylephrine, phenylpropanolamine, pirbuterol, reproterol, rimiterol, terbutaline, isoetharine, tulobuterol, orciprenaline, or (-)-4-amino-3,5-dichloro-α-[[6-[2-(2-pyridinyl) ethoxy]hexyl]-amino]methyl]benzenemethanol; diuretics, e.g. amiloride; anticholinergics e.g. ipratropium, atropine or oxitropium; hormones, e.g. cortisone, hydrocortisone or prednisolone; xanthines e.g. aminophylline, choline theophyllinate, lysine theophyllinate or theophylline; and therapeutic proteins and peptides, e.g. insulin or glucagon. It will be clear to a person skilled in the art that, where appropriate, the medicaments may be used in the form of salts (e.g. as alkali metal or amine salts or as acid addition salts) or as esters (e.g. lower alkyl esters) or as solvates (e.g. hydrates) to optimise the activity and/or stability of the medicament and/or to minimise the solubility of the medicament in the propellant.

[0018]    Particularly preferred aerosol formulations contain salbutamol (e.g. as the free base or the sulphate salt) or salmeterol (e.g. as the xinafoate salt) in combination with the beclomethasone diproprionate. Combinations of salmeterol xinafoate and beclomethasone dipropionate are preferred.

[0019]    The formulations of the invention may be prepared by dispersal of the medicament in the selected propellant in an appropriate container, e.g. with the aid of sonication.

[0020]    Minimising and preferably avoiding the use of formulation excipients e.g. surfactants, cosolvents etc in the aerosol formulations according to the invention is advantageous since the formulations may be substantially taste and odour free, less irritant and less toxic than conventional formulations.

[0021]    The chemical and physical stability and the pharmaceutical acceptability of the aerosol formulations according to the invention may be determined by techniques well known to those skilled in the art. Thus, for example, the chemical stability of the components may be determined by HPLC assay, for example, after prolonged storage of the product.

3

**EP 0 775 484 B1**

Physical stability data may be gained from other conventional analytical techniques such as, for example, by leak testing, by valve delivery assay (average shot weights per actuation), by dose reproducibility assay (active ingredient per actuation) and spray distribution analysis.

[0022]   Canisters generally comprise a container capable of withstanding the vapour pressure of the propellant used such as a metal can of aluminium which may optionally be anodised, lacquer-coated and/or plastic-coated, which container is closed with a metering valve. The metering valves are designed to deliver a metered amount of the formulation per actuation and incorporate a gasket to prevent leakage of propellant through the valve. The gasket may comprise any suitable elastomeric material such as for example low density polyethylene, chlorobutyl, black and white butadiene-acrylonitrile rubbers, butyl rubber and neoprene. Suitable valves are commercially available from manufacturers well known in the aerosol industry, for example, from Valois, France (e.g. DF10, DF30, DF60), Bespak plc, UK (e.g. BK300, BK356, BK357) and 3M-Neotechnic Ltd, UK (e.g. Spraymiser™).

[0023]   Conventional bulk manufacturing methods and machinery well known to those skilled in the art of pharmaceutical aerosol manufacture may be employed for the preparation of large scale batches for the commercial production of filled canisters. Thus, for example, in one bulk manufacturing method a metering valve is crimped onto an aluminium can to form an empty canister. The particulate medicament is added to a charge vessel and liquified propellant is pressure filled through the charge vessel into a manufacturing vessel. The drug suspension is mixed before recirculation to a filling machine and an aliquot of the drug suspension is then filled through the metering valve into the canister. Typically, in batches prepared for pharmaceutical use, each filled canister is check-weighed, coded with a batch number and packed into a tray for storage before release testing.

[0024]   Each filled canister is conveniently fitted into a suitable channelling device prior to use to form a metered dose inhaler for administration of the medicament into the lungs or nasal cavity of a patient. Suitable channelling devices comprise for example a valve actuator and a cylindrical or cone-like passage through which medicament may be delivered from the filled canister via the metering valve to the nose or mouth of a patient e.g. a mouthpiece actuator. Metered dose inhalers are designed to deliver a fixed unit dosage of medicament per actuation or "puff", for example in the range of 10 to 5000 microgram medicament per puff.

[0025]   Administration of medicament may be indicated for the treatment of mild, moderate or severe acute or chronic symptoms or for prophylactic treatment. It will be appreciated that the precise dose administered will depend on the age and condition of the patient, the particular particulate medicament used and the frequency of administration and will ultimately be at the discretion of the attendant physician. When combinations of medicaments are employed the dose of each component of the combination will in general be that employed for each component when used alone. Typically, administration may be one or more times, for example from 1 to 8 times per day, giving for example 1,2,3 or 4 puffs each time.

[0026]   Suitable daily doses, may be, for example in the range 100 to 2000 microgram of beclomethasone dipropionate, depending on the severity of the disease.

[0027]   Thus, for example, each valve actuation may deliver 50, 100, 200 or 250 microgram beclomethasone dipropionate. Typically each filled canister for use in a metered dose inhaler contains 100, 160 or 240 metered doses or puffs of medicament.

[0028]   The metered dose inhalers described herein comprise further aspects of the present invention.

[0029]   A method of treating respiratory disorders such as, for example, asthma comprises administration by inhalation of an effective amount of a formulation as herein described.

[0030]   The following non-limitative Example serves to illustrate the invention.

Example 1

Aerosol Formulation

[0031]   Micronised anhydrous beclomethasone dipropionate (60 mg), was weighed into a clean, dry, plastic-coated glass bottle and dry (<50ppm $H_2O$) 1,1,1,2,3,3,3-heptafluoro-n-propane (18.2g) was added from a vacuum flask. The bottle was quickly sealed with a blank aluminium ferrule. The resulting aerosol contained 0.33% (w/w) beclomethasone dipropionate.

**Claims**

1.   A canister comprising an aluminium can optionally anodised, lacquer coated and/or plastic coated and closed with a metering valve which contains a pharmaceutical aerosol formulation comprising particulate anhydrous beclomethasone dipropionate and 1,1,1,2,3,3,3-heptafluoro-n-propane as propellant, which formulation is substantially free of surfactant.

4

**EP 0 775 484 B1**

2.  A canister as claimed in claim 1 which contains 0.005-5.0% w/w of beclomethasone dipropionate relative to the total weight of the formulation.

3.  A canister as claimed in claim 1 or claim 2 wherein the particle size of the anhydrous beclomethasone dipropionate is such as to permit inhalation of substantially all of the drug into the lungs upon administration of the aerosol formulation.

4.  A canister as claimed in any one of claims 1 to 3 which additionally contains salbutamol.

5.  A canister comprising an aluminium can optionally anodised, lacquer coated and/or plastic coated and closed with a metering valve which contains a pharmaceutical aerosol formulation which consists essentially of particulate anhydrous beclomethasone dipropionate and 1,1,1,2,3,3,3-heptafluoro-n-propane as propellant.

6.  A metered dose inhaler which comprises a canister as claimed in any one of claims 1 to 5 fitted into a suitable channelling device.


**Patentansprüche**

1.  Kanister, der eine gegebenenfalls eloxierte, lackierte und/oder kunststoffbeschichtete und mit einem Dosierventil verschlossene Aluminiumdose umfasst, und der eine pharmazeutische Aerosolformulierung enthält, die teilchenförmiges wasserfreies Beclomethasondipropionat und 1,1,1,2,3,3,3-Heptafluor-n-propan als Treibmittel umfasst, wobei die Formulierung im wesentlichen frei von Tensid ist.

2.  Kanister gemäss Anspruch 1, der 0,005 bis 5,0 % G/G Beclomethasondipropionat relativ zum Gesamtgewicht der Formulierung enthält.

3.  Kanister gemäss Anspruch 1 oder 2, worin die Teilchengrösse des wasserfreien Beclomethasondipropionats derart ist, dass die Inhalation des im wesentlichen gesamten Arzneistoffs in die Lungen bei Verabreichung der Aerosolformulierung erlaubt wird.

4.  Kanister gemäss einem der Ansprüche 1 bis 3, der zusätzlich Salbutamol enthält.

5.  Kanister, der eine gegebenenfalls eloxierte, lackierte und/oder kunststoffbeschichtete Aluminiumdose umfasst und mit einem Dosierventil verschlossen ist, und der eine pharmazeutische Aerosolformulierung enthält, die im wesentlichen aus teilchenförmigem wasserfreiem Beclomethasondipropionat und 1,1,1,2,3,3,3-Heptafluor-n-propan als Treibmittel besteht.

6.  Dosierinhalator, der einen Kanister gemäss einem der Ansprüche 1 bis 5 umfasst, eingepasst in eine geeignete Kanalisierungsvorrichtung.


**Revendications**

1.  Boîte métallique comprenant une boîte en aluminium éventuellement anodisé, revêtue de laque et/ou revêtue de plastique et fermée avec une valve doseuse, qui contient une formulation d'aérosol pharmaceutique qui comprend du dipropionate de béclométhasone anhydre particulaire et du 1,1,1,2,3,3,3-heptafluoro-n-propane comme gaz propulseur, laquelle formulation est substantiellement dépourvue de tensioactif.

2.  Boîte métallique selon la revendication 1, qui contient de 0,005 à 5,0% en poids/poids de dipropionate de béclométhasone par rapport au poids total de la formulation.

3.  Boîte métallique selon la revendication 1 ou la revendication 2, dans laquelle la dimension particulaire du dipropionate de béclométhasone anhydre est telle qu'elle permet l'inhalation de substantiellement la totalité du médicament dans les poumons lors de l'administration de la formulation d'aérosol.

4.  Boîte métallique selon l'une quelconque des revendications 1 à 3, qui contient de plus du salbutamol.

**EP 0 775 484 B1**

5.  Boîte métallique comprenant une boîte en aluminium éventuellement anodisé, revêtue de laque et/ou revêtue de plastique et fermée avec une valve doseuse, qui contient une formulation d'aérosol pharmaceutique qui consiste essentiellement en dipropionate de béclométhasone anhydre particulaire et en 1,1,1,2,3,3,3-heptafluoro-n-propane comme gaz propulseur.

6.  Aérosol-doseur qui comprend une boîte métallique selon l'une quelconque des revendications 1 à 5 ajusté dans un dispositif de canalisation convenable.

**EXHIBIT 3**

(19) 

Europäisches
Patentamt

European
Patent Office

Office européen
des brevets

(11) **EP 2 311 793 A1**

(12) **EUROPEAN PATENT APPLICATION**

(43) Date of publication:
**20.04.2011 Bulletin 2011/16**

(21) Application number: **10184848.9**

(22) Date of filing: **19.12.2005**

(51) Int Cl.:
*C07C 215/60* (2006.01)    *C07C 213/10* (2006.01)
*A61K 9/12* (2006.01)    *A61K 31/137* (2006.01)
*A61P 11/06* (2006.01)

(84) Designated Contracting States:
**AT BE BG CH CY CZ DE DK EE ES FI FR GB GR
HU IE IS IT LI LT LU LV MC NL PL PT RO SE SI
SK TR**

(30) Priority: **17.12.2004  IN MU13562004
14.01.2005  IN MU00402005
24.03.2005  IN MU03432005**

(62) Document number(s) of the earlier application(s) in
accordance with Art. 76 EPC:
**05843722.9 / 1 828 100**

(27) Previously filed application:
**19.12.2005 PCT/GB2005/004935**

(71) Applicant: **Cipla Ltd.
Mumbai 400 008 (IN)**

(72) Inventors:
• **Lulla, Amar
Mumbai
400 005 Maharashtra (IN)**
• **Malhotra, Geena
Mumbai,
400 010 Maharashtra (IN)**
• **Rao, Dharmaraj, Ramchandra
400 601 Maharashtra (IN)**
• **Kankan, Rajendra, Narayanrao
Mumbai,
400 084 Maharashtra (IN)**
• **Chaudhary, Alka
410 206 Maharashtra (IN)**

(74) Representative: **Turner, Craig Robert
A.A. Thornton & Co.
235 High Holborn
London WC1V 7LE (GB)**

(54) **Crystalline levosalbutamol sulphate (Form II)**

(57)    The invention provides crystalline levosalbutamol sulphate polymorphic Form II. Form II is characterised by a powder XRD pattern with peaks at 8.7, 9.6, 15.2, 15.7, 19.1, 27.2, 30.7 ± 0.2 degrees 2 theta. Processes for making polymorphic Form II and pharmaceutical composition comprising it are provided. A preferred formulation comprises a pharmaceutical composition comprising crystalline levosalbutamol sulphate form II, a glucocorticoid and a pharmaceutically acceptable carrier.



EP 2 311 793 A1

**EP 2 311 793 A1**

**Description**

[0001]    The present invention relates to crystalline levosalbutamol sulphate, polymorphs thereof, processes for making the crystalline material, and compositions thereof.

[0002]    It also relates to a pharmaceutical composition comprising a therapeutically effective isomer of salbutamol in combination with a glucocorticoid, the composition being useful for the treatment of respiratory disorders including bronchoconstriction, asthma, COPD and related disorders thereof.

[0003]    Asthma is described as a chronic disease that involves inflammation of the pulmonary airways and bronchial hyperresponsiveness that results in the clinical expression of a lower airway obstruction that usually is reversible. The pathophysiology of asthma or related disorders involves bronchoconstriction resulting from bronchial smooth muscle spasm and airway inflammation with mucosal edema. Treatment of asthma and other related disorders have been known to employ β—2 agonists, also known as β-2 adrenoreceptor agonists. Such β—2 adrenoreceptor agonists are known to provide a bronchodilator effect to patients, resulting in relief from the symptoms of breathlessness. More particularly, β—2 adrenoreceptor agonists have been shown to increase the conductance of potassium channels in airway muscle cells, leading to membrane hyperpolarization and relaxation. Short-acting beta2 adrenoreceptors like salbutamol and terbutaline are recommended for the relief of acute symptoms, while long-acting agents like salmeterol, formoterol and bambuterol are used preferably in combination with other drugs for long-term asthma control.

[0004]    Chronic Obstructive Pulmonary Disease (COPD) is a preventable and treatable disease state characterized by airflow limitation that is not fully reversible. COPD (Chronic Obstructive Pulmonary Disease) is an umbrella term used to describe lung disease associated with airflow obstruction. The airflow limitation is usually progressive and associated with an abnormal inflammatory response of the lungs to noxious particles or gases, primarily caused by cigarette smoking.

[0005]    Bronchodilators are the mainstay of therapy for patients with established chronic obstructive pulmonary disease (COPD) but, at present, the majority of patients use β-agonists.

[0006]    Salbutamol pressurized inhalation is official in the British pharmacopoeia and are used for the treatment of asthma.

[0007]    Dey pharmaceutical's patent US 6,702,997 relates to an albuterol inhalation solution, system, kit and method for relieving bronchospasm in children suffering from asthma which comprises about 0.63 mg or about 1.25 mg albuterol.

