IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TEVA BRANDED PHARMACEUTICAL PRODUCTS R&D, INC., TEVA RESPIRATORY, LLC, NORTON (WATERFORD) LIMITED, and NORTON HEALTHCARE LIMITED, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 12-1101-GMS |
| PERRIGO PHARMACEUTICALS CO., PERRIGO CO., and CATALENT PHARMA SOLUTIONS, LLC, | ) ) ) ) | **CONSOLIDATED** |
| Defendants. | ) ) | |

## PLAINTIFFS' ANSWERING CLAIM CONSTRUCTION BRIEF

OF COUNSEL:
David M. Hashmall
Ira J. Levy
Brian J. Prew
Andrew E. Riley
Timothy J. Rousseau
GOODWIN PROCTER LLP
The New York Times Building
New York, New York 10018
(212) 813-8800

Daryl L. Wiesen
Nicholas K. Mitrokostas
GOODWIN PROCTER LLP
Exchange Place
53 State Street
Boston, Massachusetts 02109
(617) 570-1000

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Stephanie E. O'Byrne (No. 4446)
SHAW KELLER LLP
300 Delaware Avenue, Suite 1120
Wilmington, Delaware 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
sobyrne@shawkeller.com

*Counsel for Plaintiffs Teva Branded Pharmaceutical Products R&D, Inc., Teva Respiratory, LLC, Norton Healthcare Limited, and Norton (Waterford) Limited*

Dated: December 6, 2013

## TABLE OF CONTENTS

1. Proposed Constructions for the Disputed Terms of the '152 and '445 Patents ................... 2

    (a) Perrigo Has Not Offered Any Reasoning Whatsoever in Support of Its Proposed Non-Constructions of "No Surfactant," "Pharmaceutical Suspension Aerosol Formulation" and "Substantially Free of Surfactant" ............. 2

    (b) "Substantially Completely Insoluble" Should Be Given Its Plain and Ordinary Meaning ................................................................................................... 5

    (c) The Terms "In the Amount of 11.4% w/w," "In the Amount of 0.4% w/w" and "In the Amount of 88.2% w/w" Should Not Be Limited to These Precise Amounts ........................................................................................................ 6

2. Proposed Constructions for the Disputed Terms of the '627 and '712 Patents ................... 7

    (a) None of the Terms of the '627 Patent are Means-Plus-Function Elements ............. 8

    (b) The Terms of the Claims of the '712 Patent Should Not be Limited to the Structures Disclosed by the '627 Patent ................................................................. 11

    (c) The "Pawl" Terms Should Be Construed As Proposed by Teva ........................... 12

Conclusion ................................................................................................................................... 15

# TABLE OF AUTHORITIES

**CASES**

*Aristocrat Techs. Australia PTY Ltd. v. Int'l Game Tech.*,
  709 F.3d 1348 (Fed. Cir. 2013) ............................................................................................. 2

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*,
  512 F.3d 1338 (Fed. Cir. 2008) ........................................................................................... 12

*Globetrotter Software, Inc. v. Elan Computer Grp., Inc.*,
  362 F.3d 1367 (Fed. Cir. 2004) ............................................................................................. 6

*Genzyme Corp. v. Atrium Med. Corp.*,
  212 F. Supp. 2d 292 (D. Del. 2002) ...................................................................................... 9

*Home Diagnostics, Inc. v. LifeScan, Inc.*,
  381 F.3d 1352 (Fed. Cir. 2004) ........................................................................................... 11

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
  381 F.3d 1111 (Fed. Cir. 2004) ........................................................................................... 14

*Jeneric/Pentron, Inc. v. Dillon Co.*,
  205 F.3d 1377 (Fed. Cir. 2000) ........................................................................................ 6, 7

*Laryngeal Mask Co. v. Ambu A/S*,
  618 F.3d 1367 (Fed. Cir. 2010) ........................................................................................... 12

*Lighting World, Inc. v. Birchwood Lighting, Inc.*,
  382 F.3d 1354 (Fed. Cir. 2004) ............................................................................................. 8

