IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TEVA BRANDED PHARMACEUTICAL PRODUCTS R&D, INC., TEVA RESPIRATORY, LLC, NORTON (WATERFORD) LIMITED, and NORTON HEALTHCARE LIMITED, <br><br> Plaintiffs, <br><br> v. <br><br> PERRIGO PHARMACEUTICALS CO., PERRIGO CO., and CATALENT PHARMA SOLUTIONS, LLC, <br><br> Defendants. | Civil Action No. 12-1101-GMS (Consolidated) |

### ORDER CONSTRUING THE TERMS OF
### U.S. PATENT NOS. 7,105,152, 7,566,445, and 8,132,712

After having considered the submissions of the parties and hearing oral argument on the matter, IT IS HEREBY ORDERED, ADJUDGED, and DECREED that, as used in the asserted claims of U.S. Patent Nos. 7,105,152 (the "'152 patent"), 7,566,445 (the "'445 patent"), and 8,132,712 (the "'712 patent"):[1]

#### The '152 patent

1. **The term "no surfactant" is given its plain and ordinary meaning and construed to mean "no surfactant."**

---

[1] In their claim construction briefing, the parties sought construction of claim terms from U.S. Patent Nos. 7,105,152 (the "'152 patent"), 7,566,445 (the "'445 patent"), 6,446,627 (the "'627 patent"), and 8,132,712 (the "'712 patent"). (D.I. 97; D.I. 105-06; D.I. 120-22.) After months of negotiations, however, the parties notified the court in a letter dated March 24, 2014 that they no longer seek construction of the claim terms from U.S. Patent No. 6,446,627 (the "'627 patent") and claim 5 of U.S. Patent No. 8,132,712 (the "'712 patent"). (D.I. 148.)

The plaintiffs, Teva Branded Pharmaceutical Products R&D, Inc., Teva Respiratory, LLC, Norton (Waterford) Limited, and Norton Healthcare Limited ("Teva") contend that "no surfactant" should be construed to mean "no *added* surface active agent" because, in disclosing some formulations, the '152 patent expressly states that a surfactant is added to the formulation. (D.I. 105 at 4 (emphasis in original).) Thus, Teva argues, formulations in the '152 patent have "no surfactant" because "the applicants indicated that they were not *adding* any surfactant." (*Id.* (emphasis in original).) Teva also argues that the applicants distinguished formulations in the '152 patent with "no surfactant" from prior art references that taught that a surfactant was required. (*Id.*) The defendants, Perrigo Pharmaceuticals Co., Perrigo Co., and Catalent Pharma Solutions, LLC ("Perrigo"), in turn, contend that "no surfactant" should be given its plain and ordinary meaning. (D.I. 106 at 17-18.) Perrigo further contends that, because "no surfactant" appears in a composition claim, not a process claim, inserting "added" into the construction would be improperly importing a process limitation from the specification. (D.I. 121 at 2.) The court concludes that Perrigo is correct.

First, since the parties agreed at the *Markman* Hearing that "surfactant" and "surface active agent" are synonyms, (D.I. 126 at 33:4-6; 34:14-17), there is no need to substitute one for the other. Second, as Perrigo contends, claim 1 is indeed a composition claim and the portions of the specification that discuss the adding of surfactant, ('152 patent, 6:14-20), merely describe ways to make the formulations of the invention. *See Sanofi-Aventis U.S. LLC v. Sandoz, Inc.*, 345 Fed. Appx. 594, 597 (Fed. Cir. 2009) ("Thus, the examples illustrate how to obtain optically pure oxaliplatin. They do not clearly and unmistakably disclaim any process, and they do not justify reading a process limitation into a composition claim.") These portions of the specification do not

amount to a requirement that where surfactant is not present, this must be because it was not added. Likewise, the example in the specification that discusses a formulation with "no surfactant" does not necessarily require that the surfactant is absent because it was not added. *See* '152 patent, 8:16-24. This example focuses on the formulation as being without surfactant and makes no mention of the process through which the surfactant came to be absent. *See Sanofi-Aventis*, 345 Fed. Appx at 598 (explaining that the specification does not justify reading a process limitation into a composition claim where it focuses on the property of the composition and not the process used to obtain the property). Likewise, nothing in the prosecution history requires limiting formulations that contain no surfactant to formulations in which no surfactant was added.