[0008]    US6,251,368 relates to a pharmaceutical aerosol formulation that comprises particulate medicament selected from the group consisting of salmeterol, salbutamol, fluticasone propionate, beclomethasone dipropionate and physiologically acceptable salts and solvates thereof and a fluorocarbon or hydrogen-containing chlorofluorocarbon propellant, which formulation is substantially free of surfactant is disclosed

[0009]    US 5,547,994 by Sepracor describes a method for treating asthma, using the optically pure R (-) isomer of albuterol, which is substantially free of the S(+) isomer, is a potent bronchodilator for relieving the symptoms associated with asthma in individuals.

[0010]    CN1413976 by Suzhou Junning New Drug Dev CT (CN), which describes the synthesis of levosalbutamol.

[0011]    US patent application number US2004054215 by CIPLA Limited discloses a method for obtaining an optically pure R-isomer of albuterol.

[0012]    Several methods for preparation of levalbuterol have been described in the prior art such as US patent application number 20040115136 by King Code which describes a method of preparation of levalbuterol tartrate. It further relates to levalbuterol L-tartrate possessing properties desirable for use in a metered dose inhaler.

[0013]    Salbutamol (albuterol) is an antihistaminic compound and is a beta 2-adrenoceptor agonist used as a bronchodilator for the treatment of asthma and as a uterine relaxant for the suspension of premature labour. Salbutamol has been marketed as a racemic mixture, although the beta 2-agonist activity resides almost exclusively in the (R)-enantiomer. The enantioselective disposition of salbutamol and the possibility that (S)-salbutamol has adverse effects have led to the development of an enantiomerically pure (R)-salbutamol formulation known as levosalbutamol (levalbuterol) (Formula I).

**EP 2 311 793 A1**



Formula I

[0014]    A process for the preparation of optically pure salbutamol from mono protected salbutamol precursor is disclosed in US5545745.

[0015]    US2004114136 and WO2004052835 describe a process for preparing levalbuterol L-tartrate in crystalline form; a pharmaceutical composition comprising levalbuterol L-tartrate, in crystalline form; a metered dose inhaler comprising a canister containing an aerosol formulation of levalbuterol L-tartrate in crystalline form; and a method of affecting bronchodilation in a patient using levalbuterol L-tartrate, including levalbuterol L-tartrate specifically in crystalline form.

[0016]    Levosalbutamol is prepared by hydrogenating R-benzyl salbutamol in the presence of palladium on carbon.

[0017]    R-benzyl salbutamol can be prepared by the process described in United States patent number 5,545,745.

[0018]    Studies have proved that racemic albuterol, a commonly used bronchodilator, is an exact 50:50 mixture of two enantiomers, R- and S- isomers of salbutamol. Only the R-enantiomer (levosalbutamol) is a potent $\beta_2$ —adrenoceptor stimulant, whereas the S-enantiomer (dextrosalbutamol) shows little or no adrenoceptor activity.

[0019]    Among the different classes of drugs which are usually administered by inhalation for the treatment of respiratory diseases, glucocorticosteroids such as beclomethasone dipropionate (BDP), dexamethasone, flunisolide, budesonide, fluticasone propionate are of great importance. They can be administered in the form of a finely divided, i.e. micronised, powder, formulated as suspension in an aqueous phase containing any necessary surfactants and/or cosolvents; when intended to be administered in the form of metered doses of aerosol spray, they should also contain a low-boiling propellant.

[0020]    The effectiveness of the administration form depends on the deposition of an adequate amount of particles at the action site. One of most critical parameters determining the proportion of inhalable drug which will reach the lower respiratory tract of a patient is the size of the particles emerging from the device. In order to ensure an effective penetration into the bronchioli and alveoli and hence ensure a high respirable fraction, the mean aerodynamic diameter (MMAD) of the particles should be lower than 5-6 microns. For nasal administration, particles with higher MMAD are required.

[0021]    Fluticasone propionate is itself known from GB2088877 to have anti-inflammatory activity and to be useful for the treatment of allergic and inflammatory conditions of the nose, throat, or lungs such as asthma and rhinitis, including hay fever. Fluticasone propionate in aerosol form, has been accepted by the medical community as useful in the treatment of asthma and is marketed under the trademarks Flovent I and "Flonase". Fluticasone propionate may also be used in the form of a physiologically acceptable solvate.

[0022]    HK1009406 relates to a metered dose inhaler for dispensing an inhalation drug formulation comprising fluticasone propionate, or a physiologically acceptable solvate thereof, and a fluorocarbon propellant, optionally in combination with one or more other pharmacologically active agents or one or more excipients.

[0023]    We have appreciated that the use of a combination of salbutamol or a physiologically acceptable salt thereof and inhaled corticosteroid has clinical advantages in the treatment of COPD over the use of salbutamol alone or corticosteroid alone.

[0024]    U.S Pat. No. 6013245 relates to a pharmaceutical aerosol formulation which comprises particulate anhydrous beclomethasone dipropionate together with 1,1,1,2,3,3,3-heptafluoro-n-propane as propellant, which formulation is free of surfactant. The formulation may also contain salbutamol and includes a canister suitable for delivery and a method of treating respiratory disorders administering the formulation by inhalation.

[0025]    U.S. Pat. No. 2004136920 relates to aerosol formulations to be administered as inhalation and which comprises particulate salbutamol and physiologically acceptable salts and solvates thereof and a fluorocarbon or hydrogen-containing chlorofluorocarbon propellant, substantially free of surfactant. The patent also describes a method of treating respiratory disorders which comprises administration by inhalation of an effective amount of a pharmaceutical aerosol formulation as defined is also described.

[0026]    The present invention aims to provide a potent pharmaceutical composition comprising a therapeutically effective isomer of salbutamol or a salt, solvate, ester, derivative or polymorph thereof in combination with an inhaled

corticosteroid.

[0027]    The object of the present invention is to provide a pharmaceutical composition comprising at least two drugs, one of which is therapeutically effective isomer of salbutamol or a salt, solvate, ester, derivative or polymorph thereof in combination with an inhaled corticosteroid and a pharmaceutical acceptable carrier or excipient and optionally one or more other therapeutic agents.

[0028]    A further object of the present invention is to provide a pharmaceutical composition comprising a therapeutically effective isomer of salbutamol or a salt, solvate, ester, derivative or polymorph thereof that avoids side effects associated with higher racemic dosages.

[0029]    A still further object to provide a method for the manufacture of the pharmaceutical composition comprising the therapeutically effective isomer of salbutamol and in combination with an inhaled corticosteroid.

[0030]    Yet another object of the present invention is to provide a method for the treatment in a mammal, such as a human, of respiratory disorders such as asthma, disorders resulting in bronchoconstriction, which method comprises administration of a therapeutically effective amount of a pharmaceutical composition according to present invention.

[0031]    An object of the present invention is to provide a method for decreasing side effects of a drug combination comprising at least two drugs in a patient, comprising the step of: administering by inhalation to a patient in need thereof an effective amount of a pharmaceutical composition comprising at least two drugs, and a propellant.

[0032]    According to the present invention there is provided a pharmaceutical composition comprising a therapeutically effective isomer of salbutamol or a salt, solvate, ester, derivative or polymorph thereof, a glucocorticoid and a pharmaceutically acceptable carrier or excipient and optionally one or more other therapeutic agents.

[0033]    There is also provided a process for the manufacture of a pharmaceutical composition comprising a therapeutically effective isomer of salbutamol or a salt, solvate, ester, derivative or polymorph thereof in combination with a glucitoid drug along with at least one pharmaceutically acceptable carrier, which method comprises mixing the ingredients to form the said composition.

[0034]    The invention also provides a composition of the invention for use as a medicament.

[0035]    The composition of the invention is also provided for treating respiratory disorders and related conditions, including bronchoconstriction, asthma and COPD.

[0036]    The present invention also provides for a method for the treatment in a mammal, such as a human, of respiratory disorders such as asthma, disorders resulting in bronchoconstriction, and chronic obstructive pulmonary disease (COPD) which method comprises administration of a therapeutically effective amount of a pharmaceutical composition according to present invention.

[0037]    Beta2 adrenoreceptors are known to provide a bronchodilator effect to patients by acting on the β-2 adrenergic receptors in the airway smooth muscles and the bronchial smooth muscles, resulting in relief from the symptoms of breathlessness. More particularly, they have been shown to increase the conductance of potassium channels in airway muscle cells, leading to membrane hyperpolarization and relaxation. They are thus preferred in case of asthma treatment that requires the dilation of the bronchial smooth muscles and relieves the patient of breathlessness associated with asthma. More particularly the short acting beta2 adrenoreceptors are very useful since they provide a quicker onset of action and hence faster relief.

[0038]    The present invention relates to one such short acting beta2 adrenoreceptor, salbutamol. The salbutamol is available as a racemic mixture comprising R and S form. But only the R-enantiomer (levosalbutamol) is a potent $β_2$—adrenoceptor stimulant, whereas the S-enantiomer (dextrosalbutamol) shows little or no adrenoceptor activity. The bronchodilatory property of racemic salbutamol is attributable entirely to (R)- salbutamol, which has an approximately 100 fold greater binding affinity for $beta_2$ receptors as compared to (S)- salbutamol. In vitro, (S)-salbutamol has been reported to promote intracellular Ca $^{2+}$ influx in airway smooth muscle-cells and augment cholinergic activation of airway smooth muscles. Thus in the absence of (R)-salbutamol, (S)-salbutamol has the potential to induce bronchoconstriction in asthmatic patients. This divergent pharmacology accentuates the need of levosalbutamol over racemic salbutamol in the treatment of asthma and other airway diseases.

[0039]    Also levosalbutamol is a more potent bronchodilator when administered as the single enantiomer compared with the same amount in a racemic mixture. Levosalbutamol produces comparable efficacy at nearly one-fourth the dose of racemic salbutamol, simultaneously reducing the beta-mediated side effects.

[0040]    Accordingly the present invention further provides aerosol formulations in accordance with the invention which contain two or more particulate medicaments. Medicaments may be selected from suitable combinations of the medicaments mentioned hereinbefore or may be selected from any other suitable drug useful in inhalation therapy. Preferably, the medicament may be presented in a form which is substantially completely insoluble in the selected propellant.

[0041]    Appropriate medicaments may thus be selected from, for example, analgesics, e.g. codeine, dihydromorphine, ergotamine, fentanyl or morphine; anginal preparations, e.g. diltiazem; antiallergics, e.g. cromoglycate, ketotifen or nedocromil; antiinfectives e.g. cephalosporins, penicillins, streptomycin, sulphonamides, tetracyclines and pentamidine; antihistamines, e.g. methapyrilene; anti-inflammatories, e.g. flunisolide, budesonide, tipredane or triamcinolone acetonide; antitussives, e.g. noscapine; bronchodilators, e.g. ephedrine, adrenaline, fenoterol, formoterol, isoprenaline, met-

**EP 2 311 793 A1**

aproterenol phenylephrine, phenylpropanolamine, pirbuterol reproterol rimiterol, terbutaline, isoetharine, tulobuterol orciprenaline, or (-)-amino-3,5-dichloro-[alpha]-[[[6-[2-(2-pyridinyl)ethoxy]hexyl] amino]methyl]benzenemethanol; diuretics, e.g. amiloride; anticholinergics e.g. ipratropium, atropine or oxitropium; hormones, e.g. cortisone, hydrocortisone or prednisolone; xanthines e.g. aminophylline, choline theophyllinate, lysine theophyllinate or theophylline; and therapeutic proteins and peptides, e.g. insulin or glucagon. It will be clear to a person skilled in the art that, where appropriate, the medicaments may be used in the form of salts (e.g. as alkali metal or amine salts or as acid addition salts) or as esters (e.g. lower alkyl esters) or as solvates (e.g. hydrates) to optimise the activity and/or stability of the medicament and/or to minimise the solubility of the medicament in the propellant.

[0042]   Commercially available pharmacopoeial composition of salbutamol containing the racemic form comprises 100 to 200 mcg of salbutamol but a composition according to the present invention contains almost half the dose, or even less, and is therapeutically more effective by the use of the R form of salbutamol; levosalbutamol. Due to the reduced dosage, there are less cardiovascular complications, which are associated with higher doses of bronchodilators. Therefore the use of such therapeutically effective isomer results in increased patient compliance.

[0043]   Hence the present invention provides a pharmaceutical composition comprising a therapeutically effective isomer of salbutamol or a salt, solvate, ester, derivative or polymorph thereof that avoids side effects associated with higher racemic dosages.

[0044]   The term 'levosalbutamol' is used in the entire specification and claims in a broad sense to include not only levosalbutamol per se but also its pharmaceutically available salts, derivatives or polymorphs thereof. The pharmaceutically available salts of levosalbutamol include levosalbutamol sulphate, levosalbutamol tartrate, levosalbutamol hydrochloride. The salt of levosalbutamol used is preferably levosalbutamol sulphate.

[0045]   The active compounds and the various derivatives thereof may be made according to procedures known in the art, as will be clear to the skilled person.

[0046]   The invention employs the most active, therapeutically speaking, isomer of salbutamol. The compositions are substantially free of the less therapeutically effective isomer, meaning that this isomer will not be present in any significant amount. Suitably, such isomers will be present at no more than 10% w/w of active, more preferably 1% w/w or less. Thus, for example, compositions containing levosalbutamol, are substantially free of the S-isomer of this compound.

[0047]   Whilst any suitable form of composition may be used, particularly preferred compositions are aerosol, DPI or inhalation solution/suspension formulations containing levosalbutamol (e.g. as the free base or the sulphate salt) in combination with an antiinflammatory steroid such as a beclomethasone ester (e.g. the dipropionate) or a fluticasone ester (e.g. the propionate) or an antiallergic such as cromoglycate (e.g. the sodium salt). Combinations of salbutamol and fluticasone propionate or beclomethasone dipropionate or budesonide are preferred. It will be understood that for inhalable compositions such as aerosol formulations, the actives will be provided in suitably inhalable form.

[0048]   In the compositions of the invention, we prefer to use polymorphic forms of levosalbutamol sulphate named herewith as Form I, Form II and Form III. These are novel compounds and constitute a further aspect of the invention.

[0049]   Accordingly, in one aspect, the invention provides crystalline levosalbutamol sulphate (Form I) is characterised by a powder XRD pattern with peaks at 10.8, 11.9, 13.0, 18.3, 28.5 ± 0.2 degrees 2 theta.

[0050]   In another aspect, there is provided crystalline levosalbutamol sulphate (Form II) is characterised by a powder XRD pattern with peaks at 8.7, 9.6, 15.2, 15.7, 19.1, 27.2, 30.7 ± 0.2 degrees 2 theta.

[0051]   In another aspect, there is provided crystalline levosalbutamol sulphate (Form III) is characterised by a powder XRD pattern with peaks at 5.5, 6.9, 7.3, 18.7 ± 0.2 degrees 2 theta.

[0052]   The invention also provides various processes for making Form I, II and III.

[0053]   A process for preparing crystalline levosalbutamol sulphate Form I, comprises a) preparing levosalbutamol in an organic solvent b) adjusting the pH by addition of sulphuric acid at from 1 to 10°C c) isolating the product (Form I) at from 0 to 10°C.