*Omega Eng'g, Inc. v. Raytek Corp.*,
  334 F.3d 1314 (Fed. Cir. 2003) ........................................................................................... 13

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (en banc) ........................................................................ 1, 3

*Sage Prods., Inc. v. Devon Indus., Inc.*,
  126 F.3d 1420 (Fed. Cir. 1997) ............................................................................................. 8

*Salazar v. Procter & Gamble Co.*,
  414 F.3d 1342 (Fed. Cir. 2005) ........................................................................................... 14

*SanDisk Corp. v. Kingston Tech. Co.*,
  695 F.3d 1348 (Fed. Cir. 2012) ........................................................................................... 12

*SkinMedica Inc. v. Histogen Inc.*,
  727 F.3d 1187 (Fed. Cir. 2013) ............................................................................................. 2

*U.S. Philips Corp. v. Iwasaki Electric Co.*,
  505 F.3d 1371 (Fed. Cir. 2007) ............................................................................................. 7

*Wellman, Inc. v. Eastman Chem. Co.*,
  642 F.3d 1355 (Fed. Cir. 2011) ............................................................................................. 5

**STATUTES**

35 U.S.C. § 112, ¶ 6 .................................................................................................................. 11

Perrigo's Opening Brief offers little more than circular argument that the disputed claim terms should be construed as Perrigo asserts simply because Perrigo says so. Perrigo's proposed constructions (or in some cases non-constructions) repeatedly ignore black-letter cannons of claim construction, and Perrigo urges the court to improperly read additional limitations into the claims from the specifications of the patents-in-suit.

Moreover, the "expert" declarations that Perrigo offers in support of its proposed constructions should be disregarded. As the Court is well-aware, even properly explained and supported expert declarations are of secondary importance in claim construction and are often considered by the courts to be unreliable. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005) (en banc) ("[E]xtrinsic evidence consisting of expert reports and testimony is generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence. The effect of that bias can be exacerbated if . . . the expert's opinion is offered in a form that is not subject to cross-examination.[1]").

Perrigo's expert declarations are of the least relevant and most biased sort. They consist almost entirely of long recitations of quotations from the specifications and prosecution histories of the patents-in-suit and do little more than recite the same legal arguments made by Perrigo in its brief, often in the exact same words, and without offering any insight into the actual understanding of persons of ordinary skill in the arts. Where, as here, the expert testimony offers nothing more than conclusory statements that a person of ordinary skill in the art would understand the disputed terms as Perrigo proposes, without "explain[ing] why and how" the

---

[1] Teva requested that Perrigo make Dr. Dalby and Dr. Scott available for depositions so that Teva could cross-examine them regarding the "opinions" offered in their declarations. Ex. 5 at Nov. 19, 2013 1:29 PM email. Perrigo's refusal to permit such depositions, Ex. 6 at Nov. 21 2013, 10:05 AM email, should suffice to demonstrate the weaknesses of their opinions.

Exhibits 1-4 refer to the exhibits filed with Teva's Opening Brief. Exhibits 5-9 are filed herewith. Citations to JA__ refer to the parties' Joint Appendix of Intrinsic Evidence.

1

opinions were arrived at, the testimony should be rejected in its entirety. *See SkinMedica Inc. v. Histogen Inc.*, 727 F.3d 1187, 1210 n.14 (Fed. Cir. 2013) (affirming district court's claim construction that "gave no weight to the testimony provided by SkinMedica's expert" whose offered opinions were "conclusory and incomplete; . . . lack[ed] any substantive explanation tied to the intrinsic record; and . . . appear[ed] to conflict with the plain language of the written description"); *Aristocrat Techs. Australia PTY Ltd. v. Int'l Game Tech.*, 709 F.3d 1348, 1360 (Fed. Cir. 2013) ("We agree with the district court's characterization of [the plaintiff's expert]'s declaration and see nothing improper in discounting conclusory statements as 'not useful.'").

By contrast, as explained in its Opening Brief, Teva offers straightforward constructions for the disputed terms based on well-established principles of claim construction and the clear language of the claims, specifications and prosecution histories of each of the patents-in-suit. Accordingly, Teva respectfully requests that the Court reject Perrigo's proposed constructions, and, for the reasons set out in Teva's Opening Brief and herein, construe the claims as Teva proposes.