### The '445 patent

1. **The term "pharmaceutical suspension aerosol formulation" is construed to mean "[a] drug formulation in which the drug is in particulate form and substantially insoluble in the propellant."**

Teva proposes that the term "pharmaceutical suspension aerosol formulation" be construed to mean "[a] drug formulation in which the drug is in particulate form and substantially insoluble in the propellant". (D.I. 105 at 5-6.) This is the same construction that the parties agreed that the same phrase in the '152 patent should be given. (D.I. 97 at A-1.) Perrigo argues, however, that the term should be given its ordinary and customary meaning because nothing in the claims, specification, or prosecution history advances any special definition for this term. (D.I. 106 at 23.) For the following reasons, the court adopts Teva's proposed construction.

As the Federal Circuit has instructed, it is entirely appropriate to construe a term in light of the intrinsic record and doing so is not tantamount to giving a term a special definition. *See, e.g., Phillips v. AWH Corp.*, 415 F.3d 1303, 1321 (Fed. Cir. 2005) ("Properly viewed, the 'ordinary

meaning' of a claim term is its meaning to the ordinary artisan after reading the entire patent."). The specification of the '445 patent states repeatedly that the aerosol formulations consist of drugs in "particulate" form. *See, e.g.*, '445 patent, 1:51-2:2 (Stating that the "first aspect of the present invention" provides "a medicinal aerosol formulation comprising a particulate medicament", that the "second aspect of the present invention" provides "a medicinal aerosol formulation, comprising one or more particulate medicaments", and that the "third aspect of the present invention" provides "a pharmaceutical aerosol formulation which comprises particulate medicament".) The specification also indicates that substantial insolubility is another property characterizing the drugs. *See, e.g.*, '445 patent, 2:47-51 ("Medicaments which may be administered in aerosol formulations according to the invention include any drug useful inhalation therapy which may be presented in a form which is substantially completely insoluble in the selected propellant."); 3:9-10 ("Preferred are those compounds which are also substantially insoluble in the co-solvent.").[2] A construction that specifies that the drug formulation should be both in particulate form and substantially insoluble is thus consistent with the intrinsic record.

2. **The term "substantially free of surfactant" is construed to mean "any surface active agent, if present, is not present in an amount sufficient to have an effect on the physical properties of the formulation."**

Teva proposes that the court construe "substantially free of surfactant" as "any surface active agent, if present, is not present in an amount sufficient to have an effect on the physical

---

[2] Perrigo argues that Teva's proposed construction would render the claims internally inconsistent because "Teva does not attempt to reconcile its term 'substantially insoluble' with the actual claim language 'substantially completely insoluble.'" (D.I. 121 at 3.) The court agrees with the explanation that Teva provided during the *Markman* Hearing: "We are talking about degrees of solubility. And there is a narrowing function that goes on, both communicating the minimization in solubility in the propellant, as is discussed in the specification." (D.I. 126 at 43:1-5.) A construction employing the descriptor "substantially insoluble" is not inconsistent with the claim language stating "substantially completely insoluble." Both descriptors convey that the drug should be minimally insoluble.

properties of the formulation." (D.I. 105 at 6.) Teva argues that this construction is appropriate because, in both the specification and the prosecution history, the patentees distinguish the invention from prior art formulations in which surfactants were used to affect the physical properties of the formulation. (*Id.*) In contrast, Perrigo suggests that the term be given its ordinary and customary meaning because nothing in the intrinsic record suggests a special definition for the term. (D.I. 106 at 19.) The court concludes that Teva's proposed construction is correct.