[0054]   A process for preparing crystalline levosalbutamol sulphate Form I, comprises a) dissolving any form of levosalbutamol sulphate in water b) combining the solution from step a) with a water miscible organic solvent so as to cause precipitation c) isolating Form I thereon.

[0055]   A process for preparing crystalline levosalbutamol sulphate Form II, comprises a) dissolving any form of levosalbutamol sulphate in water b) distilling to residue c) stripping the residue with an organic solvent d) slurrying the solid in an organic solvent e) isolating crystalline Form II.

[0056]   A further process for preparing Form II comprises jet milling any other form of levosalbutamol sulphate , for example jet milling crystalline Form I.

[0057]   A process for preparing crystalline levosalbutamol sulphate Form III, comprises a) preparing levosalbutamol in an organic solvent b) adjusting the pH by addition of sulphuric acid at 25 to 30° C c) isolating the product (Form III) at 25 to 30° C .

[0058]   Another process for preparing Form III comprises a) dissolving any form of levosalbutamol sulphate in water b) combining the solution from step a) with a water-miscible organic solvent so as to cause precipitation c) isolating Form III therefrom at 25 to 30° C.

EP 2 311 793 A1

[0059]   The invention also provides a pharmaceutical composition comprising a compound of the invention and a pharmaceutically acceptable carrier.

[0060]   The novel compounds, and compositions thereof, are also provided for use as medicaments, particularly in the treatment of respiratory disorders and related conditions.

[0061]   Figure 1 shows the X-ray powder diffraction pattern of levosalbutamol sulphate Form I.

[0062]   Figure 2 shows an IR spectrum of levosalbutamol sulphate Form I.

[0063]   Figure 3 shows the X-ray powder diffraction pattern of levosalbutamol sulphate Form II.

[0064]   Figure 4 shows an IR spectrum of levosalbutamol sulphate Form II.

[0065]   Figure 5 shows the X-ray powder diffraction pattern of levosalbutamol sulphate Form III.

[0066]   Figure 6 shows an IR spectrum of levosalbutamol sulphate Form III.

[0067]   Table 1 gives the numerical XRD data for Figure 1 (Form I).

[0068]   Table 2 gives the numerical XRD data for Figure 3 (Form II).

[0069]   Table 3 gives the numerical XRD data for Figure 5 (Form III).

[0070]   Levosalbutamol sulphate crystalline Form I is characterized by an X-ray powder diffraction pattern having significant reflections expressed as 2 theta values at about 10.781, 11.941, 13.002, 18.341, 28.541 $\pm$0.2 degrees, as will be clear from Table 1.

[0071]   The X-ray powder diffractogram of levosalbutamol sulphate crystalline Form I is shown in FIG. 1. The major peaks and their intensities of X-ray powder diffractogram are shown in Table 1. The intensities of the reflections are also expressed as percent of most intense reflection.

[0072]   Other preferred significant reflections for Form I expressed as 2 theta values include 12.66, 15.819, 17.4, 20.939, 21.72, 22.5, 23.14, 24.341, 26.12, 31.28, 31.93 $\pm$ 0.2 degrees. The X-ray powder diffractograms for all the polymorphic Forms disclosed herein were collected on Rigaku d-max 2200 model X-ray diffractometer using Cu K $\alpha$ radiation ( $\lambda$= 1.5405 A°).

[0073]   Levosalbutamol sulphate crystalline Form I is also characterised by an IR spectrum with peaks at 3568, 3307, 2980, 2799, 2561, 2458, 1615, 1508, 1440, 1380, 1342, 1258, 1200, 1112, 1082, 1029, 976, 915, 836, 793, 775, 752, 648, 617, 535, 497, 453 cm⁻¹.

[0074]   Figure 2 shows the IR spectrum for Form I. The IR spectra for all the polymorphic Forms disclosed herein were collected using the Spectrum-1 make of Perkin Elmer Sample and analysed as KBr pellets in the region of 4000-400 cm⁻¹.

[0075]   In the preparation of levosalbutamol sulphate crystalline Form I, preferably R-benzyl salbutamol is hydrogenated using a catalyst, preferably a palladium on carbon catalyst, in a large volume of a suitable organic solvent. Preferably an alcoholic solvent is used, more preferably ethyl alcohol. Suitably the process is performed under hydrogen pressure, preferably at 30psi. The catalyst is preferably then filtered and the pH of the filtrate is adjusted, preferably to 5-5.5 and preferably at 0-10 °C with sulfuric acid, suitably concentrated sulphuric acid, to provide crystals, which are filtered and dried to afford levosalbutamol sulphate Form I. The product (Form I) may be obtained by isolating at 0-10° C.

[0076]   Levosalbutamol sulphate crystalline Form II is characterized by an X-ray powder diffraction pattern having significant reflections expressed as 2 theta values at about 8.701, 9.636, 15.180, 15.657, 19.139, 27.199, 30.702 $\pm$ 0.2 degrees, as will be clear from Table 2.

[0077]   The X-ray powder diffractogram of levosalbutamol sulphate Form II is shown in FIG. 3. The major peaks and their intensities of X-ray powder diffractogram are shown in Table 2. The intensities of the peaks are expressed as percent of most intense reflection.

[0078]   Other preferred significant reflections for Form II expressed as 2 theta values include peaks at about 8.701, 9.636, 15.180, 18.657, 17.44, 19.139, 21.699, 22.201, 22.837, 23.339, 23.76, 24.361, 25.022, 25.399, 26.059, 26.321, 27.199, 30.702 $\pm$ 0.2 degrees.

[0079]   Levosalbutamol sulphate crystalline Form II is also characterised by an IR spectrum with peaks at 3393, 3026, 2982, 2822, 2463, 1630, 1614, 1513, 1484, 1448, 1380, 1321, 1279, 1258, 1235, 1204, 1155, 1093, 1066, 1036, 1023, 919, 900, 838, 829, 818, 808, 788, 618, 596, 540, 493, 453, 440 cm⁻¹.

[0080]   Figure 4 shows the IR spectrum for Form II.

[0081]   A process for the preparation of levosalbutamol sulphate crystalline Form II, comprises dissolving any form of levosalbutamol sulphate in water and distilling it to residue. The residue is further stripped with an organic solvent, which is preferably water miscible and is preferably acetone, and the solid further slurried in a solvent, preferably the same solvent, and isolating the solid, preferably by filtering the solid and drying under vacuum to give levosalbutamol sulphate Form II.

[0082]   Levosalbutamol sulphate crystalline Form III is characterized by an X-ray powder diffraction pattern having significant reflections expressed as 2 theta values at about 5.496, 6.901, 7.340, 18.660 $\pm$ 0.2 degrees, as will be clear from Table 3.

[0083]   The X-ray powder diffractogram of levosalbutamol sulphate Form III is shown in FIG. 5. The major peaks and their intensities of X-ray powder diffractogram are shown in Table 3. The intensities of the peaks are also expressed as a percent of the most intense reflection.

EP 2 311 793 A1

[0084]  Other preferred significant reflections for Form III expressed as 2 theta values include peaks at about 5.496, 6.901, 7.340, 8.18, 8.399, 10.978, 11.758, 14.298, 16.321, 17.98, 18.18, 18.660, 18.86, 19.189, 20.179, 20.72, 20.019, 22.219, 23.121, 23.64, 23.858, 24.638, 25.339, 27.62, 28.79, 29.319, 30.80, 32.341, 33.218, 33.781, 34.181 ± 0.2 degrees.

[0085]  Levosalbutamol sulphate crystalline Form III is also characterised by an IR spectrum with peaks at 3533, 3412, 3086, 2979, 2823, 2799, 1613, 1547, 1505, 1437, 1397, 1380, 1365, 1353, 1303, 1256, 1243, 1198, 1110, 1133, 1086, 1075, 1055, 1029, 990, 949, 919, 838, 792, 737, 723, 640, 618, 563, 536, 480, 442, 425 cm$^{-1}$.

[0086]  Figure 6 shows the IR spectrum for Form III.

[0087]  In a process for the preparation of levosalbutamol sulphate crystalline Form III, preferably R-benzyl salbutamol is hydrogenated using a catalyst, preferably a palladium on carbon catalyst in a suitable organic solvent, preferably an alcoholic solvent, more preferably ethyl alcohol. Preferably this is done under hydrogen pressure, preferably at about 30psi. Form III can be isolated by adjusting the pH by addition of sulphuric acid at ambient temperature (25 to 30° C) and isolating the product at ambient temperature (25 to 30° C). Preferably, these steps are done by filtering the catalyst and washing, for example with denatured alcohol. The pH of the filtrate is preferably adjusted to 5-5.5 at ambient temperature (25 to 30° C) with sulfuric acid, preferably in concentrated form, to give crystals, which are filtered and dried to afford levosalbutamol sulphate Form III. The product (Form III) may be obtained by isolating at 25 to 30° C.

[0088]  Another process for the preparation of levosalbutamol sulphate crystalline Form II comprises jet milling levos-albutamol sulphate. For example, crystalline levosalbutamol Form I may be jet milled so as to give Form II.

[0089]  It will be understood that crystalline levosalbutamol sulphate and the polymorphic Forms thereof disclosed herein may be formulated with conventional excipients, auxiliaries and carriers into a wide variety of pharmaceutical compositions, including but not limited to tablets, capsules, pellets, caplets, MDI, DPI, and Respule formulations, and oral liquids such as syrups. Where appropriate plain or sustained release formulations may be provided. Those skilled in the art of pharmaceutical formulation will be aware of the conventional ingredients which may be employed to formulate the above compositions. Such formulations may be made in accordance with conventional manufacturing procedures.

[0090]  In particular, the compounds of the present invention may be combined with one or more other pharmaceutically active compounds, as will be clear to those skilled in the art. Any suitable combination of active materials is envisaged, provided the combination is acceptable from a pharmaceutical and regulatory standpoint. The compounds of the invention may, for example be combined with corticosteroids such as fluticasone, beclomethasone or budesonide; anticholinergic agents such as ipratropium, tiotropium or atropine; mucolytic agents such as ambroxol; xanthine derivatives such as theophylline; antihistamines; analgesics, and bronchodilators. As will be clear, the additional active or actives may be provided in any suitable form, including the pharmaceutically acceptable derivatives thereof, including salts, esters, polymorphs, and the optically active forms as well as the racemates.

[0091]  The invention thus provides a pharmaceutical composition comprising crystalline levosalbutamol sulphate, particularly Form I or Form II or Form III thereof, in combination with one or more pharmaceutically active compounds and, optionally, a pharmaceutically acceptable carrier.

[0092]  The compositions of the present invention are preferably administered by the inhalation route so as to provide an effective amount of local action and thus avoid undesirable systemic effects. The present compositions may further comprise pharmaceutically acceptable excipients in order to provide a suitable formulation and may be made available in the form of a metered dose inhaler.

[0093]  An aerosol formulation according to the present invention may optionally comprise in addition to levosalbutamol in combination with anti-inflammatory steroid or inhaled glucocorticoid and at least one propellant, other pharmaceutically acceptable agents like cosolvents, antioxidants or surfactants.

[0094]  For aerosol formulations, a propellant is included in the composition. Suitable propellants include propellant 11 (dichlorodifluoromethane), propellant 12 (monofluorotrichloromethane), Propellant 114, 1,1,1,2-tetrafluoroethane (HFA134a) and 1,1,1,2,3,3,3-heptafluoropropane (HFA227), or mixtures of two or more such halogen-substituted hydrocarbons.

[0095]  The aerosol formulations of the invention may be prepared by dispersal of the medicament in the selected propellant in an appropriate container, e.g. with the aid of sonication. The process is desirably carried out under anhydrous conditions to obviate any adverse effects of moisture on suspension stability.

[0096]  The formulations according to the invention form weakly flocculated suspensions on standing but, surprisingly, these suspensions have been found to be easily redispersed by mild agitation to provide suspensions with excellent delivery characteristics suitable for use in pressurised inhalers, even after prolonged storage. Minimising and preferably avoiding the use of formulation excipients e.g. surfactants, cosolvents etc in the aerosol formulations according to the invention is also advantageous since the formulations may be substantially taste and odour free, and less irritant and less toxic than conventional formulations.

[0097]  In a preferred embodiment of the present invention an aerosol composition may comprise a therapeutically effective isomer of salbutamol a salt, solvate, ester, derivative or polymorph thereof with an anti-inflammatory steroid or inhaled glucocorticoid and either propellant 11 or propellant 114 or a combination thereof and propellant 12.

EP 2 311 793 A1

[0098]    In another preferred embodiment of the present invention the aerosol may comprise a therapeutically effective isomer of salbutamol or a salt, solvate, ester, derivative or polymorph thereof with inhaled glucocorticoid and either propellant 11 or propellant 114 or a combination thereof and propellant 12 with a surfactant.

[0099]    During the trial for this formulation it was observed that in the absence of a surfactant the drug failed to form a homogenous dispersion. Various surfactants known in the art were tried like oils such as corn oil, olive oil, cottonseed oil and sunflower seed oil, mineral oils like liquid paraffin, oleic acid and also phospholipids such as lecithin, or sorbitan fatty acid esters like sorbitan oleate. Lecithin gave a comparatively good suspension quality when levosalbutamol sulphate was used in combination with fluticasone and budesonide. The preferred surfactant was oleic acid in case of levosalbutamol sulphate used in combination with beclomethasone.

[0100]    The surfactant can be used in a concentration of 0.001-100% by weight of the total active material. Preferably in a range of 1%-50%. More preferably in a concentration of 5%-30%. The concentration of surfactant according to the present invention is preferably 10% (all by weight of the total active material). Typically, the active material will constitute two actives e.g. levosalbutamol and the glucocorticoid.

[0101]    In the compositions for inhalation particle size is particularly important. The preferred particle size is between 2 $\mu$m to 5$\mu$m. It has also been found that the particle size has a considerable influence on the proportion of active substance in the aerosol which is delivered for inhalation.

[0102]    In another trial, drugs were mixed with propellant 11 or propellant 114 or a combination thereof, filled in canisters, crimped and charged with propellant 12. It was found that this gave a low FPD (fine particle dose). Hence further trials were undertaken where both the drugs and/or surfactant were micro-milled with propellant 11 or propellant 114 or a combination thereof to form a slurry and then filled in canisters, charging with propellant 12. This resulted in a better FPD as compared to the CFC aerosols where the micro-milling as described herein was not done. Hence micro-milling is preferably done in order to achieve a better FPD.

[0103]    In a broad aspect, the invention provides a process for the manufacture of a pharmaceutical composition comprising a therapeutically effective isomer of salbutamol or a salt, solvate, ester, derivative or polymorph thereof and a glucocorticoid in a propellant, which process comprises mixing the said ingredients to form said composition.