**1.      Proposed Constructions for the Disputed Terms of the '152 and '445 Patents**

    **(a)      Perrigo Has Not Offered Any Reasoning Whatsoever in Support of Its Proposed Non-Constructions of "No Surfactant," "Pharmaceutical Suspension Aerosol Formulation" and "Substantially Free of Surfactant"**

In Teva's Opening Brief, Teva set out its proposed constructions of the terms "no surfactant," "pharmaceutical suspension aerosol formulation" and "substantially free of surfactant." These proposed constructions are consistent with the intrinsic record, and are fully supported by the specifications and prosecution histories. In contrast, Perrigo offers nothing more than conclusory statements that the terms "no surfactant," "pharmaceutical suspension aerosol formulation" and "substantially free of surfactant" should be construed to have their "ordinary and customary meaning." Perrigo thus proposes these not be construed at all. Perrigo

2

does not explain why the Court should disregard the specifications and file histories, which serve as the central aide in understanding the meaning of the claims. Rather, it simply asserts that the term "no surfactant" of claim 1 of the '152 patent should "have its ordinary and customary meaning . . . —*i.e.*, 'no surfactant' means 'no surfactant.'" D.I. 106 at 18. Similarly, it claims that the terms "pharmaceutical suspension aerosol formulation" and "substantially free of surfactant" should be construed "to have their ordinary and customary meaning at the time of the claimed invention." D.I. 106 at 19. Perrigo offers no reasoning whatsoever to support its constructions other than the simple and unsupported reason that it says so.

     Perrigo equates reading a claim term in connection with its specification and prosecution history as giving the term a "special definition." *See, e.g.*, D.I. 106 at 2, 18. That is plainly the wrong legal standard. Merely reading a term in light of the specification and file history is not giving the term a "special definition," but performing the essential steps of claim construction. *Phillips*, 415 F.3d at 1312-14. In *Phillips*, the *en banc* Federal Circuit made this plain: "Properly viewed, the 'ordinary meaning' of a claim term is its meaning to the ordinary artisan *after reading the entire patent*." *Id.* at 1321 (emphasis added). Teva is not arguing that any of the terms in the '445 and '152 patents be given a "special definition," but rather that the specification and file history of the relevant patent inform the Court as to how a person of ordinary skill in the art would understand the term being used in the claim, as the same is used in the claim.

     As set forth in Teva's Opening Brief, a person of ordinary skill in the art would understand from the intrinsic evidence that the term "no surfactant" in the '152 patent means "no added surface active agent." For example, the specification states that "[w]hen a surfactant and/or ethanol are included in the formulation, they can be added to the propellant along with the

3

albuterol sulfate." '152 patent at 6:18-20 (JA7). Thus, when the inventors intended that a surfactant (or surface active agent) not be included in the formulation, it was not "added."

Similarly, Teva's proposed constructions for the terms "pharmaceutical suspension formulation" and "substantially free of surfactant" in the '445 patent also align with the understanding that a person of ordinary skill in the art would have of such terms in view of the specifications and file histories. A person of ordinary skill in the art would understand from the intrinsic record that "pharmaceutical suspension formulation" was "a drug formulation in which the drug is in particulate form and substantially insoluble in the propellant" given the numerous references to the drug being in particulate form such that it can be "suitable for inhalation into the lung" and "minimi[zing] the solubility of the drug in the propellant." '445 patent at 2:42-51 (JA18), 3:2-12 (JA19).

A person of ordinary skill in the art would understand the term "substantially free of surfactant" in the '445 patent to mean "[a]ny surface active agent, if present, is not present in an amount sufficient to have an effect on the physical properties of the formulation" based on a reading of the specification and file history of the patent. *See, e.g.*, '445 Patent File History, Applicant Arguments/Remarks (Aug. 30, 1999) (JA2331-34, 37-39) at 6 (JA2338). Teva's proposed constructions plainly comport with the meaning ascribed to that claim term in view of the specification and file history, and Perrigo's efforts to paint them as "special definitions" is entirely misplaced.