In the specification, the patentees distinguish the formulations claimed in the '445 patent from those in which surfactants are used to influence the physical properties of the formulation. *See* '445 patent, 1:31-36 ("However, historically medicinal suspension aerosols have contained a surfactant e.g. U.S. Pat. No. 30,014,844, as it was considered that the use of a surfactant was necessary to prevent agglomeration of particles, to prevent adhesion to the sides of the canister, and to aid valve lubrication and prevent valve sticking.") Likewise, in the prosecution history, the applicants also distinguished the '445 patent's claims from prior art on the basis that the prior art used surfactants to influence the homogeneity and stability of formulations. (D.I. 122, Ex. 9A, Amendment of U.S. Patent No. 7,566,445 at JA2338 ("The invention of claims 1-22 differ from Purewal by virtue of their requirement that the formulation be substantially free of surfactant. In fact, Purewal (column 3, lines 5-9) indicates that the presence of <u>increased</u> amounts of solubilized surfactant allows the preparation of stable, homogenous suspensions of drug particles and assists in obtaining stable solution formulations of certain drugs.").) All of this suggests that "substantially free of surfactant" within the meaning of the '445 patent is meant to indicate that

any surfactant in the formulation is not present at levels capable of affecting the formulations physical properties.[3]

### 3. The term "substantially completely insoluble" is construed to have its plain and ordinary meaning.

Teva proposes that the court need not construe this term because a person of ordinary skill in the art would understand from both the intrinsic record and the use of the term in fields related to the '445 patent that "a drug which is 'substantially completely insoluble' in a propellant has a low enough solubility so as to form a suspension as opposed to a solution." (D.I. 105 at 9-10.) In contrast, Perrigo argues that the term cannot be construed and is indefinite because a person of ordinary skill in the art would not understand the term "substantially completely insoluble" within the context of the intrinsic record.[4] (D.I. 106 at 19.) The court finds Teva's arguments convincing and adopts its proposed construction.

As Teva points out, both the specification and the file history of the '445 patent make clear to a person of ordinary skill in the art that "substantially completely insoluble" means that the solubility of the drug must be such that the drug forms a suspension not a solution. For instance, each of the claims of the '445 patent in which "substantially completely insoluble" appears describes a "pharmaceutical suspension aerosol formulation" which "consists of salbutamol

---

[3] In addition to the fact that the intrinsic record supports Teva's proposed construction, the case law also indicates that, as Teva argues, (D.I. 105 at 8), "'substantially' means 'approximate' instead of 'perfect.'" *See, e.g., Playtex Prods., Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 907 (Fed. Cir. 2005) ("'The term substantial is a meaningful modifier implying approximate, rather than perfect.'"); *Cree, Inc. v. SemiLEDs, Corp.*, No. 10-866-RGA, 2012 U.S. Dist. LEXIS 39582, at *56 (D. Del. Mar. 21, 2012) ("Federal Circuit law is clear that 'substantially' is not prohibitively indefinite: 'the term substantially is a meaningful modifier implying approximate, rather than perfect.'") This further suggests that "substantially free of surfactant" means that surfactant may be present in the formulations described in the '445 patent.

[4] Perrigo relies partly on the representation of its expert, Dr. Dalby, that a search of non-patent literature yielded no results for the term. (D.I. 106 at 19; D.I. 121 at 5.)