[0104]    In a further embodiment of the present invention there is provided a process for the manufacture of a pharmaceutical aerosol composition comprising a therapeutically effective isomer of salbutamol or a salt, solvate, ester, derivative or polymorph thereof and a glucocorticoid which process comprises (a) adding both the drugs, optionally with surfactant, with either propellant 11 or propellant 114 or a combination thereof to a canister (b) crimping the canister with a suitable valve and (c) charging propellant 12 through the valve. Preferably, in step (a) one or more of the actives are milled or micromilled with the propellant.

[0105]    In yet another preferred aspect of the present invention, an aerosol composition may comprise a therapeutically effective isomer of salbutamol or a salt, solvate, ester, derivative or polymorph thereof with a glucocorticoid and either 1,1,1,2-tetrafluoroethane (HFA134a) or 1,1,1,2,3,3,3-heptafluoroethane (HFA227) or a combination thereof.

[0106]    In a further aspect of the present invention there is provided a process for the manufacture of the above aerosol composition which process comprises (a) adding the therapeutically effective isomer of salbutamol and glucocorticoid to a canister (b) crimping the canister with a metered valve (c) charging the canister with either 1,1,1,2-tetrafluoroethane (HFA134a) or 1,1,1,2,3,3,3-heptafluoroethane (HFA227) or a combination thereof. Optionally, in step (a), there may also be added a cosolvent or bulking agent; a surfactant; or a cosolvent and surfactant.

[0107]    In another preferred aspect of the present invention the aerosol composition may comprise a therapeutically effective isomer of salbutamol or a salt, solvate, ester, derivative or polymorph thereof with a glucocorticoid, either 1,1,1,2-tetrafluoroethane (HFA134a) or 1,1,1,2,3,3,3-heptafluoroethane (HFA227) or a combination thereof and a cosolvent. In such a case the cosolvent has a greater polarity than the propellant. Typically the cosolvent is present in an amount of 0.01 to 5 % by weight of the composition. The cosolvent used may be any suitable cosolvent — for example selected from the group of glycols, particularly propylene glycol, polyethylene glycol and glycerol or alcohols like ethanol. Typically the cosolvent is ethanol.

[0108]    In a preferred aspect of the present invention there is provided a process for the manufacture of the above composition which process comprises (a) adding both drugs to the canister (b) adding the cosolvent to (a) and sonicating (c) crimping the canister with a metered valve (d) charging the canister with either 1,1,1,2-tetrafluoroethane (HFA134a) or 1,1,1,2,3,3,3-heptafluoroethane (HFA227) or a combination thereof.

[0109]    In yet another preferred embodiment, an aerosol composition may comprise a therapeutically effective isomer of salbutamol or a salt, solvate, ester, derivative or polymorph thereof with a glucocorticoid, and either 1,1,1,2-tetrafluoroethane (HFA134a) or 1,1,1,2,3,3,3-heptafluoroethane (HFA227) or a combination thereof, surfactant and cosolvent.

[0110]    The surface-active agent (or surfactant) stabilizes the formulation and helps in the lubrication of a valve system in the inhaler. Some of the most commonly used surface active agents are those known in the art and be selected from among Polysorbate 20, Polysorbate 80, Myvacet 9-45, Myvacet 9-08, isopropylmyristate, oleic acid, Brij, ethyloleate, glyceryl trioleate, glyceryl monolaurate, glyceryl monooleate, glyceryl monosterate, glyceryl monoricinoleate, cetylalcohol, sterylalcohol, cetylpyridinium chloride, block polymers, natural oils, polyvinyl pyrrolidone, sorbitan fatty acid esters

**EP 2 311 793 A1**

such as sorbitan trioleate, polyethoxylated sorbitan fatty acid esters (for example polyethoxylated sorbitan trioleate), sorbimacrogol oleate, synthetic amphotensides (tritons), ethylene oxide ethers of octylphenolformaldehyde condensation products, phosphatides such as lecithin, polyethoxylated fats, polyethoxylated oleotriglycerides and polyethoxylated fatty alcohols.

[0111]    The surface-active agents are preferably used in an amount of 0.02-10% by weight of the total amount of active material.

[0112]    In another aspect of the present invention there is provided a process for the manufacture of the above composition which process comprises (a) adding the drugs to a canister (b) adding cosolvent and surfactant to (a) and sonicating (c) crimping the canister with a metered valve (d) charging the canister with either 1,1,1,2-tetrafluoroethane (HFA134a) or 1,1,1,2,3,3,3-heptafluoroethane (HFA227) or a combination thereof.

[0113]    In yet another aspect of the present invention the aerosol composition may comprise a therapeutically effective isomer of salbutamol, a glucocorticoid, a bulking agent and a propellant, which is preferably HFA 134a or HFA 227 or a combination thereof. The bulking agent acts as a carrier for the drug to reach the lungs. The bulking agent may be present in a concentration of 10-500% by weight of the total amount of active material. More preferably in a range of 10-300% by weight of the total amount of active material. The bulking agent may be selected from the class of saccharides, including monosaccharides, disaccharides, polysaccharides and sugar alcohols such as arabinose, glucose, fructose, ribose, mannose, sucrose, trehalose, lactose, maltose, starches, dextran or mannitol.

[0114]    In a preferred aspect of the present invention there is provided a process for the manufacture of the above aerosol composition which process comprises (a) adding the active ingredients to a canister (b) adding a bulking agent to (a) (c) crimping the canister with a metered valve (d) charging the canister with propellant.

[0115]    In a preferred aspect of the present invention the aerosol composition may comprise at least one therapeutically effective isomer of salbutamol or a salt, solvate, ester, derivative or polymorph thereof, a glucocorticoid, a surfactant and either 1,1,1,2-tetrafluoroethane (HFA134a) or 1,1,1,2,3,3,3-heptafluoroethane (HFA227) or a combination thereof. The surfactant may be any suitable surfactant — for example those listed above or selected from the class of salts of stearic acids or esters such as ascorbyl palmitate, isopropyl myristate and tocopherol esters. Preferably the magnesium salt of stearic acid, isopropyl myristate. The surfactant is preferably used in an amount of 0.01 % to 1% by weight of the total amount of active material.

[0116]    In a preferred aspect of the present invention there is provided a process for the manufacture of the above aerosol composition which process comprises (a) adding the drugs to a canister (b) adding surfactant to (a) (c) crimping the canister with a metered valve (d) charging the canister with either 1,1,1,2-tetrafluoroethane (HFA134a) or 1,1,1,2,3,3,3-heptafluoroethane (HFA227) or a combination thereof.

[0117]    The compositions of the present invention may optionally contain antioxidants such as citric acid, or benzalkonium chloride.

[0118]    The combination of levosalbutamol and a glucocorticoid may be provided as a dry powder formulation or in the form of an inhalation solution/suspension. For dry powder inhalation, the drugs may be used alone or optionally together with a finely divided pharmaceutically acceptable carrier, which is preferably present and may be chosen from materials known as carriers in dry powder inhalation compositions, for example saccharides, including monosaccharides, disaccharides, polysaccharides and sugar alcohols such as arabinose, glucose, fructose, ribose, mannose, sucrose, trehalose, lactose, maltose, starches, dextran or mannitol. An especially preferred carrier is lactose. The dry powder may be in capsules of gelatin or HPMC, or in blisters or alternatively, the dry powder may be contained as a reservoir in a multidose dry powder inhalation device. The particle size of the active ingredient and that of the carrier where present in dry powder compositions, can be reduced to the desired level by conventional methods, for example by grinding in an airjet mill, ball mill or vibrator mill, microprecipitation, spray-drying, lyophilisation or recrystallisation from supercritical media.

[0119]    According to the present invention there is also provided a process for manufacture of a dry powder inhaler comprising levosalbutamol and a glucocorticoid, which process comprises mixing the active ingredients optionally with a suitable carrier, and providing the ingredients in a suitable dry powder inhaler.

[0120]    For inhalation solutions, the drugs may be combined with suitable excipients such as tonicity adjusting agents, pH regulators, chelating agents, wetting agents in a suitable vehicle. The preferred tonicity adjusting agent is sodium chloride. The pH regulators may be selected from pharmacologically acceptable inorganic acids or organic acids or bases. Preferred inorganic acids are selected from the group consisting of hydrochloric acid, hydrobromic acid, nitric acid, sulphuric acid, phosphoric acid and the like. Preferred organic acids and salts of organic acids, such as but not limited to acetates, lactates, malates, tartrates, citrates, ascorbates, succinates, butyrates, valerates and fumarates. Preferred inorganic bases are selected from the group consisting of sodium hydroxide, potassium hydroxide, ammonium hydroxide, sodium carbonate, calcium hydroxide. Preferred organic bases are selected from the group consisting of methyl amine, ethyleneimine, hydroquinone, ethyleneimine, ethylamine, dimethylamine, ethanolamine, butylamine, diethylamine. The preferred base is sodium hydroxide. Preferably a nasal inhalation formulation as provided by the present invention has a pH in the range of 3 to 5.

[0121]    Suitable chelating or complexing agents may be used in the compositions of the present invention, and may

be molecules which are capable of entering into complex bonds. Preferable those compounds should have the effect of complexing cations most preferably metal cations, The preferred agent is ethylenediaminetetraacetic acid (EDTA) or a salt thereof, such as the disodium salt. Suitable wetting agents may be used in the present invention with good emulsifying and wetting properties. Some typical examples include sorbitan esters, PEG, etc which are obvious to a person skilled in the art.

[0122]    Liquid vehicles for use in the compositions of the invention (particularly inhalation solutions or suspensions) include, but are not limited to, polar solvents, including, but not limited to, compounds that contain hydroxyl groups or other polar groups. Such solvents include, but are not limited to, water or alcohols, such as ethanol, isopropanol, and glycols including propylene glycol, polyethylene glycol, polypropylene glycol, glycol ether, glycerol and polyoxyethylene alcohols.

[0123]    Further polar solvents also include protic solvents, including, but not limited to, water, aqueous saline solutions with one or more pharmaceutically acceptable salt(s), alcohols, glycols or a mixture thereof. For a saline solution as the solvent or as a component thereof, particularly suitable salts are those which display no or only negligible pharmacological activity after administration.

[0124]    An Anti-microbial preservative agent may be added for multi-dose packages. Suitable preservatives will be apparent to the skilled person, particularly benzalkonium chloride or benzoic acid or benzoates such as sodium benzoate, sorbic acid or sorbates such as potassium sorbates in the concentration known from the prior art.

[0125]    According to the present invention there is also provided a process for the manufacture of an inhalation solution comprising levosalbutamol and glucocorticoid. The process preferably comprises the following steps :

1. Dissolving levosalbutamol along with isotonocity agent, chelating agent and wetting agent in purified water followed by filtration.
2. In another vessel, sonication of the glucocorticoid in part quantity of water followed by appropriate sterilization method.
3. Both the above solutions are mixed to provide the final inhalation suspension and the pH is adjusted (if required). The suspension is filled in unit dose or multidose vials.

[0126]    In another alternative embodiment, the inhalation solution of the present invention may be administered by nebulizer. Such nebulizer including, but not limited to, a jet nebulizer, ultrasonic nebulizer and breath actuated nebulizer. Preferably, the nebulizer is a jet nebulizer connected to an air compressor with adequate air flow. The nebulizer being equipped with a mouthpiece or suitable face mask. Specifically, a nebulizer (with face mask or mouthpiece) connected to a compressor may be used to deliver the inhalation solution of the present invention to a patient.

[0127]    The present invention further provides for a method for the treatment in a mammal, such as a human, of respiratory disorders such as asthma, and disorders resulting in bronchoconstriction, which method comprises administration of a therapeutically effective amount of a pharmaceutical composition according to present invention.

[0128]    It will be readily apparent to one skilled in the art that varying substitutions and modifications may be made to the invention disclosed herein without departing from the spirit of the invention. Thus, it should be understood that although the present invention has been specifically disclosed by the preferred embodiments and optional features, modification and variation of the concepts herein disclosed may be resorted to by those skilled in the art, and such modifications and variations are considered to be falling within the scope of the invention.

[0129]    The following examples are for the purpose of illustration of the invention only and are not intended in any way to limit the scope of the present invention.

Example 1: CFC inhaler A)

[0130]

| Sr.No | Ingredients | Qty /can |
|-------|-------------|----------|
| 1. | Levo-Salbutamol Sulphate | 10.08 mg |
| 2. | Fluticasone Propionate (micro-milled) | 8.24 mg |
| 3. | Lecithin 10% | 1.832 mg |
| 4. | Propellant 11 | 3.0 gms |
| 5. | Propellant 12 | 7.7 gms |

EP 2 311 793 A1

a) Add Levosalbutamol sulphate and lecithin with propellant 11
(b) Fill the slurry in the canisters.
(c) Crimp with a suitable valve and
(d) Charge propellant 12 through the valve.

B)

[0131]

| Sr.No | Ingredients | Qty /can |
|-------|-------------|----------|
| 1. | Levo-Salbutamol Sulphate | 15.12 mg |
| 2. | Beclomethasone Propionate (50 mcg) | 12 mg |
| 3. | Oleic acid 10% | 2.712 mg |
| 4. | Propellant 11 | 4.7 gms |
| 5. | Propellant 12 | 11.6 gms |

a) Add the drugs and oleic acid with propellant 11
b) (b) Fill the slurry in the canisters.
c) (c) Crimp with a suitable valve and
d) (d) Charge propellant 12 through the valve.

C)

[0132]

| Sr.No | Ingredients | Qty /can |
|-------|-------------|----------|
| 1. | Levo-Salbutamol Sulphate | 10.08mg |
| 2. | Budesonide | 24 mg |
| 3. | Lecithin 10% | 3.40 mg |
| 4. | Propellant 11 | 4.7 gms |
| 5. | Propellant 12 | 11.6 gms |

a) Add the drugs and lecithin with propellant 11
b) (b) Fill the slurry in the canisters.
c) (c) Crimp with a suitable valve and
d) (d) Charge propellant 12 through the valve.

Example 2: HFA inhaler

A)

[0133]

| Sr.No | Ingredients | Qty /can |
|-------|-------------|----------|
| 1. | Levosalbutamol sulphate | 12.00mg |
| 2. | Fluticasone Propionate (micro-milled)(50 mcg) | 8.24 mg |
| 3. | Propellant 134a | 12.8gm |

a) Add both the drugs to the canister.

11

EP 2 311 793 A1

b) Crimp the canister with a metered valve
c) Charge the canister with 1,1,1,2-tetrafluoroethane (HFA 134a) .

B)

[0134]

| Sr.No | Ingredients | Qty /can |
|-------|-------------|----------|
| 1. | Levo-Salbutamol Sulphate | 15.12 mg |
| 2. | Beclomethasone Propionate(50 mcg) | 12 mg |
| 3. | Abs. Alc.2.5% | 0.455 |
| 4. | HFA 134a | 17.74 gms |

a) Add both the drugs and alcohol and a part of HFA134a to the canister.
b) Crimp the canister with a metered valve and sonicate.
c) Charge the canister with 1,1,1,2-tetrafluoroethane (HFA134a) .