Accordingly, for the reasons set forth in Teva's Opening Brief, "no surfactant," "pharmaceutical suspension aerosol formulation" and "substantially free of surfactant" should be construed as proposed by Teva.

4

### (b) "Substantially Completely Insoluble" Should Be Given Its Plain and Ordinary Meaning

Perrigo does not offer a construction of this term, but rather argues (in less than half a page) that the term cannot be construed. Perrigo contends, in error, that "[t]he term 'substantially completely insoluble' did not have an ordinary and customary meaning at the time of the claimed invention . . . , and nothing in the claims, specification or prosecution history of the '445 patent clearly provides any special definition for this term." D.I. 106 at 19. Perrigo's argument is supported by nothing other than the unexplained assertion in the declaration of Dr. Dalby. Dalby Declaration at 5 (¶ 12). Even if this Court were to consider indefiniteness at the claim construction phase (which it should not), Perrigo simply cannot sustain its burden of demonstrating that a claim term is not amenable to construction and "insolubly ambiguous" on such a slender reed. *See Wellman, Inc. v. Eastman Chem. Co.*, 642 F.3d 1355, 1366 (Fed. Cir. 2011) ("[B]ecause claim construction frequently poses difficult questions over which reasonable minds may disagree, proof of indefiniteness must meet 'an exacting standard.'" (citations omitted)).

Moreover, Perrigo's contention is soundly belied by the fact the term "substantially completely insoluble" has a plain and ordinary meaning, as evidenced in the specification and file history of the '445 patent, and also in the use of the *same term* without further clarification by others in the *very same* field. *See* '445 Patent File History, Notice of Allowability (May 29, 2009) (JA3931-37) at 2 (JA3935) (discussing WO1993/011744A1); *see also e.g.*, EP0775484B1 (Ex. 2) at 3:33; EP2311793A1 (Ex. 3) at 4:53; WO1993/011744A1 (Ex. 4, "the '744 PCT") at 3:1. Indeed, the '744 PCT, which is cited on the face of the '445 patent, states: "Medicaments which may be administered in aerosol formulations according to the invention include any drug useful in inhalation therapy which may be presented in a form which is *substantially completely*

5

*insoluble* in the selected propellant." '744 PCT (Ex. 4) at 2:29-3:1 (emphasis added). Perrigo and Dr. Dalby's bald assertion that the person of ordinary skill in the art would not understand this term strains credulity.

### (c) The Terms "In the Amount of 11.4% w/w," "In the Amount of 0.4% w/w" and "In the Amount of 88.2% w/w" Should Not Be Limited to These Precise Amounts

Perrigo's Opening Brief does not explain why the numeric values in the terms "in the amount of 11.4% w/w," "in the amount of 0.4% w/w" and "in the amount of 88.2% w/w" as used in claims 3-10, 12-15 and 17-20 of the '445 patent should be construed in a way that would read out of the claim the example provided in the specification of the '445 patent. *See* '445 patent at 3:39-59 (JA19). Curiously, Perrigo fails to disclose to the Court the fact that the numerical claim elements were added during prosecution with specific reference to that particular example. As discussed in Teva's Opening Brief, the applicants explained during prosecution how the claimed amounts were supported as approximations from the example. Perrigo's proposed construction, which would exclude the preferred embodiment of the '445 patent that served as the basis for the claim limitation, must be rejected because "[a] claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct." *Globetrotter Software, Inc. v. Elan Computer Grp., Inc.*, 362 F.3d 1367, 1381 (Fed. Cir. 2004) (internal quotation marks omitted).