6

sulfate, ethanol in an amount of 10% w/w to 15% w/w, and 1,1,1,2-tetrafluoroethane, wherein salbutamol sulfate is substantially completely insoluble in the 1,1,1,2-tetrafluoroethane". *See* '445 patent, 4:1-8, 13-20, 47-54; 5:3-10. This context suggests that the suspension is formed because of salbutamol sulfate's substantial complete insolubility. In addition, the '445 patent's file history connects the fact that "the bronchodilator is 'substantially completely insoluble' in the propellant" with the fact that "the aerosol formulation is in the form of a suspension as opposed to a solution." (D.I. 122, Ex. 1, Amendment/Request for Reconsideration (Nov. 25, 2008) (JA2509-22) at 10 ("To further highlight this distinction, Claim 23 recites that the bronchodilator is 'substantially completely insoluble' in the propellant. In addition to this recitation, the three new independent claims 39, 46 and 47 also recite that the aerosol formulation is a 'suspension' aerosol formulation (support for which is found in bottom of page 5, for example). Thus, the present claims now clearly point out that the aerosol formulation is in the form of a suspension as opposed to a solution.").) Furthermore, the use of the same term in fields related to the '445 patent also supports the idea that "substantially completely insoluble" means forming a suspension, not a solution. (*See, e.g.*, EP 0 775 484 B1, "Surfactant free aerosol formulations containing beclomethsone dipropionate", at 3:32-34 ("Additional medicaments may be selected from any other suitable drug useful in inhalation therapy and which may be presented in a form which is substantially completely insoluble in the selected propellant."); EP 2 311 793 A1, "Crystalline levosalbutamol sulphate (Form II)", at 4:51-53 ("Medicaments may be selected from suitable combinations of the medicaments mentioned hereinbefore or may be selected from any other suitable drug useful in inhalation therapy. Preferably, the medicament may be presented in a form which is substantially completely insoluble in the selected propellant."); WO 93/011744A1 at 2:29-3:1 ("Medicaments

7

which may be administered in aerosol formulations according to the invention include any drug useful in inhalation therapy which may be presented in a form which is substantially completely insoluble in the selected propellant.").)

Ultimately, the court concludes that a person of ordinary skill in the art reading "substantially completely insoluble" in the context of the '445 patent, and with the benefit of the subject matter knowledge that such a person is presumed to possess, would understand what "substantially completely insoluble" means. Thus, the court gives the term its plain and ordinary meaning.

### 4. The term "in the amount of 11.4% w/w" is construed to mean "in the amount of 11.4% w/w."

Teva argues that the percentage amount is approximate because the patentees stated in the prosecution history that the amounts were derived from "rounding". (D.I. 105 at 10-11 (quoting Application No.: 08/999,752 Amendment (Nov. 25, 2008) at JA2514 ("With regards to new claims 40 and 42-44, the percent amounts of concentration in mixture by weight (w/w) were calculated using the weights of the ingredients in the example in p. 5 and rounding to the nearest tenth for consistency.").).) Perrigo, on the other hand, focuses solely on the claim language and contends that "[a] person of ordinary skill in the art would read and understand the % w/w terms exactly as they are written because they are clear numeric values and the patent applicant chose to exclude any language of approximation from the claims." (D.I. 106 at 20.) The court concludes that Perrigo is correct.[5]

---

[5] At the *Markman* Hearing, Perrigo's counsel modified Perrigo's construction to include the range in the prosecution history in order to include the example provided at 3:39-59 of the specification. (D.I. 126 at 60:14-61:23.) Teva rejected Perrigo's modified construction, arguing that only a construction including the word "approximately" could capture the fact that a person of skill in the art would read the "in the amount of 11.4% w/w" as a range. (*Id.* at 62:1-23 (Stating, among other things, that Perrigo's modified construction "sets an upper limit as that approximate

8

The percentage amount must be limited to those recited precisely in each of the claims because there are no broadening words such as "approximately" or "about" present in the claim that indicate any intent of the patentees to expand the percentage amount beyond the 11.4 w/w stated. '445 patent, 4:23-6:11. Accordingly, Teva's attempt to expand the scope of the claim language by inserting "approximately" where it is not present, and where there is not any indication that it is meant to be present, must fail. *See U.S. Philips Corp. v. Iwasaki Elec. Co.*, 505 F.3d 1371, 1376 (Fed. Cir. 2007) (Affirming district court's construction of a claim as including only the exact numbers claimed because there is "no reason for treating them as anything other than the ordinary numbers that they are" where "[t]he limitation does not refer to either bound as a range, an order of magnitude, or an approximation.); *Jeneric/Pentron, Inc. v. Dillon Co.*, 205 F.3d 1377, 1381 (Fed. Cir. 2000) (Affirming district court's ruling limiting a claim to the precise amounts set forth within it because "[w]ithout broadening words that ordinarily receive some leeway...the precise weight ranges of claim 1 do not 'avoid a strict numerical boundary to the specified parameter'[.]")