C)

[0135]

| Sr.No | Ingredients | Qty /can |
|-------|-------------|----------|
| 1. | Levo-Salbutamol Sulphate | 10.08 mg |
| 2. | Budesonide(100 mcg) | 24 mg |
| 3. | HFA 134a | 18.2 gms |

a) Add both the drugs to the canister.
b) Crimp the canister with a metered valve
c) Charge the canister with 1,1,1,2-tetrafluoroethane (HFA134a) .

Example 3: HFA inhaler

A)

[0136]

| Sr.No | Ingredients | Qty /can |
|-------|-------------|----------|
| 1. | Levosalbutamol sulphate | 10.08mg |
| 2. | Fluticasone Propionate (micro-milled) | 8.24 mg |
| 3. | Propellant 227 | 11.2 gms |

a) Add both the drugs to the canister.
b) Crimp the canister with a metered valve
c) Charge the canister with 1,1,1,2,3,3,3-heptafluoroethane (HFA227)

B)

[0137]

EP 2 311 793 A1

| Sr.No | Ingredients | Qty /can |
|---|---|---|
| 1. | Levosalbutamol sulphate | 10.08mg |
| 2. | Budesonide | 24 mg |
| 3. | HFA 227 | 20.6 gms |

a) Add both the drugs to the canister.
b) Crimp the canister with a metered valve
c) Charge the canister with 1,1,1,2,3,3,3-heptafluoroethane (HFA227)

Example 4: HFA inhaler

A)

[0138]

| Sr.No | Ingredients | Qty /can |
|---|---|---|
| 1. | Levo-Salbutamol Sulphate | 10.08 mg |
| 2. | Fluticasone Propionate (micro-milled) | 8.24 mg |
| 3. | Abs. Alc.2% | 0.256 |
| 4. | Lecithin 0.02% | 0.003664 mg |
| 5. | HFA 134a | 12.54 gms |

a) Add both the drugs to the canister.
b) Add alcohol and surfactant solution to (a) and sonicate
c) Crimp the canister with a metered valve
d) Charge the canister with 1,1,1,2-tetrafluoroethane (HFA134a).

B)

[0139]

| Sr.No | Ingredients | Qty /can |
|---|---|---|
| 1. | Levo-Salbutamol Sulphate | 15.12 mg |
| 2. | Beclomethasone Propionate(50 mcg) | 12 mg |
| 3. | Abs. Alc.2.5% | 0.455 |
| 4. | Oleic acid 0.02% | 0.00542 |
| 5. | HFA 134a | 17.74 gms |

a) Add both the drugs to the canister.
b) Add alcohol and surfactant solution to (a) and sonicate
c) Crimp the canister with a metered valve
d) Charge the canister with 1,1,1,2-tetrafluoroethane (HFA134a).

C)

[0140]

EP 2 311 793 A1

| Sr.No | Ingredients | Qty /can |
|---|---|---|
| 1. | Levo-Salbutamol Sulphate | 10.08 mg |
| 2. | Budesonide | 24 mg |
| 3. | Abs. Alc.2% | 0.364 |
| 4. | Lecithin 0.02% | 0.006816 mg |
| 5. | HFA 134a | 17.83 gms |

a) Add both the drugs to the canister.
b) Add alcohol and surfactant solution to (a) and sonicate of the same
c) Crimp the canister with a metered valve
d) Charge the canister with 1,1,1,2-tetrafluoroethane (HFA134a).

Example 5: Dry powder for inhalation

[0141]

| Sr.No | Ingredients | mg/cap |
|---|---|---|
| 1. | Levo-Salbutamol Sulphate | 100.00 mcg |
| 2. | Beclomethasone dipropionate | 100.00 mcg |
| 3. | Lactose q.s. | 25.00 mg |

[0142]   Levosalbutamol sulphate and beclomethasone dipropionate are blended together with lactose and filled in capsules

Example 6: Nebulising suspension

[0143]

| Sr.No | Ingredients | Quantity (%w/w) |
|---|---|---|
| 1. | Levo-Salbutamol Sulphate equiv to levosalbutamol | 15.500 |
| 2. | Beclomethasone dipropionate | 20.000 |
| 3. | Sodium chloride | 0.900 |
| 4. | Tween 80 | 0.100 |
| 5. | Disodium edetate | 0.020 |
| 6. | Sodium citrate | q.s |
| 7. | Purified water | q.s. to 2.00ml |
| 1. Dissolving levosalbutamol along with isotonocity agent, chelating agent and wetting agent in purified water followed by filtration.<br>2. In another vessel, sonication of the glucocorticoid in part quantity of water followed by appropriate sterilization method.<br>3. Both the above solutions are mixed to provide the final inhalation suspension and the pH is adjusted (if required). The suspension is filled in unit dose or multidose vials. | | |

[0144]   The following Examples illustrate preparation of crystalline polymorphic Forms I, II and III of levosalbutamol sulphate.

14

**EP 2 311 793 A1**

**Example 7**

[0145]    R-benzyl salbutamol (20.0 kg.), methanol ( 61.0 ltr.), denatured alcohol (72 ltrs.) was charged in an autoclave, palladium (5%) on charcoal (1.30 kg) was charged and stirred under 30 psi hydrogen pressure. After completion of reaction the catalyst was filtered and washed with methanol (60 lts.) and denatured alcohol (60 ltrs.). The pH of the clear filtrate was adjusted with sulphuric acid to 5 -5.5 pH at 0-10°C and the resulting solid was stirred at 0-10°C for 1 hr., filtered and washed with methanol (20 ltrs.). The product was dried under vacuum at 30°C for 1 hr. and further at 50-60°C for additional 1 hr. to give R-salbutamol Form I ( 19.0 kg.).

Example 8

[0146]    R-benzyl salbutamol (10.0 kg.), methanol (30.0 ltr.), denatured alcohol (36 ltr.) was charged in an autoclave, wet palladium (5%) on charcoal (0.65 kg) was charged and stirred under 30 psi hydrogen pressure. After completion of reaction the catalyst was filtered and washed with denatured alcohol (25 ltrs.). The pH of the clear filtrate was adjusted with sulphuric acid to 5 -5.5 pH at ambient temperature (25 to 30° C) and the resulting solid was filtered and washed with methanol (10 ltrs.) at 25 to 30° C. The product was dried under vacuum at 50-60°C temp to give R-salbutamol sulphate Form III ( 19.0 kg.).

**Example 9**

[0147]    R-salbutamol sulphate (14.80 Kg) was dissolved in water (60.0 ltrs.) and filtered to get a clear solution. The filtrate was distilled under vacuum below 60°C to residue. The residue was stripped with acetone (74.0 ltrs.) twice, further acetone (148.0 lts.) was added and the resulting slurry was stirred for 2 hrs. The slurry was filtered and dried under vacuum at 60°C for 10-12 hrs to give R-salbutamol sulphate Form II (11.1 kg.)

**Example 10**

[0148]    R-salbutamol sulphate (10 Kg) was dissolved in water (30.0 ltrs.) and stirred for 10-15 min. The resulting clear solution was filtered. Methanol (150 ltrs.) was added slowly to the clear filtrate at room temperature and stirred for 30 mins. and further chilled to 0-5°C. The resulting solid was filtered and washed with methanol. The product was dried under vacuum at 60°C for 3-4 hrs to give R-salbutamol sulphate Form I (8 kg.)

**Example 11**

[0149]    R-salbutamol sulphate (20 Kg) was dissolved in water (60.0 ltrs.) and filtered to get a clear solution ,charge 300 ltr acetone slowly at 25-30°C and the resulting mixture was stirred for 2 hrs at room temp. The resulting slurry was filtered and dried under vacuum at 80°C for 10-12 hrs to give R-salbutamol sulphate Form III (17 kg.)

**Example 12**

[0150]    R-salbutamol sulphate (10 gms) was dissolved in water (30 ml). Methanol (150 ml) was charged at 25-30°C and Isopropyl alcohol (75ml) was added and the mixture was cooled to 5-10°C for 2 hrs. filtered and dried at 80°C under vacuum for 15-20 hrs. to give Form II.

**Example 13**

[0151]    R-salbutamol sulphate was dissolved in methanol at reflux temperature. The reaction mass was then cooled to room temperature and further chilled to 5-10°C . The resulting solid was filtered and dried at 80°C to give R-salbutamol sulphate Form II

**Example 14**

[0152]    R-salbutamol sulphate Form I was subjected to jet milling to get R-salbutamol sulphate Form II having a particle size of 90% less than 5 micron and 100 % below 12.5 micron.

[0153]    Note that in Examples 9 to 13 any form of R-salbutamol sulphate may be used as the stating material.

EP 2 311 793 A1

**TABLE 1**

| LEVOSALBUTAMOL S04 - Form I | | | | | |
|---|---|---|---|---|---|
| | | | | | |
| Peak No. | 2θ (deg) | d (A) | Height | Height % | FWHM |
| 1 | 10.781 | 8.1998 | 10389 | 59.5 | 0.237 |
| 2 | 11.941 | 7.4053 | 2043 | 11.7 | 0.237 |
| 3 | 12.660 | 6.9865 | 1090 | 6.2 | 0.232 |
| 4 | 13.005 | 6.8036 | 1080 | 6.2 | 0.167 |
| 5 | 15.819 | 5.5975 | 1576 | 9.0 | 0.266 |
| 6 | 17.400 | 5.0924 | 2170 | 12.4 | 0.236 |
| 7 | 18.341 | 4.8332 | 2847 | 16.3 | 0.268 |
| 8 | 19.019 | 4.6624 | 621 | 3.6 | 0.271 |
| 9 | 20.939 | 4.2390 | 2564 | 14.7 | 0.265 |
| 10 | 21.720 | 4.0883 | 3195 | 18.3 | 0.282 |
| 11 | 22.500 | 3.9482 | 2001 | 11.5 | 0.202 |
| 12 | 23.140 | 3.8406 | 17446 | 100.0 | 0.234 |
| 13 | 24.341 | 3.6537 | 1870 | 10.7 | 0.243 |
| 14 | 26.120 | 3.4087 | 1108 | 6.4 | 0.285 |
| 15 | 28.541 | 3.1249 | 1379 | 7.9 | 0.281 |
| 16 | 31.280 | 2.8572 | 914 | 5.2 | 0.378 |
| 17 | 31.939 | 2.7997 | 955 | 5.5 | 0.451 |
| 18 | 33.980 | 2.6361 | 686 | 3.9 | 0.361 |
| 19 | 34.279 | 2.6138 | 419 | 2.4 | 0.350 |
| 20 | 35.739 | 2.51036 | 712 | 4.1 | 0.329 |
| 21 | 36.340 | 2.4702 | 635 | 3.6 | 0.391 |

**TABLE 2**

| LEVOSALBUTAMOL S04 - Form II | | | | | |
|---|---|---|---|---|---|
| | | | | | |
| Peak No. | 2θ (deg) | d (A) | Height | Height % | FWHM |
| 1 | 8.701 | 10.1542 | 8249 | 100.0 | 0.205 |
| 2 | 9.636 | 9.1706 | 2610 | 31.6 | 0.195 |
| 3 | 13.422 | 6.5914 | 365 | 4.4 | 0.184 |
| 4 | 15.180 | 5.8318 | 6090 | 73.8 | 0.213 |
| 5 | 15.657 | 5.6550 | 2247 | 27.2 | 0.201 |
| 6 | 17.440 | 5.0809 | 2091 | 25.3 | 0.193 |
| 7 | 19.139 | 4.6335 | 1416 | 17.2 | 0.272 |
| 8 | 19.360 | 4.5811 | 900 | 10.9 | 0.385 |
| 9 | 19.583 | 4.5294 | 666 | 8.1 | 0.376 |

EP 2 311 793 A1

(continued)

| Peak No. | 2θ (deg) | d (A) | Height | Height % | FWHM |
|----------|----------|-------|--------|----------|------|
| 10 | 20.221 | 4.3879 | 462 | 5.6 | 0.156 |
| 11 | 21.439 | 4.1413 | 7819 | 94.8 | 0.256 |
| 12 | 21.699 | 4.0921 | 3525 | 42.7 | 0.356 |
| 13 | 22.201 | 4.0008 | 2317 | 28.1 | 0.128 |
| 14 | 22.837 | 3.8907 | 1299 | 15.7 | 0.091 |
| 15 | 23.339 | 3.8083 | 4096 | 49.7 | 0.308 |
| 16 | 23.760 | 3.7417 | 2345 | 28.4 | 0.236 |
| 17 | 24.361 | 3.6508 | 1107 | 13.4 | 0.165 |
| 18 | 25.022 | 3.5558 | 829 | 10.0 | 0.080 |
| 19 | 25.399 | 3.5038 | 1127 | 13.7 | 0.176 |
| 20 | 26.059 | 3.4166 | 1162 | 14.1 | 0.271 |
| 21 | 26.321 | 3.3832 | 1437 | 17.4 | 0.256 |
| 22 | 27.199 | 3.2759 | 2718 | 32.9 | 0.255 |
| 23 | 28.740 | 3.1037 | 622 | 7.5 | 0.193 |
| 24 | 29.263 | 3.0493 | 356 | 4.3 | 0.628 |
| 25 | 30.077 | 2.9687 | 721 | 8.7 | 0.162 |
| 26 | 30.702 | 2.9097 | 1586 | 19.2 | 0.211 |
| 27 | 31.640 | 2.8255 | 631 | 7.6 | 0.351 |
| 28 | 32.001 | 2.7944 | 700 | 8.5 | 0.464 |
| 29 | 32.319 | 2.7677 | 680 | 8.2 | 0.354 |
| 30 | 33.859 | 2.6452 | 368 | 4.5 | 0.382 |
| 31 | 34.242 | 2.6165 | 730 | 8.8 | 0.315 |
| 32 | 35.002 | 2.5615 | 424 | 5.1 | 0.244 |
| 33 | 35.299 | 2.5406 | 316 | 3.8 | 0.542 |
| 34 | 35.838 | 2.5036 | 376 | 4.6 | 0.239 |
| 35 | 36.238 | 2.4769 | 427 | 5.2 | 0.232 |
| 36 | 36.737 | 2.443 | 254 | 3.1 | 0.313 |
| 37 | 37.999 | 2.3660 | 297 | 3.6 | 0.245 |
| 38 | 38.265 | 2.3502 | 319 | 3.9 | 0.658 |
| 39 | 38.777 | 2.3203 | 491 | 6.0 | 0.380 |

**TABLE 3**

| LEVOSALBUTAMOL S04 - Form III | | | | | |
|---|---|---|---|---|---|
| | | | | | |
| Peak No. | 2θ (deg) | d (A) | Height | Height % | FWHM |
| 1 | 5.496 | 16.0657 | 2337 | 41.8 | 0.206 |