Neither of the cases cited by Perrigo in support of its unduly and erroneously-narrowed construction support the assertion that numeric values must always be construed to mean the exact recited numeric value, with no room for approximation. Indeed, in *Jeneric/Pentron, Inc. v. Dillon Co.*, 205 F.3d 1377 (Fed. Cir. 2000), the Federal Circuit reasoned that the claim terms would be limited to the exact values after consulting the claims themselves, the specification and the prosecution history, and concluding that the claims "contain[ed] a mixture of imprecise

6

[(using the word 'about')] and precise claim limitations" and that the precise limitations in the claims "cover[ed] the outermost ranges listed in [an example in the specification]." *Id.* at 1381-82. The court further relied on evidence that the claim terms at-issue "needed to be written narrowly to avoid being anticipated or rendered obvious by [the prior art]" and that the patentee could "not rely on the precise ranges of the claims to distinguish itself from prior art during prosecution and then alter construe the ranges more broadly during an infringement action." *Id.* at 1382. Similarly, in *U.S. Philips Corp. v. Iwasaki Electric Co.*, 505 F.3d 1371 (Fed. Cir. 2007), the Federal Circuit consulted with the specification of the asserted patent before construing the recited claim limitation narrowly. *Id.* at 1376. The court examined the use of similar wording in the specification and also determined that the examples provided in the specification fit within a narrow construction of the limitation. *Id.*

The opposite conclusion, that the terms are *not* limited to the precise numerical values, is required here. A review of the intrinsic record, required even by these cases cited by Perrigo, demonstrates that the numerical terms at issue were included as approximations based on the example, not as precise values to avoid prior art. Perrigo's Opening Brief does not engage with the specification or prosecution history of the '445 patent at all. Instead, Perrigo invites error by ignoring the intrinsic record and applying as absolute a rule of claim construction that numerical values must be given their precise values, which does not exist. For the reasons set forth in Teva's Opening Brief, the Court should adopt Teva's proposed constructions of these terms.

2. **Proposed Constructions for the Disputed Terms of the '627 and '712 Patents**

Perrigo's proposed constructions for the '627 and '712 patents are riddled with inconsistencies and erroneous assumptions. In the '627 patent, Perrigo contends that some terms that use the word "means" ("drive means", display means" and "reverse rotation prevention means") are means-plus-function elements whereas other terms in the same claims that also use

7

the word "means" ("actuator means" and "rotary gear means") are not. Perrigo does not even attempt to explain this inconsistency. Perrigo goes even further and argues that the terms of the '627 and '712 patents should not only be given the same meaning, but that the terms of the '712 patent should be limited by the specification of the *unrelated* '627 patent. Perrigo's proposed constructions should be rejected.

### (a) None of the Terms of the '627 Patent are Means-Plus-Function Elements

As an initial matter, Perrigo concedes that claim terms using the word "means" are not means-plus-function limitations "if . . . used in common parlance or by persons of skill in the pertinent art to designate structure, even if the term covers a broad class of structures and even if the term identifies the structures by their function." D.I. 106 at 5 (quoting *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1359-60 (Fed. Cir. 2004)). Nor does Perrigo dispute that "where a claim recites a function, but then goes on to elaborate sufficient structure, material, or acts within the claim itself to perform entirely the recited function, the claim is not in means-plus-function format." D.I. 106 at 4 (quoting *Sage Prods, Inc. v.Devon Indus., Inc.*, 126 F.3d 1420, 1427-28 (Fed. Cir. 1997)). Here, because all of the claim terms of the '627 patent would be understood by the person of skill in the art to designate structure, either based on use of common parlance or due to other language in the claim, none of the claims should be construed to have means-plus-function elements, and all should be given their plain and ordinary meanings.

First, Perrigo does not argue that the term "actuator means" in the '627 patent is *not* a means-plus-function element. Indeed, Perrigo does not even appear to dispute that the term "actuator means" has a plain and ordinary meaning to the person of ordinary skill in the art. Perrigo concedes that "[a] person of ordinary skill in the art, therefore, would understand "actuator means" to mean something that actuates, or moves or controls, something else." D.I. 106 at 10. Because a person of ordinary skill in the art would understand the term "actuator

8

means," the Court need not construe it. Thus, Perrigo's improper attempt to add limitations to the term "actuator means" beyond its plain and ordinary meaning must be rejected.