**5. The term "in the amount of 0.4% w/w" is construed to mean "in the amount of 0.4% w/w."**

For the same reasons that the court provides in the construction of "in the amount of 11.4% w/w", the court adopts Perrigo's construction and construes "in the amount of 0.4% w/w" to mean "in the amount of 0.4% w/w."

**6. The term "in the amount of 88.2% w/w" is construed to mean "in the amount of 88.2% w/w."**

---

value, but doesn't take into account...what one does in the real world with these numbers is provide ranges to the FDA. And that's why 'approximately' captures the essence of what the invention talks about....").)

For the same reasons that the court provides in the construction of "in the amount of 11.4% w/w", the court adopts Perrigo's construction and construes "in the amount of 88.2% w/w" to mean "in the amount of 88.2% w/w."

### The '712 patent

1. **The term "actuator" is construed to mean "a mechanical device that moves or controls the drive means."**

In a letter to the court dated January 14, 2014, the parties stipulated that "actuator means" within the now-dismissed '627 patent should be construed as "a mechanical device that moves or controls the drive means".[6] (D.I. 129.)

Claims 1, 18, and 19 of the '712 patent state that the invention claimed is, among other things, "an actuator" as well as "a driver for driving the rotary gear in a step-wise fashion in response to displacement of the actuator". See '712 patent, 9:30-32; 10:33-36; 10:49-52. This language is nearly identical to claim 1 of the '627 patent, which states that the invention claimed consists of an "actuator means" as well as a "drive means for driving said rotary gear means in step-wise fashion in response to displacement of said actuator means". See '627 patent, 10:52-58. Thus, the court concludes that a person of ordinary skill in the art would understand "actuator means" within the '627 patent and "actuator" within the '712 patent to have the same meaning. Accordingly, the court construes "actuator" in the '712 patent to mean "a mechanical device that moves or controls the drive means."

2. **The term "a rotary gear...comprising a wheel mounted on a spindle which wheel having a plurality of ratchet teeth around its periphery" is construed to have its plain and ordinary meaning.**

---

[6] This construction is nearly identical to the construction, "a mechanical device for moving or controlling the drive means", that Perrigo originally proposed. (D.I. 106 at 10-11).

Teva proposes that this term be given its plain and ordinary meaning, (D.I. 105 at 13). Perrigo contends, however, that this term should be construed to mean "a wheel mounted on a spindle, the wheel having a plurality of ratchet teeth around its periphery." (D.I. 106 at 13-14.) In response, Teva argues that Perrigo's construction is entirely too narrow because, in limiting the meaning of "rotary gear" to only the three components explicitly recited in the claim, Perrigo's construction ignores the broadening effect of the word "comprising". (D.I. 105 at 14; D.I. 126 at 78:12-18.) For the following reasons, the court concludes that Teva is correct.

Claims 1, 18, and 19 of the '712 patent each describe the rotary gear as "comprising a wheel mounted on a spindle which wheel having a plurality of ratchet teeth around its periphery". *See* '712 patent, 9:30-32; 10:36-38, 52-54. As Perrigo aptly observes, (D.I. 106 at 13-14), this language closely parallels that of the '627 patent in which the rotary gear means is described as "having a wheel mounted on a spindle said wheel having a plurality of ratchet teeth around a periphery of said wheel". *See* '627 patent, 10:52-58. A crucial difference in the claim language, however, is the presence of the word "comprising" in only the '712 patent. As the Federal Circuit has frequently repeated, in the patent claim context, the term comprising means "including but not limited to." *See, e.g., Lee v. Mike's Novelties, Inc.*, No. 2013-1049, 2013 U.S. App. LEXIS 23400, *10 (Fed. Cir. Nov. 21, 2013) (Stating that "[w]e have established that '[i]n the patent claim context, the term 'comprising' is well understood to mean 'including but not limited to[]'" and concluding that "[b]ecause both independent claims 1 and 11 use the term 'comprising,' they read on devices that include additional features beyond those claimed."); *see also CIAS, Inc. v. Alliance Gaming Corp.*, 504 F.3d 1356, 1360 (Fed. Cir. 2007) (Explaining that "patent claims 'use the signal comprising, which is generally understood to signify that the claims do not exclude the