17

**EP 2 311 793 A1**

(continued)

| Peak No. | 2θ (deg) | d (A) | Height | Height % | FWHM |
|----------|----------|-------|--------|----------|------|
| 2 | 6.901 | 12.799 | 320 | 5.7 | 0.295 |
| 3 | 7.340 | 12.034 | 1938 | 34.6 | 0.217 |
| 4 | 8.181 | 10.7983 | 2348 | 42.0 | 0.645 |
| 5 | 8.399 | 10.5187 | 5559 | 99.4 | 0.251 |
| 6 | 10.978 | 8.0527 | 577 | 10.3 | 0.190 |
| 7 | 11.758 | 7.5203 | 978 | 17.5 | 0.178 |
| 8 | 12.778 | 6.9221 | 365 | 6.5 | 0.186 |
| 9 | 14.298 | 6.1895 | 565 | 10.1 | 0.233 |
| 10 | 14.701 | 6.0206 | 428 | 7.7 | 0.165 |
| 11 | 16.321 | 5.4266 | 4839 | 86.5 | 0.292 |
| 12 | 16.981 | 5.2172 | 498 | 8.9 | 0.134 |
| 13 | 17.980 | 4.9293 | 1110 | 19.8 | 0.319 |
| 14 | 18.180 | 4.8758 | 1421 | 25.4 | 0.532 |
| 15 | 18.660 | 4.7512 | 4455 | 79.6 | 0.432 |
| 16 | 18.860 | 4.7013 | 3247 | 58.0 | 0.243 |
| 17 | 19.189 | 4.6215 | 636 | 11.4 | 0.100 |
| 18 | 20.179 | 4.3969 | 797 | 14.2 | 0.529 |
| 19 | 20.720 | 4.2833 | 2355 | 42.1 | 0.315 |
| 20 | 22.019 | 4.0335 | 5594 | 100.0 | 0.306 |
| 21 | 22.219 | 3.9976 | 2598 | 46.4 | 0.595 |
| 22 | 23.121 | 3.8436 | 761 | 13.6 | 0.563 |
| 23 | 23.640 | 3.7604 | 2729 | 48.8 | 0.460 |
| 24 | 23.858 | 3.7265 | 2189 | 39.1 | 0.547 |
| 25 | 24.638 | 3.6103 | 654 | 11.7 | 0.168 |
| 26 | 25.339 | 3.5120 | 1235 | 22.1 | 0.276 |
| 27 | 25.721 | 3.4607 | 445 | 8.0 | 0.215 |
| 28 | 26.299 | 3.3859 | 414 | 7.4 | 0.352 |
| 29 | 26.518 | 3.3585 | 550 | 9.8 | 0.354 |
| 30 | 26.879 | 3.3142 | 493 | 8.8 | 0.249 |
| 31 | 27.620 | 3.2270 | 1316 | 23.5 | 0.274 |
| 32 | 28.799 | 3.0974 | 719 | 12.9 | 0.655 |
| 33 | 29.319 | 3.0437 | 827 | 14.8 | 0.654 |
| 34 | 30.800 | 2.9006 | 565 | 10.1 | 0.319 |
| 35 | 31.242 | 2.8606 | 430 | 7.7 | 0.207 |
| 36 | 32.341 | 2.7659 | 867 | 15.5 | 0.232 |
| 37 | 33.218 | 2.6948 | 719 | 12.9 | 0.313 |
| 38 | 33.781 | 2.6512 | 565 | 10.1 | 0.245 |
| 39 | 34.181 | 2.6211 | 1029 | 18.4 | 0.267 |

EP 2 311 793 A1

(continued)

| Peak No. | 2θ (deg) | d (A) | Height | Height % | FWHM |
|----------|----------|--------|--------|----------|-------|
| 40 | 36.646 | 2.4502 | 325 | 5.8 | 0.557 |
| 41 | 37.140 | 2.4187 | 376 | 6.7 | 0.252 |
| 42 | 37.522 | 2.3950 | 478 | 8.5 | 0.306 |
| 43 | 39.397 | 2.2852 | 356 | 6.4 | 0.427 |

## Claims

1.  Crystalline levosalbutamol sulphate (Form II) **characterised by** a powder XRD pattern with peaks at 8.7, 9.6, 15.2, 15.7, 19.1, 27.2, 30.7 $\pm$ 0.2 degrees 2 theta.

2.  Crystalline levosalbutamol sulphate according to claim 1 **characterised by** an IR spectrum with peaks at 3393, 3026, 2982, 2822, 2463, 1630, 1614, 1513, 1484, 1380, 1321, 1279, 1258, 1235, 1204, 1155, 1093, 1066, 1036, 1023, 919, 900, 838, 829, 818, 808, 788, 618, 596, 540, 493, 453, 440 cm$^{-1}$.

3.  Crystalline levosalbutamol sulphate according to claim 1 or 2 substantially as shown in Figure 3; and/or **characterised by** having an IR spectrum substantially as shown in Figure 4; and/or **characterised by** a powder XRD pattern with peaks substantially as shown in Table 2.

4.  A process for preparing crystalline levosalbutamol sulphate Form II according to claim 1 or 2 which process comprises a) dissolving any form of levosalbutamol sulphate in water b) distilling to residue c) stripping the residue with an organic solvent d) slurrying the solid in an organic solvent e) isolating crystalline Form II.

5.  A process according to claim 4 wherein step (a) comprises dissolving crystalline levosalbutamol sulphate Form I or Form II in water.

6.  A process according to claim 4 or 5 wherein in step (c) or step (d) or both the solvent is acetone.

7.  A process for preparing crystalline levosalbutamol sulphate Form II according to claim 1, 2 or 3, which process comprises jet milling any other form of levosalbutamol sulphate.

8.  A process according to claim 7 wherein crystalline levosalbutamol Form I is jet milled to give said Form II.

9.  A pharmaceutical composition comprising a compound according to any one of claims 1 to 3, and a pharmaceutically acceptable carrier.

10. A pharmaceutical composition comprising a compound according to any one of claims 1 to 3 or a compound prepared by the process of any one of claims 4 to 8 in combination with one or more pharmaceutically active compounds and, optionally, a pharmaceutically acceptable carrier.

11. A pharmaceutical composition according to claim 10 wherein the further active compound is a glucocorticoid, optionally wherein the glucocorticoid is one or more of fluticasone propionate, beclomethasone dipropionate or budesonide.

12. A compound according to any one of claims 1 to 3, or a composition according to claim 9, 10 or 11, for use as a medicament.

13. A compound or composition according to claim 12 for use in the treatment of respiratory disorders and related conditions.

14. A combination comprising a compound according to any one of claims 1 to 3 and one or more pharmaceutically active compounds and optionally at least one pharmaceutically acceptable carrier; for simultaneous, separate or sequential use.

**EP 2 311 793 A1**

15. A pharmaceutical composition according to any one of claims 9 to 14 comprising suitable pharmaceutically acceptable excipients to form an aerosol formulation, a dry powder formulation or an inhalation solution/suspension.

16. A pharmaceutical composition according to claim 15 further comprising a propellant selected from the group comprising propellant 11, propellant 12, propellant 114, 1,1,1,2-tetrafluoroethane (HFA134a) and 1,1,1,2,3,3,3-heptafluoropropane (HFA227), or mixtures of two or more such halogen-substituted hydrocarbons.; optionally a surfactant is optionally a cosolvant; and optionally a bulking agent.

17. A pharmaceutical composition according to claim 15 or 16 in the form of a dry powder formulation.

18. A dry powder inhaler comprising a composition according to claim 17.

19. A pharmaceutical composition according to claim 15 in the form of an inhalation suspension.

20. A pharmaceutical composition according to claim 19 comprising, in addition to active material, a polar solvent, a tonicity-adjusting agent, a wetting agent, a chelating agent and optionally an acid.

21. A composition according to any one of claims 15 to 20 for use as a medicament.

22. A composition according to any one of claims 15 to 20 for use in treating respiratory disorders and related conditions, including bronchoconstriction, asthma and COPD.

23. Use of a combination of crystalline levosalbutamol sulphate Form II according to any one of claims 1 to 3 and a glucocorticoid for treatment in the long-term management of asthma and COPD.

24. A combination comprising levosalbutamol sulphate Form II according to any one of claims 1 to 3 and a glucocorticoid and optionally at least one pharmaceutically acceptable carrier; for simultaneous, separate or sequential use.

**EP 2 311 793 A1**



Fig 1
FORM I

**EP 2 311 793 A1**



FIG 2
FORM I

**EP 2 311 793 A1**



EP 2 311 793 A1



FIG 4
FORM II

**EP 2 311 793 A1**



Fig 5
FORM III

**EP 2 311 793 A1**



FIG 6
FORM III

**EP 2 311 793 A1**



**EUROPEAN SEARCH REPORT**

Application Number

EP 10 18 4848

## DOCUMENTS CONSIDERED TO BE RELEVANT

| Category | Citation of document with indication, where appropriate, of relevant passages | Relevant to claim | CLASSIFICATION OF THE APPLICATION (IPC) |
|---|---|---|---|
| A | WO 02/48090 A (CIPLA LIMITED; WAIN, CHRISTOPHER, PAUL; HAMIED, YUSUF, KHWAJA; KANKAN,) 20 June 2002 (2002-06-20)<br>* page 6, lines 1-8 *<br>* examples 3,8 *<br>----- | 1-24 | INV.<br>C07C215/60<br>C07C213/10<br>A61K9/12<br>A61K31/137<br>A61P11/06 |
| | | | TECHNICAL FIELDS SEARCHED (IPC)<br><br>C07C<br>A61K<br>A61P |

The present search report has been drawn up for all claims

| Place of search | Date of completion of the search | Examiner |
|---|---|---|
| Munich | 7 March 2011 | Götz, Gerhard |

CATEGORY OF CITED DOCUMENTS

X : particularly relevant if taken alone
Y : particularly relevant if combined with another document of the same category
A : technological background
O : non-written disclosure
P : intermediate document

T : theory or principle underlying the invention
E : earlier patent document, but published on, or after the filing date
D : document cited in the application
L : document cited for other reasons

& : member of the same patent family, corresponding document

**EP 2 311 793 A1**

## ANNEX TO THE EUROPEAN SEARCH REPORT
## ON EUROPEAN PATENT APPLICATION NO.

EP 10 18 4848

This annex lists the patent family members relating to the patent documents cited in the above-mentioned European search report.
The members are as contained in the European Patent Office EDP file on
The European Patent Office is in no way liable for these particulars which are merely given for the purpose of information.

07-03-2011

| Patent document cited in search report | | Publication date | Patent family member(s) | | Publication date |
|---|---|---|---|---|---|
| WO 0248090 | A | 20-06-2002 | AT | 291006 T | 15-04-2005 |
| | | | AU | 2091802 A | 24-06-2002 |
| | | | CA | 2431400 A1 | 20-06-2002 |
| | | | DE | 60109494 D1 | 21-04-2005 |
| | | | DE | 60109494 T2 | 04-08-2005 |
| | | | EP | 1349828 A1 | 08-10-2003 |
| | | | ES | 2240335 T3 | 16-10-2005 |
| | | | HK | 1060345 A1 | 24-06-2005 |
| | | | PT | 1349828 E | 29-07-2005 |
| | | | US | 2004054215 A1 | 18-03-2004 |

EPO FORM P0459

For more details about this annex : see Official Journal of the European Patent Office, No. 12/82

**EP 2 311 793 A1**

**REFERENCES CITED IN THE DESCRIPTION**

*This list of references cited by the applicant is for the reader's convenience only. It does not form part of the European patent document. Even though great care has been taken in compiling the references, errors or omissions cannot be excluded and the EPO disclaims all liability in this regard.*

**Patent documents cited in the description**

- US 6702997 B **[0007]**
- US 6251368 B **[0008]**
- US 5547994 A **[0009]**
- CN 1413976 **[0010]**
- US 2004054215 A **[0011]**
- US 20040115136 A **[0012]**
- US 5545745 A **[0014] [0017]**

- US 2004114136 A **[0015]**
- WO 2004052835 A **[0015]**
- GB 2088877 A **[0021]**
- HK 1009406 **[0022]**
- US 6013245 A **[0024]**
- US 2004136920 A **[0025]**

# EXHIBIT 4

**PCT**

WORLD INTELLECTUAL PROPERTY ORGANIZATION
International Bureau

INTERNATIONAL APPLICATION PUBLISHED UNDER THE PATENT COOPERATION TREATY (PCT)

| (51) International Patent Classification 5 : <br><br> **A61K 9/00** | **A1** | (11) International Publication Number: **WO 93/11744** <br><br> (43) International Publication Date: 24 June 1993 (24.06.93) |
|---|---|---|

(21) International Application Number: PCT/EP92/02809

(22) International Filing Date: 4 December 1992 (04.12.92)

(30) Priority data:
9126405.1     12 December 1991 (12.12.91)   GB
9202522.0     6 February 1992 (06.02.92)    GB

(71) Applicant *(for all designated States except US):* GLAXO GROUP LIMITED [GB/GB]; Glaxo House, Berkeley Avenue, Greenford, Middlesex UB6 0NN (GB).

(72) Inventors; and
(75) Inventors/Applicants *(for US only)* : AKEHURST, Rachel, Ann [GB/GB]; TAYLOR, Anthony, James [GB/GB]; WYATT, David, Andrew [GB/GB]; Glaxo Group Research Limited, Park Road, Ware, Hertfordshire SG12 0DP (GB).

(74) Agents: FILLER, Wendy, Anne et al.; Glaxo Holdings plc, Glaxo House, Berkeley Avenue, Greenford, Middlesex UB6 0NN (GB).

(81) Designated States: AT, AU, BB, BG, BR, CA, CH, CS, DE, DK, ES, FI, GB, HU, JP, KP, KR, LK, LU, MG, MN, MW, NL, NO, NZ, PL, PT, RO, RU, SD, SE, US, European patent (AT, BE, CH, DE, DK, ES, FR, GB, GR, IE, IT, LU, MC, NL, PT, SE), OAPI patent (BF, BJ, CF, CG, CI, CM, GA, GN, ML, MR, SN, TD, TG).

**Published**
*With international search report.*

(54) Title: MEDICAMENTS

(57) Abstract

This invention relates to aerosol formulations of use for the administration of medicaments by inhalation, in particular a pharmaceutical aerosol formulation which comprises particulate medicament and a fluorocarbon or hydrogen-containing chlorofluorocarbon propellant, which formulation is substantially free of surfactant and with the proviso that said medicament is other than salmeterol, salbutamol, fluticasone propionate, beclomethasone dipropionate or a physiologically acceptable salt or solvate thereof. A method of treating respiratory disorders which comprises administration by inhalation of an effective amount of a pharmaceutical aerosol formulation as defined is also described.