Second, Perrigo does not argue that the term "rotary gear means" is a means-plus-function element. Indeed, Perrigo does not dispute that the claim language itself recites sufficient structure. Rather, Perrigo seeks to read out entirely the words "rotary gear means" from the claim and rewrite the claim language to improperly limit the term to structural elements in a manner that corrupts the language of the claim. For example, the claim recites a "wheel having a plurality of ratchet teeth around *a* periphery of said wheel," whereas Perrigo would have the Court limit the term to a single periphery, *i.e.*, "its periphery," where nothing in the specification or file history leads to such a conclusion. Perrigo's proposed construction will simply result in more, not less, confusion and the Court should allow these clear terms to stand on their own, without further interpretation or rewording.

Just as a person of ordinary skill in the art would understand the structures of the claimed "actuator means" and "rotary gear means," so would a person of ordinary skill in the art have no difficulty understanding the structure of the claimed "drive means," "display means" and "reverse rotation prevention means" of claim 1 of the '627 patent. *See Genzyme Corp. v. Atrium Med. Corp.*, 212 F. Supp. 2d 292, 305 (D. Del. 2002) ("What is important is not simply that [it] is defined in terms of what it does, but that the term, as the name for structure, has a reasonably well understood meaning in the art." (citation omitted)). The Court should reject Perrigo's invitation to limit these terms to the structures disclosed in the specification. Perrigo necessarily acknowledges that a person of ordinary skill in the art would not need further construction to understand the structure of the "drive means" and "display means" terms. Through its proposed constructions of the similarly worded "driver" and "display" terms of claims 1, 18 and 19 of the

9

'712 patent, which Perrigo does not contend need to be construed as means-plus-function limitations, Perrigo acknowledges that a person of ordinary skill in the art would understand the structure of the "drive means" and "display means" terms.

The intrinsic record confirms that these terms have a known structure. The specification itself describes the structure of a "drive means" as being known to persons of ordinary skill in the art. *See* '627 patent at 4:60-64 (JA31) ("I[n] known ratchet indexing mechanisms, a drive element is used to engage a one-direction tooth form of a rack."). Indeed, during prosecution of the '627 patent, the examiner rejected the pending claims on the basis of prior art that disclosed, among other things, "drive means." *See* '627 Patent File History, Office Action (May 22, 2001) (JA4169-4172) at 3 (JA4171) ("Rand discloses an MDI having dose counter including an actuator, *drive means* 11 . . . .", "Mareilli discloses an MDI having a dose counter including in fig. 5 the *drive* and preventing *means* . . . ."), "Klein discloses an MDI having a dose counter include a *drive means* 52 . . . ." (emphasis added)). And a number of other prior art references of record use the term "drive means" to reflect the drive element of a mechanical invention, further evidencing the fact that the term "drive means" has an understood meaning in the art. *See, e.g.*, U.S. Patent No. 5,740,793 (JA4193-228) at 2:4 (JA4218), 11:55 (JA4223); G.B. Patent No. 1,216,626 (JA4106-14) at 2:25 (JA4107).

Similarly, the claim itself recites that the structure of the "display means" includes "a visible array of incrementing integers on a surface thereof indexable by a single integer in response to each step of the step-wise motion of the rotary gear means," without stating a counterpart function, and that the structure of the "reverse rotation prevention means" is a

10

friction clutch."[2] '627 patent at claim 1 (JA34-35). Thus, none of the terms of the '627 patent should be construed as "means-plus-function" elements, and all should be given their plain and ordinary meaning.[3]

### (b) The Terms of the Claims of the '712 Patent Should Not be Limited to the Structures Disclosed by the '627 Patent

While both the '627 and '712 patents are directed to dose counters, they are separate patents, filed at different times, with different inventors. Although Perrigo concedes that all of the terms in claims 1, 18 and 19 of the '712 patent are not means-plus-function terms (as none of the terms use the word "means"), Perrigo asks this Court to construe these terms as limited to specific structures disclosed in the specification *of the unrelated '627 patent*. The only reason offered by Perrigo for this proposed construction is that, according to Perrigo, "the '712 patent [claims] an alleged improvement of dose counter shown in Fig[ures] 1-4 of the '627 patent." *See* D.I. 106 at 12. But all inventions are improvements on what has come before, and the courts have never applied a rule that limits any patent to statements made in a different patent, absent clear disavowal of claim scope. The fact that the '712 patent constitutes an improvement over prior art does not provide an invitation to limit a claim term of one patent to the structure of a previous patent, even one over which it improves, especially where the specifications and the claim language are conceded to be different. *See Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1358 (Fed. Cir. 2004) ("Absent a clear disavowal or contrary definition in the