11

presence in the accused device or method of factors in addition to those explicitly recited.'") (citation omitted). Thus, the presence of the word "comprising" within the claims of the '712 patent cautions against cabining the "rotary gear" to only the features explicitly recited in the claims.

Ultimately, there is no indication here that a person of skill in the art would assign this term a specialized meaning or that a jury would not be able to understand the plain language of this term. Indeed, the parties do not appear to disagree that these terms have a plain and ordinary meaning. (*See, e.g.*, D.I. 126 at 66:1-8.) Thus, the court sees no need to further construe this term and assigns it its plain and ordinary meaning. *See Phillips*, 415 F.3d at 1314 ("In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.")

### 3. The term "a driver for driving said rotary gear in step-wise fashion in response to displacement of the actuator" is construed to have its plain and ordinary meaning.

Teva contends that this term has a plain and ordinary meaning to a person of ordinary skill and thus, requires no further construction. (D.I. 105 at 19.) Perrigo proposes, however, that this term be construed as "a transverse hook element…mounted between two arms 52, 53…the bases of which are conjoined to the boss portion 42…[t]he transverse hook element [being] dimensioned and oriented to engage with ratchet teeth 61 formed around the periphery of ratchet wheel 60 to rotate it in a forward direction; a transverse hook element 351 mounted between a pair of arms 352, 353, which are joined at their bases by a web…[t]he web [being] connected to the boss portion 342 of the actuator 341; the ratchet tooth-engaging element is supported at both ends by a support

12

arm 752, 753; drive pawl 451; drive pawl hook element 551; drive pawl 550; drive pawl 650; and/or drive pawl 751." (D.I. 106 at 14.) This construction is identical to the construction that Perrigo sought for the term "a driver for driving the rotary gear in a step-wise fashion in response to displacement of the actuator" within the '627 patent prior to the parties' stipulation dismissing the '627 patent. (D.I. 97.) Perrigo suggests that the two terms should be construed the same way because "[t]he portions of the specification of the '712 patent related to [the driver] are nearly the same as the corresponding portions of the specification of the '627 patent. A person of ordinary skill in the art would therefore read and understand these terms to have the same meanings." (D.I. 106 at 14 (citations omitted).)

It is certainly the case that the '627 patent is the basis for figures 1-4 in the '712 patent. (D.I. 122, Ex. 11C, June 10, 2011 Office Action at JA004660 (stating that "[t]he applicant has generally acknowledged that the instant invention is an improvement on the existing prior art and....It is noted that Bowman et al. (US 6,446,627) is the US version of WO 98/28033 that is the basis for prior art figures 1-4.").) Overall, the specifications of the two patents are the same. (*Compare* D.I. 122, Ex. 3 *to* D.I. 122, Ex. 4.) Contrary to Perrigo's argument that "[t]he claims line up", (D.I. 126 at 105:14-15), however, the claims of the two patents are not identical. Most importantly, there is no statement that Perrigo can point to within the '712 patent that states or suggests that the patentees intended to disavow any claim scope or limit the claims to the structures in the '627 patent. Indeed, the statement in the prosecution history that observes that figures 1-4 of the '712 patent are derived from '627 does not amount to a clear disavowal. Thus, the court declines to limit this term to the structures to which the '627 patent's drive term should be limited. *See Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1358 (Fed. Cir. 2004) ("Absent a

clear disavowal or contrary definition in the specification or the prosecution history, the patentee is entitled to the full scope of its claim language.") Since neither party has argued that a person of skill in the art would understand this term to have anything other than its plain and ordinary meaning, the court gives this term its plain and ordinary meaning. *See Phillips*, 415 F.3d at 1314.