*FOR THE PURPOSES OF INFORMATION ONLY*

Codes used to identify States party to the PCT on the front pages of pamphlets publishing international applications under the PCT.

| | | | | | |
|---|---|---|---|---|---|
| AT | Austria | FR | France | MR | Mauritania |
| AU | Australia | GA | Gabon | MW | Malawi |
| BB | Barbados | GB | United Kingdom | NL | Netherlands |
| BE | Belgium | GN | Guinea | NO | Norway |
| BF | Burkina Faso | GR | Greece | NZ | New Zealand |
| BG | Bulgaria | HU | Hungary | PL | Poland |
| BJ | Benin | IE | Ireland | PT | Portugal |
| BR | Brazil | IT | Italy | RO | Romania |
| CA | Canada | JP | Japan | RU | Russian Federation |
| CF | Central African Republic | KP | Democratic People's Republic | SD | Sudan |
| CG | Congo | | of Korea | SE | Sweden |
| CH | Switzerland | KR | Republic of Korea | SK | Slovak Republic |
| CI | Côte d'Ivoire | KZ | Kazakhstan | SN | Senegal |
| CM | Cameroon | LI | Liechtenstein | SU | Soviet Union |
| CS | Czechoslovakia | LK | Sri Lanka | TD | Chad |
| CZ | Czech Republic | LU | Luxembourg | TG | Togo |
| DE | Germany | MC | Monaco | UA | Ukraine |
| DK | Denmark | MG | Madagascar | US | United States of America |
| ES | Spain | ML | Mali | VN | Viet Nam |
| FI | Finland | MN | Mongolia | | |

1

# MEDICAMENTS

This invention relates to aerosol formulations of use for the administration of
5    medicaments by inhalation.

The use of aerosols to administer medicaments has been known for several decades.
Such aerosols generally comprise the medicament, one or more chlorofluorocarbon
propellants and either a surfactant or a solvent, such as ethanol. The most commonly
used aerosol propellants for medicaments have been propellant 11 ($CCl_3F$) and/or
10    propellant 114 ($CF_2ClCF_2Cl$) with propellant 12 ($CCl_2F_2$). However these propellants are
now believed to provoke the degradation of stratospheric ozone and there is thus a need
to provide aerosol formulations for medicaments which employ so called "ozone-friendly"
propellants.

A class of propellants which are believed to have minimal ozone-depleting effects in
15    comparison to conventional chlorofluorocarbons comprise fluorocarbons and
hydrogen-containing chlorofluorocarbons, and a number of medicinal aerosol
formulations using such propellant systems are disclosed in, for example, EP 0372777,
WO91/04011, WO91/11173, WO91/11495 and WO91/14422. These applications are all
concerned with the preparation of pressurised aerosols for the administration of
20    medicaments and seek to overcome the problems associated with the use of the new class
of propellants, in particular the problems of stability associated with the pharmaceutical
formulations prepared. The applications all propose the addition of one or more of
adjuvants such as alcohols, alkanes, dimethyl ether, surfactants (including fluorinated and
non-fluorinated surfactants, carboxylic acids, polyethoxylates etc) and even conventional
25    chlorofluorocarbon propellants in small amounts intended to minimise potential ozone
damage.

Thus, for example EP 0372777 requires the use of 1,1,1,2-tetrafluoroethane in
combination with both a cosolvent having greater polarity than 1,1,1,2-tetrafluoroethane
(e.g. an alcohol or a lower alkane) and a surfactant in order to achieve a stable
30    formulation of a medicament powder. In particular it is noted in the specification at page

2

3, line 7 that "it has been found that the use of propellant 134a (1,1,1,2-tetrafluoroethane) and drug as a binary mixture or in combination with a conventional surfactant such as sorbitan trioleate does not provide formulations having suitable properties for use with pressurised inhalers".  Surfactants are generally recognised by those skilled in the art to be

5    essential components of aerosol formulations, required not only to reduce aggregation of the medicament but also to lubricate the valve employed, thereby ensuring consistent reproducibility of valve actuation and accuracy of dose dispensed.  Whilst WO91/11173, WO91/11495 and WO91/14422 are concerned with formulations comprising an admixture of drug and surfactant, WO91/04011 discloses medicinal aerosol formulations

10    in which the particulate medicaments are pre-coated with surfactant prior to dispersal in 1,1,1,2-tetrafluoroethane.

We have now surprisingly found that, in contradistinction to these teachings, it is in fact possible to obtain satisfactory dispersions of medicaments in fluorocarbon or hydrogen-containing chlorofluorocarbon propellants such as 1,1,1,2-tetrafluoroethane

15    without recourse to the use of any surfactant or cosolvent in the composition, or the necessity to pre-treat the medicament prior to dispersal in the propellant.

There is thus provided in one aspect of the invention a pharmaceutical aerosol formulation which comprises particulate medicament and a   fluorocarbon or hydrogen-containing chlorofluorocarbon propellant, which formulation is substantially

20    free of surfactant and with the proviso that said medicament is other than salmeterol, salbutamol, fluticasone propionate, beclomethasone dipropionate or a physiologically acceptable salt or solvate thereof.  By "substantially free of surfactant" is meant formulations which contain no significant amounts of surfactant, for example less than 0.0001% by weight of the medicament.

25    The particle size of the particulate (e.g. micronised) medicament should be such as to permit inhalation of substantially all of the medicament into the lungs upon administration of the aerosol formulation and will thus be less than 100 microns, desirably less than 20 microns, and preferably in the range 1-10 microns, e.g. 1-5 microns.

Medicaments which may be administered in aerosol formulations according to the

30    invention include any drug useful in inhalation therapy which may be presented in a form

3

which is substantially completely insoluble in the selected propellant.   Appropriate medicaments may thus be selected from, for example, analgesics, e.g. codeine, dihydromorphine, ergotamine, fentanyl or morphine; anginal preparations, e.g. diltiazem; antiallergics, e.g. cromoglycate, ketotifen or nedocromil; anti-infectives, e.g.

5     cephalosporins, penicillins, streptomycin, sulphonamides, tetracyclines and pentamidine; antihistamines, e.g. methapyrilene; anti-inflammatories, e.g. flunisolide, budesonide, tipredane or triamcinolone acetonide; antitussives, e.g. noscapine; bronchodilators, e.g. ephedrine, adrenaline, fenoterol, formoterol, isoprenaline, metaproterenol, phenylephrine, phenylpropanolamine, pirbuterol, reproterol, rimiterol, terbutaline, isoetharine,

10    tulobuterol, orciprenaline, or (-)-4-amino-3,5-dichloro-α-[[[6-[2-(2-pyridinyl) ethoxy] hexyl]amino]methyl]benzenemethanol;   diuretics, e.g. amiloride; anticholinergics e.g. ipratropium, atropine or oxitropium; hormones, e.g. cortisone, hydrocortisone or prednisolone; xanthines e.g. aminophylline, choline theophyllinate, lysine theophyllinate or theophylline; and therapeutic proteins and peptides, e.g. insulin or glucagon. It will be

15    clear to a person skilled in the art that, where appropriate, the medicaments may be used in the form of salts (e.g. as alkali metal or amine salts or as acid addition salts) or as esters (e.g. lower alkyl esters) or as solvates (e.g. hydrates) to optimise the activity and/or stability of the medicament and/or to minimise the solubility of the medicament in the propellant.

20    Particularly preferred medicaments for administration using aerosol formulations in accordance with the invention include anti-allergics, bronchodilators and anti-inflammatory steroids of use in the treatment of respiratory disorders such as asthma by inhalation therapy, for example cromoglycate (e.g. the sodium salt), terbutaline (e.g. the sulphate salt), reproterol (e.g. the hydrochloride salt) or (-)-4-amino-

25    3,5-dichloro-α-[[[6-[2-(2-pyridinyl)-ethoxy]hexyl]amino]methyl]benzenemethanol.

It will be appreciated by those skilled in the art that the aerosol formulations according to the invention may , if desired, contain a combination of two or more active ingredients.   Aerosol compositions containing two active ingredients (in a conventional propellant system) are known, for example, for the treatment of respiratory disorders such

30

4

as asthma.   Accordingly the present invention further provides aerosol formulations in accordance with the invention which contain two or more particulate medicaments. Medicaments may be selected from suitable combinations of the medicaments mentioned hereinbefore.   Thus, suitable combinations of bronchodilatory agents include ephedrine

5      and theophylline, fenoterol and ipratropium, and isoetharine and phenylephrine aerosol formulations.

Preferred aerosol formulations in accordance with the invention comprise (a) an effective amount of a particulate bronchodilatory medicament (b) an effective amount of a particulate antiinflammatory, preferably a steroidal antiinflammatory medicament and (c) a

10     fluorocarbon or hydrogen - containing chlorofluorocarbon propellant with the proviso that said medicaments are other than salmeterol, salbutamol, fluticasone propionate, beclomethasone dipropionate or a physiologically acceptable salt or solvate thereof. Alternatively aerosol formulations may contain a bronchodilator such as isoprenaline in combination with an antiallergic such as cromoglycate (e.g. the sodium salt).

15     Combinations of isoprenaline and sodium cromoglycate are especially preferred.

The final aerosol formulation desirably contains 0.005-10% w/w, preferably 0.005-5% w/w, especially 0.01-1.0% w/w, of medicament relative to the total weight of the formulation.

The propellants for use in the invention may be any   fluorocarbon or

20     hydrogen-containing chlorofluorocarbon or mixtures thereof having a sufficient vapour pressure to render them effective as propellants. Preferably the propellant will be a non-solvent for the medicament.    Suitable propellants include, for example, $C_{1-4}$hydrogen-containing chlorofluorocarbons such as $CH_2ClF$, $CClF_2CHClF$, $CF_3CHClF$, $CHF_2CClF_2$,   $CHClFCHF_2$,   $CF_3CH_2Cl$ and   $CClF_2CH_3$;   $C_{1-4}$hydrogen-containing

25     fluorocarbons such as $CHF_2CHF_2$, $CF_3CH_2F$,   $CHF_2CH_3$ and $CF_3CHFCF_3$; and perfluorocarbons such as $CF_3CF_3$ and $CF_3CF_2CF_3$.

Where mixtures of the  fluorocarbons or hydrogen-containing chlorofluorocarbons are employed they may be mixtures of the above identified compounds or mixtures, preferably binary mixtures, with other fluorocarbons or hydrogen-containing

30     chlorofluorocarbons for example $CHClF_2$, $CH_2F_2$ and $CF_3CH_3$.   Preferably a single

5

fluorocarbon or hydrogen-containing chlorofluorocarbon is employed as the propellant. Particularly preferred as propellants are $C_{1-4}$ hydrogen-containing fluorocarbons such as 1,1,1,2-tetrafluoroethane ($CF_3CH_2F$) and 1,1,1,2,3,3,3-heptafluoro-n-propane ($CF_3CHFCF_3$).

5    It is desirable that the formulations of the invention contain no components which may provoke the degradation of stratospheric ozone. In particular it is desirable that the formulations are substantially free of chlorofluorocarbons such as $CCl_3F$, $CCl_2F_2$ and $CF_3CCl_3$.

The propellant may additionally contain a volatile adjuvant such as a saturated 10   hydrocarbon for example propane, n-butane, isobutane, pentane and isopentane or a dialkyl ether for example dimethyl ether. In general, up to 50% w/w of the propellant may comprise a volatile hydrocarbon, for example 1 to 30% w/w. However, formulations which are substantially free of volatile adjuvants are preferred.

It is further desirable that the formulations of the invention are substantially free of 15   liquid components of higher polarity than the propellant employed. Polarity may be determined for example, by the method described in European Patent Application Publication No. 0327777. In particular formulations which are substantially free of alcohols such as ethanol are preferable. As used herein "substantially free" means less than 1% w/w based upon the fluorocarbon or hydrogen-containing chlorofluorocarbon, in 20   particular less than 0.5% for example 0.1% or less.

A particularly preferred embodiment the invention provides a pharmaceutical aerosol formulation consisting essentially of one more particulate medicament and one or more fluorocarbon or hydrogen-containing chlorofluorocarbon propellant, with the proviso that said medicament is other than salmeterol, salbutamol, fluticasone propionate, 25   beclomethasone dipropionate or a physiologically acceptable salt or solvate thereof.

The formulations of the invention may be prepared by dispersal of the medicament in the selected propellant in an appropriate container, e.g. with the aid of sonication. The process is desirably carried out under anhydrous conditons to obviate any adverse effects of moisture on suspension stability.

30

WO 93/11744                                                    PCT/EP92/02809

6

The formulations according to the invention form weakly flocculated suspensions on standing but, surprisingly, these suspensions have been found to be easily redispersed by mild agitation to provide suspensions with excellent delivery characteristics suitable for use in pressurised inhalers, even after prolonged storage. Minimising and preferably

5   avoiding the use of formulation excipients e.g. surfactants, cosolvents etc in the aerosol formulations according to the invention is also advantageous since the formulations may be substantially taste and odour free, less irritant and less toxic than conventional formulations.

The chemical and physical stability and the pharmaceutical acceptability of the

10  aerosol formulations according to the invention may be determined by techniques well known to those skilled in the art. Thus, for example, the chemical stability of the components may be determined by HPLC assay, for example, after prolonged storage of the product. Physical stability data may be gained from other conventional analytical techniques such as, for example, by leak testing, by valve delivery assay (average shot

15  weights per actuation), by dose reproducibility assay (active ingredient per actuation) and spray distribution analysis.

The particle size distribution of the aerosol formulations according to the invention is particularly impressive and may be measured by conventional techniques, for example by cascade impaction or by the "Twin Impinger" analytical process. As used herein reference

20  to the "Twin Impinger" assay means "Determination of the deposition of the emitted dose in pressurised inhalations using apparatus A" as defined in British Pharmacopaeia 1988, pages A204-207, Appendix XVII C. Such techniques enable the "respirable fraction" of the aerosol formulations to be calculated. As used herein reference to "respirable fraction" means the amount of active ingredient collected in the lower impingement

25  chamber per actuation expressed as a percentage of the total amount of active ingredient delivered per actuation using the twin impinger method described above. The formulations according to the invention have been found to have a respirable fraction of 20% or more by weight of the medicament, preferably 25 to 70%, for example 30 to 60%.

30

7

Optionally, the medicament may be surface-modified prior to its dispersion in the propellant by treatment with a substantially non-polar liquid medium which is a non-solvent for the medicament.   There is thus provided in a further aspect of the invention an aerosol formulation comprising particulate, surface-modified medicament, as

5     defined herein, and a fluorocarbon or hydrogen-containing chlorofluorocarbon propellant, which formulation is substantially free of surfactant.  By "surface-modified medicament" is meant particles of medicament which have been surface-modified by admixture with a substantially non-polar non-solvent liquid, followed by removal of the liquid, with the proviso that said medicament is other than salmeterol, salbutamol, fluticasone propionate,

10    beclomethasone dipropionate or a physiologically acceptable salt or solvate thereof.  The substantially non-polar non-solvent liquid medium is conveniently an aliphatic hydrocarbon, e.g. a lower alkane, which is sufficiently volatile to permit its ready evaporation, e.g. at ambient temperature and pressure, after slurrying with the medicament. The use of isopentane as liquid medium is particularly advantageous in this

15    respect.

The medicament is desirably slurried with the liquid medium under anhydrous conditions to obviate any adverse effects of moisture on suspension stability.  The slurry may advantageously be sonicated to maximise the surface-modifying effect of the treatment.   The liquid may be removed by any convenient means for example by

20    evaporation or by filtration followed by evaporation, provided that following treatment the medicament is substantially free of the liquid.  The formulations of the invention will be substantially free of the non-solvent non-polar liquid.  Surface-modified medicament prepared by the above described process comprises a further aspect of the present invention.