---

[2] Contrary to Perrigo's bald assertion, a "friction clutch" is a structural description, as demonstrated by the common use of the term in many patents within the same field of art. *See, e.g.*, U.S. Patent No. 8,584,669 (Ex. 7) at 9:50-54; U.S. Patent No. 7,587,988 (Ex. 8) at 2:59-61; EP 2502644 A1 (Ex. 9) at 1:40-43.

[3] Even if the terms of the '627 patent were construed as means-plus-function limitations, Perrigo's proposed constructions would improperly limit the claims by reading out equivalents to the structures identified in the specification. 35 U.S.C. § 112, ¶ 6 ("such [means-plus-function term] shall be construed to cover the corresponding structure, material, or acts described in the specification and any equivalents thereof" (emphasis added)). For that reason alone, Perrigo's constructions must be rejected.

11

specification or the prosecution history, the patentee is entitled to the full scope of its claim language."). Perrigo cites no case to supports its novel legal theory, as none exists. Here, a person of ordinary skill in the art would understand what is meant in the claims by the terms "actuator," "rotary gear," "driver" and "display," and Perrigo has not argued otherwise. Thus, the Court should give these terms in the '712 patent their plain and ordinary meanings.

    **(c)  The "Pawl" Terms Should Be Construed As Proposed by Teva**

  Perrigo does not dispute in its Opening Brief that, under black-letter patent law, the indefinite article "a" in the "a pawl" term of claims 1, 18 and 19 of the '712 patent serves as an indefinite article to mean "one or more." *See* D.I. 106 at 15-17; *see also SanDisk Corp. v. Kingston Tech. Co.*, 695 F.3d 1348, 1360 (Fed. Cir. 2012); *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342-43 (Fed. Cir. 2008). And Perrigo acknowledges that the subsequent use of "[t]he term 'the pawl' . . . clearly refers back to the '[a] pawl to prevent reverse rotation of the rotary gear.'" D.I. 106 at 17. Accordingly, the phrase "a pawl to prevent reverse rotation of the rotary gear . . . wherein the pawl comprises at least two ratchet teeth" should be construed to mean "one or more pawls to prevent reverse rotation of the rotary gear . . . wherein the one or more pawls comprises at least two ratchet teeth" as proposed by Teva.

  Perrigo's Opening Brief does not justify its attempt to read additional limitations about the spacing of the ratchet teeth into the "pawl" term. The limitations that Perrigo seeks to add come from the '712 patent's discussion in its specification of two different figures. '712 patent at 5:64-6:5 (JA49) (dealing with the embodiment of Figure 5), 7:57-8:14 (JA50) (dealing with Figure 8). Perrigo's Opening Brief does nothing more than cite these sections of the '712 patent's specification. But using these examples to support Perrigo's proposed additional construction would improperly import these limitations from a preferred embodiment of the specification. *See Laryngeal Mask Co. v. Ambu A/S*, 618 F.3d 1367, 1372 (Fed. Cir. 2010) ("We

12

do not generally limit claims to the preferred embodiment."). Indeed, Perrigo points out that the specification of the '712 patent states that only "*[t]ypically*, one and only one, of ratchet teeth 64, 66 on pawl 60 ever engages with the ratchet wheel," D.I. 106 at 17 (quoting '712 patent at 6:4-6 (JA49)) (emphasis added), which shows that the specification contemplates that this is merely a preferred embodiment and that the ratchet teeth may engage simultaneously.

Nor does the prosecution history cited by Perrigo support importing these limitations into the "pawl" term. In order for the prosecution history to limit the "pawl" term, "the alleged disavowing actions or statements made during prosecution [must] be both clear and unmistakable." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1326 (Fed. Cir. 2003). Here, there is no clear and unmistakable statement in the prosecution history that the ratchet teeth of the pawl must be "radially spaced less than the distance between adjacent teeth on the wheel of the rotary gear such that one and the same tooth of the pawl engages with the ratchet teeth of the wheel of the rotary gear following each step of the step-wise rotary motion of the rotary gear." Indeed, there is no statement by the applicants whatsoever in the prosecution history regarding a required spacing of the ratchet teeth of the pawl.