4. **The term "a pawl to prevent reverse rotation of the rotary gear...wherein the pawl comprises at least two ratchet teeth each for engaging with the ratchet teeth of the wheel to prevent reverse rotation of the rotary gear, the at least two ratchet teeth being radially spaced such that one of the at least two ratchet teeth of the pawl engages with the ratchet teeth of the wheel following each step of the step-wise rotary motion of the rotary gear" is construed to mean "a pawl having at least two ratchet teeth each for engaging with the ratchet teeth of the wheel to prevent reverse rotation of the rotary gear, the at least two ratchet teeth of the pawl being radially spaced less than the radial distance between adjacent teeth on the wheel of the rotary gear such that one and the same tooth of the pawl engages with the ratchet teeth of the wheel of the rotary gear following each step of the step-wise rotary motion of the rotary gear."**

Teva proposes that this term be construed as "one or more pawls [to prevent reverse rotation]...[wherein] one or more pawls [comprises at least two ratchet teeth]." (D.I. 105 at 14-15.) Perrigo, on the other hand, suggests that the correct construction is "a pawl having at least two ratchet teeth each for engaging with the ratchet teeth of the wheel to prevent reverse rotation of the rotary gear, the at least two ratchet teeth of the pawl being radially spaced less than the radial distance between adjacent teeth on the wheel of the rotary gear such that one and the same tooth of the pawl engages with the ratchet teeth of the wheel of the rotary gear following each step of the step-wise rotary motion of the rotary gear." (D.I. 106 at 16-17.)

In essence, the parties disagree on two matters regarding this term. First, the parties differ regarding whether "a pawl" and "the pawl" should be construed as a single pawl or as one or more pawls. Teva advocates the latter construction because, as a matter of law, "the use in a patent claim of 'the indefinite articles a or an means one or more.'" (D.I. 105 at 15-16.) Perrigo argues

that both the specification and the prosecution history of the '712 patent establish that the single pawl comprising "at least two ratchet teeth" is the improvement that the '712 patent offers over the dose counter claimed in the '627 patent. (D.I. 106 at 15-17.) Thus, Perrigo contends, the "at least two ratchet teeth" must be on the same pawl. (*Id.*) Second, the parties disagree regarding the requirements of the radial spacing mentioned in the term. Perrigo argues that the construction of "at least two ratchet teeth" must explicitly provide that the ratchet teeth should be spaced such that only one of the ratchet teeth engages the rotary gear's wheel following each step-wise rotation. (D.I. 106 at15-17.) Teva counters that the term already describes how the "at least two ratchet teeth" must be spaced relative to each other and additional requirements would improperly import limitations from the figures in the specification. (D.I. 105 at 16; D.I. 120 at 12.) The court concludes that Perrigo has the right of both issues.

Although, as Teva argues, "a" or "an" ordinarily indicate one or more, there is a key exception. As the Federal Circuit has explained, an exception to the rule "arises where the language of the claims themselves, the specification, or the prosecution history necessitate a departure from the rule." *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342-43 (Fed. Cir. 2008) (citations omitted). Here, both the specification and the prosecution history suggests that a departure from the rule is necessary because what is contemplated is a single pawl with at least two teeth.

The specification of the '712 patent explains that "[t]here is a requirement in the art…for a dose counter with a reduced failure rate." *See* '712 patent, 4:44-45. The specification continues on to explain that, in order to address this need, "[t]he counter of the present invention thus provides a pawl having at least two teeth…." *Id.* at 4:64-65. To clarify what the nature of the