25    The formulations according to the invention may be filled into canisters suitable for delivering pharmaceutical aerosol formulations.  Canisters generally comprise a container capable of withstanding the vapour pressure of the propellant used such as a plastic or plastic-coated glass bottle or preferably a metal can, for example an aluminium can which may optionally be anodised, lacquer-coated and/or plastic-coated, which container is

30    closed with a metering valve.   The metering valves are designed to deliver a metered

8

amount of the formulation per actuation and incorporate a gasket to prevent leakage of propellant through the valve. The gasket may comprise any suitable elastomeric material such as for example low density polyethylene, chlorobutyl, black and white butadiene-acrylonitrile rubbers, butyl rubber and neoprene. Suitable valves are

5   commercially available from manufacturers well known in the aerosol industry, for example, from Valois, France (e.g. DF10, DF30, DF60), Bespak plc, UK (e.g. BK300, BK356) and 3M-Neotechnic Ltd, UK (e.g. Spraymiser™).

Conventional bulk manufacturing methods and machinery well known to those skilled in the art of pharmaceutical aerosol manufacture may be employed for the preparation of

10   large scale batches for the commercial production of filled canisters. Thus, for example, in one bulk manufacturing method a metering valve is crimped onto an aluminium can to form an empty canister. The particulate medicament is added to a charge vessel and liquified propellant is pressure filled through the charge vessel into a manufacturing vessel. The drug suspension is mixed before recirculation to a filling machine and an

15   aliquot of the drug suspension is then filled through the metering valve into the canister. Typically, in batches prepared for pharmaceutical use, each filled canister is check-weighed, coded with a batch number and packed into a tray for storage before release testing.

Each filled canister is conveniently fitted into a suitable channelling device prior to

20   use to form a metered dose inhaler for administration of the medicament into the lungs or nasal cavity of a patient. Suitable channelling devices comprise for example a valve actuator and a cylindrical or cone-like passage through which medicament may be delivered from the filled canister via the metering valve to the nose or mouth of a patient e.g. a mouthpiece actuator. Metered dose inhalers are designed to deliver a fixed unit

25   dosage of medicament per actuation or "puff", for example in the range of 10 to 5000 microgram medicament per puff.

Administration of medicament may be indicated for the treatment of mild, moderate or severe acute or chronic symptoms or for prophylactic treatment. It will be appreciated that the precise dose administered will depend on the age and condition of the patient, the

30   particular particulate medicament used and the frequency of administration and will

9

ultimately be at the discretion of the attendant physician. When combinations of medicaments are employed the dose of each component of the combination will in general be that employed for each component when used alone. Typically, administration may be one or more times, for example from 1 to 8 times per day, giving for example 1,2,3 or 4 puffs each time.

Thus, for example, each valve actuation may deliver 5mg sodium cromoglycate, 250 microgram terbutaline sulphate or 500 microgram reproterol hydrochloride. Typically each filled canister for use in a metered dose inhaler contains 100, 160 or 240 metered doses or puffs of medicament.

The filled canisters and metered dose inhalers described herein comprise further aspects of the present invention.

A still further aspect of the present invention comprises a method of treating respiratory disorders such as, for example, asthma, which comprises administration by inhalation of an effective amount of a formulation as herein described.

The following non-limitative Examples serve to illustrate the invention.

Example 1

Micronised sodium cromoglycate (1.2g) is weighed directly into an aluminium can and 1,1,1,2-tetrafluorethane (to 18.2g) added from a vacuum flask. A metering valve is crimped into place and the sealed can sonicated for five minutes. The aerosol delivers 5mg sodium cromoglycate per actuation.

Example 2

Micronised terbutaline sulphate (60mg) is weighed directly into an aluminium can and 1,1,1,2-tetrafluorethane (to 18.2g) added from a vacuum flask. A metering valve is crimped into place and the sealed can sonicated for five minutes. The aerosol delivers 250 microgram terbutaline sulphate per actuation.

10

Example 3

Micronised reproterol hydrochloride (120mg) is weighed directly into an aluminium can and 1,1,1,2-tetrafluorethane (to 18.2g) added from a vacuum flask. A metering valve is crimped into place and the sealed can sonicated for five minutes. The aerosol delivers 5    500 microgram reproterol hydrochloride per actuation.

Example 4

Micronised terbutaline sulphate (60mg) is weighed directly into an aluminium can and 1,1,1,2,3,3,3-heptafluoro-n-propane (to 21.4g) added from a vacuum flask. A metering 10    valve is crimped into place and the sealed can sonicated for five minutes. The aerosol delivers 250 microgram terbutaline sulphate per actuation.

15

20

25

30

11

## Claims

1.     A pharmaceutical aerosol formulation which comprises particulate medicament and a fluorocarbon or hydrogen-containing chlorofluorocarbon propellant, which formulation is substantially free of surfactant and with the proviso that said medicament is other than salmeterol, salbutamol, fluticasone propionate, beclomethasone dipropionate or a physiologically acceptable salt or solvate thereof.

2.     A pharmaceutical aerosol formulation consisting essentially of one more particulate medicament and one or more fluorocarbon or hydrogen-containing chlorofluorocarbon propellant, with the proviso that said medicament is other than salmeterol, salbutamol, fluticasone propionate, beclomethasone dipropionate or a physiologically acceptable salt or solvate thereof.

3.     A formulation as claimed in Claim 1 or Claim 2 wherein said medicament is an anti-allergic, a bronchodilator or an anti-inflammatory steroid.

4.     A formulation as claimed in any one of Claims 1 to 3 wherein said medicament is cromoglycate, terbutaline, reproterol or (-)-4-amino-3,5-dichloro-$\alpha$-[[[6-[2-(2-pyridinyl)ethoxy]hexyl]amino]methyl]benzenemethanol or a physiologically acceptable salt thereof.

5.     A formulation as claimed in any one of claims 1 to 4 which contains two or more particulate medicaments.

6.     A formulation as claimed in any one of claims 1 to 5 which comprises a particulate bronchodilatory medicament and a particulate anti-inflammatory medicament.

WO 93/11744 · PCT/EP92/02809

12

7.    A formulation as claimed in any one of Claims 1 to 5 which comprises a particulate bronchodilatory medicament and a particulate anti-allergic medicament.

8.    A formulation as claimed in Claim 7 which comprises isoprenaline and cromoglycate or a physiologically acceptable salt thereof.

9.    A formulation as claimed in any one of Claims 1 to 8 which contains 0.005 to 10% w/w of medicament relative to the total weight of the formulation.

10.    A formulation as claimed in any one of Claims 1 to 9 wherein the propellant is 1,1,1,2-tetrafluoroethane or 1,1,1,2,3,3,3-heptafluoro-n-propane.

11.    A formulation as claimed in any one of Claims 1 to 10 which has a respirable fraction of 20% or more by weight of the medicament.

12.    A formulation as claimed in any one of Claims 1 to 11 wherein said particulate medicament is surface-modified.

13.    Surface-modified medicament prepared by admixture of particles of a medicament other than salmeterol, salbutamol, fluticasone propionate, beclomethasone dipropionate or a physiologically acceptable salt or solvate thereof, with a substantially non-polar, non-solvent liquid, followed by removal of the liquid.

14.    A canister suitable for delivering a pharmaceutical aerosol formulation which comprises a container capable of withstanding the vapour pressure of the propellant used, which container is closed with a metering valve and contains a pharmaceutical aerosol formulation which comprises particulate medicament and a   fluorocarbon or hydrogen-containing chlorofluorocarbon propellant, which formulation is substantially free of surfactant and with the proviso that said medicament is other than salmeterol,

WO 93/11744

PCT/EP92/02809

13

salbutamol, fluticasone propionate, beclomethasone dipropionate or a physiologically acceptable salt or solvate thereof.

15.    A metered dose inhaler which comprises a canister as claimed in Claim 14 fitted into
5    a suitable channelling device.

16.    A method of treating respiratory disorders which comprises administration by inhalation of an effective amount of a pharmaceutical aerosol formulation which comprises particulate medicament and a    fluorocarbon or hydrogen-containing
10    chlorofluorocarbon propellant, which formulation is substantially free of surfactant and with the proviso that said medicament is other than salmeterol, salbutamol, fluticasone propionate, beclomethasone dipropionate or a physiologically acceptable salt or solvate thereof.

15

20

25

30

# INTERNATIONAL SEARCH REPORT

International Application No    PCT/EP  92/02809

| I. CLASSIFICATION OF SUBJECT MATTER   (if several classification symbols apply, indicate all)[6] |
|---|
| According to International Patent Classification (IPC) or to both National Classification and IPC |
| Int.Cl. 5  A61K9/00 |

| II. FIELDS SEARCHED |
|---|

| Minimum Documentation Searched[7] |  |
|---|---|
| Classification System | Classification Symbols |
| Int.Cl. 5 | A61K |

| Documentation Searched other than Minimum Documentation<br>to the Extent that such Documents are Included in the Fields Searched[8] |
|---|
|  |

| III. DOCUMENTS CONSIDERED TO BE RELEVANT[9] | | |
|---|---|---|
| Category[°] | Citation of Document,[11] with indication, where appropriate, of the relevant passages[12] | Relevant to Claim No.[13] |
| A | WO,A,9 104 011 (RIKER)<br>4 April 1991<br>cited in the application<br>see claims<br>see page 6, line 27 – line 32<br>see page 8, line 1 – line 22<br>--- | 1-16 |
| A | WO,A,9 111 495 (BOEHRINGER INGELHEIM)<br>8 August 1991<br>cited in the application<br>see claims<br>see page 2, line 10 – line 31<br>--- | 1-16 |
| A | WO,A,9 111 173 (FISONS)<br>8 August 1991<br>cited in the application<br>see claims<br>see page 3, line 15 – line 16<br>---<br><div align="right">-/--</div> | 1-16 |

| ° Special categories of cited documents :[10] | |
|---|---|
| "A" document defining the general state of the art which is not considered to be of particular relevance | "T" later document published after the international filing date or priority date and not in conflict with the application but cited to understand the principle or theory underlying the invention |
| "E" earlier document but published on or after the international filing date | "X" document of particular relevance; the claimed invention cannot be considered novel or cannot be considered to involve an inventive step |
| "L" document which may throw doubts on priority claim(s) or which is cited to establish the publication date of another citation or other special reason (as specified) | "Y" document of particular relevance; the claimed invention cannot be considered to involve an inventive step when the document is combined with one or more other such documents, such combination being obvious to a person skilled in the art. |
| "O" document referring to an oral disclosure, use, exhibition or other means | |
| "P" document published prior to the international filing date but later than the priority date claimed | "&" document member of the same patent family |

| IV. CERTIFICATION | |
|---|---|
| Date of the Actual Completion of the International Search<br><br>09 MARCH 1993 | Date of Mailing of this International Search Report<br><br>23. 03. 93 |
| International Searching Authority<br><br>EUROPEAN PATENT OFFICE | Signature of Authorized Officer<br><br>SCARPONI U. |

Form PCT/ISA/210 (second sheet) (January 1985)

International Application No                     PCT/EP  92/02809

| III. DOCUMENTS CONSIDERED TO BE RELEVANT | (CONTINUED FROM THE SECOND SHEET) | |
|---|---|---|
| Category ° | Citation of Document, with indication, where appropriate, of the relevant passages | Relevant to Claim No. |
| A | WO,A,9 114 422 (MINNESOTA MINING MANUFACTURING COMPANY) 3 October 1991 cited in the application see claims<br>--- | 1-16 |
| P,A | WO,A,9 208 447 (GLAXO) 29 May 1992 see claims<br>----- | 1-16 |

**INTERNATIONAL SEARCH REPORT**

| | International application No. |
|---|---|
| | PCT/EP 92/02809 |

---

**Box I   Observations where certain claims were found unsearchable (Continuation of item 1 of first sheet)**

This international search report has not been established in respect of certain claims under Article 17(2)(a) for the following reasons:

1. [ ]   Claims Nos.:
   because they relate to subject matter not required to be searched by this Authority, namely:

   ALTHOUGH CLAIM 16 IS DIRECTED TO A METHOD OF TREATMENT OF THE HUMAN BODY BY
   THERAPY (RULE 39.1(IV) PCT) THE SEARCH  HAS BEEN CARRIED  OUT AND BASED ON
   THE ALLEGED EFFECTS OF THE COMPOSITION.

2. [ ]   Claims Nos.:
   because they relate to parts of the international application that do not comply with the prescribed requirements to such
   an extent that no meaningful international search can be carried out, specifically:

3. [ ]   Claims Nos.:
   because they are dependent claims and are not drafted in accordance with the second and third sentences of Rule 6.4(a).

---

**Box II   Observations where unity of invention is lacking (Continuation of item 2 of first sheet)**

This International Searching Authority found multiple inventions in this international application, as follows:

1. [ ]   As all required additional search fees were timely paid by the applicant, this international search report covers all
   searchable claims.

2. [ ]   As all searchable claims could be searches without effort justifying an additional fee, this Authority did not invite payment
   of any additional fee.

3. [ ]   As only some of the required additional search fees were timely paid by the applicant, this international search report
   covers only those claims for which fees were paid, specifically claims Nos.:

4. [ ]   No required additional search fees were timely paid by the applicant. Consequently, this international search report is
   restricted to the invention first mentioned in the claims; it is covered by claims Nos.:

**Remark on Protest**        [ ]   The additional search fees were accompanied by the applicant's protest.

                             [ ]   No protest accompanied the payment of additional search fees.

---

Form PCT/ISA/210 (continuation of first sheet (1)) (July 1992)

## ANNEX TO THE INTERNATIONAL SEARCH REPORT
## ON INTERNATIONAL PATENT APPLICATION NO.

EP    9202809
SA        67186

This annex lists the patent family members relating to the patent documents cited in the above-mentioned international search report.
The members are as contained in the European Patent Office EDP file on
The European Patent Office is in no way liable for these particulars which are merely given for the purpose of information.    09/03/93

| Patent document cited in search report | Publication date | Patent family member(s) | | Publication date |
|---|---|---|---|---|
| WO-A-9104011 | 04-04-91 | AU-A- | 6409790 | 18-04-91 |
| | | EP-A- | 0493437 | 08-07-92 |
| WO-A-9111495 | 08-08-91 | DE-A- | 4003272 | 08-08-91 |
| | | AU-A- | 7211391 | 21-08-91 |
| | | EP-A- | 0514415 | 25-11-92 |
| WO-A-9111173 | 08-08-91 | EP-A- | 0513127 | 19-11-92 |
| WO-A-9114422 | 03-10-91 | AU-A- | 7668691 | 21-10-91 |
| | | EP-A- | 0526481 | 10-02-93 |
| | | US-A- | 5118494 | 02-06-92 |
| WO-A-9208447 | 29-05-92 | AU-A- | 8862991 | 11-06-92 |

EPO FORM P0479

For more details about this annex : see Official Journal of the European Patent Office, No. 12/82