Moreover, the passage cited by Perrigo in its Opening Brief supports Teva's construction. There, the applicants merely clarified that the Parker prior art reference cited by the examiner only had one ratchet tooth that could prevent reverse rotation, not "at least two" such ratchet teeth as required by the claim. '712 File History, Applicant Remarks/Argument (Oct. 11, 2011) (JA4665-4674) at 7 (JA4666). As shown in the annotated figure from the Parker prior reference that the applicants provided in their remarks, reproduced below, only one of the pawl teeth there, labeled by the '712 patent applicants as "B," functions to prevent reverse rotation. The remaining pawl tooth "A" never prevents reverse rotation, but instead "merely serves to limit the

13

engagement of the pawl teeth with a single tooth on the ratchet wheel 16," and "pawl tooth 'C' permits reverse rotation." *Id.* The examiner agreed with applicants that, properly understood, the Parker reference only had one tooth that prevented reverse rotation.[4] '712 File History, Notice of Allowability (Nov. 7, 2011) (JA4681-88) at 3 (JA4682).



Figure 1: '712 File History, Applicant Remarks/Argument
(Oct. 11, 2011) (JA4665-74) at 7 (JA4666).

Accordingly, as neither the claims, specification nor prosecution history requires that in every embodiment of the claimed inventions "the at least two ratchet teeth of the pawl are radially spaced less than the distance between adjacent teeth on the wheel of the rotary gear such that one and the same tooth of the pawl engages with the ratchet teeth of the wheel of the rotary

---

[4] Moreover, even if the examiner had stated a contrary understanding of the "pawl" term, this would not be a sufficient reason to read additional limitations into the term as "it is the applicant, not the examiner, who must give up or disclaim subject matter that would otherwise fall within the scope of the claims." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1124 (Fed. Cir. 2004). This is especially true with respect to statements made by an examiner, as here, in Reasons for Allowance, as the applicants do not have an opportunity to respond. *See, e.g., Salazar v. Procter & Gamble Co.*, 414 F. 3d 1342, 1343 (Fed. Cir. 2005) ("Because the district court erred in using the patent examiner's Reasons of Allowance to exclude nylon from the scope of the claim term 'elastic,' this court vacates the grant of summary judgment and remands.").

14

gear following each step of the step-wise rotary motion of the rotary gear," the Court should reject Perrigo's proposed construction.

## CONCLUSION

For all the foregoing reasons, the Court should adopt all of Teva's proposed constructions of the disputed claim terms.

| | |
|---|---|
| | /s/ Stephanie E. O'Byrne |
| OF COUNSEL: | John W. Shaw (No. 3362) |
| David M. Hashmall | Karen E. Keller (No. 4489) |
| Ira J. Levy | Stephanie E. O'Byrne (No. 4446) |
| Brian J. Prew | SHAW KELLER LLP |
| Timothy J. Rousseau | 300 Delaware Avenue, Suite 1120 |
| Andrew E. Riley | Wilmington, Delaware 19801 |
| GOODWIN PROCTER LLP | (302) 298-0700 |
| The New York Times Building | jshaw@shawkeller.com |
| 620 Eighth Avenue | kkeller@shawkeller.com |
| New York, NY 10018 | sobyrne@shawkeller.com |
| (212) 813-8800 | |
| | *Counsel for Plaintiffs Teva Branded* |
| Daryl L. Wiesen | *Pharmaceutical Products R&D, Inc., Teva* |
| Nicholas K. Mitrokostas | *Respiratory, LLC, Norton Healthcare Limited,* |
| GOODWIN PROCTER LLP | *and Norton (Waterford) Limited* |
| Exchange Place | |
| 53 State Street | |
| Boston, MA 02109 | |
| (617) 570-1000 | |

Dated: December 6, 2013

15