15

pawl was prior to the improvement, the specification states that "[t]he dose counter of the present invention is based on that set out in FIGS. 3 and 4 described hereinabove except that the pawl 60 has been modified." (*Id.* at 5:31-33.) Figure 4 shows a single pawl, labeled 60, consisting of a single, rectangular structure to which there are no ratchet teeth attached. It is this single pawl that is being modified by the addition of at least two ratchet teeth. Thus, from the outset, the specification makes clear that the improvement contributed by the '712 patent is to attach at least two ratchet teeth to a single pawl. In addition to the statements in the specification, the prosecution history also indicates that the improvement consists of a single pawl by referring repeatedly to "the pawl" when describing the two ratchet teeth engage with the ratchet teeth of the wheel. (*See, e.g.*, D.I. 122, Ex. 11E, Notice of Allowance and Fee(s) Due (Nov. 7, 2011) at JA004681 ("(1) <u>Each</u> of the two ratchet teeth of the pawl can be engaged with the ratchet teeth of the wheel…(2) <u>One</u> of the two ratchet teeth can of the pawl is to be engaged with the ratchet teeth of the wheel in a given step.") (Emphasis in original.)

Just as Perrigo's understanding that the ratchet teeth should be on a single pawl is correct, so too is its understanding regarding the spacing of the pawls and the importance of incorporating this understanding into the construction. The specification states that "it would be inappropriate to provide a precise numerical value" for the radial spacing because "[t]he spacing will clearly depend on the precise nature of the components used in the inhaler". *See* '712 patent, 8:7-10. The specification goes to explain, however, that "the radial spacing will be less than the radial distance between adjacent teeth 32 on the wheel of the rotary gear 30." (*Id.* at 8:10-13.) This spacing of the first and second teeth on the pawl is essential "to accommodate different tolerance levels in the components of the inhaler." (*Id.* at 8:3-7.) Perrigo's proposed construction incorporates this

16

crucial understanding of how the ratchet teeth are spaced in relation to the teeth on the rotary gear's wheel.

Perrigo's proposed construction also ensures that the claim is not construed to encompass pawls comprising two ratchet teeth such the both ratchet teeth are capable of engaging the ratchet wheel at the same time. In the Notice of Allowance, the examiner made clear that the fact that only one of the ratchet teeth on the pawl described in the '712 patent could engage the ratchet wheel was crucial to distinguishing the '712 patent from prior art. (D.I. 122, Ex. 11E at JA004682 ("One of the two ratchet teeth of the pawl is to be engaged with the ratchet teeth of the wheel in a given step. This limitation distinguishes over such art as Keeton (US 7,252,065), Nicoletti (US 6,175,994), Nakaya et al. (US 5,485,971) and Chiang (US 2011/0220450) all of which teach at least two ratchet teeth on a pawl. In each case, the two ratchet teeth engage the wheel simultaneously, mainly for strength and redundancy.").) Consistent with this, the specification of the '712 patent expressly states that "[t]ypically, one, and only one, of ratchet teeth 64, 66 on pawl 60 ever engages with the ratchet wheel." *See* '712 patent, 6:4-6.

5. **The term "display coupled to the rotary gear...having a visible array of incrementing integers on a surface thereof indexable by a single integer in response to each step of the step-wise rotary motion of the rotary gear" is construed to have its plain and ordinary meaning.**

Teva argues that this term should be given its plain and ordinary meaning. (D.I. 105 at 19-20.) Perrigo, however, advances the construction that it suggested the display term within the now-dismissed '627 patent be given: "a flexible tape 68 wound around the second hollow axle 67 which serves as a supply spool and passes to the first hollow axle 63 which serves as a take up spool... [t]he surface of the tape 68 is marked with a progression of descending numbers which

denotes the number of doses remaining in the aerosol canister; and/or 2) flexible tape display 368." (D.I. 106 at 8-9.) For the same reasons that the court declined to construe the '712 patent's drive term identically to the drive term within the '627 patent, the court also declines to give the two patents' display terms the same construction. The court assigns this term its plain and ordinary meaning.

### 6. The term "the pawl" is construed to have its plain and ordinary meaning.

For the same reasons that the court construed "a pawl" to mean exactly that—in other words, a single pawl—the court also gives "the pawl" its plain and ordinary meaning.

Dated: May 12, 2014

CHIEF, UNITED STATES DISTRICT JUDGE