EXTERNAL COUNSEL ONLY

(c)     *CFC-Free Aerosols: The Final Hurdle*, Manufacturing Chemist (1992), PTX 271 at PER(Albu)034648 ("So with CFCs on the way out, manufacturers are turning to hydrofluoroalkanes (HFAs)—mainly HFA-134a and HFA-227 . . . .");

(d)     Canadian Patent Application No. 2,062,854 A1 ("the Keller '854 application"), PTX 622 at PER(Albu)034920 ("In an especially preferred embodiment of the invention, the aerosol comprises the alternative propellant gas heptafluoropropane (227).");

(e)     U.S. Patent No. 5,916,540, PTX 659 at PER(Albu)036324 (entitled "Aerosol Formulations Containing P134a and/or P227 and Particulate Medicament"); and

(f)     Purewal et al., *Formulation of Metered Dose Inhalers*, in Metered Dose Inhaler Technology (1998), PTX 469 at TEV_092112 (Table 2.3, containing "Potential Replacements for CFC Propellants or Adjuvants" and including HFA-134a, HFA-227, and HFA-152a, as well as hydrocarbons, HCFCs, HFAs/HFCs, perfluorocarbons, alcohols, and ethers. Table 2.3 "does not represent an exhaustive list of potential replacements for CFC propellants. It is a list of compounds worthy of investigation as propellants, alone or as additives in a mixture.").

220.     In fact, in late-1991 to mid-1992, a POSA would have been aware that a number of different propellants were being investigated as potential replacements for CFCs. *See* PTX 408 at PER(Albu)007782 (hereinafter "Kontny"). Kontny states "HFA-227 is preferable to HFA-134a" with respect to its vapor pressure. *Id.* at 784.

221.     A POSA would also recognize that the Keller '854 application states that the preferred alternative propellants include, "pentafluoroethane (125), tetrafluoroethane (134 and 134a), trifluoroethane (143a), difluoroethane (152 and 152a) and heptafluoropropane (227)." PTX 622 at PER(Albu)034922. Another reference, Keller 1991, states that "the hydrocarbons propane, n-butane and isobutane, and mixtures thereof, which are employed in industrial and topical sprays" are conceivable alternatives to CFC-based propellants. PTX 405 at PER(Albu)034512. Keller 1991 notes that "HFC 227 is much more similar in its physical behavior to the CFC propellant gas mixtures (11/12 or 12/114) which are normally used than [sic] is HFC 134a." *Id.* at 513. Keller 1991 concludes that based on theoretical considerations

EXTERNAL COUNSEL ONLY

and preliminary findings of the available propellants, "227 will presumably be more suitable than 134a for replacing CFC-containing propellant gases." *Id*. at 516.

222.    Defendants' experts have argued that by June 1990 HFA-227 was not reasonably available, and was not expected to be commercially available for at least several years.  A POSA would not be constrained by whether propellant was available on a commercial scale.  Indeed, a POSA would recognize that one could attempt to develop novel propellants that were not even disclosed in the literature.  Neither HFA-134a nor HFA-227 had been tested toxicologically or received approval for human use by 1990.  Kontny, which published in June of 1991, states, "[f]or [HFA-134a and HFA-227] preliminary estimates suggest that formulation development and formulation/component toxicity studies could be completed such that an [Investigational New Drug Application ("IND")] could be filed in 2-3 years."  PTX 408 at PER(Albu)007785; *see also* PTX 297 at TEV_0920564 ("[I]t seems unlikely that many reformulated MDIs will be available within the next 5-10 years.").  Accordingly, the commercial-scale availability of HFA-227 as compared to HFA-134a would not have prevented a POSA from considering either HFA-227 or several other propellants.  Additionally, numerous publications and patents in the early 1990s show that HFA-227 was available to some parties.  *See* PTX 271 at PER(Albu)034649; PTX 337 at PER(Albu)034494; PTX 405 at PER(Albu)034512; PTX 408 at PER(Albu)007781; PTX 622 at PER(Albu)034926.

223.    Defendants have also argued that a POSA would be motivated to design around the claims of the Purewal '777 application to remove surfactant.  Under Defendants' own design around theory, a POSA would have reason to investigate alternatives to HFA-134a in order to avoid the claims in the Purewal '777 application.  For example, a POSA would recognize that Keller 1991 suggested that HFA-227 may have superior properties to HFA-134a.  *See* PTX 405

EXTERNAL COUNSEL ONLY

at PER(Albu)034516.  In addition, Kontny identifies hydrochlorofluorocarbons ("HCFC")

propellants that, although they still had some ozone depleting potential, could have been used to

design around the Purewal '777 application.  *See* PTX 408 at PER(Albu)007782; *see also* DTX

1047 at PER(Albu)033991 (Table 3.5, containing fourteen fluorocarbon alternatives that have

reduced or zero ozone depleting potential).

224.    Alternatively, a POSA could have investigated formulations that eliminated

propellant entirely (*e.g*., dry powder formulations).  *See* PTX 521 at TEV_0921314 (disclosing

that MDI propellant can cause bronchoconstriction); PTX 355 (tablets).  Defendants' experts

have argued that every unnecessary component should be removed from these formulations.

Thus, assuming Defendants' design around theory, a POSA would have reason to investigate

alternatives to HFA-134a such as HFA-227, HCFCs, and/or removing the propellant entirely in

order to deliver the drug in a different form such as in a dry powder inhaler or dose-metering

nebulizer.  *See* PTX 830 at PER(Albu)046911 (Ventolin Rotocaps DPI); PTX 526 at

TEV_0921317.

225.    For at least these reasons, a POSA would have recognized that there were several

alternative propellants being investigated and would not have reason to confine studies to just

HFA-134a.  In fact, assuming Defendants' design around theory, a POSA would have been

motivated to move away from HFA-134a and to investigate new propellants and/or dry powder

or nebulizer systems.

### iii.    A POSA Would Have Thought Surfactants Were Needed For a Stable Pharmaceutical Suspension Aerosol Formulation

226.    In late-1991 to mid-1992, a POSA would have believed that surfactants were

considered a necessary component of suspension aerosol formulations for the following reasons.

EXTERNAL COUNSEL ONLY

**1.    A POSA Would Recognize That Surfactants Were Accepted As a Necessary Ingredient in CFC-Based Inhalers**

227.    A POSA would have understood that the literature demonstrated that CFC-based pharmaceutical suspension aerosol formulations overwhelmingly contained surfactants. Remington's Pharmaceutical Sciences ("Remington's") indicates that a prototype for a suspension aerosol formulation would contain "[d]ispersing agent(s) – sorbitan oleate, oleyl alcohol, etc," where sorbitan oleate and oleyl alcohol are surfactants.  DTX 1060 at PER(Albu)48070.  The 1991 Physicians' Desk Reference ("PDR") further supports this conclusion:  all seven of the beta agonist MDI aerosol formulations that are identified as suspensions in the 1991 PDR contain surfactant, including Proventil and Ventolin.  PTX 831 at TEV_0929295, 296, 304, 311-314, 324.  One of the few exceptions at the time, Azmacort, was not comparable because a POSA would have recognized that the Azmacort formulation was an atypical suspension in CFC-12 and likely only possible because of triamcinolone acetonide's unique physicochemical properties.

228.    Other literature demonstrates that a POSA would have considered a surfactant a necessary component of pharmaceutical suspension aerosol formulations.  For example, several references include or discuss the need for surfactant in suspension aerosol formulations:

(a)    Hickey et al., *Effects of surfactants on aerosol powders in suspension. Implications for airborne particle size*, Int. J. Pharm., 42:267-270 (1988), PTX 375 at TEV_0920848 (investigation of the role of surfactant concentration in CFC formulations; "[m]anufacture of an aerosol unit usually involves (a) micronizing and drying the drug; (b) dispersal in a low-volatility non-aqueous concentrate *containing a hydrophobic surfactant* . . . ." (emphasis added));

(b)    U.S. Patent No. 4,814,161, DTX 1077 at PER(Albu)034232 (1:29-32) ("Suspension of drug in aerosol propellants is achieved by pulverizing the drug into the desired particle size range and thereafter suspending the particles in propel[a]nts *with the aid of a surfactant*" (emphasis added));

(c)    WO 91/04011, PTX 722 at PER(Albu)007533 (2:26-29) ("*Non-perfluorinated surfactants have commonly been used* as dispersing agents for powdered medicaments in aerosol propellants . . . ." (emphasis added));

(d)    Morén, *Chlorofluorocarbons (CFCs) and their Replacement*, The Regulatory Affairs Journal (1991) ("Morén"), PTX 445 at PER(Albu)034541 ("In order to increase the chemical stability of the drug, and to reduce the local irritation of ethanol at inhalation, MDIs were soon reformulated to suspensions of the drug in a mixture of CFC propellants *with the addition of a liquid surfactant in a low concentration*." (emphasis added));

(e)    Byron, *Pulmonary Targeting with Aerosols*, Pharm. Tech. 42-56 (1987), PTX 268 at TEV_0920484 ("[T]he *MDI has additional problems* because it frequently uses formulations that contain suspensions of micronized hydrophilic drug in fluorocarbon propellant. This requires that the actuator nozzles are large enough to prevent clogging, because this phenomenon, as well as the presence of the suspension itself, limits the minimum size of primary droplets. In addition, *high concentration of hydrophobic surfactants must be included in the propellants as suspending agents*." (emphasis added));

(f)    U.S. Patent No. 5,182,097 ("the '097 patent"), PTX 643 at PER(Albu)035037-038 (2:56-60, 3:4-12) ("It is another object of the present invention to provide formulations for use in MDIs which include a drug and a surfactant suspended in HFC-134a alone or in combination with other compounds such as perfluoropentane, propane, butane, and isobutene . . . . The ideal alternative propellant will satisfy the following criteria: . . . (2) *the surfactant* (oleic acid) should dissolve in the propellant blend, (3) the micronized drug (albuterol) should be easily dispersible in the propellant blend with the aid of the surfactant . . . ."); *see also* U.S. Patent No. 5,190,029 ("the '029 patent"), PTX 644 at PER(Albu)007983-984 (2:64-68, 3:12-19);

(g)    Dalby, *Possible Replacements for CFC-Propelled Metered-Dose Inhalers*, PTX 297 at TEV_0920564 ("REFORMULATION CONSIDERATIONS . . . Will existing *surfactants* (lubricants) dissolve in the propellant?" (emphasis added)); and

(h)    PTX 469 at TEV_092114 ("For the purposes of this discussion, the MDI may be considered to consist of the following six components: . . . *The Surfactant* . . . ." (emphasis added)), 126-29.

### 2.    A POSA Would Have Believed That Surfactants Were Necessary in CFC-Free Inhalers

229.    In late-1991 to mid-1992, a POSA would have been aware that information on

CFC-free suspensions was sparse. The few examples of CFC-free suspension aerosol literature

**EXTERNAL COUNSEL ONLY**

published prior to the filing of the '152 patent show that surfactants were considered necessary in CFC-free suspension aerosol formulations. *See generally* DTX 736; PTX 644; PTX 643; PTX 722; PTX 723. Removing surfactant from suspension formulations would have been counterintuitive at the time, because a POSA would have believed that surfactants were necessary to stabilize the formulation and provide lubrication to the valve components. *See* DTX 736 at PER(Albu)034361 (stating that surfactants are used "to stabilize the formulation and lubricate the valve components"); PTX 644 at PER(Albu)007983 (1:40-42) ("Surfactants are usually dissolved in the spray product and can serve the dual functions of lubricating the valve and reducing the aggregation of micronized particles."); PTX 643 at PER(Albu)035037 (1:34-36) ("Surfactants are usually dissolved in the spray product and can serve the dual functions of lubricating the valve and reducing the aggregation of micronized particles."). Accordingly, around 1991 to mid-1992, a POSA would have expected that pharmaceutical aerosol suspension formulations without surfactant would not be stable and would not provide enough lubrication to the valve components.

230. The art to which Defendants cite, the Purewal '777 application, supports the position that as of late-1991 to mid-1992, a POSA would have believed that surfactants were necessary in CFC-free suspension formulations. The Purewal '777 application teaches that known surfactants, such as oleic acid, were considered "particularly advantageous since the toxicity and use of such compounds in metered dose inhalers for drug delivery to the human lung is well established." DTX 736 at PER(Albu)034359 (2:48-49). A POSA would have no reason to remove this particularly advantageous component.

231. A POSA would also immediately have recognized that formulations in the Mullins '533 patent were significantly different from the later-CFC formulations of Proventil and

**EXTERNAL COUNSEL ONLY**

Ventolin, or the formulations of the Purewal '777 application.  First, the formulations of the

Mullins '533 patent do not disclose albuterol or albuterol sulfate because albuterol was not

publically known at the time.  *See* DTX 1036 (U.S. Patent No. 3,644,353, directed to compounds

that include albuterol, was filed in 1967).  Second, the Mullins '533 patent is directed to CFC-

based formulations.  All of the examples in the Mullins '533 patent contain blends of multiple

CFCs.  DTX 805 at 406-407 (5:1-7:61).  The formulations of the Mullins '533 patent contain

mixtures of CFC 12 and CFC 114, not HFA-134a.  *Id.*  The properties of CFC-12, CFC-114, and

HFA-134a are significantly different.[5]  Third, the CFC blends are atypical of those used in MDIs

for lung delivery.  Finally, the formulations of the Mullins '533 patent contained 5% or less by

weight of ethanol.  *Id*. at 707 (7:71-75).  Proventil and Ventolin did not contain any ethanol.  *See*

PTX 831 at TEV_0920295, 312-313.  Thus, a POSA would not have recognized the Mullins

'533 patent formulations to be analogous to either Proventil, Ventolin, or the formulations of the

Purewal '777 application, and would have been unwilling to assume that conclusions could be

drawn from such comparisons.

232.    Even if a POSA considered both the Mullins '533 patent and the Purewal '777

application, a POSA would have believed that the concentration of ethanol should be minimized,

and only used to the extent needed to solubilize a surfactant in order to prepare suitable

suspension formulations.  Additionally, a POSA would know that the challenge of removing

surfactant while leaving the metering valve unmodified would likely increase the chance of valve

sticking due to, among other things, swelling in the new propellants.

---

[5] For instance, CFC-12 has a density of 1.33 g/ml at 20ºC and a vapor pressure of 67.6 psig at 20ºC.  CFC-114 has a density of 1.47 g/ml at 20ºC and a vapor pressure of 11.9 psig at 20ºC. HFA-134a has a density of 1.21 g/ml at 20ºC and a vapor pressure of 81 psig at 20ºC.  *See* PTX 408 at PER(Albu)007782.

233.    Azmacort was a metered dose inhaler that contained a formulation of
triamcinolone acetonide (a corticosteroid), 1% by weight ethanol and CFC 12.  *See* PTX 834 at
PER(Albu)012758-759.  A POSA would have immediately recognized that Azmacort's
formulation was significantly different from Proventil, Ventolin or the formulations of the
Purewal '777 application.  First, Azmacort contained a corticosteroid, which is chemically quite
different from the adrenergic receptor agonist albuterol sulfate.  Second, Azmacort contained
CFC-12, not HFA-134a.  The properties of CFC-12 and HFA-134a are significantly different.[6]
Finally, Azmacort contained 1% by weight of ethanol.  Proventil and Ventolin did not contain
any ethanol, and the Purewal '777 application discloses formulations with ranges of ethanol
concentrations only when a surfactant is present.  *See* PTX 831 at TEV_0920295, 312-313; DTX
736 at PER(Albu)034360 (3:13-15).  Thus, a POSA would not have understood Azmacort to be
comparable to either Proventil, Ventolin or the formulations in the Purewal '777 application, and
would not have had a reason to combine the information from those formulations to remove
surfactant, or increase the amount of ethanol, let alone in the absence of a surfactant.  Even if a
POSA considered both Azmacort and the Purewal '777 application, a POSA would have
believed that the concentration of ethanol should be minimized and used only to solubilize a
surfactant in order to prepare pharmaceutical suspension aerosol formulations.

234.    The Marecki '539 patent is directed to devices for delivering aerosols.  DTX 804
at PER(Albu)008028-048.  A POSA would have recognized that the Marecki '539 patent
concerns improvements in MDI sealing components.  *Id.* at 031 (3:21-24) ("[T]his invention
provides thermoplastic elastomeric sealing members comprising a copolymer of about 80 to

---

[6] For instance, CFC 12 has a density of 1.33 g/ml at 20ºC and a vapor pressure of 67.6 psig at
20ºC while HFA-134a has a density of 1.21 g/ml at 20ºC and a vapor pressure of 81 psig at 20ºC.
*See* PTX 408 at PER(Albu)007782.

about 95 mole percent ethylene . . . .").  While the Marecki '539 patent does mention several

aerosol formulations, those formulations are only discussed in the context of their use while

testing the performance of the improved sealing members.  *See id.* at 033 (8:49-51).  To the

extent a POSA would have relied on the formulations disclosed in Marecki '539 patent, a POSA

would have been aware that, of the twelve formulations disclosed in that reference, the

"particularly preferred formulation" of albuterol sulfate contained oleic acid.  *Id.* at 032 (6:56-

64).  Additionally, the only formulations in the Marecki '539 patent that contain ethanol and

HFA-134a that do not contain oleic acid are beclomethasone dipropionate solution formulations.

*Id.* at 033-034 (8:52-9:5).  Moreover, a POSA would recognize that the twelve formulations

disclosed in Marecki '539 were not tested to determine if they were suitable suspension aerosol

formulations, but rather were tested to determine the performance of the improved seals of the

Marecki '539 patent.  *See id.* at 033 (8:49-51).  Thus, a POSA would have been aware that the

focus of Marecki '539 was disclosing improved seals, not suitable aerosol formulations.

### iv.  A POSA Would Not Have Selected Ethanol From 5% to About 15% by Weight As a Component of a Suspension Aerosol Formulation

235.    Defendants fail to show why, in late-1991 to mid-1992, a POSA would have used

ethanol from 5 to about 15% by weight in a pharmaceutical suspension aerosol formulation.

### 1.  A POSA Would Have Reason to Investigate Various Additives Beyond Ethanol

236.    Had a POSA considered the use of an additive to dissolve surfactant in a

suspension aerosol formulation, a POSA would have investigated a number of different options

other than ethanol.  The Purewal '777 application discloses many "suitable" compounds besides

ethanol, including "alcohols such as . . . isopropyl alcohol, propylene glycol, hydrocarbons such

as propane, butane, isobutane, pentane, isopentane, neopentane, and other propellants such as

EXTERNAL COUNSEL ONLY

those commonly referred to as Propellants 11, 12, 114, 113, 142b, 152a 124, and dimethyl

ether." DTX 736 at PER(Albu)034360 (2:42-45). More generally, the Purewal '777 application

claims classes of polar additives including alcohols and saturated hydrocarbons. *Id*. at 366 (9:45-

47). The Purewal '777 application discloses a number of preferred high polarity compounds

other than ethanol. *Id*. at 361 (4:43-44).

    237.    Further, the literature shows that a POSA would have not limited an investigation

to just ethanol. *See* PTX 284 at PER(Albu)007792 (Dalby & Byron, *Safety Evaluation of*

*Metered Dose Inhalers Containing Flammable Propellants*, Pharmaceutical Research 8(10)S1-

S350 (1991)). In this reference, the flammability of combinations of HFA-134a and butane, a

saturated hydrocarbon, is analyzed. *Id.* Thus even after Purewal '777 application, a POSA

would have investigated "high polarity" compounds other than ethanol. Accordingly, there is no

reason that a POSA would have selected ethanol as a co-solvent.

          **2.**    **A POSA Would Not Have Expected to Be Able to Successfully Use Larger Concentrations of Solvents Such As Ethanol in a Suspension Aerosol Formulation**

    238.    In late-1991 to mid-1992, a POSA would have had no reason to use large amounts

(5 to 15% by weight) of ethanol in suspension aerosol formulations because a POSA would have

considered that such alcohol content could lead to increased drug solubility and crystal growth.

Defendants' experts have argued that ethanol is a substitute for CFC-11 in suspension aerosol

formulations. In 1991, a paper published by Defendants' own expert, Dr. Dalby, showed that

increasing CFC-11 content in a model system increased drug solubility. PTX 286 (Dalby et al.,

*Determination of Drug Solubility in Aerosol Propellants*, 8 Pharm. Res. 1206-1209 (1991)).

Drug solubility is highly unfavorable for suspension aerosol formulations, which contain

particulate drug. A POSA would have expected that as ethanol content was increased, the

**EXTERNAL COUNSEL ONLY**

overall solubility of the active drug substance would also increase, leading to poor formulation characteristics such as crystal growth or Ostwald Ripening. It was known in the art that albuterol base was soluble in ethanol and albuterol sulfate was slightly soluble in ethanol. A POSA would have been aware that even small amounts of solubility could impact the stability of a suspension formulation. Using ethanol was believed to lead to more drug dissolving in the formulation. Moreover, a POSA would have known that low volatility ingredients, such as ethanol, would lead to a low respirable fraction due to the low volatility of the co-solvent.[7] *See* PTX 305 at TEV_0920569.

239.    A POSA also would have recognized that ethanol may be a poor choice as a co-solvent. For example, an article by Morén states that:

> Ethanol may be suitable as an additive in *some* formulations. However, ethanol has a high boiling point which may reduce the availability of the drug to the lungs. Furthermore, ethanol may impair the physical stability of the drug suspension, and it produces irritation on inhalation of high concentrations.

PTX 445 at PER(Albu)034544 (emphasis added). Thus, Morén teaches away from the use of ethanol in a suspension aerosol formulation. Accordingly, a POSA would have had reason to consider other co-solvents, or at a minimum reason to minimize the concentration of ethanol in an MDI formulation, not to increase the proportion of the co-solvent.

240.    A POSA would also have known that blending ethanol with HFA-134a would lower the density of the resultant mixture, leading to worse density matching, which was an important criterion for a POSA designing a suspension aerosol formulation. *See* PTX 336 at TEV_0920736; PTX 274 at TEV_0920524; PTX 408 at PER(Albu)007782; PTX 273 at

---

[7] A POSA would also have been aware that the use of ethanol could pose issues in selling the product in countries or communities with large populations that are prohibited from ingesting alcohol.

EXTERNAL COUNSEL ONLY

TEV_0920520; PTX 265 at TEV_0920468.  The literature thus taught away from using ethanol

in a suspension aerosol formulation.

### 3.    A POSA Would Have Understood That Solvents Such As Ethanol Were Used to Solubilize Surfactants

241.    Given the unfavorable characteristics of ethanol, a POSA would have understood,

in late-1991 to mid-1992, that solvents such as ethanol were only being introduced to help

solubilize *surfactants*, which a POSA would have considered necessary for stability.  Thus, for

example, the Purewal '777 application states that the polar additive, which may be ethanol,

"provides a mixture in which increased amounts of surfactant may be dissolved compared to

their solubility in [HFA-134a] alone."  DTX 736 at PER(Albu)034360 (3:13-15);  *see also* PTX

408 at PER(Albu)007783 ("Whereas ethanol is highly miscible with [HFA-134a and HFA-227],

the suspending agents [surfactants] that have typically been used in CFC-containing MDI

products exhibit considerably lower solubilities in HFA-134a and HFA-227 than in the CFC

blends . . . .").

242.    Thus, even if a POSA was seeking to make a suspension aerosol formulation

without surfactant, which would not have been believed to be possible, a POSA would have had

no reason to use ethanol, as it was taught to be used only in order to solubilize surfactant.

### 4.    A POSA Would Not Have Considered Ethanol a Substitute for CFC-11

243.    In late-1991 to mid-1992, a POSA would not have considered ethanol a substitute

for CFC-11, as Defendants' experts contend, because these two compounds are significantly

different.  CFC-11 has a density of 1.49 g/ml at 20ºC and a vapor pressure of -1.8 psig at 20ºC.

PTX 408 at PER(Albu)007782.  Ethanol has a density of 0.79 g/ml at 20ºC and a vapor pressure

of 0.86 psig at 20ºC.  *See* PTX 336 at TEV_0920736; PTX 274 at TEV_0920524.  While there

EXTERNAL COUNSEL ONLY

are other parameters that are important for a co-solvent in an aerosol formulation, these parameters demonstrate that these two compounds are significantly different.

244.    Additionally, drug solubility in ethanol is generally much higher than it is in CFC-11.  *See* PTX 509 at TEV_0921291-292; *see also* PTX 721 at PER(Albu)034163 (4:3-7) ("[C]ertain drugs which are practically insoluble in chlorofluorocarbon propellants alone can be solubilized . . . by addition the of a small amount of a co-solvent such as ethanol."). Accordingly, it would have been clear to a POSA that ethanol was not a substitute for CFC 11.

**v.    A POSA Would Not Have a Reasonable Expectation of Success in Making a Suspension Aerosol Formulation Containing Albuterol Sulfate, HFA-134a, 5 to About 15% Ethanol, but Without Surfactant**

245.    In late-1991 to mid-1992, a POSA would not have expected the claimed formulations of the '152 patent to result in suitable suspension aerosol formulations.  To the contrary, for reasons discussed above, a POSA would have understood that pharmaceutical suspension aerosol MDI formulations are complicated mixtures of numerous chemicals.  *See* PTX 265 at TEV_0920443-444.  Finding stable suspension formulations requires the delicate balancing of numerous factors for each component, including the density, vapor pressure, and solvency.  *See id.*  The complex nature of these systems made new formulation development an unpredictable process.  *See* PTX 506 at TEV_0921288 ("It was just like starting over . . . .").

**1.    A POSA Would Recognize That Drug Dissolution in MDI Propellants Was Difficult to Determine**

246.    Reduced solubility of the drug in the formulation is a factor that contributes to formulation stability.  Ostwald Ripening and crystal growth, processes that grow particle size and depend on solubility of the drug in the formulation leads to poor formulation performance. *See* PTX 305 at TEV_0920573-574.  An article from 1991 states, "[i]t is difficult to determine

EXTERNAL COUNSEL ONLY

the extent of drug dissolution in pressurized suspension formulations by conventional methods." PTX 286 at TEV_0920558.  Accordingly, as of late-1991 to mid-1992, a POSA would not have been able to predict the solubility of drugs, excipients, and adjuvants in new formulations with a reasonable expectation of success.

> **2.    A POSA Would Not Have Expected to Be Able to Directly Substitute HFAs For CFCs**

247.    A POSA would have known that HFAs and CFCs had very different physical properties.  For example, Kontny summarizes that a POSA would have known that, "[r]eformulation of metered-dose inhalers (MDIs) without the use of chlorofluorocarbon (CFC) propellants presents numerous obstacles because there are no alternative propellants that can serve as immediate replacements for pharmaceutical use."  PTX 408 at PER(Albu)007779; *see also* PTX 506 at TEV_0921288 ("It was just like starting over . . . .").  Additionally, "no single propellant or combination of propellants [had] been identified with all of the physical-chemical properties of CFCs."  *Id.*  In regard to HFA-134a and HFA-227, a POSA would also have known that, "in comparison with CFCs, HFA-134a and HFA-227 have considerably different solvency characteristics," and that "[u]nfortunately, preliminary studies have shown that elastomer materials used successfully in the past with CFC-containing MDIs are not compatible with HFA-134a and HFA-227."  PTX 408 at PER(Albu)007783.  Finally, Kontny summarizes outstanding issues at the time:

> Lack of a replacement propellant with physical-chemical properties similar to CFC-11 leaves suspending agent solubilization, vapor pressure reduction, density modification and manufacturing methodology as outstanding issues with uncertain potential impact on the development of MDIs containing HFA-134a and/or HFA-227.

*Id.* at 785.  Accordingly, a POSA would have no reasonable expectation of success in attempting to substitute HFA propellants for CFC propellants.

EXTERNAL COUNSEL ONLY

**3.    A POSA Would Not Have Expected to Be Able to Use Concentrations of Ethanol in the Range of 5% to About 15% w/w to Form Suspension Aerosol Formulations**

248.    As set forth above, a POSA would not have had a reasonable expectation of success in using larger concentrations of a solvent such as ethanol because the larger amounts of ethanol would be expected to solubilize more drug in the formulations leading to poor suspension qualities. *See supra* ¶¶ 241-242.

**4.    A POSA Would Not Have Expected to Be Able to Eliminate Surfactant**

249.    As discussed above, a POSA would have expected a suspension formulation to require the presence of a surfactant. To the extent there were suspension aerosol formulations in the art that did not contain surfactant, they were significantly different formulations than those claimed in the formulations of the '152 patent. *See supra* ¶ 233. Accordingly, a POSA would not have had a reasonable expectation of success in removing surfactant from Proventil, Ventolin or the formulations of the 777 Purewal application. *See supra* ¶¶ 226-234.

250.    Defendants have taken the position that a POSA would have been motivated to design around the claims of the Purewal '777 application and the obvious and practical design around would have been to remove surfactant from the formulations. This theory, however, is belied by practice. For example, both the Keller '854 application (PTX 622) and WO 91/11173 ("the Steele '173 application") (PTX 723) discuss the Purewal '777 application but do not arrive at the conclusion that removing the surfactant is the obvious choice.

251.    The Keller '854 application considers the Purewal '777 application, but then continues to investigate alternative surfactants. See PTX 622 at PER(Albu)034919-20. It states, "that non-ionic surfactants from the group consisting of monoacetylated and diacetylated monoglycerides are readily soluble in the 'alternative' propellant gases mentioned, especially in

EXTERNAL COUNSEL ONLY

heptafluoropropane (227), and promote the production of homogeneous suspensions while additionally exhibiting outstanding lubricating properties for the dosing valve." *Id*. The Keller 854 application goes on to claim formulations containing surfactants. *Id*. at 931-932.

252.    The Steele '173 application is directed to formulations that contain a drug, either HFA-134a or HFA-227, and a surfactant. PTX 723 at PER(Albu)034546-034563. In describing the Purewal '777 application, and particularly the polar additives (which include ethanol), the Steele '173 application notes that, "the use of . . . co-solvents is undesirable since they may have unsuitable properties, for example, they may be flammable and/or toxic." *Id*. at 549 (2:17-19). The Steele '173 application goes on to claim both HFA-134a and HFA-227 with fluorinated surfactants and no polar additive (ethanol). *Id*. at 559-60 (12:1-13:10).

253.    The '097 patent also did not eliminate the use of a surfactant after publication of the Purewal '777 application. Rather, from the specification of the '097 patent, it is clear that the inventors of the '097 patent actually increased the amount of surfactant used. PTX 643 at PER(Albu)035039 (6:11-13) (stating that 0.2% surfactant by weight "represents a high surfactant concentration compared to the concentration used in several commercially available MDI products").

254.    At least the Keller '854 application, the Steele '173 application, and the '097 patent show that a POSA reading the Purewal '777 application would have had many options in the design of a CFC-free suspension aerosol formulation. Additionally, the Keller '854 application, the Steele '173 application, and the '097 patent show that a POSA would not have been motivated to remove the surfactant from the Purewal '777 application. All three references show researchers choosing to investigate other elements of the formulation, and none selected what Defendants claim a POSA would have been motivated to do.

**EXTERNAL COUNSEL ONLY**

255.    For at least these reasons, a POSA would not have been motivated to combine Proventil and Ventolin with the Purewal '777 application, or in combination with any other reference cited by Defendants' experts to arrive at the pharmaceutical suspension aerosol formulations in claims 1-4, 8 and 9 of the '152 patent with a reasonable expectation of success.

### C.    Conclusions of Law

256.    The differences between the prior art and the claimed invention are such that the invention as a whole would not have been obvious to a POSA as of the either the earliest priority date for the '152 patent, December 18, 1991, or for the date that Defendants propose should be the earliest priority date for claims 1-4, 8 and 9 of the '152 patent, May 4, 1992.

257.    Defendants have failed to prove, by clear and convincing evidence, that a POSA would have found claims 1-4, 8 and 9 of the '152 patent to be obvious over Proventil or Ventolin and the Purewal '777 application, further in view of the Mullins '533 patent, Azmacort, or the Marecki '539 patent.[8]    As detailed below, Defendants' analysis uses hindsight to arrive at the invention of the '152 patent.  Moreover, many of the references that Defendants use actually teach away from the invention of the '152 patent, and some are not prior art.  Accordingly, the art would not have provided a POSA with a reason to make claims 1-4, 8 and 9 of the '152 patent with any reasonable expectation of success.

258.    Both Proventil and Ventolin contained albuterol free base, a mixture of CFCs (CFC-11 and CFC-12) and oleic acid, a surfactant.  Indeed, those formulations' use of oleic acid,

---

[8] Defendants should be precluded from raising new invalidity defenses in the Pretrial Order or at trial that were not previously disclosed in Defendants' February 7, 2014 expert reports, including Defendants' April 28, 2014 Third Supplemental Invalidity Contentions, May 8, 2014 Fourth Supplemental Invalidity Contentions and Dr. Dalby's May 15, 2014 "Supplemental" Expert Report. *See* Schedule L-1 at ¶ 1. Accordingly, Plaintiffs do not address herein the merits of Defendants' newly added invalidity defenses of anticipation, obviousness, and obviousness-type double patenting of the '152 and '445 patents that were not previously disclosed in Defendants' February 7, 2014 expert reports.  If Defendants are allowed to introduce these new defenses, Plaintiffs reserve the right to supplement and/or amend these responses.

EXTERNAL COUNSEL ONLY

a surfactant, would have motivated a POSA to make a formulation with surfactant. Accordingly, these products would not have provided a motivation to make a formulation of albuterol sulfate, HFA-134a, ethanol from 5 to about 15% by weight, with no surfactant, or a reasonable expectation of success in doing so.

259.    The teachings of the Purewal '777 application would not have provided motivation to select albuterol sulfate or the combination of albuterol sulfate, ethanol and HFA-134a. The Purewal '777 application discloses at least forty different medicaments and at least fifty different salts that may be used in the formulations of the Purewal '777 application. DTX 736 at PER(Albu)034362 (5:12-35). The examples of the Purewal '777 application use albuterol sulfate, beclomethasone dipropionate and disodium chromoglycate. *Id.* at 363-366 (6:17-9:31). The Purewal '777 application states that, "it has been shown that the free base of salbutamol exhibits a greater dispersion stability than salbutamol sulphate in the formulations of the invention." *Id.* at 362 (5:26-27). Thus, the Purewal '777 application provides motivation to use albuterol free base instead of albuterol sulfate, which teaches away from the use of albuterol sulfate.

260.    The formulations disclosed in the Purewal '777 application differ from the claimed invention in that the formulations of the Purewal '777 application all contain surfactants. Because the Purewal '777 application is consistent with a POSA's view at the time that surfactants were considered to be a necessary ingredient in stable suspension formulations, the Purewal '777 application teaches away from removing surfactant from a suspension aerosol formulation containing HFA-134a, and teaches away from the use of a polar adjuvant in a suspension formulation unless that formulation has surfactant.

EXTERNAL COUNSEL ONLY

261.    The Mullins '533 patent, which teaches non-albuterol sulfate drugs, a mixture of CFCs (CFC-12 and CFC-114) and less than 5% by weight ethanol would not have provided a motivation to make a formulation of albuterol sulfate, HFA-134a, ethanol from 5 to about 15% by weight, and no surfactant, or a reasonable expectation of success for doing so.  Indeed, the Mullins '533 patent teaches away from using ethanol above 5% w/w.  *See* DTX 805 at PER(Albu)007405 (4:8-12) ("Preferably, [ethanol] should not exceed 5% by weight of the final formulation because higher levels of ethanol may adversely affect the dispersion in that it may cause some reflocculation of the dispersed solids.").

262.    The Marecki '539 patent is not available as prior art to the '152 patent.  The Marecki '539 patent was filed on December 18, 1991, and is a continuation-in-part of U.S. Patent Application No. 07/632,133, which was filed on December 21, 1990.  DTX 804 at PER(Albu)008028.  The Marecki '539 patent did not publish prior to issuance on March 1, 1994. The Marecki '539 patent is not available as prior art to the '152 patent under pre-AIA 35 U.S.C. §§ 102(a) or 102(b), and could only potentially be available under pre-AIA 35 U.S.C. § 102(e), which it is not because pre-AIA 35 U.S.C. § 103(c) disqualifies the Marecki '539 patent. Defendants have failed to prove that the Marecki '539 patent is prior art, under any section of 35 U.S.C. § 102, to the '152 patent.  To the extent that Defendants allege that the Marecki '539 patent is prior art under 35 U.S.C. § 102(e), they have not proven that 35 U.S.C. § 103(c) does not apply.  Accordingly, the Marecki '539 patent cannot be used to prove obviousness or anticipation.

263.    Nonetheless, all of the formulations disclosed in the Marecki '539 patent that contain albuterol sulfate and HFA-134a also contain ethanol and surfactant.  DTX 804 at PER(Albu)008033-34 (8:52-9:5).  Teachings about formulations that contain surfactant would

EXTERNAL COUNSEL ONLY

not have provided a motivation to remove surfactant in a formulation or a reasonable expectation of success for doing so.

264.    In general, the art as a whole demonstrates that claims 1-4, 8 and 9 of the '152 patent are not invalid as obvious for at least the following general reasons:

(a)    in view of the many CFC-based products that could have been reformulated in light of the Montreal Protocol, there was no motivation to choose albuterol sulfate formulations;

(b)    a POSA would recognize that there were several alternatives to CFC-based propellants being investigated;

(c)    the art did not motivate a POSA to remove surfactant from Proventil or Ventolin in view of the Purewal '777 application;

(d)    a POSA would recognize that surfactants were accepted as a necessary component in suspension aerosol formulations;

(e)    a POSA would not have used ethanol without a surfactant;

(f)    a POSA would not have selected ethanol from 5% to about 15% by weight as a component of a suspension aerosol formulation without surfactant; and

(g)    a POSA would not have a reasonable expectation of success in making a suspension aerosol formulation containing albuterol sulfate, HFA-134a, 5 to about 15% ethanol, but without surfactant.

265.    For at least the foregoing reasons, a POSA would not have been motivated to combine Proventil or Ventolin with the Purewal '777 application, or in combination with any other piece of prior art cited by Defendants, to arrive at the pharmaceutical suspension aerosol formulations in claims 1-4, 8 and 9 of the '152 patent with a reasonable expectation of success. To the contrary, Defendants' positions rely on hindsight and ignore copious teachings in the art leading away from the claimed inventions.  Claims 1-4, 8 and 9 of the '152 patent are not invalid for obviousness.

266.    Defendants have failed to meet their burden of establishing, by clear and convincing evidence, that claims 1-4, 8 and 9 of the '152 patent are obvious over the prior art.

EXTERNAL COUNSEL ONLY

## IX.    Objective Indicia of Non-Obviousness Demonstrate the Validity of the '152 Patent

### A.    Findings of Fact

267.    ProAir® HFA meets the limitations of at least one claim of each of the patents-in-suit.  The formulation of ProAir® HFA product consists of only three components:  albuterol sulfate, ethanol and HFA-134a.  JTX 31 at PER(Albu)013268; PTX 760 at TEV_00003585. Moreover, the container closure system of ProAir® HFA consists of a canister, metering valve, an actuator with dose counter, and a dust cap.  PTX 8 at TEV_0622431; *see also* PTX 11 at TEV_0226877.

268.    The inventions described in claims 1-4, 8 and 9 of the '152 patent have unexpected properties compared to the state of the prior art.  In the transition away from CFC-based MDIs, developers were forced to investigate and develop alternative propellants, including HFA-134a.  However, because the potential CFC replacements have different physical properties than the previously used CFCs, all other aspects of the MDI also needed to be reassessed.  This development work included investigation into various drugs, drug concentrations, excipients, excipient concentrations, delivery profiles, the valve, the canister and the actuator.  As detailed above, a POSA would not have expected to be able to successfully make a stable formulation with albuterol sulfate, 5% to 15% w/w ethanol and HFA-134a, without surfactant.  *See supra* Section VIII.  Particularly, a POSA would not have expected a suspension aerosol formulation without surfactant to be stable.  ███████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████  Additionally, a POSA would have expected that increasing the amount of ethanol in a suspension aerosol formulation that contained albuterol sulfate would lead to poor suspensions because of crystal growth or Ostwald Ripening.

EXTERNAL COUNSEL ONLY

Accordingly, prior to the invention of the '152 patent, a POSA would not have expected that a suspension aerosol formulation containing albuterol sulfate, 5 to 15% w/w ethanol and HFA-134a, without surfactant, would have formed a stable pharmaceutical suspension aerosol formulation. Further, a POSA would have been skeptical that formulations containing albuterol sulfate, 5 to 15% w/w ethanol and HFA-134a, without surfactant, would have formed a stable pharmaceutical suspension aerosol formulation.

269.    In addition, the inventions described in claims 1-4, 8 and 9 of the '152 patent and claims 1-20 of the '445 patent unexpectedly provide the patient with a warmer and softer plume that is capable of delivering more drug to the lungs. PTX 362 at TEV_0919920-925. Prior art MDIs were designed to deliver aerosolized medication to the lungs, however their drug delivery efficiency was low, because a large portion of the drug emitted from the MDI deposited in the throat. For example, CFC-based MDIs were characterized by cold, forceful plumes that resulted in patient discomfort. *See* PTX 277 at TEV_0920537; PTX 326 at TEV_0920623-624; PTX 318 at TEV_0920611; PTX 258 at TEV_0920417. When ProAir® HFA was compared with Proventil HFA (ethanol and oleic acid) and Ventolin HFA (no ethanol or oleic acid), it was found to be "more likely to deliver drug to the deep lung based on the spray velocity of the plume, since we believe the spray velocity and oropharyngeal deposition are directly proportional to each other." PTX 362 at TEV_0919923; *see also* PTX 441 at TEV_0920899 (noting that spray orifice was sensitive to orifice diameter and increased with increasing orifice diameters). "ProAir HFA, which delivers a warmer, low velocity plume could improve drug delivery by reducing the variability observed when using a pMDI." PTX 362 at TEV_0919923. Thus, ProAir® HFA has better plume characteristics due to the claimed features of claims 1-4, 8 and 9 of the '152 and claims 1-20 of the '445 patents.

**EXTERNAL COUNSEL ONLY**

270.     The inventions described in the claims of the '152 and '445 patents describe formulations that are particularly amenable to two-step filling process because of the high ethanol content, JTX 3 at PER(Albu)012710 (2:12-38), which enables less expensive manufacture of these formulations.  *See* JTX 3 at PER(Albu)012710 (2:3-11).  ████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████  ████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████

271.     Sales totals for ProAir® HFA indicate that it has achieved considerable commercial success.  ProAir® HFA revenues exceeded $400 million in 2013, and in the 2009-2013 period, ProAir® HFA revenues exceeded $2.1 billion.  PTX 617 at TEV_0919520; PTX 53 at TEV_0919716.

272.     Prescriptions for ProAir® HFA have grown significantly since launch, which is another indicator of commercial success.  In the year ending June 2013, there were over 26 million prescriptions for ProAir® HFA, and through the end of the June 2013, cumulative ProAir® HFA prescriptions totaled over 140 million.

273.     The profits generated by ProAir® HFA further evidence its commercial success.

████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████

██████████████████████████████████

274.    In promoting and educating doctors and managed care providers about ProAir® HFA, Plaintiffs emphasize the safety and efficacy attributes of the product, including the favorable plume characteristics that derive from the inventions of the '152 and '445 patents. ProAir® HFA's substantial share of sales and prescriptions in the SABA market provides yet another indicator of ProAir® HFA's commercial success. ProAir® HFA has been the leading product in the SABA market since 2008.

275.    The formulation and device of ProAir® HFA are claimed in the '152 and '445 patents, and therefore, the commercial success of ProAir® HFA is attributable to the claimed features of that product.

### B.    Conclusions of Law

276.    Because ProAir® HFA embodies and is coextensive with the asserted claims of the '152 patent, a nexus between the asserted secondary considerations and the patented invention is presumed. *Brown & Williamson*, 229 F.3d at 1130.

277.    For at least the reasons stated above, secondary considerations support a finding of nonobviousness of the '152 patent.

## X.    The Asserted Claims of the '152 Patent Are Not Invalid for Obviousness Type Double Patenting

### A.    Legal Principles of Obviousness-Type Double Patenting

278.    The judicial doctrine of obviousness-type double patenting is intended to "'prevent the extension of the term of a patent . . . by prohibiting the issuance of the claims in a second patent not patentably distinct from the claims of the first patent.'" *Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*, 689 F.3d 1368, 1376 (Fed. Cir. 2012) (quoting *In re Longi,* 759 F.2d 887,

EXTERNAL COUNSEL ONLY

892 (Fed. Cir. 1985)).  "The doctrine has also been phrased as prohibiting claims in the second patent which define 'merely an obvious variation' of an invention claimed in the first patent."  *In re Braat*, 937 F.2d 589, 592 (Fed. Cir. 1991).

279.    Before consideration can be given to the issue of double patenting, two or more patents must have at least one common inventor and/or be either commonly owned or non-commonly owned but subject to a joint research agreement.  *In re Hubbell*, 709 F.3d 1140, 1146-48 (Fed. Cir. 2013).  An obviousness-double patenting analysis requires two steps.  "First, as a matter of law, a court construes the claim in the earlier patent and the claim in the later patent and determines the differences.  Second, the court determines whether the differences in subject matter between the two claims render the claims patentably distinct."  *Eli Lilly & Co. v. Barr Labs. Inc.*, 251 F. 3d 955, 968 (Fed. Cir. 2001) (citations omitted).  "A later patent claim is not patentably distinct from an earlier patent claim if the later claim is obvious over, or anticipated by, the earlier claim."  *Id.*

280.    The obviousness-type double patenting analysis focuses on the patentable distinctiveness of the inventions as they are claimed.  *Gen. Foods Corp. v. Studiengesellschaft Kohle mbH*, 972 F.2d 1272, 1275 (Fed. Cir. 1992) ("[T]he law of double patenting is concerned *only* with what patents *claim*.  'Double patenting,' therefore, involves an inquiry into what, if anything, has been claimed twice." (emphasis in original)).  "As a general rule, obviousness-type double patenting determinations turn on a comparison between a patentee's earlier and later claims, with the earlier patent's written description considered only to the extent necessary to construe the claims."  *Teva Parenteral Meds.*, 689 F.3d at 1378-79; *see also In re Vogel*, 422 F.2d 438, 442 (C.C.P.A. 1970) ("In determining the meaning of a word in a claim, the specification may be examined.").  This is because the focus of the obviousness-type double

patenting doctrine is to "prevent[] a patentee from claiming an obvious variant of what it had previously *claimed*, not what it has previously *disclosed*." *Teva Parenteral Meds.,* 689 F.3d at 1379 (emphasis in original). In a double patenting analysis, the "disclosure of a patent cited in support of a double patenting rejection cannot be used as though it were prior art." *Gen. Foods Corp.* 972 F.2d at 1281; *see also Braat*, 937 F.2d at 594 n.5 ("The patent disclosure must not be used as prior art . . . ."); *Vogel*, 422 F.2d at 441(in considering obviousness-type double patenting, "the patent disclosure may not be used as prior art").

281. Other than not taking into account the specification of the earlier patent in determining the validity of the later claim when it is not prior art, the analysis in an obviousness-type double patenting context parallels that in a traditional obviousness case under § 103. *Amgen Inc. v. F. Hoffman-La Roche*, 580 F.3d 1340, 1361 (Fed. Cir. 2009) ("This part of the obviousness-type double patenting analysis is analogous to an obviousness analysis under 35 U.S.C. § 103 . . . ."). "An obviousness determination requires that a skilled artisan would have perceived a reasonable expectation of success in making the invention in light of the prior art." *Id.* at 1362.

282. Defendants bear the burden of establishing, by clear and convincing evidence, the defense of obviousness-type double patenting. *Otsuka Pharm. Co. v. Sandoz, Inc.,* 678 F.3d 1280, 1290 (Fed. Cir. 2012).

**B.     Findings of Fact**

283. Defendants assert that claims 1-4, 8 and 9 of the '152 patent are invalid for obviousness-type double patenting over claims that issued in 5 different patents, some of which have different named inventors. As explained below, none of the claims of the '152 patent are rendered obvious by the reference patents, all of which relate to different forms of formulations

EXTERNAL COUNSEL ONLY

(solutions), different propellants (HFA-227), or different formulations (with surfactant and/or without ethanol).

### 1.    U.S. Patent No. 5,776,432

284.    Defendants assert that claims 1-4, 8 and 9 of the '152 patent are invalid for obviousness-type double patenting over claims 1, 2 and 4 of U.S. Patent No. 5,776,432 ("the '432 patent").  The '432 patent was before the Examiner of the application that led to the '152 patent.

285.    The '432 patent was filed as U.S. Patent Application No. 08/455,872 on May 31, 1995.

286.    The '432 patent is a continuation of U.S. Patent Application No. 07/769,547, filed on October 1, 1991, now abandoned, which is a continuation-in-part of U.S. Patent Application No. 07/599,694, filed on October 18, 1990, now abandoned.

287.    The '432 patent issued on July 7, 1998 to "Minnesota Mining and Manufacturing Company."

288.    Claims 1, 2 and 4 of the '432 patent are directed to solution formulations.  For example, claim 1 of the '432 patent states:  "ethanol in an amount effective to solubilize the beclomethasone 17,21 dipropionate in the propellant, the formulation being further characterized in that the beclomethasone 17,21 dipropionate is dissolved in the formulation."  DTX 9 at PER(Albu)012827 (5:12-16).  In contrast, claims 1-4, 8 and 9 of the '152 patent are directed to "pharmaceutical suspension aerosol formulations."  A POSA would not consider making, or believe that he could make, a suspension formulation as claimed in claims 1-4, 8 and 9 of the '152 patent in view of the solution formulations in claims 1, 2 and 4 of the '432 patent.

289.    Defendants' experts argue that when a formulator of ordinary skill in the art set out to make a suspension formulation and observed that some of the drug dissolved, the

EXTERNAL COUNSEL ONLY

formulator would understand that the drug may be more suitable for use in a solution. However, this analysis is legally backwards, *i.e.*, it discusses the motivation to switch from a suspension formulation to a solution formulation. The test is whether a POSA looking at the solution formulations claimed in the '432 patent would be motivated to prepare the suspension formulations claimed in the '152 patent with a reasonable expectation of success. The answer to the legally correct question is "no."

290.     Claims 1, 2 and 4 of the '432 do not refer to a suspension formulation, rather they discuss adding ethanol until beclomethasone 17,21 dipropionate has "dissolved" in the formulation. A POSA would have understood that dissolving the medicament in the formulation is the opposite of what one would want when making a suspension formulation. Thus, the language of claims 1, 2 and 4 of the '432 patent does not give a POSA a reason to make a suspension formulation as claimed in claims 1-4, 8 and 9 of the '152 patent. Indeed, the dissolution of beclomethasone 17,21 dipropionate in ethanol/propellant blends that is disclosed in claims 1, 2, and 4 of the '432 patent teach a POSA that a suspension of beclomethasone 17,21 dipropionate in ethanol and HFA-134a will either be impractical to maintain at room temperature (if beclomethasone 17,21 dipropionate is at a concentration below its solubility in the blend of ethanol and HFA-134a it will dissolve to form a solution) or will create an unsuitable suspension in which crystal growth will occur (if beclomethasone 17,21 dipropionate is used at a concentration above its solubility in the chosen blend of ethanol and HFA-134a). If anything, claims 1, 2, and 4 of the '432 patent would motivate a POSA to significantly reduce or remove ethanol altogether in order to lower the solubility of beclomethasone 17,21 dipropionate in the formulation in the event that a suspension formulation was the desired outcome.

EXTERNAL COUNSEL ONLY

291.    Moreover, claims 1, 2 and 4 of the '432 patent are directed to "a propellant comprising a hydrofluorocarbon selected from the group consisting of 1,1,1,2-tetrafluoroethane, 1,1,1,2,3,3,3-heptafluoropropane, and a mixture thereof."  DTX 9 at PER(Albu)012827 (5:11-12).  In contrast, claims 1-4, 8 and 9 of the '152 patent are directed to "1,1,1,2-tetrafluoroethane as propellant" (*i.e.*, HFA-134a).  A POSA would not have any reason to select HFA-134a from among those propellants and propellant mixtures.  As discussed previously, assuming Defendants' design around theory for the sake of argument, a POSA would not have been motivated to select HFA-134a because a POSA would want to avoid the "extremely broad" Purewal '777 application.  *See supra* ¶¶ 250-255.

292.    Claims 1-4, 8 and 9 of the '152 patent are directed to a "particulate drug," "albuterol or a pharmaceutically acceptable salt or solvate thereof," and "albuterol sulfate"—they are not directed to dissolved "beclomethasone 17,21 dipropionate" as recited in claim 1 of the '432 patent.  A POSA would not have any reason to switch from "beclomethasone 17,21 dipropionate" to a "particulate drug," "albuterol or a pharmaceutically acceptable salt or solvate thereof" or "albuterol sulfate."  Claims 1, 2 and 4 of the '432 patent do not refer to a drug in particulate form, "albuterol or a pharmaceutically acceptable salt or solvate thereof," or "albuterol sulfate."  Thus, the language of the '432 patent claims does not give a POSA any reason to proceed with a "particulate drug," "albuterol or a pharmaceutically acceptable salt or solvate thereof," or "albuterol sulfate," that are described in claims 1, 4, 8 and 9 of the '152 patent.

293.    Even if a POSA faced with claims 1, 2 and 4 of the '432 had reason to make a suspension aerosol formulation with HFA-134a, albuterol sulfate and ethanol in an amount of 5 to 15% by weight, as set forth above (*supra* ¶¶ 226-234), a POSA would have understood that

EXTERNAL COUNSEL ONLY

surfactant was a necessary component of a pharmaceutical suspension aerosol formulation.

Thus, a POSA would not have made a suspension aerosol formulation without surfactant, as

claimed in claims 1-4, 8 and 9 of the '152 patent.

### 2. U.S. Patent No. 7,101,534

294.    Defendants assert that claims 1-4, 8 and 9 of the '152 patent are invalid for

obviousness-type double patenting over claims 1-3, 5 and 9 of U.S. Patent No. 7,101,534 ("the

'534 patent").  The '534 patent was allowed on the same day and by the same Examiner as the

'152 patent, and issued a week earlier than the '152 patent.

295.    The '534 patent issued on September 5, 2006 to "3M Innovative Properties

Company."

296.    The '534 patent was filed as U.S. Patent Application No. 08/455,874 on May 31,

1995.

297.    The '534 patent is a division of U.S. Patent Application No. 07/878,039, filed on

May 4, 1992, now abandoned, which is a continuation-in-part of U.S. Patent Application No.

07/809,791, filed on December 18, 1991, now abandoned, and a continuation-in-part of U.S.

Patent Application No. 07/810,401, filed on December 18, 1991, now abandoned.

298.    Claims 1-4, 8 and 9 of the '152 patent are directed to "1,1,1,2-tetrafluoroethane."

However, claims 1-3, 5 and 9 of the '534 patent are directed to a different compound,

"1,1,1,2,3,3,3-heptafluoropropane," which has different physical properties.  PTX 680 at 16:14-

20.  A POSA would not have had any reason to switch from "1,1,1,2,3,3,3-heptafluoropropane"

to "1,1,1,2-tetrafluoroethane."  Claims 1-3, 5 and 9 of the '534 patent do not refer to HFA-134a,

and therefore, the language of the claims does not give a POSA a reason to switch from

HFA-227 to HFA-134a.

EXTERNAL COUNSEL ONLY

299.    Assuming Defendants' design around theory for the sake of argument, a POSA would have been motivated to use a propellant other than HFA-134a because the Purewal '777 application claims referred only to formulations containing HFA-134a.  Thus, assuming Defendants' design around theory, a POSA would have been motivated to either continue using HFA-227 or switch to another propellant that was not claimed in the Purewal '777 application.  Moreover, as discussed above (*supra* ¶¶ 250-255), a POSA would recognize that some of the physical properties of HFA-227 more closely matched those of CFC-based propellants than HFA-134a.

300.    Even if a POSA were hypothetically motivated to change claims 1-3, 5 and 9 of the '534 patent by switching the propellant from HFA-227 to HFA-134a, a POSA would have believed from the teachings of the prior art, including the Purewal '777 application, that surfactant was a necessary ingredient in formulations using HFA-134a as a propellant.  *See supra* ¶¶ 226-234.  Thus, a POSA would not have made a suspension aerosol formulation without surfactant, as claimed in claims 1-4, 8 and 9 of the '152 patent.

301.    For reasons discussed previously, a POSA would not have had a reasonable expectation of success that using HFA-134a with claims 1-3, 5 and 9 of the '534 patent would result in a stable pharmaceutical suspension aerosol formulation.  A POSA would recognize that HFA-134a has a density of 1.21 g/ml at 20ºC and a vapor pressure of 81 psig at 20ºC, while HFA-227 has a density of 1.41 g/ml at 20ºC and a vapor pressure of 43 psig at 20ºC.  PTX 408 at PER(Albu)007782.  For example, Table 2 of Kontny (reproduced below) demonstrates that HFA-134a has significantly different physical properties than HFA-227.  *Id.*  Moreover, at the time, a POSA would have known that full toxicology testing had not yet been published for HFA-134a.  *See id.* at 785.

EXTERNAL COUNSEL ONLY

TABLE 2
Comparison of CFC, HCFC, HC and HFC Propellant Properties

| Propellant | Density g/ml,20°C | Vapor Pressure (psig,20°C) | Boiling Point (°C) | Ozone Depletion Potential(*) | Global Warming Potential(*) | Flammability | Commercially Available |
|---|---|---|---|---|---|---|---|
| CFCs: | | | | | | | |
| CFC-11 | 1.49 | -1.8 | 24 | 1 | 1 | None | Yes |
| CFC-12 | 1.33 | 67.6 | -30 | 1 | 3 | None | Yes |
| CFC-114 | 1.47 | 11.9 | 4 | 0.7 | 3.9 | None | Yes |
| Non-CFCs: | | | | | | | |
| HCFC-22 | 1.21 | 121 | -41 | 0.05 | 0.34 | None | Yes |
| HCFC-123 | 1.47 | 0 | 28 | 0.02 | 0.02 | None | Yes |
| HCFC-124 | 1.38 | 46 | 10 | 0.02 | 0.1 | None | 1995-1996 |
| HCFC-141b | -1.26 | 0 | 32 | 0.1 | 0.09 | Yes | 1995-1996 |
| HC-n-Propane | 0.50 | 108.1 | -44 | 0 | | High | Yes |
| HC-n-Butane | 0.58 | 17 | 0 | 0 | | High | Yes |
| HC-n-Pentane | 0.63 | -23 | 36 | 0 | | High | Yes |
| HC-Isobutane | 0.56 | 31.1 | 11 | 0 | | High | Yes |
| HC-Isopentane | 0.62 | -3.2 | 82 | 0 | | High | Yes |
| HFA (HFC)-125 | 1.23 | 165 | -55 | 0 | 0.58 | None | 1995-1996 |
| HFA-134a | 1.21 | 81 | -27 | 0 | 0.26 | None | Yes |
| HFA (HFC)-152a | 0.91 | 62 | -25 | 0 | 0.03 | Yes | Yes |
| HFA-227 | 1.41 | 43 | -17 | 0 | 0.3 | None | 1994-1995 |

* Relative to CFC-11

### 3.　　U.S. Patent No. 6,352,684

302.　　Defendants assert that claims 1-4, 8 and 9 of the '152 patent are invalid for obviousness-type double patenting over claims 1-3, 5-7 and 10 of U.S. Patent No. 6,352,684 ("the '684 patent").

303.　　The '684 patent and the '152 patent do not share any common inventors.

304.　　The '684 patent was filed as U.S. Patent Application No. 09/067,346 on April 28, 1998.

305.　　The '684 patent is a continuation of U.S. Patent Application No. 08/783,737, filed on January 16, 1997, now U.S. Patent No. 5,766,573, and a continuation of U.S. Patent Application No. 08/784,436, filed on January 16, 1997, now U.S. Patent No. 5,776,434, which is a continuation of U.S. Application No. 08/455,880, filed on May 31, 1995, now abandoned, which is a continuation of U.S. Patent Application No. 08/455,638, filed on May 31, 1995, now abandoned, which is a division of U.S. Patent Application No. 08/026,476, filed on March 4, 1993, now U.S. Patent No. 5,695,743, which is a division of U.S. Patent Application No. 07/649,140, filed on January 30, 1991, now U.S. Patent No. 5,225,183, which is a

continuation of U.S. Patent Application No. 07/442,119, filed on November 28, 1989, now abandoned.

306.     The '684 patent issued on March 5, 2002 to "Riker Laboratories Inc."

307.     According to the face of the '152 patent, the examiner considered the '684 patent during the prosecution of the applications that led to the '152 patent.

308.     First, claims 1-4, 8 and 9 of the '152 patent are directed to formulations that are characterized in that they contain "no surfactant." Claims 1-3, 5-7 and 10 of the '684 patent, however, are directed to formulations that contain surfactant. Claim 1 of the '684 patent recites "less than 5% surface active agent by weight of the formulation." DTX 284 at PER(Albu)036847 (10:1-2). Defendants argue that a POSA would read this limitation to include no surfactant. However, a POSA would have actually read this limitation to recite the presence of some added surfactant in the claimed formulation in an amount less than 5% by weight.

309.     Looking to the specification of the '684 patent to construe the term "less than 5% surface active agent by weight of the formulation," a POSA would have understood that a surfactant is a necessary part of the suspension formulations claimed in the '684 patent, which states that, "[a]ccording to the present invention there is provided an aerosol formulation comprising a medicament, a surfactant, [HFA-134a] and at least one compound having a higher polarity than [HFA-134a]." DTX 284 at PER(Albu)036843 (2:18-21). All of the twenty-four examples in the specification of the '684 patent include surfactant. DTX 284 at PER(Albu)036846-847 (7:5-9:63). In addition, the specification explains that "[t]he surface active agents are generally present in amounts not exceeding 5 percent by weight of the total formulation [and] will usually be present in the weight ratio 1:100 to 10:1 surface active agent:drug(s), but the surface active agent may exceed this weight ratio in cases where the drug

EXTERNAL COUNSEL ONLY

concentration in the formulation is very low." DTX 284 at PER(Albu)036845 (5:33-38). Thus,

after construing the term "less than 5% surface active agent by weight of the formulation," a

POSA would have believed that the suspension formulations of the '684 patent contained

surfactant. Accordingly, as of the mid 1991- late 1992 time period, a POSA would have been of

the belief that surfactants were a necessary ingredient to a suitable pharmaceutical suspension

aerosol formulation. *See supra* ¶¶ 226-234.

310.    A POSA would not have been motivated to eliminate surfactant from the

formulations in claims 1-3, 5-7 and 10 of the '684 patent. As discussed above (*supra* ¶¶ 226-

234), as of the mid 1991- late 1992 time period, a POSA would have been of the belief that

surfactants were needed components of suspension formulations.

311.    In support of their argument that claim 1 includes formulations without surfactant,

Defendants look to claim 11 of the '684 patent, a claim not asserted for double patenting.

Defendants argue that under the principle of claim differentiation, claim 1 must be broader in

scope than claim 11, and as such includes formulations that are surfactant-free. However,

Defendants misinterpret claim 11 of the '684 patent, which states "[a]n aerosol formulation

according to claim 5 comprising surface active agent *selected from the group consisting*

*of* . . . [list of about thirty different surfactants]." DTX 284 at PER(Albu)036847 (10:33-46)

(emphasis added). Claim 1 is broader than claim 11 in that it includes surfactants other than

those expressly recited in dependent claim 11, which is consistent with the principle of claim

differentiation.

312.    Second, claims 1-4, 8 and 9 of the '152 patent are directed to "suspension aerosol

formulations." The '684 patent encompasses both solution and suspension formulations. Claim

4 of the '684 patent, which depends from claim 2, specifies that the formulation is a "solution

formulation." DTX 284 at PER(Albu)036847 (10:10-11). Looking at the claims of the '684 patent, a POSA would not have had any motivation to proceed with a suspension formulation over a solution formulation.

313. Third, claims 1-4, 8 and 9 of the '152 patent are directed to formulations that contain "ethanol in an amount of 5 to about 15% by weight." However, claims 1-3, 5-7 and 10 of the '684 patent are directed to "at least one compound having a higher polarity than 1,1,1,2-tetrafluoroethane." Claim 5 of the '684 patent, which depends from claim 1, recites that the compound having a higher polarity than HFA-134a is "selected from the group consisting of alcohols, propane, butane, isobutane, pentane, isopentane, neopentane, and mixtures thereof." DTX 284 at PER(Albu)036847 (10:12-17). Claim 6 of the '684 patent, which depends from claim 5, further recites that the compound is "selected from the group consisting of ethyl alcohols[,] isopropyl alcohol, n-pentane, isopentane, neopentane, isopropyl myristate and mixtures thereof." DTX 284 at PER(Albu)036847 (10:18-21). A POSA looking at the claims of the '684 patent would not have been motivated to select ethanol from among the many compounds included in claims 5 and 6. Furthermore, under the principles of claim differentiation, claim 1 of the '684 patent includes at least this many, if not more, high polarity compounds. A POSA would not have had any reason to select ethanol from this list of compounds. At most, a POSA would have started with the compounds identified in claims 5 and 6 of the '684 patent.

314. Fourth, claims 1-4, 8 and 9 of the '152 patent are directed to a "particulate drug," "albuterol or a pharmaceutically acceptable salt or solvate thereof," and "albuterol sulfate." Claims 1-3, 5-7 and 10 of the '684 patent, however, are generically directed to a "medicament." Looking at the specification to construe the term "medicament," a POSA would have understood

EXTERNAL COUNSEL ONLY

that a long list of medicaments were disclosed, including over ten classes of drugs and over forty specific drugs.  DTX 284 at PER(Albu)0368475 (5: 38-58).  Moreover, for each of the above medicaments more than fifty salts were also disclosed.  *Id.* at 6:1-13.

315.    A POSA would not have any motivation to select a particulate version of these medicaments, "albuterol or a pharmaceutically acceptable salt or solvate thereof," or "albuterol sulfate," from among all of the medicaments disclosed in the '684 patent.  Furthermore, even if a POSA would have been motivated to select albuterol from among the many medicaments disclosed in the '684 patent, a POSA would not have selected albuterol sulfate.  As discussed above, the '684 patent discloses many possible salt forms available, and its specification makes clear that albuterol base is preferred over albuterol sulfate as a medicament.  DTX 284 at PER(Albu)036845 (5:62-65) ("[I]t has been shown that the free base of salbutamol exhibits a greater dispersion stability than salbutamol sulphate in the formulations of the invention.").

### 4.    U.S. Patent No. 5,766,573

316.    Defendants assert that claims 1-4, 8 and 9 of the '152 patent are invalid for obviousness-type double patenting over claims 1-3 of U.S. Patent No. 5,766,573 ("the '573 patent").

317.    The '573 patent and the '152 patent do not share any common inventors.

318.    The '573 patent was filed as U.S. Patent Application No. 08/783,737 on January 16, 1997.

319.    The '573 patent is a continuation of U.S. Patent Application No. 08/455,880, filed on May 31, 1995, now abandoned, which is a division of U.S. Patent Application No. 08/26,476, filed on March 4, 1995, now U.S. Patent No. 5,695,743, which is a division of U.S. Patent Application No. 07649,140, filed on January 31, 1991, now U.S. Patent No. 5,225,183, which is

**EXTERNAL COUNSEL ONLY**

a continuation of U.S. Patent Application No. 07/442,119, filed on November 28, 1989, now abandoned.

320.    The '573 patent issued on June 16, 1998 to "Riker Laboratories Inc."

321.    According to the face of the '152 patent, the examiner considered the '573 patent during prosecution of the applications that led to the '152 patent.

322.    As an initial matter, the reasons for why claims 1-4, 8 and 9 of the '152 patent are not invalid for obviousness-type double patenting over claims 1-3, 5-7, and 10 of the '684 patent apply to the analysis of obviousness-type double patenting over the '573 patent because the '684 patent and the '573 patent share a common specification.  In addition, claims 1-4, 8 and 9 of the '152 patent are not invalid for obviousness-type double patenting over claims 1-3 of the '573 for the reasons discussed below.

323.    First, claims 1-4, 8 and 9 of the '152 patent are directed to "suspension aerosol formulations."  Claims 1-3 of the '573 patent encompass both solution and suspension formulations.  A POSA looking at the claims of the '573 patent would not have had any motivation to proceed with a suspension formulation over a solution formulation.  However, if there was a need to select a suspension formulation, the POSA would have understood that suspension aerosol formulations of the prior art required surfactant as a necessary component.  Thus, assuming for the sake of argument that there was a need to proceed with suspension formulations, a POSA would not have a reason to exclude a surfactant from the suspension formulation.  As discussed above (*supra* ¶¶ 226-234), as of the mid 1991- late 1992 time period, a POSA would have considered a surfactant to be a necessary component in a suspension formulation.

EXTERNAL COUNSEL ONLY

324.    Second, claims 1-4, 8 and 9 of the '152 patent are directed to a "particulate drug," "albuterol or a pharmaceutically acceptable salt or solvate thereof," and "albuterol sulfate." Claims 1-3 of the '573 patent, however, are generically directed to a "medicament." DTX 814 at PER(Albu)036023 (10:1-17). Referring to the specification to construe the term "medicament," a POSA would have understood that a long list of medicaments were disclosed, including over ten classes of drugs and over forty specific drugs. DTX 814 at PER(Albu)036021 (5:43-64). Moreover, for each of the above medicaments more than fifty salts were also disclosed. DTX 814 at PER(Albu)036021 (6:5-19).

325.    In addition, claim 3 of the '573 patent discloses eight medicaments: "salbutamol, beclomethasone dipropionate, disodium cromoglycate, pirbuterol, isoprenaline, adrenaline, rimiterol, or ipratropium bromide." DTX 814 at PER(Albu)036023 (10:15-18). A POSA would not have been motivated to select a particulate version of these medicaments, "albuterol or a pharmaceutically acceptable salt or solvate thereof," or "albuterol sulfate," from among all of the medicaments disclosed in the '573 patent or the eight medicaments disclosed in claim 3 of the '573 patent. Furthermore, even if a POSA would have been motivated to select albuterol from among the many medicaments disclosed in the '573 patent, a POSA would not have selected albuterol sulfate. As discussed above, the '573 patent discloses many possible salt forms available, and its specification makes clear that albuterol base is preferred over albuterol sulfate as a medicament. DTX 814 at PER(Albu)036021 (6:1-4) ("[I]t has been shown that the free base of salbutamol exhibits a greater dispersion stability than salbutamol sulphate in the formulations of the invention.").

326.    Third, claims 1-4, 8 and 9 of the '152 patent are directed to formulations that contain "ethanol in an amount of 5 to about 15% by weight." Claims 1-3 of the '573 patent are

EXTERNAL COUNSEL ONLY

not so limited. Claim 2 of the '573 patent recites ethyl alcohol (*i.e.,* ethanol) along with five other compounds. DTX 814 at PER(Albu)036023 (10:10-13). A POSA may have selected any one of these six compounds identified in claim 2 for potential inclusion in a formulation and would not have limited themselves to just ethanol. Moreover, a POSA would not have any motivation to select ethanol from the disclosed "compound[s]" in an amount of 5 to about 15 percent by weight."

327. Finally, claims 1-4, 8 and 9 of the '152 patent are directed to formulations that contain "no surfactant." Defendants' experts recognized that the claims of the '573 patent do not exclude surfactant. Looking to the specification of the '573 patent to construe the preamble of claim 1, DTX 814 at PER(Albu)036023 (10:2-9) ("In the method of delivering an aerosol formulation containing a medicament from an aerosol container equipped with a metering valve, said formulation being suitable for delivery to the lung by inhalation from said container . . ."), a POSA would have believed that the '573 patent, when directed to suspension formulations, contained a surfactant. In summarizing the invention, the '573 patent states that, "[a]ccording to the present invention there is provided an aerosol formulation comprising a medicament, a surfactant, [HFA-134a] and at least one compound having a higher polarity than [HFA-134a]." DTX 814 at PER(Albu)036019 (2:9-12). The specification further explains that "[t]he aerosol formulations comprise a surface active agent to stabilise the formulation and lubricate the valve components," *id.* at 020 (4:65-67), and that "[t]he presence of increased amounts of solubi(liz)ed surfactant allows the preparation of stable, homogenous suspensions of drug particles." *Id.* at 3:2-7. Furthermore, all of the twenty-four examples disclosed in the '573 patent include surfactant. *See id.* at 022-323 (7:10-9:20). Thus, a POSA that read the specification to construe

EXTERNAL COUNSEL ONLY

claim 1 of the '573 patent would understand that the suspension formulations of the '573 patent have a surfactant as a needed component of the invention.

### 5.    U.S. Patent No. 5,695,743

328.    Defendants assert that claims 1-4, 8 and 9 of the '152 patent are invalid for obviousness-type double patenting over claims 1 and 2 of U.S. Patent No. 5,695,743 ("the '743 patent").

329.    The '743 patent and the '152 patent do not share any common inventors.

330.    The '743 patent was filed as U.S. Patent Application No. 08/026,476 on March 4, 1993.

331.    The '743 patent is a division of U.S. Patent Application No. 07/649,140, filed on January 30, 1991, now U.S. Patent No. 5,225,183, which is a continuation of U.S. Patent Application No. 07/442,119, filed on November 28, 1989, now abandoned.

332.    The '743 patent issued to "Riker Laboratories Inc." on December 9, 1997.

333.    According to the face of the '152 patent, the Examiner considered the '743 patent.

334.    As an initial matter, the reasons for why claims 1-4, 8 and 9 of the '152 patent are not invalid for obviousness-type double patenting over claims 1-3, 5-7, and 10 of the '684 patent apply to the analysis of obviousness-type double patenting over the '743 patent because the '684 patent and the '743 patent share a common specification.  In addition, claims 1-4, 8 and 9 of the '152 patent are not invalid for obviousness-type double patenting over claims 1 and 2 of the '743 patent for the reasons discussed below.

335.    First, claims 1-4, 8 and 9 of the '152 patent are directed to "suspension aerosol formulations."  Claims 1 and 2 of the '743 patent encompasses both solution and suspension formulations.  A POSA looking at the claims of the '743 patent would not have any motivation to proceed with a suspension formulation over a solution formulation.  However, if there was a

need to select a suspension formulation, a POSA would have understood that suspension aerosol formulations of the prior art required surfactant as a necessary component. Thus, assuming for the sake of argument that there was a need to proceed with suspension formulations, a POSA would not have had a reason to exclude a surfactant from the suspension formulation. As discussed above (*supra* ¶¶ 226-234), as of the mid 1991- late 1992 time period, a POSA would have considered a surfactant to be a necessary component to suspension formulations.

336.    Second, claims 1-4, 8 and 9 of the '152 patent are directed to a "particulate drug," "albuterol or a pharmaceutically acceptable salt or solvate thereof," and "albuterol sulfate." Claims 1 and 2 of the '743 patent, however, are generically directed to a "medicament." Looking at the specification to construe the term "medicament," a POSA would have understood that a long list of medicaments were disclosed, including over ten classes of drugs and over forty specific drugs. DTX 285 at PER(Albu)035865 (5:37-58). Moreover, for each of the above medicaments, more than fifty salts were also disclosed. *Id.* at 5:66–6:11.

337.    In addition, claim 2 of the '743 patent discloses eight medicaments: "salbutamol, beclomethasone dipropionate, disodium cromoglycate, pirbuterol, isoprenaline, adrenaline, rimiterol, and ipratropium bromide." DTX 285 at PER(Albu)035867 (10:9-13). A POSA would not have been motivated to select a particulate version of these medicaments, "albuterol or a pharmaceutically acceptable salt or solvate thereof," or "albuterol sulfate," from among all of the medicaments disclosed in the '743 patent or the eight medicaments disclosed in claim 2 of the '743 patent. Furthermore, even if a POSA would have been motivated to select albuterol from among the many medicaments disclosed in the '743 patent, a POSA would not have selected albuterol sulfate. As discussed above, the '743 patent discloses many possible salt forms available, and its specification makes clear that albuterol base is preferred over albuterol sulfate

EXTERNAL COUNSEL ONLY

as a medicament. *Id.* at 865 (5:62-65) ("[I]t has been shown that the free base of salbutamol exhibits a greater dispersion stability than salbutamol sulphate in the formulations of the invention.").

338.    Third, claims 1-4, 8 and 9 of the '152 patent are directed to formulations that contain "ethanol in an amount of 5 to 15% by weight."  However, neither claim 1 nor claim 2 of the '743 patent include ethanol.  A POSA would understand that a suspension formulation without a solvent, such as ethanol, has substantially different properties than a suspension formulation with ethanol.  Defendants recognize that the '743 patent claims do not include ethanol, but improperly look to the '743 patent specification to ascertain the scope of the claims.  Even assuming that a POSA were to look to the specification, it would explain that compounds of higher polarity than HFA-134a may be used in combination with HFA-134a and a surfactant to obtain a "stable aerosol formulation."  DTX 285 at PER(Albu)035863-864 (2:56-3:4).  Furthermore, the specification of '743 patent explains that "[p]referred compounds of higher polarity than Propellant 134a include ethanol, pentane, isopentane and neopentane."  *Id.* at 864 (4:59-61).  A POSA would not have had any motivation to include a compound of higher polarity in the claimed formulation or to select ethanol over pentane, isopentane or neopentane.

339.    Moreover, claims 1-4, 8 and 9 of the '152 patent are directed to ethanol "in an amount of 5 to about 15 percent by weight."  As discussed above, neither claim 1 nor claim 2 of the '743 patent include ethanol or a concentration thereof.  As no term needs to be construed in claims 1 or 2 of the '743 patent, a POSA would need not reference the specification.  Thus, a POSA would not have been motivated to select ethanol "in an amount of 5 to about 15 percent by weight."

EXTERNAL COUNSEL ONLY

340.    Finally, claims 1-4, 8 and 9 of the '152 patent are directed to formulations that are further characterized in that they contain "no surfactant."  Defendants' experts recognized that the claims of the '743 patent do not include an express "no surfactant" limitation.  Referring to the specification of the '743 patent to construe the preamble of claim 1 ("An aerosol formulation comprising . . . ."), a POSA would understand that a suspension formulation of the '743 patent claims contains a surfactant.  In summarizing the invention, the '743 patent states that, "[a]ccording to the present invention there is provided an aerosol formulation comprising a medicament, a surfactant, [HFA-134a] and at least one compound having a higher polarity than [HFA-134a]."  DTX 285 at PER(Albu)035863 (2:6-9).  The specification further explains that "[t]he aerosol formulations comprise a surface active agent to stabilise the formulation and lubricate the valve components," *id.* at 864 (4:62-64), and that "[t]he presence of increased amounts of solubised [sic] surfactant allows the preparation of stable, homogenous suspensions of drug particles."  *Id.* at 863-64 (2:63-3:4).  Furthermore, all of the twenty-four examples disclosed in the '743 patent include surfactant.  *See id.* at 866-67 (7:1-9:23).  Thus, a POSA that read the specification to construe claim 1 of the '743 patent would have understood that the suspension formulations of the '743 patent have surfactant as a needed component of the invention.

### C.    Conclusions of Law

341.    Defendants have failed to meet their burden of establishing, by clear and convincing evidence, that claims 1-4, 8 and 9 of the '152 patent are invalid for obviousness-type double patenting over any of the asserted references for the reasons set forth below.

**EXTERNAL COUNSEL ONLY**

1.    **Claims 1-4, 8 and 9 of the '152 Patent Are Patentably Distinct From Claims 1, 2 and 4 of the '432 Patent**

342.    Claims 1-4, 8 and 9 of the '152 patent are not invalid for obviousness-type double patenting over claims 1, 2 and 4 of the '432 patent.

343.    First, the '432 Patent claims are directed to *solution* formulations, containing a *single underlined dissolved drug*, beclomethasone 17,21 diprioprionate, and a number of *different propellants* (including HFA 134-a, HFA-227, and mixtures thereof).  A POSA would not have any reason, starting with such a formulation, to make a *suspension* formulation, with *any drug in particulate form*, and to select HFA-134 as the sole propellant.  Moreover, a POSA would have believed that such a formulation with 5 to 15% by weight ethanol was unlikely to form a suspension formulation.  Even if a POSA were motivated to make the following changes to claims 1, 2 and 4 of the '432 patent:  (1) target suspension formulations over solution formulations; (2) select HFA-134a from the disclosed propellants and mixtures thereof; and (3) switch from "beclomethasone 17, 21 dipropionate" to a "particulate drug," "albuterol or a pharmaceutically acceptable salt or solvate thereof," and/or "albuterol sulfate," the first thing a POSA would do would be to modify the formulation of claims 1, 2 and 4 of the '432 patent by adding a surfactant.  As discussed above (*supra* ¶¶ 226-234), as of the mid 1991- late 1992 time period, a POSA would have been aware that solution formulations were sometimes made without surfactant, but would have believed that surfactants were necessary for suspension formulations.

a.    **Defendants Improperly Rely on the Specification of the '432 Patent and the '684 Patent**

344.    In support of their position that claim 1 of the '152 patent is obvious in view of claims 1, 2 and 4 of the '432 patent, Defendants assert that Examples 8 and 9 from the '432 patent describe that beclomethasone 17, 21 dipropionate was cold filled into aerosol vials as a suspension formulation before changing to a solution formulation at room temperature.

EXTERNAL COUNSEL ONLY

Defendants' argument improperly relies on the specification of the '432 patent in a manner that is not permissible in a double patenting analysis. *See Gen. Foods Corp.,* 972 F.2d at 1281. Assuming, for the sake of argument, that a person of ordinary skill is allowed to review the specification of the '432 patent, it confirms that claims 1, 2 and 4 are only directed to solution formulations.

345.    Defendants also improperly rely on the '684 patent to support their argument that the recitation of suspension versus solution is not a patentable distinction. Although this reliance is misplaced, for the reasons set forth below, the '684 patent does not alter the conclusion. *See infra* ¶¶ 351-354.

346.    For at least the foregoing reasons, a POSA would not have been motivated to make the necessary changes to the formulations claimed in claims 1, 2 and 4 of the '432 patent to arrive at claims 1-4, 8 and 9 of the '152 patent with any reasonable expectation of success.

### 2.    Claims 1-4, 8 and 9 of the '152 Patent are Patentably Distinct from Claims 1-3, 5 and 9 of the '534 Patent

347.    Claims 1-4, 8 and 9 of the '152 patent are not invalid for obviousness-type double patenting over claims 1-3, 5 and 9 of the '534 patent.

348.    The '534 patent claims are directed to formulations with *HFA-227* as propellant. A POSA would not have had any reason to switch from HFA-227 to HFA-134a. *See supra* ¶¶ 298-301. Moreover, even if a POSA were motivated to change claims 1-3, 5 and 9 of the '534 patent by switching the propellant from HFA-227 to HFA-134a, a POSA would have believed from the teachings of the prior art, including the Purewal '777 application, that a surfactant was a necessary ingredient in formulations using HFA-134a as a propellant. *See supra* ¶¶ 226-234. Thus, a POSA would not have made a suspension aerosol formulation without surfactant, as claimed in claims 1-4, 8 and 9 of the '152 patent.

EXTERNAL COUNSEL ONLY

a. **Defendants Improperly Rely on the Specification of the '152 Patent**

349.    Defendants improperly rely on the specification of the '152 patent to argue that the '152 patent is obvious.  Defendants' experts argue that, because the specification of the '152 patent mentions HFA-227 and HFA-134a, claims to each propellant cannot be patentable. Because the '152 patent is not prior art to itself, however, the statements in that specification are wholly irrelevant to the double patenting analysis.  Regardless, the same patent examiner allowed the '534 and '152 patents on the same day and never issued a provisional double patenting rejection using one set of patent claims against the other.

350.    Thus, for at least the foregoing reasons, a POSA would not have been motivated to make the necessary changes to the formulations of claims 1-3, 5, and 9 of the '534 patent to arrive at claims 1-4, 8 and 9 of the '152 patent with any reasonable expectation of success.

3. **Claims 1-4, 8 and 9 of the '152 Patent are Patentably Distinct from Claims 1-3, 5-7 and 10 of the '684 Patent**

351.    Claims 1-4, 8 and 9 of the '152 patent are not invalid for obviousness-type double patenting over claims 1-3, 5-7 and 10 of the '684 patent.

352.    The '684 patent claims are directed to suspension and solution formulations that contain *"less than 5% surface active agent,"* a medicament, and one of many listed compounds having a higher polarity than HFA-134a.  A POSA would not have any reason, starting with such a formulation, to make a *suspension* formulation with *ethanol* in an amount of 5 to about 15% by weight, a*ny drug in particulate form*, and *without surfactant*.

353.    Even if a POSA were motivated to make the following changes to the claims of the '684 patent:  (1) remove the "surface active agent;" (2) target suspension formulations over solution formulations; (3) select ethanol from the many "high polarity" compounds disclosed; and (4) switch from a "medicament" to a "particulate drug" or select "albuterol or a

EXTERNAL COUNSEL ONLY

pharmaceutically acceptable salt or solvate thereof," or "albuterol sulfate" from the many

"medicaments" disclosed in the '684, a POSA would still have not been motivated to arrive at

the claims of the '152 patent.  A POSA would have understood from the prior art that ethanol

was being added to the formulations of the '684 patent in order to solubilize the surfactant and to

prepare "stable, homogenous suspensions."  DTX 284 at PER(Albu)036844 (3:8-14).   Thus, if

ethanol was used in the formulations of the '684 patent, a POSA would have been motivated to

keep surfactants in the formulation.  However, if surfactants were removed from formulations of

the '684 patent, a POSA would have been motivated to also remove the ethanol because it would

no longer be needed to solubilize the surfactant.  Also, for the reasons discussed above with

respect to non-obviousness, a POSA would not have a reasonable expectation of success that

changing from the formulations in claims 1-3, 5-7 and 10 of the '684 patent to the formulations

in claims 1-4, 8 and 9 of the '152 patent would result in a pharmaceutical suspension aerosol

formulation.  *See supra* Section VIII.B.

354.    For at least the foregoing reasons, a POSA would not have been motivated to

make the necessary changes to the formulations claimed in claims 1-3, 5-7 and 10 of the '684

patent to arrive at claims 1-4, 8 and 9 of the '152 patent with any reasonable expectation of

success.

### 4.    Claims 1-4, 8 and 9 of the '152 Patent are Patentably Distinct from Claims 1-3 of the '573 Patent

355.    Claims 1-4, 8 and 9 of the '152 patent are not invalid for obviousness-type double

patenting over claims 1-3 of the '573 patent.

356.    The '573 patent claims are directed to suspension and solution formulations that

contain a medicament and one of six additional *compounds*.  In addition, a POSA would have

understood that the suspension formulations of the '573 patent contained surfactant as a

**EXTERNAL COUNSEL ONLY**

necessary component.  A POSA would not have any reason, starting with such a formulation, to make a *suspension* formulation with *ethanol* in an amount of 5 to about 15% by weight, *any drug in particulate form*, and *no surfactant*.

357.   Even if a POSA were motivated to make the following changes to the claims of the '573 patent:  (1) exclude surfactant; 2) target a suspension formulation over a solution formulation; (3) select ethanol from the many "compound[s]"; (4) further select the concentration of ethanol "in an amount of 5 to about 15 percent by weight"; and (5) switch from a "medicament" to a "particulate drug" or select "albuterol or a pharmaceutically acceptable salt or solvate thereof," or "albuterol sulfate" from the many "medicaments" disclosed in the '573 patent, a POSA would still have not been motivated to arrive at the claims of the '152 patent.  A POSA would have understood from the prior art that ethanol was being added to the formulations of the '573 patent in order to solubilize the surfactant and to prepare "stable, homogenous suspensions."  DTX 814 at PER(Albu)036019 (2:66-3:7).  Thus, if ethanol was used in the formulations of the '573 patent, a POSA would have been motivated to keep surfactants in the formulation.  However, if surfactants were removed from formulations of the '573 patent, a POSA would have been motivated to also remove the ethanol because it would no longer be needed to solubilize the surfactant.  Additionally, as discussed above with respect to non-obviousness, a POSA would not have a reasonable expectation of success that changing from the formulations in claims 1-3 of the '573 patent to the formulations in claims 1-4, 8 and 9 of the '152 patent would result in a pharmaceutical suspension aerosol formulation.  *See supra* Section VIII.B.

358.    For at least the foregoing reasons, a POSA would not have been motivated to make the necessary changes to the formulations claimed in claims 1-3 of the '573 patent to arrive at claims 1-4, 8 and 9 of the '152 patent with a reasonable expectation of success.

### 5.    Claims 1-4, 8 and 9 of the '152 Patent are Patentably Distinct from Claims 1 and 2 of the '743 Patent

359.    Claims 1-4, 8 and 9 of the '152 patent are not invalid for obviousness-type double patenting over claims 1 and 2 of the '743 patent.

360.    The '743 patent claims are directed to suspension and solution formulations that contain a medicament.  In addition, a POSA would have understood that the suspension formulations of the '743 patent contained a surfactant as a necessary component.  A POSA would not have had any reason, starting with such a formulation, to make a *suspension* formulation with *ethanol* in an amount of 5 to about 15% by weight, *any drug in particulate form*, and *no surfactant*.

361.    Even if a POSA were motivated to make the following changes to the claims of the '743 patent:  (1) exclude surfactant; (2) target a suspension formulation over a solution formulation; (3) add ethanol; (4) further select the concentration of ethanol "in an amount of 5 to about 15 percent by weight;" and (5) switch from a "medicament" to a "particulate drug" or select "albuterol or a pharmaceutically acceptable salt or solvate thereof," or "albuterol sulfate" from the many "medicaments" disclosed in the '743 patent, a POSA would still have not been motivated to arrive at the claims of the '152 patent.  A POSA would have understood that ethanol was being added to the formulations of the '743 patent in order to solubilize the surfactant and to prepare "stable, homogenous suspensions."  DTX 285 at PER(Albu)035863-864 (2:63-3:4).  Thus, if ethanol was used in suspension formulations of the '743 patent, a POSA would have been motivated to keep surfactants in the formulation.  However, if surfactants were

EXTERNAL COUNSEL ONLY

removed from suspension formulations of the '743 patent, a POSA would have been motivated to also remove the ethanol because it would no longer be needed to solubilize the surfactant. Also, for the reasons discussed above with respect to non-obviousness, a POSA would not have a reasonable expectation of success that changing from the formulations in claims 1 and 2 of the '743 patent to the formulations in claims 1-4, 8 and 9 of the '152 patent would result in a pharmaceutical suspension aerosol formulation. *See supra* Section VIII.B.

362.    For at least the foregoing reasons, a POSA would not have been motivated to make the necessary changes to the formulations claimed in claims 1 and 2 of the '743 patent to arrive at claims 1-4, 8, and 9 of the '152 patent with a reasonable expectation of success.

### a.    Defendants Improperly Rely on Non-Prior Art Statements by 3M and Others

363.    Defendants' experts rely on certain statements from the prosecution history of the 09/444,296 patent application concerning a proposed interference between Glaxo Group Ltd. and 3M and other statements made by Norton Healthcare limited in a complaint from another litigation.  None of these statements are prior art to the '152 patent.  Accordingly, these statements are unrelated to the fundamental question of whether a POSA would have been motivated to make the necessary changes to arrive at claims 1-4, 8 and 9 of the '152 patent with a reasonable expectation of success and any reliance thereupon is misplaced, and well outside the scope of the proper material to be considered in a double patenting analysis.

## XI.    The Asserted Claims of the '152 Patent Are Not Invalid Under 35 U.S.C. § 112

### A.    Legal Principles

#### 1.    Written Description

364.    Section 112, 35 U.S.C. states that "the specification shall contain a written description of the invention"; that has been interpreted by the Federal Circuit to mean that "[t]he

EXTERNAL COUNSEL ONLY

specification must describe an invention understandable to th[e] skilled artisan and show that the

inventor actually invented the invention claimed." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598

F.3d 1336, 1351 (Fed. Cir. 2010) (en banc). The relevant test is whether the specification shows

that the inventor was "in possession of" the claimed invention, *i.e.*, whether the specification

"allow[s] one skilled in the art to visualize or recognize the identity of the subject matter

purportedly described." *Koito Mfg. Co. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1154 (Fed. Cir.

2004) (internal quotation marks omitted). At the same time, the Federal Circuit has "made clear

that the written description requirement does not demand . . . examples." *Ariad*, 598 F.3d at

1352. All that is required is that the specification describe the invention "in a definite way [that]

identifies the claimed invention." *Id.* That is, a POSA must be able to understand what the

invention is and see what the inventor claimed corresponds to what the specification describes.

*Id.*; *Koito*, 381 F.3d at 1154.

365. The presumption of validity applies to a written description defense, and

Defendants bear the burden of establishing by clear and convincing evidence that the claims do

not meet the written description requirement. *Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d

1352, 1364 (Fed. Cir. 2003). "Compliance with the written description requirement is a question

of fact." *Crown Packaging Tech., Inc. v. Ball Metal Beverage Container Corp.*, 635 F.3d 1373,

1380 (Fed. Cir. 2011) (internal quotation marks omitted).

## 2. Enablement

366. A patent claim is invalid for lack of enablement only if the claimed invention

cannot be practiced without "undue experimentation" by a POSA. *Monsanto Co. v. Scruggs*, 459

F.3d 1328, 1337-38 (Fed. Cir. 2006); *In re Wands*, 858 F.2d 731, 736-37 (Fed. Cir. 1988). What

constitutes undue experimentation, as explained by the courts, "requires the application of a

EXTERNAL COUNSEL ONLY

standard of reasonableness, having due regard for the nature of the invention and the state of the art." *In re Wands*, 858 F.2d at 737.

367.    The Federal Circuit has made clear that a patent specification is not a product specification. *Koito*, 381 F.3d at 1156. Although a patent specification must provide an enabling disclosure, a claim does not fail the enablement requirement simply because details that would be known and available to those of skill in the art are not set forth in the patent specification. *See Ajinomoto Co. v. Archer-Daniels-Midland Co.*, 228 F.3d 1338, 1345 (Fed. Cir. 2000) ("Enablement is determined from the viewpoint of persons of skill in the field of the invention at the time the patent application was filed."); *United States v. Telectronics, Inc.*, 857 F.2d 778, 785 (Fed. Cir. 1988) ("The test of enablement is whether one reasonably skilled in the art could make or use the invention from the disclosures in the patent coupled with information known in the art without undue experimentation."); *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1384 (Fed. Cir. 1986) ("[A] patent need not teach, and preferably omits, what is well known in the art.").

368.    Determining whether required experimentation is "undue" requires consideration of the technology at issue and the level of skill in the art. *Falko-Gunter Falkner v. Inglis*, 448 F.3d 1357, 1365 (Fed. Cir. 2006) (claims to a vaccine enabled where skill level in art was high, agreeing with the BPAI that "the mere fact that the experimentation may have been difficult and time consuming does not mandate a conclusion that such experimentation would have been considered 'undue' in this art"); *Monsanto Co. v. Scruggs*, 459 F.3d 1328, 1338 (Fed. Cir. 2006) (specific DNA sequence was not required for enablement in part because of the level of skill in the art); *In re Wands*, 858 F.2d at 740 (weighing the high level of skill in the art in holding that undue experimentation would not be required). As a matter of law, a POSA is deemed familiar

## EXTERNAL COUNSEL ONLY

with all pertinent prior art. *Custom-Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955,

962 (Fed. Cir. 1986).

369.    A claim will not be invalidated for lack of enablement simply because the

specification does not contain examples disclosing every embodiment within the scope of the

claim language.  *See In re Angstadt*, 537 F.2d 498, 502-03 (C.C.P.A. 1976).

370.    In determining whether a claim is enabled, courts have looked to the following

factors, known as the "*Wands*" factors:

> (1) the quantity of experimentation necessary, (2) the amount of
> direction or guidance presented, (3) the presence or absence of
> working examples, (4) the nature of the invention, (5) the state of
> the prior art, (6) the relative skill of those in the art, (7) the
> predictability or unpredictability of the art, and (8) the breadth of
> the claims.

*In re Wands*, 858 F.2d at 737.

371.    Whether a patent claim satisfies the enablement requirement is a question of law

based on underlying facts.  *Sitrick v. Dreamworks, LLC*, 516 F.3d 993, 999 (Fed. Cir. 2008);

*Genentech, Inc. v. Novo Nordisk, A/S*, 108 F.3d 1361, 1365 (Fed. Cir. 1997).

### B.    Findings of Fact

372.    From the specification of the '152 patent, it is readily apparent that the applicants

disclosed detailed information in support of their invention, and that the quantity of

experimentation, if any, would not be undue.  The inventors provided significant guidance in the

specification.  For example, the specification describes the preferred concentration of particulate

drug in formulation:

> Generally the concentration of the drug in a formulation of the
> invention is preferably less than about 0.1 percent, more preferably
> less than about 0.08 percent, and most preferably less than about
> 0.05 percent.  Accordingly, it is preferred according to this
> invention that the drug have a potency such that concentrations less
> than about 0.1 percent, more preferably less than about 0.08

**EXTERNAL COUNSEL ONLY**

> percent, and most preferably less than about 0.05 percent, are therapeutically effective.  Preferred drugs for use in the formulations of the invention therefore include formoterol, salmeterol, and pharmaceutically acceptable salts thereof, particularly formoterol fumarate.

JTX 1 at PER(Albu)012698 (4:29-44).

373.    The specification also states:

> The propellant in a formulation of the invention can be HFC 134a, HFC 227, or a mixture thereof in any proportion.  The propellant is present in an amount sufficient to propel a plurality of doses from a metered dose inhaler.

*Id*. at 4:45-48.

374.    The patent specification, as discussed above (*supra* ¶ 55), also discloses numerous examples that described methods to prepare formulations, methods to fill formulations into aerosol canisters, and methods to analyze the performance of the various formulations, including particle size analysis, respirable fraction analysis, through life delivery analysis, and deposition of the emitted dose analysis.

375.    The relative skill in the art related to the subject matter of the '152 patent is relatively high.  Based on the teaching of the specification, a POSA would have understood the need to select a particulate drug that is substantially insoluble in the propellant.  JTX 1 at PER(Albu)012698 (3:30-33).  A POSA would have further understood that the particulate drug should "remain suspended in a formulation of the invention for a time sufficient to allow reproducible dosing of the drug."  *Id*. at 3:64-66.  Thus, after consulting the specification, a POSA would have understood that a particulate drug should not be very soluble in either propellant or solvent so as to form a stable suspension formulation.

376.    The specification states that pirbuterol acetate formulations of the claimed inventions constitute "about 0.4 to about 1.0 percent by weight, more preferably about 0.45 to

EXTERNAL COUNSEL ONLY

about 0.9 percent by weight, of the aerosol formulation." JTX 1 at PER(Albu)012698 (4:61-63). When ethanol is present in formulations with pirbuterol acetate it constitutes "about 0.1 to about 12 percent by weight, preferably from about 5 to about 12 percent by weight of the aerosol formulation." *Id*. at 698-699 (4:66-5:2). When ethanol is present in the pirbuterol acetate formulation, the specification teaches that oleic acid is "optional[]." *Id*. at 699 (5:4-6). The specification teaches that "[t]he propellant in a pirbuterol acetate formulation of the invention comprises HFC 227, preferably as substantially the only propellant . . . [h]owever, one or more other propellants such as . . . HFC 134a, and the like can be used, preferably in pirbuterol acetate formulations of the invention containing ethanol." *Id*. at 5:14-20. The patent specification also discloses that pirbuterol acetate formulations of the invention "exhibit substantially no growth in particle size or change in crystal morphology of the pirbuterol acetate over a prolonged period, are substantially and readily redispersible, and upon redispersion do not flocculate so quickly as to prevent reproducible dosing of pirbuterol acetate." *Id*. at 5:21-26.

377.     The patent specification also states that "[p]referably micronized albuterol sulfate constitutes about 0.2 to about 0.5 percent by weight, more preferably from about 0.35 to about 0.42 percent by weight of the aerosol formulation." JTX 1 at 699 (5:29-33). When ethanol is present in formulations containing albuterol sulfate it constitutes "about 0.1 to about 20 percent by weight, preferably from about 5 to about 15 percent by weight of the formulation." *Id*. at 5:34-38. When ethanol is present in the albuterol sulfate formulation, the specification teaches that oleic acid and sorbitan trioleate are "optional[]." *Id*. at 5:39-40. According the patent specification, the "propellant constitutes the remainder of the weight of the formulation once the albuterol sulfate and the optional surfactant and/or ethanol are accounted for." *Id*. at 5:48-51. The patent specification also discloses that albuterol sulfate formulations of the invention

EXTERNAL COUNSEL ONLY

"exhibit substantially no growth in particle size or change in crystal morphology of the albuterol sulfate over a prolonged period, are substantially and readily redispersible, and upon redispersion do not flocculate so quickly as to prevent reproducible dosing of albuterol sulfate." *Id*. at 5:54-59.

378.    The patent specification states that the invention can be prepared by "combining (i) the drug in an amount sufficient to provide a plurality of therapeutically effective doses; and (ii) the propellant in an amount sufficient to propel a plurality of doses from an aerosol canister; and dispersing the drug in the propellant.  The drug can be dispersed using a conventional mixer or homogenizer, by shaking, or by ultrasonic energy.  Bulk formulation can be transferred to smaller individual aerosol vials by using valve to valve transfer methods or by using conventional cold-fill methods."  JTX 1 at PER(Albu)012699 (5:60-6:2).  Concerning the preparation of albuterol sulfate formulations, the patent specification states that:

> [t]he albuterol sulfate suspension aerosol formulations of this invention can be prepared by combining the albuterol sulfate and the propellant and dispersing the albuterol sulfate in the propellant using a conventional mixer or homogenizer.  When a surfactant and/or ethanol are included in the formulation, they can be added to the propellant along with the albuterol sulfate." *Id*. at 6:14-20.

The patent then describes a number of examples, including examples with 5 to 15% w/w ethanol, where surfactant was optionally included.

379.    Based on the specification and the test results disclosed in the aforementioned examples, the specification of the '152 patent reasonably conveys to a POSA that the inventors had possession of the inventions claimed in the '152 patent.  Furthermore, based on the specification, test methods, and the test results disclosed in the aforementioned examples, a POSA would be able to practice the asserted claims of the '152 patent without undue experimentation.

**EXTERNAL COUNSEL ONLY**

380.    In addition, applicants' November 10, 1998 amendment added the claims 1-3 at issue here.  *See* JTX 2 at PER(Albu)008476-00.  Applicants expressly informed the examiner where support could be found for these claims:

**EXHIBIT D**

| Applicants' Claims | Support in Applicants' '039 Specification |
|---|---|
| 78.    A pharmaceutical suspension aerosol formulation consisting essentially of: | Pg. 3, lines 34-36 |
| (i)    particulate drug; | Pg. 5 lines 27-29, pg. 7, line 35-pg. 8, line 6 |
| (ii)    1,1,1,2-tetrafluoroethane as propellant; and | Pg. 8, lines 7-8; pg. 9, lines 13-17 |
| (iii)    ethanol, wherein the formulation is further characterized in that | Pg. 8, lines 30-35; pg. 9, lines 32-36 |
| it contains no surfactant. | Pg. 8, line 37-pg. 9, line 3; Pg. 11, lines 32-34 |
| 79.    The pharmaceutical suspension aerosol formulation of claim 78, wherein the drug is micronized. | Pg. 6, lines 22-27; pg. 8, lines 28-29 |
| 80.    The pharmaceutical suspension aerosol formulation of claim 85 wherein ethanol is present in an amount from about 0.1 to about 20 percent by weight. | Pg. 9, lines 33-35 |
| 81.    The pharmaceutical suspension aerosol formulation of claim 86 wherein ethanol is present in an amount from about 0.1 to about 12 percent by weight. | Pg. 8, lines 32-34 |
| 82.    An aerosol canister equipped with a metering valve, containing a formulation according to claim 78 in an amount sufficient to provide a plurality of | Pg. 11, line 18-pg. 12, line 16 |

| Applicants' Claims | Support in Applicants' '039 Specification |
|---|---|
| therapeutically effective doses of the drug. | |
| 83.    An aerosol canister equipped with a metering valve containing a pharmaceutical suspension aerosol formulation consisting essentially of: | Pg. 11, line 18-pg. 12, line 16 |
| (i)    particulate drug in a concentration of less than about 0.1% by weight; | Pg. 7, line 35; pg. 8, lines 6 |
| (ii)    1,1,1,2-tetrafluoroethane as propellant; and | Pg. 8, lines 7-8; pg. 9, lines 13-17 |
| (iii)    about 0.1 to about 12% by weight of ethanol, wherein the formulation is further characterized in that it contains no surfactant. | Pg. 8, lines 32-34 |
| | Pg. 8, line 37-pg. 9, line 3; pg. 11, lines 32-24 |

I-1-118

**EXTERNAL COUNSEL ONLY**

*Id.* at PER(Albu)008493-494.

381.    In the Office Action responding to these statements, the examiner did not disagree with the applicants' statement that the new claims were supported by the specification.  *See* JTX 2 at PER(Albu)008501-06.

382.    Thus, for this additional reason, the specification of the '152 patent reasonably conveys to a POSA that the inventors had possession of the inventions claimed in claims 1-4, 8 and 9 of the '152 patent.

       **C.**    **Conclusions of Law**

383.    Defendants assert that the asserted claims of the '152 patent do not satisfy the written description or enablement requirement under 35 U.S.C. § 112.  Defendants have not shown by clear and convincing evidence that the specification of the '152 patent does not reasonable convey to those skilled in the art that the inventors had possession of the claimed subject matter.

384.    Here, there can be no serious debate that the written description and enablement requirements are satisfied.  Defendants focus on the absence of a specific example for the formulation used in both ProAir® HFA and the ANDA Product.  But a specific example containing albuterol sulfate, ethanol, HFA-134a and the absence of surfactant is not a requirement of the law.  *See Ariad*, 598 F.3d at 1352 ("We have made clear that the written description requirement does not demand . . . examples").  All that is required is that the specification describe the invention "in a definite way [that] identifies the claimed invention." *See id*.  That is, a POSA must be able to understand what the invention is and see what the inventor claimed corresponds to what the specification describes.  *See id*.; *Koito*, 381 F.3d at 1154.

EXTERNAL COUNSEL ONLY

385.     The invention at issue here relates to a pharmaceutical suspension aerosol

formulation consisting essentially of particulate drug, HFA-134a, ethanol in an amount of 5 to

about 15% by weight and no surfactant.  As discussed above, the specification of the '152 patent

describes that invention.  Defendants have not shown by clear and convincing evidence that a

POSA would not be able to make and use the invention without undue experimentation.

386.     As discussed above, Defendants also argue that claims 1 and 4 of the '152 patent

are not enabled because a POSA would not understand how to make a suspension of

beclomethasone dipropionate, as described in claim 4 of the '152 patent, without undue

experimentation.  *See, e.g.*, *Gevo, Inc. v. Butamax Advanced Biofuels LLC*, Civ. No. 13-576-

SLR, 2013 U.S. Dist. LEXIS 104684, at *56-57 (D. Del. July 26, 2013) (holding that a "single

inoperative embodiment" did not render an asserted claim invalid for lack of enablement);

*Crown Operations Int'l, Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1381 n.8 (Fed. Cir. 2002) (holding

that, to the extent that defendants have alleged a lack of enablement based on inoperable

embodiments, defendants must show that the asserted claim "reads on significant numbers of

inoperative embodiments").  As an initial matter, Defendants offer no evidence that

beclomethasone dipropionate cannot form a suspension as claimed in claim 4 of the '152 patent.

387.     Defendants ignore that it would not require undue experimentation for a POSA to

select a particulate drug from the list of drugs in claim 4.  For example, based on the teaching of

the specification, a POSA would understand the need to select a particulate drug that is

substantially insoluble in the propellant.  JTX 1 at PER(Albu)012698 (3:30-33).  A POSA would

further understand that the particulate drug should "remain suspended in a formulation of the

invention for a time sufficient to allow reproducible dosing of the drug."  *Id.* at 3:64-67.  Thus,

after consulting the specification, a POSA would understand that a particulate drug should not be

**EXTERNAL COUNSEL ONLY**

very soluble in either propellant or solvent so as to form a stable suspension formulation.

Accordingly, a POSA would be able to practice claims 1 and 4 without undue experimentation.

## XII.    Defendants' "Prosecution Irregularities" Challenge Fails

### A.    Background

388.    Defendants contend that the Court should not enforce the '152 patent because of an amendment (the "Second Rule 1.129(a) submission") that, Defendants argue, the examiner should not have allowed during prosecution of the application that issued as the '152 patent. Defendants argument is erroneous on a number of grounds.

389.    As an initial matter, an allegation of "prosecution irregularities" is not a defense to patent infringement.  *See* 35 U.S.C. §§ 102-112.  Defendants do not have standing to challenge such alleged prosecution irregularities.

390.    Section 1.129 (or "Rule 1.129") is a transitional provision enacted to aid implementation of the new patent term enacted by the Uruguay Round Agreements Act ("URAA").

391.    The URAA provided for a patent term of twenty years from the earliest filing date of a patent application, while the prior patent term had been seventeen years from the date of issuance or twenty years from the date of filing, whichever is longer.  The URAA patent term provision went into effect on June 8, 1995.  The twenty-year patent term is sometimes referred to as "post-GATT" term—referring to the General Agreements on Tariffs and Trade that precipitated the change in U.S. patent term—and the seventeen-year patent term is sometimes referred to as "pre-GATT" term.

392.    A Rule 1.129(a) submission must be filed prior to the filing of an appeal brief and prior to abandonment of an application, with the appropriate filing fee.  37 C.F.R. § 1.129(a).  A "submission" under Rule 1.129(a) "includes, but is not limited to, an information disclosure

EXTERNAL COUNSEL ONLY

statement, an amendment to the written description, claims or drawings and a new substantive

argument or new evidence in support of patentability." *Id.*

393.    Rule 1.129 was implemented to "facilitate the completion of prosecution of

applications pending in the [U.S. Patent and Trademark Office] as of June 8, 1995 and to ease

the transition between a 17-year patent term and a 20-year patent term."  PTX 808 at

PER(Albu)065658 (Manual of Patent Examining Procedure ("MPEP") § 706.07(g)).

> An applicant [is] able to take advantage of [Rule 1.129] on two
> separate occasions provided the submission and fee are presented
> prior to the filing of the Appeal Brief and prior to abandonment of
> the application.  This [has] the effect of enabling an applicant to
> essentially reopen prosecution of the pending application on two
> separate occasions by paying a fee for each occasion, and avoid the
> impact of refiling the application to obtain consideration of
> additional claims and/or information relative to the claimed subject
> matter.

*Id.*

394.    Here, the Second Rule 1.129(a) submission was proper and the examiner did not

err in accepting it.  But even if the Second Rule 1.129(a) submission was not a proper

amendment, the examiner had discretion to allow it or, had he denied it, the applicant would

have been permitted to "cure" any defect without forfeiting any patent term.  Holding the patent

"expired" now would unfairly deprive the patentee of the statutory pre-GATT term to which the

'152 patent is entitled.

**B.    Findings of Fact**

**1.    The '039 Application**

395.    U.S. Patent Application No. 07/809,791 ("the '791 application") was filed on

December 18, 1991.

396.    The '791 application is titled "Albuterol Sulfate Suspension Aerosol

Formulations."

**EXTERNAL COUNSEL ONLY**

397.    The inventors named on the face of the '791 application are Martin J. Oliver and Robert A. Moris.

398.    U.S. Patent Application No. 07/810,401 ("the '401 application") was filed on December 18, 1991.

399.    The '401 application is titled "Pirbuterol Suspension Aerosol Formulations."

400.    The inventor named on the face of the '401 application is Robert K. Schultz.

401.    U.S. Application No. 07/878,039 ("the '039 application") was filed on May 4, 1992.

402.    The '039 application is a continuation-in-part of the '401 and '791 applications.

403.    The '039 application is titled "Suspension Aerosol Formulations."

404.    The inventors named on the face of the '039 application are Robert K. Schultz, David W. Schultz, Martin J. Oliver, Robert A. Moris and Philip A. Jinks.

405.    The '039 application was originally filed with sixty claims numbered 1-60. JTX 36 at PER(Albu)012904-911.

406.    On February 8, 1993, the examiner, Gollamudi Kishore, issued a first Office Action in the '039 application.  JTX 36 at PER(Albu)012947-951.  The Office Action included a restriction requirement (hereinafter, the "Restriction Requirement") and two election of species requirements.  *Id.*

407.    The Restriction Requirement included six inventions.  *Id.*

408.    In the Restriction Requirement, the examiner further imposed a requirement for an election of a drug species.  *Id.* at 950-951.  That species requirement was later withdrawn.  *Id.* at 954.

EXTERNAL COUNSEL ONLY

409.    In the Restriction Requirement, the examiner also imposed a requirement for an election of a propellant species, which stated that "[t]his application contains claims directed to the following patentably distinct species of the claimed invention: 1) HFC 134a. 2) a mixture of HFC 134a and 227 in inventions I, and II.  Applicant is required under 35 U.S.C. § 121 to elect a single disclosed species for prosecution on the merits to which the claims shall be restricted if no generic claim is finally held to be allowable.  Currently, [claims] 1, 5-8, 27-29 are generic." *Id.* at 950.

410.    The propellant species election requirement did not include HFC 227 as an electable species and only applied to Inventions I and II.  Only the claims of Inventions I and II were directed to formulations that contained propellant selected from the group consisting of HFC 134a, HFC 227 and a mixture thereof.  *See id.*

411.    The propellant species election requirement in the Restriction Requirement also noted that the propellant species were patentably distinct, but not that they were independent. *See id.*

412.    The claims identified for Invention I all depended from claim 1, which recited a pharmaceutical suspension formulation suitable for aerosol administration "consisting essentially of" a drug and a propellant (HFC 134a, HFC 227, or a mixture thereof).  *Id.* at 904.

413.    The claims identified for Invention III all depended from claim 31, which recited an aerosol formulation comprising a drug (selected from pirbuterol acetate and pirbuterol hydrochloride) and a propellant (HFC 227) where the formulation was "substantially free of perfluorinated surfactant."  *Id.* at 907-908.

414.    On March 9, 1993, in response to the Restriction Requirement, the applicants elected Invention I, with HFC 134a as the specific propellant.  *Id.* at 952.

**EXTERNAL COUNSEL ONLY**

415.    On October 22, 1997, the '039 application was expressly abandoned.  *Id.* at PER(Albu)013081.

### 2.    The '603 Application

416.    U.S. Patent Application No. 08/955,603 ("the '603 application") was filed on October 22, 1997 as a file wrapper continuation of the '039 application.

417.    The '603 application is titled "Suspension Aerosol Formulations."

418.    The inventors named on the face of the '603 application are Robert K. Schultz, David W. Schultz, Robert A. Moris and Philip A. Jinks.

419.    On March 4, 1998, the examiner issued a final rejection.  JTX 33 at PER(Albu)012419-424.

420.    On August 18, 1998, the applicants filed an Amendment After Final Rejection proposing cancellation of all pending claims and addition of claims 76-107.  *Id.* at 428-441.

421.    On August 27, 1998, the examiner issued an Advisory Action indicating that the August 18, 1998 proposed Amendment After Final would not be entered.  Among other reasons, the Advisory Action stated that the proposed Amendment After Final would "raise new issues that would require further consideration and/or search."  *Id.* at 499.

422.    On March 4, 1999, the applicants filed a Continued Prosecution Application ("CPA") Request Transmittal as a continuation of the '603 application (hereinafter "the '603 CPA").  *Id.* at 506-507.

423.    The '603 CPA included a specific request for a CPA as well as an express abandonment of the prior application.  *Id.*

424.    The '603 CPA indicated that the power of attorney and assignment from the inventors were "of record in prior application."  *Id.*

EXTERNAL COUNSEL ONLY

425.    The '603 CPA included a Preliminary Amendment asking to cancel claims 76-107 and add claims 108-15.  *Id.* at 653-659.  Despite the applicants' request, claims 76-107 were not actually theretofore pending because they were refused entry in the August 27, 1998 Advisory Action.  *See id.* at 499.

### 3.    The '490 Application

426.    U.S. Patent Application No. 08/455,490 ("the '490 application") was filed on May 31, 1995.

427.    The '490 application is a divisional of the '039 application.

428.    The inventors named on the face of the '490 application are Robert K. Schultz, David W. Schultz, Robert A. Moris, Martin J. Oliver, and Philip A. Jinks. Mr. Oliver and Mr. Jinks were later removed as inventors during prosecution of the '490 application.

429.    The transmittal of the '490 application canceled claims 1-30 and 47-60, leaving claims 31-46, which included Inventions III and IV as defined by Examiner Kishore in the Restriction Requirement.  JTX 2 at PER(Albu)008053.

430.    The transmittal of the '490 application did not expressly elect an invention from the Restriction Requirement, or a specific drug or propellant species.

431.    On October 12, 1995, Examiner Kishore issued an Office Action in which claims 31-46 were rejected under 35 U.S.C. § 102(a) and 35 U.S.C. § 103 based on prior art, which included WO 91/11495 ("Weil") and WO 91/14422 ("Schultz").  *Id.* at 8239-244.

432.    Both Weil and Schultz disclosed aerosol formulations with propellants HFC 134a, HFC 227 or mixtures thereof.  *Id.*

433.    In the October 12, 1995 Office Action, Examiner Kishore did not issue a restriction requirement or impose any species election requirement in response to the transmittal of the '490 application.  *See id.*

**EXTERNAL COUNSEL ONLY**

434.    The April 16, 1996 Amendment, Response and Petition cancelled claims 36 and 37, amended claims 31, 35, 41, 43, and 45, and added new claims 61-77.  *Id.* at 8247-54.

435.    Claim 63, added with the April 16, 1996 Amendment, Response and Petition, recited:

> A suspension aerosol formulation comprising: a therapeutically effective amount of medicament, and a propellant selected from the group consisting of [HFA-134a], [HFA-227], and a mixture thereof, wherein said medicament includes micronized pirbuterol or a salt thereof and constitutes greater than 0.5 percent by weight of said formulation, and wherein said medicament is readily redispersible, and upon redispersion does not assume a state so as to prevent reproducible dosing.  *Id.* at 251-252.

436.    Claim 66, added with the April 16, 1996 Amendment, Response and Petition, recited:  "The formulation of claim 63, wherein said medicament constitutes about 0.9 percent by weight of said formulation."  *Id.* at 8252.

437.    Claim 67, added with the April 16, 1996 Amendment, Response and Petition, recited:  "The formulation of claim 66, wherein said propellant consists essentially of [HFC 227]."  *Id.*

438.    Claim 68, added with the April 16, 1996 Amendment, Response and Petition, recited:  "The formulation of claim 63, wherein said medicament constitutes about 1.63 percent by weight of said formulation."  *Id.*

439.    Claim 69, added with the April 16, 1996 Amendment, Response and Petition, recited:  "The formulation of claim 68, wherein said propellant consists essentially of [HFC 134a]."  *Id.*

440.    In July 1996, the examiner updated the prior art search.  *Id.* at 8051.

441.    On July 5, 1996, in the '490 application, the examiner issued a final Office Action rejecting all the pending claims (31-35, 38-46, and 61-77).  *Id.* at 8309-314.

EXTERNAL COUNSEL ONLY

442. The July 5, 1996 Office Action acted upon the then-pending claims, including claims 63, 67, and 69. *Id.* This was the first time the examiner acted upon claim 69 during examination of the '490 application. The July 5, 1996 Office Action did not withdraw claim 69 from consideration. *See id.* The July 5, 1996 Office Action rejected the then pending claims based on references including Weil and Schultz. *Id.* at 8311-313. The July 5, 1996 Office Action does not mention the Restriction Requirement from the '039 application. *See id.* at 8309-14. The July 5, 1996 Office Action does not mention the species requirement imposed in the '039 application with respect to Inventions I and II. *See id.* The July 5, 1996 Office Action did not issue a requirement for an election of species in the '490 application. *See id.*

443. In response to the July 5, 1996 Office Action, on January 6, 1997, the applicants submitted their first submission under 37 C.F.R. § 1.129(a) (the "First Rule 1.129(a) Submission"). *Id.* at 8325-322.

444. The First Rule 1.129(a) Submission included an amendment that retained claims 63, 67 and 69. JTX 2 at PER(Albu)008325, 331.

445. The First Rule 1.129(a) Submission did not make any change to dependent claim 69. *See id.* at 8251-53.

446. In the Office Action of January 30, 1997, Examiner Kishore again acted upon the then-pending claims, and rejected claim 63 (comprising HFC 227, HFC 134a or a mixture thereof), claim 67 (wherein the propellant consisted essentially of HFC 227), and claim 69 (wherein the propellant consisted essentially of HFC 134a), under 35 U.S.C. § 102(a) as anticipated by each of Weil and Schultz. *Id.* at 8332-36. This was the second time the examiner acted upon claim 69 during examination of the '490 application.

### EXTERNAL COUNSEL ONLY

447.    The examiner did not indicate an update to the prior art search at the time of the January 30, 1997 Office Action.  *See id.* at 8051.  The January 30, 1997 Office Action did not withdraw claim 69 from consideration.  *See id.* at 8332-36.  The January 30, 1997 Office Action did not mention the Restriction Requirement from the '039 application.  *See id.*  The January 30, 1997 Office Action did not mention the species requirement imposed in the '039 application with respect to Inventions I and II.  *See id.*  The January 30, 1997 Office Action did not issue a requirement for an election of species in the '490 application.  *See id.*

448.    On July 30, 1997, the applicants filed an amendment in response to the January 30, 1997 Office Action.  *Id.* at 8343-44.  The July 30, 1997 amendment did not make any changes to dependent claim 69.  *Id.*

449.    In an Office Action on November 5, 1997, the examiner again acted upon the then-pending claims, including claims 63, 67, and 69.  *Id.* at 8446-53.  This was the third time the examiner acted upon claim 69 during examination of the '490 application.  The November 5, 1997 Office Action issued a final rejection of all pending claims under 35 U.S.C. § 102(a) based on each of Weil and Schultz.  *Id.*  The examiner did not indicate an update to the prior art search at the time of the November 5, 1997 Office Action.  *See id.* at 8051.  The November 5, 1997 Office Action did not withdraw claim 69 from consideration.  *See id.* at 8446-53.  The November 5, 1997 Office Action did not mention the Restriction Requirement from the '039 application. *See id..*  The November 5, 1997 Office Action did not mention the species requirement imposed in the '039 application with respect to Inventions I and II.  *See id..*  The November 5, 1997 Office Action did not issue a requirement for an election of species in the '490 application.  *See id.*

**EXTERNAL COUNSEL ONLY**

450.    On November 4, 1998, applicants filed a "Second Submission Under 37 C.F.R. 1.129(a) and Request That an Interference Be Declared Under 37 C.F.R. 1.607" (the "Second Rule 1.129(a) Submission"). *Id.* at 8495-96.

451.    The Second Rule 1.129(a) Submission amended the claim set by cancelling all pending claims and adding claims 78-83. *Id.*

452.    As with the thrice-examined (and then cancelled) claim 69, the new claims in the Second Rule 1.129(a) Submission required a suspension aerosol formulation including, among other things, a drug, ethanol and a propellant consisting essentially of HFC 134a. *Id.*

453.    In the Second Rule 1.129(a) Submission, the applicants responded to the previous rejections in the November 5, 1997 Office Action and the prior art applied therein, arguing that the amended claim set overcame those rejections. *Id.* at 8476-480.

454.    At the time of the Second Rule 1.129(a) Submission, the examiner did not update the prior art search. *Id.* at 051.

455.    The Second Rule 1.129(a) Submission was not filed as a CPA. *Id.* at 8495-500. The Second Rule 1.129(a) Submission did not include an express abandonment of the prior application. *Id.* The Second Rule 1.129(a) Submission did not include an inventor's declaration pursuant to 35 U.S.C. § 111. *Id.*

456.    On November 12, 1998, the PTO charged the applicants' deposit account under Fee Code 146, which is the fee code for Rule 1.129(a) submissions. *Id.* at 8497. On November 16, 1998, the PTO adjusted the charge and credited the applicants' deposit account for a Rule 1.129(a) submission fee under Fee Code 146. *Id.* On January 20, 1999, the PTO charged the applicants' deposit account for a Rule 1.129(a) submission fee under Fee Code 146. *Id.*

EXTERNAL COUNSEL ONLY

457.    On March 9, 1999, the examiner issued a non-final Office Action.  *Id.* at 8501-506.  In the March 9, 1999 Office Action, the examiner entered the amendment of the Second Rule 1.129(a) Submission and examined the new claims (claims 78-83) on the merits.  *Id.*  The examiner did not indicate an update to the prior art search at the time of the March 9, 1999 Office Action.  *See id.* at 8051.  The March 9, 1999 Office Action did not withdraw claims 78-83 from consideration.  *See id.* at 8501-506.  The March 9, 1999 Office Action did not mention the Restriction Requirement from the '039 application.  *See id.*  The March 9, 1999 Office Action did not mention the species requirement imposed in the '039 application with respect to Inventions I and II.  *See id.*  The March 9, 1999 Office Action did not issue a requirement for an election of species in the '490 application.  *See id.*  The March 9, 1999 Office Action treated the Second Rule 1.129(a) Submission as a fully responsive submission.  *See id.*  The March 9, 1999 Office Action did not inform the applicants that their submission was not fully responsive, and did not provide the applicants with thirty days to correct their submission as required by the MPEP.  *See* PTX 808 at PER(Albu)065658, 730-732 (MPEP §§ 706.07(g), 714.03 (7th Ed., Jul. 1998)).

458.    On March 16, 1999, Examiner Kishore and 3M patent counsel Mary Susan Howard participated in an Examiner Interview.  JTX 2 at PER(Albu)008507.  On March 16, 2000, another examiner interview was held between Examiner Kishore, Supervisor Thurman K. Page, other representatives from the PTO, and 3M counsel Mary Susan Howard and Barbara McCurdy.  *Id.* at 8700.

459.    On March 31, 2004, the examiner issued an Office Action, which included a provisional obviousness-type double patenting rejection of the then-pending claims based on the claims of the co-pending U.S. Patent Application No. 09/444,296 ("the '296 application").  *Id.* at 8707-11.

**EXTERNAL COUNSEL ONLY**

460.    On October 4, 2004, the applicants filed an amendment and response to the prior Office Action.  *Id.* at 8707-15.

461.    On March 21, 2005, the examiner issued an Office Action, which again included a provisional obviousness-type double patenting rejection based on the '296 application.  The examiner's rejection was final.  *Id.* at PER(Albu)009204-09.

462.    On September 16, 2005, the applicants filed a Request for Reconsideration and Withdrawal of Final Rejection.  *Id.* at 9328.

463.    On January 25, 2006, the applicants filed their Brief on Appeal.  *Id.* at 9345-53.

464.    On April 17, 2006, the examiner issued a Notice of Allowability.  *Id.* at 9366-70. The examiner stated that:

> The primary reasons for allowance [were] that the prior art does not disclose nor teach or fairly suggest a pharmaceutical suspension aerosol formulation as instantly claimed that consists essentially of a combination of the following ingredients: (i) particulate drug; (ii) [HFA-134a] as propellant; and (iii) ethanol in amounts of 5 to about 15% by weight, without the presence of any surfactant.

*Id.* at 9368.

465.    In the April 17, 2006 Notice of Allowability, the examiner noted that:

> The prior art fails to disclose or teach a pharmaceutical suspension aerosol formulation comprising ethanol in the amounts claimed . . . and fails to disclose or teach the exclusion of surfactant from aerosol formulations.  In contrast prior art formulations utilize distinct amounts of ethanol and additionally include the presence of surfactants in their suspension aerosol formulations.

Id.

466.    In the April 17, 2006 Notice of Allowability, the examiner stated that the invention claimed in the '490 application was "an improvement over prior art formulations"

EXTERNAL COUNSEL ONLY

because, among other things, it "avoids the incorporation of additional components, such as surfactant." *Id.*

### C.    Conclusions of Law

#### 1.    The Second Rule 1.129(a) Submission Was Proper and the Examiner Did Not Err in Accepting It

##### a.    "Prosecution Irregularities" is Not a Defense to Patent Infringement

467.    Defendants cannot challenge the actions of the PTO in the context of this patent infringement suit. *See Magnivision, Inc. v. Bonneau Co.*, 115 F.3d 956, 960 (Fed. Cir. 1997) ("Imperfection in patent examination, whether by the examiner or the applicant, does not create a new defense called 'prosecution irregularities' . . . ."); *see also Aristocrat Techs. Austl. PTY Ltd. v. Int'l Game Tech.*, 543 F.3d 657, 661 (Fed. Cir. 2008), *cert. denied* 129 S. Ct. 1791 (2009) (discussing defenses in an action involving patent validity or infringement). Defendants' arguments notwithstanding, the '152 patent cannot be held invalid or unenforceable based on decisions made within the discretion of patent examiners during prosecution of the related patent applications. *See Aristocrat Techs.*, 543 F.3d at 661; *Magnivision*, 115 F.3d at 960.

468.    If any actionable claim exists, the appropriate forum for a challenge to the PTO's decisions during prosecution of the '152 patent would be a civil suit against the PTO under the Administrative Procedures Act ("APA"). *See N.Y. Univ. v. Autodesk, Inc.*, 495 F. Supp. 2d 369, 372-73 (S.D.N.Y. 2007) (quoting 5 U.S.C. §§ 701 *et seq.*); *see also Dickinson v. Zurko*, 527 U.S. 150, 164 (1999) (confirming that the APA applies to PTO decisions).

##### b.    The Second Rule 1.129(a) Submission Was Proper and the Examiner Did Not Err in Accepting It

469.    Assuming prosecution irregularities could form the basis of Defendants' claim that the '152 patent is invalid or unenforceable, Defendants fail to prove by clear and convincing

evidence that '152 patent is unenforceable.  In particular, the examiner did not err in accepting and acting upon the Second Rule 1.129(a) Submission.

470.    The intent of Rule 1.129 is "to facilitate completion of prosecution by permitting applicants to present submissions after a final rejection has been issued . . . ."  *In re Application of Shunpei Yamazaki*, App. No. 08/386,187, Atty. Docket No. 740756-1193, 2009 WL 873542, at *9 (Comm'r Pat. Nov. 6, 2007).

471.    "If [an] applicant complies with the requirements of [Rule 1.129], the finality of the previous rejection [is] withdrawn and the submission [is] entered and considered on the merits to the extent that the submission would have been considered if made prior to final rejection."  *See* Changes to Implement 20-Year Patent Term and Provisional Applications, 56 Fed. Reg. 63951, 63956 (Dec. 12, 1994).  The requirements of Rule 1.129(a) are: (1) the application must have been pending for at least two years as of June 8, 1995; (2) the Rule 1.129(a) submission must be submitted prior to abandonment or the filing of an appeal brief; and (3) the Rule 1.129(a) submission must be accompanied by an appropriate fee.  *See* 37 C.F.R. § 1.129(a).  Applicants are entitled to two submissions *as a matter of right* in a qualifying application in response to final rejections.  *See id*; *see also* PTX 808 at PER(Albu)065658 (MPEP § 706.07(g) (7th ed. July 1998) ("The further limited reexamination [under Rule 1.129(a)] permits applicants to present for consideration, *as a matter of right* upon payment of a fee, a submission after a final rejection has been issued on an application." (emphasis added))).

472.    The Second Rule 1.129(a) Submission satisfied all requirements of that rule. There had only been one prior Rule 1.129(a) submission in the '490 application, meaning that the applicants had one submission as a matter of right remaining.  It is undisputed that the Second Submission was filed with the appropriate filing fee in response to a second final

**EXTERNAL COUNSEL ONLY**

rejection. It is further undisputed that the '490 application was pending for more than two years prior to June 8, 1995. In addition, the Second Submission was submitted before the filing of an appeal brief or abandonment of the '490 application. As such, all the requirements of Rule 1.129(a) were satisfied by the Second Rule 1.129(a) Submission. *See* 37 C.F.R. § 1.129(a).

473.    The Second Rule 1.129(a) Submission in the '490 application was in the form of an amendment, and also was "fully responsive" to the prior Office Action. *See* PTX 808 at PER(Albu)065729-730 (MPEP § 714.02 (7th ed. July 1998)). The November 5, 1997 Office Action, to which the Second Rule 1.129(a) Submission responded, contained a final rejection of the pending claims based on several prior art references, including Schultz and Weil. In response and to overcome this rejection, the applicants argued that Weil and Schultz were "fatally flawed as anticipatory references" because "both teach the use of surfactant but neither discloses the use of ethanol," distinguishing this prior art from the then-pending claims. In the Second Rule 1.129(a) Submission, the applicants also responded to the previous Office Action by revising the claims more clearly to distinguish them over the references cited in the November 5, 1997 Office Action. Thus, the Second Rule 1.129(a) Submission was fully responsive to the prior Office Action.

474.    The Second Rule 1.129(a) Submission was not rendered "not fully responsive," as Defendants urge, simply because the submission accomplished an amendment by cancelling all pending claims and presenting new claims for examination. *See* PTX 808 at PER(Albu)065730 (MPEP § 714.02 (7th ed. July 1998) ("The claims may be amended by canceling particular claims, by presenting new claims, or rewriting particular claims as indicated in 37 C.F.R. 1.121(a)(2) and (b)(2).")).

EXTERNAL COUNSEL ONLY

475.    Furthermore, the examiner accepted the Second Rule 1.129(a) Submission as proper.  If the examiner had found the Second Submission to be improper or incomplete, the examiner would have been required to notify the applicants and provide them with a period of time within which to correct any deficiency in their original submission.  *See* PTX 808 at PER(Albu)065658 (MPEP § 706.07(g) (7th ed. July 1998)).  With respect to the '490 application, the examiner gave no such notice to the applicants, indicating that the examiner believed that the Second Rule 1.129(a) Submission was proper and complete.

### c.    The Second Rule 1.129(a) Submission Did Not Improperly Switch Inventions

476.    The Second Submission did not improperly "switch" from an elected propellant species to a non-elected species by allegedly switching from claims directed to propellant HFC 227 to claims to directed to HFC 134a, as Defendants contend.

477.    The election of species requirement in the '039 application only applied to Inventions I and II.   JTX 36 at PER(Albu)012950-951.  Moreover, the species election requirement only applied to the indicated HFC 134a propellant species and the mixtures of HFC 134a and HFC 227 propellant species.  *See id.*

478.    The applicants could not have elected the propellant species HFC 227 in the '490 application, both because the election of species requirement did not apply to Invention III and because HFC 227 was not an electable species.

479.    Because the applicants did not elect a propellant species in the '490 application, the applicants could not have switched from an elected to a non-elected species when they presented claims reciting HFC 134a in the Second Rule 1.129(a) Submission.

480.    Regardless, as discussed above, many years before the Second Rule 1.129(a) Submission, claims directed to HFC 134a were entered into prosecution of the '490 application.

EXTERNAL COUNSEL ONLY

The April 1996 amendment added claim 69 directed to only HFC 134a as the propellant. However, when the applicants added claim 69, the examiner did not mention the Restriction Requirement from the '039 application, did not require the applicants to restrict their claims to formulations with only HFC 227 as the propellant, and did not indicate that the amendment was in any way improper.

481.    Even more to the point, the examiner entered the amendment adding claim 69 and acted on claim 69 three times throughout the more than two and a half years leading up to the Second Rule 1.129(a) Submission. The examiner's action on claim 69 further indicates his approval of the amendment adding claims directed to HFC 134a as the propellant. Moreover, this underscores that no switch could have occurred or did occur with the Second Rule 1.129(a) Submission. In addition, Defendants admit that no switch of invention occurred from claim 69 of the April 1996 amendment in the Second Rule 1.129(a) Submission. This fact alone is dispositive of the issue.

> **d.    If Any Switch Occurred, the Examiner Reasonably Exercised Discretion and Properly Examined the '490 Application**

482.    Since the propellant species requirement did not apply to Invention III claims, it was within the examiner's discretion whether to impose a species requirement at the time of the April 1996 amendment. The applicable section of the United States Code uses discretionary language, and the MPEP reinforces that interpretation. 35 U.S.C. § 121 ("If two or more independent and distinct inventions are claimed in one application, the Commissioner *may* require the application to be restricted to one of the inventions." (emphasis added)); PTX 817 at PER(Albu)060222 (MPEP § 803.01 (6th ed. rev. 1 Sept. 1995)) ("Since requirements for restriction under Title 35 U.S.C. § 121 are discretionary with the Commissioner . . . .").

EXTERNAL COUNSEL ONLY

483.    The guideline under the MPEP is that examiners cannot impose a restriction requirement where examination of an application directed to independent and distinct inventions would not impose a serious burden on the PTO.  *Id.* at 222 (MPEP § 803 (outlining the two criteria for a proper requirement for restriction as including that "[t]here must be a serious burden on the examiner if restriction is not required.")).  For example, the burden is limited where the examiner would not have to conduct an additional prior art search in order to continue to examine the pending claims.

484.    In the '490 application, the examiner had already performed a prior art search that was sufficient to continue examination of claims directed to HFC 134a without a serious burden.  The two primary references relied upon by the examiner in Office Actions during prosecution of the '490 application were Schultz and Weil.  Schultz  and Weil describe both HFC 134a and HFC 227.  *See* PTX 726 (WO 91/14422); PTX 724 (WO 91/11495).  Because Examiner Kishore was already aware of sufficient prior art to continue examination of claims directed to all of the propellant variations presented during prosecution of the '490 application, there was limited burden on the examiner to proceed with examination of the claims.  Indeed, the examiner did not perform a new prior art search following the Second Rule 1.129(a) Submission.  JTX 2 at PER(Albu)008051.  To the extent reciting HFC 134a added to the search burden, the examiner accepted that burden by conducting an updated search after the April 1996 amendment added a claim specifying HFC 134a as the propellant.

485.    The imposition of a restriction requirement is discretionary, and examiners are required to examine all claims even if they include independent or distinct inventions when the prior art search and further examination can be done without serious burden.  *See* PTX 813 at PER(Albu)065849 (MPEP § 819.01 (7th ed. July 1998) ("Office May Waive Election and Permit

EXTERNAL COUNSEL ONLY

Shift:  While applicant, as a matter of right, may not shift from claiming one invention to

claiming another, the Office is not precluded from permitting a shift.  It may do so where the

shift results in no additional work or expense, and particularly where the shift reduces work as by

simplifying the issues.")).

486.    Thus, it was a matter of Examiner Kishore's discretion to allow the applicants to

present claims to a different propellant species rather than require restriction.  *See* 37 C.F.R.

§ 1.142 ("If the distinctness and independence of the inventions be clear, such [restriction]

requirement will be made before any action on the merits; however, it may be made at any time

before final action in the case *at the discretion of the examiner*." (emphasis added)); § 1.146

("[I]f such application contains claims directed to more than a *reasonable number* of species, the

examiner *may* require restriction of the claims to not more than a *reasonable number* of species

before taking further action in the application." (emphasis added)); *see also* PTX 762 (American

Inventor's Protection Act of 1999-Comparison Chart, (stating that applicants in a Rule 1.129(a)

submission "may not switch inventions (divisional equivalent) *as a matter of right*," suggesting

examiner discretion to allow a switch (emphasis added))).

487.    Although MPEP § 714.19(N) provides that "[a]n amendment canceling all claims

drawn to the elected invention and presenting only claims drawn to the nonelected invention

should not be entered," that section merely describes amendments that are "ordinarily denied

entry" and provides the examiner with discretion to accept amendments even that fall under this

provision.  *See* PTX 808 at PER(Albu)065744-745 (7th ed. July 1998).  Thus, assuming there

was any switch to a non-elected propellant species with either the Second Rule 1.129(a)

Submission or the April 1996 amendment, it was within the examiner's discretion to allow that

switch.  Moreover, even if the examiner had found the Second Rule 1.129(a) Submission to be

**EXTERNAL COUNSEL ONLY**

improper under § 714.19(N), the examiner would again have been required to provide applicants with time to correct their response under MPEP §§ 714.03 and 714.05.  *See id.*  As noted above, the examiner gave no such notice to the applicants, indicating that the examiner believed that the Second Rule 1.129(a) Submission did not improperly switch inventions.

488.    Finally, even if the Second Rule 1.129(a) Submission was improper and the examiner did err in accepting that submission, the examiner's further action on the '490 application after the Second Rule 1.129(a) Submission would have "completely cured" any impropriety resulting from a switch.  *See Meden v. Curtis*, 1905 C.D. 272, 117 O.G. 1795 (Comm'r Pat. 1905).

### 2.    The '152 Patent Is Not Effectively Expired

#### a.    The Claims Added With the Second Rule 1.129(a) Submission Were Not Moved From the Pre-GATT '603 Application

489.    Defendants contend that the applicants in the '490 application somehow "moved" the claims newly added in the Second Rule 1.129(a) Submission from the '603 application.  Based on this, Defendants argue that the claims added with the Second Rule 1.129(a) Submission, which later issued in the '152 patent, should be considered expired.  This is apparently because, if the claims had been in a patent issuing from the '603 application, they would have been entitled only to post-GATT term.  Defendants are incorrect, and fail to show by clear and convincing evidence that the '152 patent is unenforceable.

490.    In reality, the examiner refused to enter in the '603 application the claims relied on by Defendants.  JTX 33 at PER(Albu)012428-41; 449 (Advisory Action stating that the proposed new claims would not be entered).  Thus, the claims added with the Second Rule 1.129(a) Submission were never pending in the '603 application and could not have been "moved" from that application to the '490 application.

EXTERNAL COUNSEL ONLY

491.    Defendants' argument implies that the claims added with the Second Rule 1.129(a) Submission properly belonged to the invention elected in the '603 application (Invention I) instead of the invention elected in the '490 application (Invention III).

492.    The independent claim of Invention I was directed to formulations "consisting essentially of" drug and propellant.  Because of that transitional phrase, which would exclude any other components that would materially affect the formulation as claimed, Invention I formulations were not open to the addition of other excipients, such as ethanol.  On the other hand, the independent claim of Invention III was directed to formulations "comprising" drug and propellant, thereby permitting the inclusion other excipients, such as ethanol.  Indeed, dependent claims of Invention III were specifically directed to formulations including ethanol.

493.    Meanwhile, the independent claim added with the Second Rule 1.129(a) Submission was directed to a formulation "consisting essentially of" drug, propellant, ethanol, and no surfactant.  As such, the formulation of the claims added with the Second Rule 1.129(a) Submission not only allowed for the inclusion ethanol, but *required* ethanol in the claimed formulation.  Therefore, the claims added with the Second Rule 1.129(a) Submission could not have properly been considered to be part of Invention I of the Restriction Requirement.

###### b.    The Second Rule 1.129(a) Submission Cannot Be Treated As a CPA.

494.    Defendants urge this Court to consider the Second Rule 1.129(a) Submission to be a CPA, which would result in the '152 patent being deprived of its rightful pre-GATT patent term.  This Court again must reject Defendants' argument.

495.    A CPA is technically a new patent application.  A new patent application can only be made by authorization of the inventors under 35 U.S.C. § 111.  For a CPA in particular, the inventors or their assignees must submit a specific request for a CPA.

EXTERNAL COUNSEL ONLY

496.    In filing the Second Rule 1.129(a) Submission, the '490 applicants did not authorize any new application under 35 U.S.C. § 111 and did not request a CPA. This alone would be sufficient to preclude treating the Second Rule 1.129(a) Submission as a CPA.

497.    Another reason the Second Rule 1.129(a) Submission cannot be treated as a CPA is that a CPA is a request to expressly abandon the application from which it is filed. An express abandonment is an intentional act by applicants authorizing abandonment. There was no such act in the '490 application. By way of comparison, the applicants did file a CPA request in the '039 application, which clearly included on its face an express abandonment of the '039 application.

498.    Moreover, to the extent applicants shifted inventions, the examiner accepted the shift by entering the amendment and acting on the claims. In such a case, PTO policy in place at the time of the Second Rule 1.129(a) Submission dictates that there is no abandonment. *See* PTX 813 at PER(Albu)065849 (MPEP § 819.01 (7th ed. July 1998) ("If the examiner has accepted a shift from claiming one invention to claiming another, the case is not abandoned.")).

499.    Because a CPA is a request to expressly abandon the prior application, there is a specific signature requirement for a CPA request. Only certain people authorized under 37 C.F.R. § 1.33(b) can sign an express abandonment or a request for a CPA. *See* 37 C.F.R. § 1.138(b); PTX 806 at PER(Albu)065351 (MPEP § 201.06(d) (7th ed. July 1998)). None of these authorized persons signed a CPA request in the '490 application.

500.    Further, the PTO accepted the Second Rule 1.129(a) Submission as such. This can be seen in the PTO's next Office Action, where the examiner entered the new claims and did not object to the propriety of the Second Rule 1.129(a) Submission. *See* JTX 2 at PER(Albu)008501-506.

EXTERNAL COUNSEL ONLY

501.    That the PTO considered the Second Submission to be a Rule 1.129(a)

submission can also be seen in how the PTO processed the Second Submission with the

authorized fee for a Rule 1.129(a) submission, not the fee for a CPA.  The fee code stamp on the

bottom of the first page of the second submission after final indicates that the PTO processed the

fee under fee code ("FC") 146.  *Id.* at 8497.  Fee code 146 was for a submission under 37 C.F.R.

§ 1.129(a), while the fee code for a CPA was 131.  *See* PTX 616 at TEV_0920123-129 (PTO Fee

Code Chart).  Fee code 131 was not used to process the Second Rule 1.129(a) Submission.  *See*

JTX 2 at PER(Albu)008497.

502.    Not only is it clear that the Second Submission was intended as a submission

under Rule 1.129(a) and accepted and acted upon as such, it would be entirely improper to

retroactively imply that the Second Submission was something it was not.  Under Rule 1.129(a),

an applicant is entitled to two submissions *as a matter of right* in response to final rejections by

the examiner in a pre-GATT application pending at the time of the transition.  *See* 37 C.F.R.

§ 1.129(a).  In the event the examiner considers a Rule 1.129(a) submission incomplete or not

fully responsive, the examiner *must* provide the applicant with 30 days to submit a complete

response.  No such notification or time period for correction was provided in the '490

application.  And if an applicant disagrees with the examiner's opinion, the applicant can seek

review internally at the PTO.  Here, of course, there was no such opinion from which to seek

review.

503.    Furthermore, it cannot at this time be determined what would have happened to

the '490 application had the examiner considered the Second Rule 1.129(a) Submission

improper.  If the examiner had held the Second Rule 1.129(a) Submission improper, he would

have been *required* to provide the applicants notice of any deficiency and the applicants would

EXTERNAL COUNSEL ONLY

have been given thirty days to respond appropriately and/or seek review of the holding within the PTO.  To treat the Second Rule 1.129(a) Submission as if it were instead a CPA would be to deprive the applicants, after the fact, of the mechanism to correct their allegedly improper submission, as applicants would have been entitled to do.

504.    Because the Second 1.129(a) Submission in the prosecution of the application that issued as the '152 patent was proper and, in any event, does not constitute a defense to patent infringement, Defendants have failed to prove by clear and convincing evidence that the '152 patent is expired or unenforceable.

### U.S. PATENT NO. 7,566,445

**XIII.   Defendants' Infringement of the '445 Patent**

      **A.      Findings of Fact Relating to Defendants' Infringement of the '445 Patent**

505.    Plaintiffs assert that claims 1-20 of the '445 patent are infringed by Defendants' ANDA.

506.    Following the claim construction hearing in this case, the Court construed the term "pharmaceutical suspension aerosol formulation" to mean "[a] drug formulation in which the drug is in particulate form and substantially insoluble in the propellant."  D.I. 164  at 3-4.

507.    The Court also construed the term "substantially free of surfactant" to mean "any surface active agent, if present, is not present in an amount sufficient to have an effect on the physical properties of the formulation."  D.I. 164  at 4-6.  Rejecting Defendants' proposed construction, the Court noted that in the specification, "the patentees distinguish the formulations claimed in the '445 patent from those in which surfactants are used to influence the physical properties of the formulation."  *Id*. at 5.  The Court also noted that in the prosecution history, "the applicants also distinguished the '445 patent's claims from prior art on the basis that the prior art used surfactants to influence the homogeneity and stability of formulations."  *Id*.

**EXTERNAL COUNSEL ONLY**

508.    Moreover, the Court construed the term "substantially completely insoluble" to have its plain and ordinary meaning. D.I. 164  at 6-8.  Adopting Plaintiffs' proposed construction, the Court stated that "both the specification and the file history of the '445 patent make clear to a POSA that 'substantially completely insoluble' means that the solubility of the drug must be such that the drug forms a suspension not a solution." *Id.* at 6.

509.    Finally, the Court construed the terms "in the amount of 11.4% w/w," "in the amount of 0.4% w/w," and "in the amount of 88.2% w/w" to mean "in the amount of 11.4% w/w," "in the amount of 0.4% w/w," and "in the amount of 88.2% w/w" respectively. *Id.* at 8-10.

### 1.    Defendants Infringe Claims 1-20 of the '445 Patent

#### a.    The ANDA Product Includes Each and Every Limitation of Claim 1 of the '445 Patent

510.    The elements of claim 1 of the '445 patent—"[a] product suitable for delivering a pharmaceutical aerosol formulation comprising, (a) an aerosol canister comprising a container closed with a metering valve, said container comprising a pharmaceutical suspension aerosol formulation substantially free of surfactant, and which consists of salbutamol sulphate, ethanol in an amount of 10% w/w to 15% w/w, and 1,1,1,2-tetrafluoroethane, wherein salbutamol sulphate is substantially completely insoluble in the 1,1,1,2-tetrafluoroethane, and (b) an actuator with a spray orifice aperture of from 100 to 300 microns"—are met by the ANDA Product.

##### i.    "A product suitable for delivering a pharmaceutical aerosol formulation comprising"

511.    Defendants' ANDA labeling demonstrates that the ANDA Product is a "product suitable for delivering a pharmaceutical aerosol formulation." ████████████████

████████████████████████████████████    ████████████████████

████████████████████████████████████████

EXTERNAL COUNSEL ONLY

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████

###### ii.    "an aerosol canister comprising a container closed with a metering valve"

512.    The ANDA Product contains "an aerosol canister comprising a container closed with a metering valve."  JTX 11 at PER(Albu)013574 (Table 3.2.P.2.2-54); JTX 12 at PER(Albu)013658 (Table 3.2.P.2.4-1 ), 659, 666 ("████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████").  Accordingly, the ANDA Product has "an aerosol canister comprising a container closed with a metering valve."

###### iii.    "said container comprising a pharmaceutical suspension aerosol formulation"

513.    Defendants' ANDA describes a container comprising a pharmaceutical suspension aerosol that is "a drug formulation in which the drug is in particulate form and is substantially insoluble in propellant." █████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

**EXTERNAL COUNSEL ONLY**

████████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

514.    Second, the ANDA Product contains a formulation "in which the drug is in particulate form." ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

515.    Lastly, the ANDA Product contains a drug that "is substantially insoluble in the propellant." ██████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

iv.    **"substantially free of surfactant"**

516.    The Court construed the term "substantially free of surfactant" to mean "any surface active agent, if present, is not present in an amount sufficient to have an effect on the physical properties of the formulation."  D.I. 164  at 4-5.

517.    The ANDA Product is "substantially free of surfactant." ██████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

**EXTERNAL COUNSEL ONLY**

518.   As discussed above, the ANDA Product contains no surfactant and is substantially free of surfactant, and Defendants' non-infringement argument ███████████████████ fails.  *See supra* ¶¶ 181-194.

519.   ████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

██████████████████████████████

██████████████████████████████████

█████████████████████████████

█████████████████████████████████

████████████████████

520.   ████████████████████████

██████████████████████████████

██████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████

████████████████████████████████

EXTERNAL COUNSEL ONLY

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████████

> **v.    "and which consists of salbutamol sulphate, ethanol in an amount of 10% w/w to 15% w/w, and 1,1,1,2-tetrafluoroethane"**

521.    The ANDA Product "consists of salbutamol sulphate, ethanol in an amount of 10% w/w to 15% w/w, and 1,1,1,2-tetrafluoroethane." ██████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████

522.    Accordingly, the ANDA Product has a formulation that "consists of salbutamol sulphate, ethanol in an amount of 10% w/w to 15% w/w, and 1,1,1,2-tetrafluoroethane."

> **vi.    "wherein salbutamol sulfate is "substantially completely insoluble" in the 1,1,1,2-tetrafluoroethane"**

523.    Defendants' ANDA Product contains salbutamol sulfate "wherein the salbutamol sulfate is substantially completely insoluble in the 1,1,1,2-tetrafluoroethane."  The solubility of albuterol sulfate in HFA-134a is so low, such that it is substantially completely insoluble in HFA-134a.  *See* PTX 509 at TEV_0921291-292.

524.    Accordingly, the albuterol sulfate contained in the formulation of the ANDA Product is "substantially completely insoluble in the 1,1,1,2-tetrafluoroethane."

**EXTERNAL COUNSEL ONLY**

      vii.    **"an actuator with a spray orifice aperture of from 100 to 300 microns"**

525.    The ANDA Product contains "an actuator with a spray orifice aperture of from 100 to 300 microns." ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████    Accordingly the ANDA Product has an "an actuator with a spray orifice aperture of from 100 to 300 microns."

526.    Therefore, the ANDA Product infringes claim 1 of the '445 patent.

      b.    **The ANDA Product Includes Each and Every Limitation of Claim 2 of the '445 Patent**

527.    The elements of claim 2 of the '445 patent—"[a] product suitable for delivering a pharmaceutical aerosol formulation comprising, (a) an aerosol canister comprising a container closed with a metering valve, said container comprising a pharmaceutical suspension aerosol formulation substantially free of surfactant, and which consists essentially of salbutamol sulphate, ethanol in an amount of 10% w/w to 15% w/w, and 1,1,1,2-tetrafluoroethane, wherein salbutamol sulphate is substantially completely insoluble in the 1,1,1,2-tetrafluoroethane, and (b) an actuator with a spray orifice aperture of from 100 to 300 microns."—are met by the ANDA Product.  *See* JTX 3 at PER(Albu)012711 (4:11-22).

528.    ███████████████████████████████

████████████████████████████████████

████████████████

EXTERNAL COUNSEL ONLY

### i. "A product suitable for delivering a pharmaceutical aerosol formulation comprising"

529. For the reasons stated above with respect to claim 1 of the '445 patent (*supra* ¶ 511), the ANDA Product meets this limitation of claim 2 of the '445 patent.

### ii. "an aerosol canister comprising a container closed with a metering valve"

530. For the reasons stated above with respect to claim 1 of the '445 patent (*supra* ¶ 512), the ANDA Product meets this limitation of claim 2 of the '445 patent.

### iii. "said container comprising a pharmaceutical suspension aerosol formulation"

531. For the reasons stated above with respect to claim 1 of the '445 patent (*supra* ¶ 513-514), the ANDA Product meets this limitation of claim 2 of the '445 patent.

### iv. "substantially free of surfactant"

532. For the reasons stated above with respect to claim 1 of the '445 patent (*supra* ¶¶ 516-520), the ANDA Product meets this limitation of claim 2 of the '445 patent.

### v. "and which consists essentially of salbutamol sulphate, ethanol in an amount of 10% w/w to 15% w/w, and 1,1,1,2-tetrafluoroethane"



533.

534.

Accordingly, the ANDA Product describes a formulation that "consists essentially of salbutamol sulphate, ethanol in an amount of 10% w/w to 15% w/w, and 1,1,1,2-tetrafluoroethane."

vi.    **"wherein salbutamol sulfate is substantially completely insoluble in the 1,1,1,2-tetrafluoroethane"**

535.    For the reasons stated above with respect to claim 1 of the '445 patent (*supra* ¶¶ 523-524), Defendants' ANDA Product meets this limitation of claim 2 of the '445 patent.

vii.    **"an actuator with a spray orifice aperture of from 100 to 300 microns"**

536.    For the reasons stated above with respect to claim 1 of the '445 patent (*supra* ¶ 525), the ANDA Product meets this limitation of claim 2 of the '445 patent.  Therefore, the ANDA Product infringes claim 2 of the '445 patent.

c.    **The ANDA Product Includes Each and Every Limitation of Claim 3 of the '445 Patent**

537.    Claim 3 of the '445 patent depends from claim 1 and further specifies that, "the aerosol formulation contains ethanol in the amount of 11.4% w/w."  JTX 3 at PER(Albu)012710 (4:23-24).  The elements of claim 3 of the '445 patent are met by the ANDA Product.

538.    ███████████████████████████████████████████████████ ███████████████████████████████████████████████████████ █████████████████████████

539.    The ANDA Product has a formulation "wherein the aerosol formulation contains ethanol in the amount of 11.4% w/w."  █████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████  Accordingly, the range of ethanol that Defendants are seeking approval for in the ANDA product meets each and every limitation of claim 3 of the '445 patent.

**EXTERNAL COUNSEL ONLY**

540.    Assuming, for the sake of argument, that the Court's construction ("in the amount of 11.4% w/w) is expressly limited to 11.4<u>00</u>% w/w (a position Plaintiffs disagree with), Defendants still infringe because ███████████████████████████████████ ██████████████████████████████████████████████████████. *See* JTX 22 at PER(Albu)000280 (section 2.3.P.5); JTX 9 at PER(Albu)013325 (section 2.3.P.5); *see also* PTX 200 at PER(Albu)013869 (section 3.2.P.5.4).

541.    For these reasons, the ANDA Product meets each and every limitation of claims 1 and 3 of the '445 patent.  Therefore, the ANDA Product infringes claim 3 of the '445 patent.

### d.    The ANDA Product Includes Each and Every Limitation of Claim 4 of the '445 Patent

542.    Claim 4 of the '445 patent depends from claim 1 and further specifies that "the aerosol formulation contains salbutamol sulfate in the amount of 0.4% w/w."  PTX 3 at PER(Albu)012711 (4:25-26).  The elements of claim 4 of the '445 patent are met by the ANDA Product.

543.    ███████████████████████████████████████ ███████████████████████████████████████████████ ██████████████████████

544.    The ANDA Product contains a formulation, "wherein the aerosol formulation contains salbutamol sulfate in the amount of 0.4% w/w." ██████████████████ ███████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████████████████ ██████████████████████████

EXTERNAL COUNSEL ONLY

545. ███████████████████████████████████████████

████████████████████████████████████████████████████████

███████ The claims, however, do not require 0.4<u>00</u>%, which would be precise to thousandths of

a percent.  Accordingly, 0.4% can encompass the set of numbers which round to 0.4%, *i.e.*

0.350% to 0.449%.  This point is clearly explained by referencing the specification and

prosecution history of the '445 patent.  An example in the '445 patent sets forth a formulation

that contains 0.03g of albuterol sulfate, 0.97g of ethanol, and 7.5g of HFA-134a.  JTX 3 at

PER(Albu)012711 (3:40-63) (3:40-63).  During prosecution, applicants stated that "'0.4%

salbutamol sulfate was derived by dividing the weight of salbutamol sulfate (0.03g) by the total

weight of the ingredients, *i.e.,* 0.03g/(0.03g + 0.97g + 7.5g) to arrive at 0.35%, which was

rounded to 0.4%."  JTX 4 at PER(Albu)010949. ███████████████████████

████████████████████████████████████████████████████

███████

546. Assuming, for the sake of argument, that the Court's construction ("in the amount

of 0.4% w/w") is further modified and expressly limited to 0.4<u>00</u>% w/w (a position that Plaintiffs

do not agree with), Defendants still infringe because ████████████████████████

████████████████████████████████████. *See* JTX 9 at

PER(Albu)013324 (section 2.3.P.5); *see also* PTX 200 at PER(Albu)013867 (section 3.2.P.5.4).

A POSA would recognize that in a suspension aerosol formulation a target concentration of

0.400% w/w could realistically be made with an accuracy of ± 5% (0.380-0.420% w/w, as

applied to the hypothetical construction of 0.400% w/w).  Notably, Defendants are seeking

approval for a product that has an accuracy of ██████████████████████████

████████████████████████. *Id.*  Defendants are seeking approval for a

EXTERNAL COUNSEL ONLY

product that ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

albuterol sulfate that function, in substantially the same way, to achieve substantially the same result as "in the amount of 0.4<u>00</u>% w/w."  Accordingly, if the Court's construction is further limited to "in the amount of 0.4<u>00</u>% w/w," the ANDA Product also infringes claim 4 of the '445 patent under the doctrine of equivalents.

        **e.**     **The ANDA Product Includes Each and Every Limitation of Claim 5 of the '445 Patent**

547.    Claim 5 of the '445 patent depends from claim 1 and further specifies that, "the aerosol formulation contains 1,1,1,2-tetrafluoroethane in the amount of 88.2% w/w." JTX 3 at PER(Albu)012711 (4:27-29),  The elements of claim 5 of the '445 patent are met by the ANDA Product.

548.    ████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████

549.    The ANDA Product contains a formulation, "wherein the aerosol formulation contains 1,1,1,2-tetrafluoroethane in the amount of 88.2% w/w." ██████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

**EXTERNAL COUNSEL ONLY**

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████ the ANDA

Product meets each and every limitation of claims 1 and 5 of the '445 patent, and therefore, infringes claim 5 of the '445 patent.

550.    Assuming, for the sake of argument, that the Court's construction ("in the amount of 88.2% w/w") is further modified and expressly limited to 88.2<u>00</u>% w/w (a position that Plaintiffs do not agree with), Defendants still infringe because ████████████████████████

████████████████████████████████████████ Accordingly, if the Court's construction is further limited to "in the amount of 88.2<u>00</u>% w/w," the ANDA Product infringes claim 5 of the '445 patent.

**f.    The ANDA Product Includes Each and Every Limitation of Claim 6 of the '445 Patent**

551.    Claim 6 of the '445 patent depends from claim 1 and further specifies "wherein the aerosol formulation contains salbutamol sulphate in the amount of 0.4% w/w, ethanol in the amount of 11.4% w/w, and 1,1,1,2-tetrafluoroethane in the amount of 88.2% w/w."  JTX 3 at

PER(Albu)012711 (4:30-33).  The elements of claim 6 of the '445 patent are met by the ANDA

Product.

552.    ███████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████

553.    For the reasons stated above with respect to claims 1, 3, 4 and 5 of the '445 patent

(*supra* ¶¶ 510-526, 537-550), the ANDA Product meets each and every limitation of claims 1

and 6 of the '445 patent, and therefore, infringes claim 6 of the '445 patent.

> **g.    The ANDA Product Includes Each and Every Limitation of
> Claim 7 of the '445 Patent**

554.    Claim 7 of the '445 patent depends from claim 2 and further specifies that "the

aerosol formulation contains ethanol in the amount of 11.4% w/w."  JTX 3 at PER(Albu)012711

(4:34-35).  The elements of claim 7 of the '445 patent are met by the ANDA Product.

555.    ███████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████

556.    For the reasons stated above with respect to claims 2 and 3 of the '445 patent

(*supra* ¶¶ 527-541), the' ANDA Product infringes claim 7 of the '445 patent.

> **h.    The ANDA Product Includes Each and Every Limitation of
> Claim 8 of the '445 Patent**

557.    Claim 8 of the '445 patent depends from claim 2 and further specifies that, "the

aerosol formulation contains salbutamol sulfate in the amount of 0.4% w/w."  JTX 3 at

PER(Albu)012711 (4:36-37).  The elements of claim 8 of the '445 patent are met by the ANDA

Product.

EXTERNAL COUNSEL ONLY

558.     ██████████████████████████████

████████████████████████████████████████

████████████████

559.     For the reasons stated above with respect to claims 2 and 4 of the '445 patent (*supra* ¶¶ 527-536, 542-546), the ANDA Product infringes claim 8 of the '445 patent.

### i.     Defendants' ANDA Product Includes Each and Every Limitation of Claim 9 of the '445 Patent

560.     Claim 9 of the '445 patent depends from claim 2 and further specifies that, "the aerosol formulation contains 1,1,1,2-tetrafluoroethane in the amount of 88.2% w/w." JTX 3 at PER(Albu)012711 (4:38-40).  The elements of claim 9 of the '445 patent are met by the ANDA Product.

561.     ██████████████████████████████

████████████████████████████████████████

████████████████

562.     For the reasons stated above with respect to claims 2 and 5 of the '445 patent (*supra* ¶¶ 527-536, 547-550), the ANDA Product infringes claim 9 of the '445 patent.

### j.     Defendants' ANDA Product Includes Each and Every Limitation of Claim 10 of the '445 Patent

563.     Claim 10 of the '445 patent depends from claim 2 and further specifies "wherein the aerosol formulation contains salbutamol sulphate in the amount of 0.4% w/w, ethanol in the amount of 11.4% w/w, and 1,1,1,2-tetrafluoroethane in the amount of 88.2% w/w."  JTX 3 at PER(Albu)012711 (4:41-44).  The elements of claim 10 of the '445 patent are met by the ANDA Product.

**EXTERNAL COUNSEL ONLY**

564. ███████████████████████████████

██████████████████████████████████████

████████████████

565.    For the reasons stated above with respect to claims 2 and 6 of the '445 patent (*supra* ¶¶ 527-526, 551-553), the ANDA Product infringes claim 10 of the '445 patent.

> **k.    Defendants' ANDA Product Includes Each and Every Limitation of Claim 11 of the '445 Patent**

566.    The elements of claim 11 of the '445 patent—"[a] product suitable for delivering a pharmaceutical aerosol formulation comprising, (a) an aerosol canister comprising a container closed with a metering valve, said container comprising a pharmaceutical suspension aerosol formulation substantially free of surfactant, and which consists of salbutamol sulphate, ethanol in an amount of 10% w/w to 15% w/w, and 1,1,1,2-tetrafluoroethane, wherein salbutamol sulphate is substantially completely insoluble in the 1,1,1,2-tetrafluoroethane, and (b) an actuator with a spray orifice aperture of from 150 to 250 microns"—are met by the ANDA Product.  *See* JTX 3 at PER(Albu)012711 (4:45-56).

567. ███████████████████████████████

██████████████████████████████████████

████████████████

> **i.    "A product suitable for delivering a pharmaceutical aerosol formulation comprising"**

568.    For the reasons stated above with respect to claim 1 of the '445 patent (*supra* ¶ 511), the ANDA Product meets this limitation of claim 11 of the '445 patent.

EXTERNAL COUNSEL ONLY

ii.    **"an aerosol canister comprising a container closed with a metering valve"**

569.    For the reasons stated above with respect to claim 1 of the '445 patent (*supra* ¶ 512), the ANDA Product meets this limitation of claim 11 of the '445 patent.

iii.    **"said container comprising a pharmaceutical suspension aerosol formulation"**

570.    For the reasons stated above with respect to claim 1 of the '445 patent (*supra* ¶ 513-515), the ANDA Product meets this limitation of claim 11 of the '445 patent.

iv.    **"substantially free of surfactant"**

571.    For the reasons stated above with respect to claim 1 of the '445 patent (*supra* ¶¶ 516-520), the ANDA Product meets this limitation of claim 11 of the '445 patent.

v.    **"and which consists of salbutamol sulphate, ethanol in an amount of 10% w/w to 15% w/w, and 1,1,1,2-tetrafluoroethane"**

572.    For the reasons stated above with respect to claim 1 of the '445 patent (*supra* ¶¶ 521-522), the ANDA Product meets this limitation of claim 11 of the '445 patent.

vi.    **"wherein salbutamol sulfate is substantially completely insoluble in the 1,1,1,2-tetrafluoroethane"**

573.    For the reasons stated above with respect to claim 1 of the '445 patent (*supra* ¶¶ 523-524), the ANDA Product meets this limitation of claim 11 of the '445 patent.

vii.    **"an actuator with a spray orifice aperture of from 150 to 250 microns"**

574.    The ANDA Product contains "an actuator with a spray orifice aperture of from 150 to 250 microns." ███████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

EXTERNAL COUNSEL ONLY

████████████████████████████████████████████

███████████████████████████████████████

575.    For these reasons, the ANDA Product infringes claim 11 of the '445 patent.

**l.      The ANDA Product Includes Each and Every Limitation of Claim 12 of the '445 Patent**

576.    Claim 12 of the '445 patent depends from claim 11 and further specifies that "the aerosol formulation contains ethanol in the amount of 11.4% w/w." JTX 3 at PER(Albu)012711 (4:57-58). The elements of claim 12 of the '445 patent are met by the ANDA Product.

577.    ████████████████████████████████████

████████████████████████████████████████████

████████████████

578.    For the reasons stated above with respect to claims 11 and 3 of the '445 patent (*supra* ¶¶ 537-541, 566-575), the ANDA Product infringes claim 12 of the '445 patent.

**m.     The ANDA Product Includes Each and Every Limitation of Claim 13 of the '445 Patent**

579.    Claim 13 of the '445 patent depends from claim 11 and further specifies that "the aerosol formulation contains salbutamol sulfate in the amount of 0.4% w/w." JTX 3 at PER(Albu)012711 (4:59-60). The elements of claim 13 of the '445 patent are met by the ANDA Product.

580.    ████████████████████████████████████

████████████████████████████████████████████

████████████████

581.    For the reasons stated above with respect to claims 11 and 4 of the '445 patent (*supra* ¶¶ 542-546, 566-575), the ANDA Product infringes claim 13 of the '445 patent.

EXTERNAL COUNSEL ONLY

**n.    Defendants' ANDA Product Includes Each and Every Limitation of Claim 14 of the '445 Patent**

582.    Claim 14 of the '445 patent depends from claim 11 and further specifies that, "the aerosol formulation contains 1,1,1,2-tetrafluoroethane in the amount of 88.2% w/w."  JTX 3 at PER(Albu)012711 (4:61-62).  The elements of claim 14 of the '445 patent are met by the ANDA Product.

583.    ██████████████████████████████████████

████████████████████████████████████████████

███████████████████████

584.    For the reasons stated above with respect to claims 11 and 5 of the '445 patent (*supra* ¶¶ 547-550, 566-575), the ANDA Product infringes claim 14 of the '445 patent.

**o.    Defendants' ANDA Product Includes Each and Every Limitation of Claim 15 of the '445 Patent**

585.    Claim 15 of the '445 patent depends from claim 11 and further specifies "wherein the aerosol formulation contains salbutamol sulphate in the amount of 0.4% w/w, ethanol in the amount of 11.4% w/w, and 1,1,1,2-tetrafluoroethane in the amount of 88.2% w/w."  JTX 3 at PER(Albu)012711 (4:64-67).  The elements of claim 15 of the '445 patent are met by the ANDA Product.

586.    ██████████████████████████████████████

████████████████████████████████████████████

████████████████████

587.    For the reasons stated above with respect to claims 11 and 6 of the '445 patent (*supra* ¶¶ 551-553, 566-575), the ANDA Product infringes claim 15 of the '445 patent.

EXTERNAL COUNSEL ONLY

**p.    Defendants' ANDA Product Includes Each and Every Limitation of Claim 16 of the '445 Patent**

588.    The elements of claim 16 of the '445 patent—"[a] product suitable for delivering a pharmaceutical aerosol formulation comprising, (a) an aerosol canister comprising a container closed with a metering valve, said container comprising a pharmaceutical suspension aerosol formulation substantially free of surfactant, and which consists essentially of salbutamol sulphate, ethanol in an amount of 10% w/w to 15% w/w, and 1,1,1,2-tetrafluoroethane, wherein salbutamol sulphate is substantially completely insoluble in the 1,1,1,2-tetrafluoroethane, and (b) an actuator with a spray orifice aperture of from 150 to 250 microns"—are met by the ANDA Product.  *See* JTX 3 at PER(Albu)012712 (5:1-12).

589.    ███████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████

**i.    "A product suitable for delivering a pharmaceutical aerosol formulation comprising"**

590.    For the reasons stated above with respect to claim 1 of the '445 patent (*supra* ¶ 511), the ANDA Product meets this limitation of claim 16 of the '445 patent.

**ii.    "an aerosol canister comprising a container closed with a metering valve"**

591.    For the reasons stated above with respect to claim 1 of the '445 patent (*supra* ¶ 512), the ANDA Product meets this limitation of claim 16 of the '445 patent.

**iii.    "said container comprising a pharmaceutical suspension aerosol formulation"**

592.    For the reasons stated above with respect to claim 1 of the '445 patent (*supra* ¶¶ 513-515), the ANDA Product meets this limitation of claim 16 of the '445 patent.

EXTERNAL COUNSEL ONLY

### iv.    "substantially free of surfactant"

593.    For the reasons stated above with respect to claim 1 of the '445 patent (*supra* ¶¶ 516-520), the ANDA Product meets this limitation of claim 16 of the '445 patent.

### v.    "and which consists essentially of salbutamol sulphate, ethanol in an amount of 10% w/w to 15% w/w, and 1,1,1,2-tetrafluoroethane"

594.    For the reasons stated above with respect to claim 2 of the '445 patent (*supra* 533-534), the ANDA Product meets this limitation of claim 16 of the '445 patent.

### vi.    "wherein salbutamol sulfate is substantially completely insoluble in the 1,1,1,2-tetrafluoroethane"

595.    For the reasons stated above with respect to claim 1 of the '445 patent (*supra* ¶¶ 523-524), the ANDA Product meets this limitation of claim 16 of the '445 patent.

### vii.    "an actuator with a spray orifice aperture of from 150 to 250 microns"

596.    For the reasons stated above with respect to claim 11 of the '445 patent (*supra* ¶ 574), the ANDA Product meets this limitation of claim 16 of the '445 patent.

597.    For these reasons, Defendants' ANDA Product infringes claim 16 of the '445 patent.

### q.    Defendants' ANDA Product Includes Each and Every Limitation of Claim 17 of the '445 Patent

598.    Claim 17 of the '445 patent depends from claim 16 and further specifies that "the aerosol formulation contains ethanol in the amount of 11.4% w/w."  JTX 3 at PER(Albu)012712 (6:1-2).  The elements of claim 17 of the '445 patent are met by the ANDA Product.

599.    ███████████████████████████████████

██████████████████████████████████████████

██████████████████

EXTERNAL COUNSEL ONLY

600.    For the reasons stated above with respect to claims 16 and 3 of the '445 patent (*supra* ¶¶ 537-541, 588-597), the ANDA Product infringes claim 17 of the '445 patent.

**r.    The ANDA Product Includes Each and Every Limitation of Claim 18 of the '445 Patent**

601.    Claim 18 of the '445 patent depends from claim 16 and further specifies that "the aerosol formulation contains salbutamol sulfate in the amount of 0.4% w/w."  JTX 3 at PER(Albu)012712 (6:3-4).  The elements of claim 18 of the '445 patent are met by the ANDA Product.

602.    ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████

603.    For the reasons stated above with respect to claims 16 and 4 of the '445 patent (*supra* ¶¶ 542-546, 588-597), the ANDA Product infringes claim 18 of the '445 patent.

**s.    The ANDA Product Includes Each and Every Limitation of Claim 19 of the '445 Patent**

604.    Claim 19 of the '445 patent depends from claim 16 and further specifies that "the aerosol formulation contains 1,1,1,2-tetrafluoroethane in the amount of 88.2% w/w."  JTX 3 at PER(Albu)012712 (6:5-7).  The elements of claim 19 of the '445 patent are met by the ANDA Product.

605.    ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████

606.    For the reasons stated above with respect to claims 16 and 5 of the '445 patent (*supra* ¶¶ 547-550, 588-597), the ANDA Product infringes claim 19 of the '445 patent.

EXTERNAL COUNSEL ONLY

     **t.**    **The ANDA Product Includes Each and Every Limitation of
Claim 20 of the '445 Patent**

607.    Claim 20 of the '445 patent depends from claim 16 and further specifies "wherein
the aerosol formulation contains salbutamol sulphate in the amount of 0.4% w/w, ethanol in the
amount of 11.4% w/w, and 1,1,1,2-tetrafluoroethane in the amount of 88.2% w/w."  JTX 3 at
PER(Albu)012712 (6:8-11).  The elements of claim 20 of the '445 patent are met by Defendants'
ANDA Product.

608.    ████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████

609.    For the reasons stated above with respect to claims 16 and 6 of the '445 patent
(*supra* ¶¶ 551-555, 588-597), the ANDA Product infringes claim 20 of the '445 patent.

    **B.**    **Conclusions of Law Relating to Defendants' Infringement of the '445 Patent**

610.    Defendants infringed claims 1-20 of the '445 patent by submitting Defendants'
ANDA seeking approval to make, use, and sell the ANDA Product prior to the expiration of the
'445 patent.  *See* 35 U.S.C. § 271(e)(4)(A).

611.    The ANDA Product meets each and every element of claims 1-20 of the '445
patent, and Defendants will thus literally infringe these claims if it makes, uses, sells, offers to
sell, or imports into the United States its ANDA Product prior to the expiration of the '445
patent.  *See id.* at § 271(a)-(c).

612.    Perrigo Co. and Catalent have, under 35 U.S.C. § 271(b), acted in concert,
actively supported, participated in, encouraged, and/or induced Perrigo Pharmaceutical Co.'s
filing of Defendant's ANDA for the proposed ANDA Product, and in the preparation to sell, in
the United States, generic albuterol sulfate HFA inhalation aerosol.

EXTERNAL COUNSEL ONLY

613.    In the context of infringement under 35 U.S.C. § 271, which is premised on the

filing of an ANDA with the FDA, the infringement inquiry is hypothetical and requires the court

to compare the claims with the product described in the ANDA. *Pozen*, 696 F.3d at 1157. The

Court in an ANDA case must determine whether the patentee has proven by a preponderance of

the evidence that the alleged infringer will likely market an infringing product. *Id.* at 1167-68.

614.    This hypothetical inquiry is grounded in the ANDA application and the materials

typically submitted in its support. *See Sunovion*, 731 F.3d at 1279-80.

615.    The ANDA itself answers the question of infringement where the ANDA includes

a specification that requires the ANDA applicant to produce a product that falls within the scope

of the asserted claims. *See, e.g.*, *Sunovion*, 731 F.3d at 1278. Thus, the court relies on the

specifications in the ANDA and any amendments to the ANDA to determine whether the ANDA

filer's proposed ANDA Product will infringe. *Id.* at 1278.

616.    The ANDA Product meets each and every limitation of claims 1-20 of the '445

patent. Defendants' only argument that it does not infringe claims 1-20 of the '445 patent is that

the ANDA Product allegedly does not meet the limitation "substantially free of surfactant" from

claims 1, 2, 11 and 16 of the '445 patent.

617.    ███████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

618.    Second, as discussed above, the formulation of a drug product contained in an

MDI is limited to those components which have been intentionally added and have a

demonstrated pharmaceutical purpose in the formulation. FDA regulations require ANDA

**EXTERNAL COUNSEL ONLY**

applicants to provide "information to show that the active ingredient is the same as that of the

reference . . . listed drug." 21 C.F.R. § 314.94(a)(5)(i).  Drug products that are inhalation

aerosols should "contain the same inactive ingredients as the reference listed drug identified by

the applicant," but "may include different inactive ingredients provided that the applicant

identifies and characterizes the differences and provides information demonstrating that the

differences do not affect the safety or efficacy of the proposed drug product."

*Id.* § 314.94(a)(9)(v).  In addition, FDA regulations require that the description of the drug

product in the prescribing information contain "[t]he same qualitative and/or quantitative

ingredient information as required . . . for drug labels."  21 C.F.R. § 201.57(c)(12)(i)(C).

Prescription drug labels must contain the "quantity or proportion of each active ingredient," and

for drugs administered other than orally, "the names of all inactive ingredients."  21 C.F.R. §

201.100(b)(4)-(5). ██████████████████████████████

██████████████████████████████████████████

████████████

     619.  ██████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████  In *Sunovion*, the district

court construed the term "essentially free" as meaning 0.25% or less of a substance.  731 F.3d at

1275-78.  The amended ANDA sought approval to have not more than 0.6% of the substance.

*Id.* at 1278-79.  While the defendants argued that the substance in the ANDA product would

always be in a range of 0.3 to 0.6%, the Federal Circuit stated that:

**EXTERNAL COUNSEL ONLY**

> [w]hat Reddy has asked the FDA to approve as a regulatory matter
> is the subject matter that determines whether infringement will
> occur, and the fact that Reddy either tells the court that its
> manufacturing guidelines will keep it outside the scope of the
> claims or has even filed a declaration in the court stating that it will
> stay outside the scope of the claims does not overcome the basic
> fact that it has asked the FDA to approve, and hopes to receive
> from the FDA, approval to market a product within the scope of
> the issued claims.

*Id.* at 1278. Thus, the Federal Circuit found infringement because not more than 0.6% (*i.e.*, 0.0 to 0.6%) falls within the scope of less than 0.25%. *Id.* at 1280. Just as in *Sunovion*, here Defendants are seeking approval for a product that literally falls within the scope of the claims of the '445 patent.

620.



*See Broadcom*, 732 F.3d at 1333 ("It is well settled that an accused device that sometimes, but not always, embodies a claim nonetheless infringes.").

621. Fifth, as discussed above,

Moreover, the testing performed by Defendants was flawed for the reasons discussed above. *See supra* ¶¶ 163-164.

EXTERNAL COUNSEL ONLY

622.    Accordingly, the ANDA Product literally infringes claims 1-20 of the '445 patent. If not literal, the ANDA Product infringes claims 1-20 of the '445 patent under the doctrine of equivalents because it is insubstantially different from the claimed invention.

## XIV.    The Asserted Claims of the '445 Patent Are Non-Obvious

### A.    Findings of Fact

#### 1.    Scope and Content of the Prior Art

##### a.    The '152 Patent Discloses the Use of Conventional MDI Components

623.    A POSA would understand that the '152 patent is primarily concerned with formulations.  For example, the '152 patent describes a formulation that comprises a particulate drug, ethanol in an amount of 5% to about 15% by weight and HFA-134a wherein the formulation is further characterized in that it contains no surfactant.  JTX 1 at PER(Albu)012704 (16:15-21).  Reviewing the specification, a POSA would recognize that the inventors of the '152 patent used conventional components for canisters and actuators.  JTX 1 at PER(Albu)012699 (6:21-23).  Contemporaneously, U.S. Patent No. 5,899,201 ("the Schultz '201 patent"), which lists Robert Schultz as an inventor (who is also an inventor on the '152 patent), states that a "standard suspension actuator" has an orifice size of 560 μm.  *See* DTX 820 at PER(Albu)036302 (6:1-2).  Accordingly, a POSA would understand that the conventional components of the '152 patent would include the "standard suspension actuator," which would have a larger spray aperture orifice.

624.    As of August 1, 1996, a POSA would have understood that conventional suspension aerosol formulation valves would be used with actuators that contained an orifice size larger than 300 microns.  For example, the specification of the '445 patent states that the normal suspension aerosol product at the time utilized an actuator with a spray orifice diameter of about

I-1-170

EXTERNAL COUNSEL ONLY

480 microns.  JTX 3 at PER(Albu)012711 (3:28-33).[9]  A POSA, from reading the '152 patent, would not have reason to use anything other than the conventional suspension formulation actuators with typical spray orifice diameters.  Even if a POSA had a reason to attempt an unconventional suspension formulation orifice with the formulations of the '152 patent, the '152 patent provides no information concerning the selection of that unconventional system which would provide a POSA with a reasonable expectation of success.

### b. The Formulation of Airomir Contains a Surfactant

625.    Defendants have argued that Airomir, a European aerosol product, is available as prior art to the '445 patent, relying on a collection of documents that was submitted to the PTO well after August 1, 1996.  *See* DTX 818 (collection of documents submitted to the PTO in 2008, hereinafter referred to as the "Airomir Documents")  It is undisputed that Airomir was never available in the United States.  Defendants' have failed to prove that the cited Airomir Documents were available to POSAs as of August 1, 1996.  Further, Defendants' experts assert that aPOSA would have measured the size of the spray orifice that Airomir used and that a POSA would have found that the orifice was smaller than 250 μm.  Defendants' experts fail to provide any evidence for this assertion.  To the contrary, Defendants' experts have acknowledged that people have measured the Airomir spray orifice to be larger than 250 μm.  Accordingly, a POSA would not have thought the Airomir spray orifice to be smaller than 250 μm.

626.    Assuming, *arguendo*, that the Airomir Documents were available to a POSA as of August 1, 1996, a POSA would understand that Airomir's formulation consisted of albuterol

---

[9] A POSA would understand that, although the '445 patent discloses spray orifices of 480 μm as "normal" and the Schultz '201 patent discloses 560 μm as the standard suspension orifice, these are consistent in that both are larger spray orifices as compared to the smaller standard solution orifices.

EXTERNAL COUNSEL ONLY

sulfate, *oleic acid* ethanol and HFA-134a.  A POSA would understand that 0.033% w/w oleic acid was added to the Airomir formulation.  *See* DTX 818 at PER(Albu)011471, 477.  That is, a POSA would understand that oleic acid was being added to the Airomir formulation to stabilize the suspension of albuterol sulfate in HFA-134a.

627.    By contrast, the formulations of the '445 patent contain an amount of surface active agent, if any, that is insufficient to have an effect on the overall physical properties of the formulation.  A POSA would clearly have recognized a difference between a formulation containing a surfactant (*e.g.*, Airomir) and the inventions of the '445 patent.  Because the formulation of Airomir contains surfactant, a POSA would not have reason to consider Airomir when working on developing formulation products that are substantially free of surfactant.

628.    Additionally, even the amounts of the common ingredients between Airomir and the claims of the '445 patent are different.  The dependent claims of the '445 patent are directed to formulations that contain 0.4% albuterol sulfate by weight, 11.4% ethanol by weight, and 88.2% HFA-134a by weight.  *See* JTX 3 at PER(Albu)012711-12 (4:23-44, 57-67; 6:1-11).  In comparison, Airomir contained 0.40% albuterol sulfate by weight, 14.43% ethanol by weight, 85.07% HFA-134a by weight, and 0.03% oleic acid by weight.  *See* DTX 818 at PER(Albu)011471-77.  While the amount of albuterol sulfate is the same in the two formulations, the ethanol and HFA-134a are different, and, importantly, Airomir contains surfactant.

### c.    The Formulation of Airomir Is Different Than the '152 Patent

629.    A POSA would have considered the invention of the '152 patent to be different than Airomir because of the presence of surfactant in Airomir.  Surfactants play a number of roles in suspension aerosol formulations, and have an impact on the properties of the formulations.  *See* DTX 736 at PER(Albu)034361 (4:45-46) (stating that surfactants are used "to

EXTERNAL COUNSEL ONLY

stabilise the formulation and lubricate the valve components"); PTX 644 at PER(Albu)007983 (1:40-42) ("Surfactants are usually dissolved in the spray product and can serve the dual functions of lubricating the valve and reducing aggregation of micronized particles."); PTX 643 at PER(Albu)035037 (1:24-26) ("Surfactants are usually dissolved in the spray product and can serve the dual functions of lubricating the valve and reducing aggregation of micronized particles.").  A POSA would not have believed that a surfactant-free suspension formulation product would have "substantially similar" properties to a surfactant-containing suspension formulation product.  *See* PTX 275 at TEV_0920530 ("It can be seen that both the rate of evaporation, change of size with distance, and the residual droplet diameter depend quite dramatically upon the surfactant concentration.").

### d.    A POSA Would Not Have Been Motivated to Use a Smaller Orifice With the Formulations of the '152 Patent with a Reasonable Expectation of Success

630.    As the literature shows, a difficulty in formulating for MDIs was preventing blockage or occlusion of the nozzle while at the same time providing a functional formulation, in terms of effective delivery of the drug to the patient:

(a)    Sackner & Kim, *Auxiliary MDI Aerosol Delivery Systems*, Chest, 88(2), 161S-70S (1985), PTX 484 at TEV_0921200 ("Enlargement of the diameter of the MDI canister orifice creates larger droplets.  Reduction of the orifice's diameter diminishes jet discharge efficiency; too small an orifice diameter promotes obstruction of the orifice as a result of clogging with aerosol particles.");

(b)    PTX 644 at PER(Albu)007987 (10:27-33) ("For pharmaceutical purposes, the particle size of the powder is preferably no greater than 100 microns in diameter, since larger particles may clog the metering valve or orifice of the container.  Preferably, the particle size should be less than 10 microns in diameter.");

(c)    Herzka, *Powder Aerosols*, J. Soc. Cosmet. Chem., 21, 553-62 (1970), PTX 374 at TEV_0920840 ("Valve clogging is due primarily to agglomeration of particles, particle size growth, and build-up of particles within the valve . . . . The orifice size plays an important role in preventing valve clogging.  The particle size of powders is limited by the size of the orifice.  Naturally, one would expect that as

the size of the orifice is increased, the danger of valve clogging will be reduced."); and

(d)     U.S. Patent No. 5,292,499, PTX 646 at TEV_0920210 (12:21-23) ("suspension systems" utilize "a larger orifice diameter, in order to prevent clogging").

631.     A POSA would have understood that as of August 1, 1996, it was no simple task to achieve this balance. Indeed, even after the filing of the '445 patent, the literature acknowledged the empirical nature of MDI device development and the combination of the device and the formulation. *See* PTX 496 at TEV_0921213 (Disclosing in 2003 that, "[u]nfortunately, a great deal of device design and formulation development of pMDIs has been performed empirically.").

632.     As the art shows, a POSA would not have been motivated to reduce the standard suspension orifice size because a POSA would have expected that smaller orifices would increase clogging and conversely, larger orifices would reduce clogging. *See* PTX 484 at TEV_0921200; PTX 374 at TEV_0920840; PTX 646 at TEV_0920210 (12:21-23). In suspension formulations, the drug may agglomerate and cause blocking of the MDI nozzle. *See* PTX 374 at TEV_0920840. Even in the event that the orifice is not fully clogged, occlusion of the orifice can impact the spray characteristics, which can affect performance of the MDI. *See* PTX 251 at TEV_0920337 (discussing regulatory tests, including spray patter/plume geometry). Accordingly, a POSA would be motivated to use the large orifice sizes that were standard at the time when preparing a suspension formulation.

633.     A POSA would have recognized that reducing the size of agglomerates in the formulation would lower the risk of clogging. *See* PTX 644 at PER(Albu)007987 (10:27-33). A common approach available to a POSA to deal with agglomeration was to include a surfactant, such as in Airomir. *See* PTX 264 at TEV_0920431; PTX 263 at TEV_0920436. As of August 1, 1996, a POSA would have recognized that the smaller than usual orifice that Airomir was

EXTERNAL COUNSEL ONLY

purportedly using was in the context of a surfactant-containing suspension formulation.  A POSA would have believed that the presence of surfactant in a suspension aerosol formulation product would impact the product performance of MDIs.  *See* PTX 275 at TEV_0920530.  Accordingly, a POSA would have been motivated to use the  larger spray orifice in a formulation substantially free of surfactant, such as that claimed in the '445 patent.

634.    A POSA, when developing a suspension aerosol formulation in the mid-1990s, would have been concerned with actuator clogging, particularly when using smaller actuator orifices.  One way a POSA would have attempted to minimize this problem would have been to use larger orifice sizes.

> **e.    A POSA Would Not Have Been Motivated By Common Knowledge, the Schultz '201 Patent, or the Sioutas '803 Patent to Combine the Formulations of the '152 Patent With Airomir With Any Reasonable Expectation of Success**
>
> **i.    "Common Knowledge of Reasonably-Available Minimum Spray Orifice Diameter Products"**

635.    A POSA would not have been motivated to combine the formulation of the '152 patent with Airomir and further with common knowledge of minimum spray orifice diameter products.  As an initial matter, Defendants have failed to produce any documentary evidence of "common knowledge" of minimum spray orifice diameter products for use with suspension aerosol formulations.  Defendants' unsupported assertion that a company, Bespak, was attempting to sell different-sized actuators is not material to a POSA's motivation to choose a particular orifice size for use with a particular suspension formulation product.

636.    A POSA would have also understood that the orifice size of an MDI actuator would be highly dependent on the intended application.  First, a POSA would understand that clogging was a particular concern for suspension aerosol formulators.  *See* PTX 484 at TEV_0921200; PTX 374 at TEV_0920840; PTX 646 at TEV_0920210 (12:21-23); PTX 644 at

EXTERNAL COUNSEL ONLY

PER(Albu)007987 (10:27-32). For example, if a POSA were developing a suspension

formulation, a POSA would have selected a larger orifice size than what was used for solution

aerosols. *See* DTX 820 at PER(Albu)036302 at (6:1-2) ("standard suspension actuator having an

exit orifice diameter of 0.56 mm (Model M3710, 3M)").[10]

637.    Second, if as of August 1, 1996, a POSA were developing a suspension

formulation product with no surfactant, a POSA would have been concerned about actuator

clogging because of the absence of surfactant and therefore, would have reason to select a typical

suspension formulation actuator with a larger orifice size to prevent the known problems

associated with obstructing and clogging the nozzle. A POSA would have known that the

addition of surfactant would be expected to reduce particulate aggregation in the formulation.

*See* PTX 264 at TEV_0920431; PTX 263 at TEV_0920436. In the absence of surfactant, more

particle aggregation would be expected. Accordingly, a POSA would not have been motivated

to use a formulation that is substantially free of surfactant with a smaller orifice.

638.    Finally, none of Defendants' experts provide an explanation as to why a POSA

would have had a reasonable expectation of success in using the "common knowledge,"

unnamed and unspecified smaller orifice actuators with the formulations of the '152 patent to

arrive at claims 1-20 of the '445 patent with any reasonable expectation of success.

### ii.    The Schultz '201 Patent

639.    A POSA would not have reason to combine the suspension formulations of the

'152 patent with the surfactant-containing formulation of Airomir and further with the solution

formulations of the Schultz '201 patent. Defendants' experts compare a solution formulation of

---

[10] This is different than if a POSA were developing a solution formulation where clogging was
less of an issue, a POSA would tend to select a smaller orifice size. *See* DTX 820 at
PER(Albu)036301 at (4:5-8) ("Narrower diameters commonly are used in connection with
solution aerosol formulations . . . . ").

EXTERNAL COUNSEL ONLY

beclomethasone dipropionate ("BDP") in the Schultz '201 patent to Airomir.  The differences

between these two formulations are significant.  The BDP formulation of the Schultz '201 patent

is a solution formulation with no surfactant and a steroid active agent, as compared to Airomir,

which was a suspension formulation that contained surfactant and a beta agonist active agent.

*See* DTX 820 at PER(Albu)036302 (6:5-8); DTX 818 at PER(Albu)011471-477.  These

formulations are not similar at least because solution and suspension formulations are different in

their physical properties, which affect their product performance, and because they contain drugs

that are structurally very different.

640.    Defendants rely on Table 2 of the Schultz '201 patent to argue that a 254 micron

spray orifice yields a better respirable fraction, or the fraction of the dose that makes it to the

lungs, compared to a larger orifice.  The only formulation, however, being tested in Table 2 is a

solution formulation of BDP; a solution formulation that was known to adequately perform with

a smaller spray orifice.  *See* DTX 820 at PER(Albu)036302 (6:4-25) ("tested with a solution

aerosol formulation").  Table 2 is not directed to suspension formulations, to which the claims of

the '445 patent are directed.  Additionally, a POSA looking at Table 2 would have understood

that, while the respirable mass for the suspension is slightly less, the difference between the

suspension orifice and the solution orifice would not provide motivation to choose one over the

other, especially with the consideration of clogging.  *Id*.  Unlike Defendants' selective and

hindsight analysis, when the Schultz '201 patent is taken as a whole, it teaches how aerosols can

be delivered using a novel aerosol actuator.[11]  Accordingly, a POSA would not have had reason

---

[11] Defendants' experts have pointed out that the Schultz '201 patent teaches that smaller orifice
sizes can be used with "suspension aerosol formulations that are particularly difficult to deliver
in the form of an aerosol containing a high respirable mass."  DTX 820 at PER(Albu)036301
(4:6-7).  Defendants' experts have not provided any reason for why the formulations of the '152
patent would be considered "particularly difficult to deliver in the form of an aerosol containing

**EXTERNAL COUNSEL ONLY**

to combine the suspension formulations of the '152 patent with surfactant containing formulation of Airomir and further with the solution formulations of the Schultz '201 patent with any reasonable expectation of success.[12]

641.    If a POSA did consider the '152 patent in view of the Schultz '201 patent, a POSA would have been motivated to use larger spray orifices because the '152 patent is directed to suspension aerosol formulations that cannot contain surfactant. The Schultz '201 patent states that the standard orifice for a suspension aerosol has a diameter of 560 μm. DTX 820 at PER(Albu)036302 (6:1-2). Accordingly, the Schultz '201 patent does not teach using a smaller diameter spray orifice size with a suspension formulation.

### iii.    The Sioutas '803 Patent

642.    A POSA would not have been motivated to combine the suspension formulations of the '152 patent with surfactant containing formulation of Airomir and further with U.S. Patent No. 5,115,803 ("the Sioutas '803 patent"). Defendants' experts do not analyze the teachings of the Sioutas '803 patent as a whole, rather using hindsight they selectively only consider portions of the disclosure. The Sioutas '803 patent discloses a non-standard actuator that contains a deagglomeration chamber, for use with formulations that do not yield optimal suspensions. DTX 821 at PER(Albu)012806 (2:6-27). The Sioutas '803 patent does not specifically discuss albuterol, albuterol sulfate, HFA-134a or ethanol containing formulations. Defendants have not provided any reason why a POSA would have considered the formulations of the '152 patent to be a non-optimal suspension. A POSA would have recognized that the Sioutas '803 patent

---

a high respirable mass." Accordingly, a POSA would not have been motivated to combine the formulations of the '152 patent with the disclosures of the Schultz 201 patent.

[12] The Schultz '201 patent also states that "[i]t has been found that an actuator of the invention obviates the need for the use of narrow exit orifices." DTX 820 at PER(Albu)036301 (4:12-14). Accordingly, the Schultz '201 patent teaches away from using smaller orifice sizes in general.

EXTERNAL COUNSEL ONLY

provided no direction as to the specific types of formulations to use with this actuator.

Additionally, a POSA would not have been motivated to use the spray orifice of the Sioutas '803

patent in combination with a standard actuator for suspension formulations.

### B.    Conclusions of Law

#### 1.    Claims 1-20 of the '445 Patent Are Not Obvious

643.    Defendants have failed to prove by clear and convincing evidence that a POSA

would have found claims 1-20 of the '445 patent to be obvious over the '152 patent in view of

Airomir.  Defendants' experts argue that a POSA would have known of the formulations of the

'152 patent and Airomir, and because of the similarity of these compositions, a POSA would

have combined the '152 patent formulations with a smaller spray orifice diameter of about 250

microns.  Defendants' analysis, however, uses hindsight to arrive at the invention of the '445

patent.  Moreover, many of the references that Defendants rely on, to the extent they are even

prior art, in fact teach away from the invention of the '445 patent.  Accordingly, the art as a

whole would not have provided a POSA with any reason to make claims 1-20 of the '445 patent

with a reasonable expectation of success.

#### a.    The '152 Patent Discloses the Use of Conventional MDI Components

644.    A POSA would have understood that the '152 patent teaches suspension aerosol

formulations.  Reviewing the specification, a POSA would have further recognized that the

inventors of the '152 patent used conventional components for canisters and actuators.  JTX 1 at

PER(Albu)012699 (6:21-23).  Accordingly, a POSA would have understood that the '152 patent

teaches the use of standard suspension actuators, which have a larger spray aperture orifice than

the spray orifices claimed in combination with the formulation of the '445 patent.

EXTERNAL COUNSEL ONLY

645.    As of August 1, 1996, a POSA would have recognized that the art taught that conventional suspension aerosol formulation valves would be used with actuators that contained an orifice size larger than 300 microns.  Even if a POSA had a reason to attempt an unconventional suspension formulation orifice with the formulations of the '152 patent, the '152 patent provides no information concerning the selection of that unconventional system which would provide a POSA with a reasonable expectation of success.  Teachings in the art of formulations that use standard suspension actuators do not provide motivation to use smaller orifice sizes, and do not provide a reasonable expectation of success in using smaller orifices.

### b.    The Formulation of Airomir Contains a Surfactant

646.    Defendants have failed to prove that Airomir, or any of the Airomir Documents (*see* DTX 818), are available as prior art to the '445 patent.  Accordingly, Defendants' obviousness arguments for the claims of the '445 patent fail because Airomir and the Airomir Documents cannot be used as the basis for an obviousness argument.  *See* pre-AIA 35 U.S.C. §§ 102(a)-(g).[13]

647.    Assuming, *arguendo*, that Airomir and the Airomir Documents were available to a POSA as of August 1, 1996, a POSA would have understood that Airomir's formulation consisted of albuterol sulfate, *oleic acid*, ethanol and HFA-134a.  A POSA would have understood that 0.033% w/w oleic acid was added to the Airomir formulation.  *See* DTX 818 at PER(Albu)011471, 477.  The art taught that formulations which contain surfactant are not similar to formulations that are substantially free of surfactant.  *See supra* ¶¶ 625-628.  Accordingly, the art does not provide any motivation to remove the surfactant from Airomir, or any reasonable expectation of success in doing so.

---

[13] If Defendants are allowed to introduce new argument or documents to attempt to show that Airomir was available as prior art, Plaintiffs reserve their right to supplement this argument.

EXTERNAL COUNSEL ONLY

### c.    The Formulation of Airomir is Different Than the Formulations Disclosed in the '152 Patent

648.    For the same reasons as above, Airomir and the Airomir Documents were not available as prior art to the '445 patent.  Assuming, *arguendo*, that by August 1, 1996, the art taught all of the details of Airomir, a POSA would have considered the formulations of the '152 patent to be different than Airomir HFA because of the presence of surfactant in Airomir HFA and no surfactant in the formulations of the '152 patent.  The art taught that surfactants play a number of roles in suspension aerosol formulations and impact the properties of the formulations.  *See supra* ¶ 629.  The teachings of the art would not have lead a POSA to believe that a surfactant-free suspension product would be substantially similar to a surfactant-containing suspension product.  *See id*.  Accordingly, the art did not provide motivation to use the Airomir orifice with the formulations of the '152 patent, or a reasonable expectation of success for doing so.

### d.    A POSA Would Not Have Been Motivated to Use a Smaller Orifice With the Formulations of the '152 Patent With a Reasonable Expectation of Success

649.    Teachings in the art demonstrate a key difficulty in formulating MDIs to prevent blockage or occlusion of the nozzle, while at the same time providing a functional formulation, in terms of effective delivery of the drug to the patient.  *See supra* ¶¶ 630-634.  The art did not motivate POSAs to reduce orifice size because a POSA would have expected that smaller orifices would increase clogging and conversely, larger orifices would reduce clogging.  *See* PTX 484 at TEV_0921200; PTX 374 at TEV_0920840; PTX 646 at TEV_0920210 (12:21-23).  Further, the art did not provide POSAs with any reasonable expectation of success in trying to use smaller orifices with suspension formulations.  To the contrary, teachings in the art motivated POSAs to use larger orifice sizes for suspension formulations.

EXTERNAL COUNSEL ONLY

650.    The art taught that in suspension formulations, drug may agglomerate and cause

blocking of the MDI nozzle.  *See* PTX 374 at TEV_0920840.  A POSA would have recognized

that reducing the size of agglomerates in the formulation would lower the risk of clogging by

using surfactant in a suspension formulation.  *See* PTX 644 at PER(Albu)007987 (10:27-32);

PTX 264 at 340; PTX 263 at 345.  Assuming Airomir and the Airomir Documents were

available as prior art, and that a POSA would have known that Airomir used a smaller orifice,

neither of which is true, the POSA would have recognized that the smaller than usual orifice that

Airomir was purportedly using was in the context of a surfactant-containing suspension

formulation.  Accordingly, because the art does not provide a motivation for using a smaller

spray orifice with a suspension formulation that is substantially free of surfactant, and does not

provide a reasonable expectation of success for doing so, a POSA would have in fact been

motivated to use a larger spray orifice that was typically used in suspension formulations in a

formulation substantially free of surfactant, such as that claimed in the 445 patent.

> **e.     A POSA Would Not Be Motivated By Common Knowledge,
> the Schultz '201 Patent, or the Sioutas '803 Patent to Combine
> the Formulations of the '152 Patent with Airomir HFA with a
> Reasonable Expectation of Success**

> **i.     "Common Knowledge of Reasonably-Available
> Minimum Spray Orifice Diameter Products"**

651.    By August 1, 1996, a POSA would not have been motivated to combine the

formulations of the '152 patent with Airomir and further with common knowledge of actuators

with smaller spray orifices.  Teachings in the art show that the orifice size of an MDI actuator

would be highly dependent on the intended application and that clogging was a particular

concern for suspension aerosol formulators.  *See* PTX 484 at TEV_0921200; PTX 374 at

TEV_0920840; PTX 646 at TEV_0920210 (12:21-23); PTX 644 at PER(Albu)007987 (10:27-

32).  Further, teachings in the art showed that for suspension formulations, a POSA would have

EXTERNAL COUNSEL ONLY

selected a larger orifice size than what was used for solution aerosols. *See* DTX 820 at

PER(Albu)036302 (6:1-2) ("standard suspension actuator having an exit orifice diameter of 0.56

mm (Model M3710, 3M)). The art also taught that if a POSA were developing a suspension

formulation product with no surfactant, the POSA would have been motivated to select a larger

orifice size to prevent the known problems associated with clogging the nozzle. A POSA would

have known that the addition of surfactant would be expected to reduce particulate aggregation

in the formulation. *See* PTX 264 at TEV_0920431; PTX 263 at TEV_0920436. In the absence

of surfactant, more particle aggregation would be expected. Accordingly, for these reasons,

"common knowledge" in the art did not motivate a POSA to use a smaller spray orifice with a

formulation substantially free of surfactant, and did not provide a reasonable expectation of

success for doing so.

652.    Additionally, Defendants' have failed to prove that their positions are truly

representative of the "common knowledge" in the art to the extent that their positions depend on

the experiences of Mr. Howlett, without any documentary support. *See Eli Lilly & Co. v. Sicor*

*Pharms., Inc.*, 705 F. Supp. 2d 971, 982-83 (S.D. Ind. 2010) (finding that slides allegedly

presented at a conference were not prior art, the court stating, "[n]o other evidence in the record

supports Defendants' contention that these slides were ever disclosed or otherwise made known

publicly . . . . [T]he Federal Circuit has reiterated that 'corroboration is required of any witness

whose testimony alone is asserted to invalidate a patent, regardless of his or her level of

interest'" (quoting *Finnigan Corp. v. ITC*, 180 F.3d 1354, 1369 (Fed. Cir. 1999))). Additionally,

the assertion that Bespak was attempting to sell different-sized actuators is not material to a

POSA's motivation to choose a particular orifice size for use with a particular suspension

formulation product.

EXTERNAL COUNSEL ONLY

### ii.      The Schultz '201 Patent

653.     By August 1, 1996, a POSA would not have had reason to combine the

suspension formulations of the '152 patent with the surfactant containing formulation of Airomir

and further with the solution formulations of the Schultz '201 patent.  Teachings in the art show

that the differences between the formulations in the '152 patent, Airomir and the Schultz '201

patent are significant.  *See supra* ¶¶ 639-641.  The art shows that Defendants' argument that the

Schultz '201 patent teaches that a 254 micron spray orifice yields a better respirable fraction

would not motivate a POSA to use the 254 micron spray orifice with the formulations of the '152

patent or Airomir because Table 2 of the Schultz '201 patent refers to solution formulations, not

suspension formulations.  Further, teachings in the art regarding clogging would not have

motivated a POSA not to use a smaller spray orifice.  Accordingly, the art would not have

motivated a POSA to combine the suspension formulations of the '152 patent with surfactant

containing formulation of Airomir and further with the solution formulations of the Schultz '201

patent to arrive at claims 1-20 of the '445 patent with any reasonable expectation of success.

654.     If a POSA did consider the '152 patent in view of the Schultz '201 patent, a

POSA would have been motivated to use larger spray orifices because the '152 patent is directed

to suspension aerosols that are free of surfactant.  The Schultz '201 patent states that the standard

orifice for a suspension aerosol has a diameter of 560 µm.  DTX 820 at PER(Albu)036302 (6:1-

2).  Accordingly, the Schultz '201 patent teaches away from using a smaller diameter spray

orifice with a suspension formulation.

### iii.      The Sioutas '803 Patent

655.     By August 1, 1996, a POSA would not be have been motivated to combine the

suspension formulation of the '152 patent with surfactant containing formulation of Airomir and

further with the Sioutas '803 patent.  The Sioutas '803 patent teaches a non-standard actuator

EXTERNAL COUNSEL ONLY

that contains a deagglomeration chamber, for use with formulations that do not yield optimal suspensions and does not specifically discuss albuterol, albuterol sulfate, HFA-134a or ethanol containing formulations. DTX 821 at PER(Albu)012806 (2:6-27). Defendants have not argued that the formulations of the claims of the '152 patent are non-optimal suspensions, nor have Defendants provided any reason as to why a POSA would have looked to actuators with deagglomeration chambers and non-standard designs, like the invention of the Sioutas '803 patent, and then only select the spray orifice size when developing a new suspension aerosol formulation and actuator combination. The teachings of the Sioutas '803 patent would not have provided motivation to use a smaller spray orifice with the formulations of the '152 patent or Airomir to arrive at claims 1-20 of the '445 patent with any reasonable expectation of success for doing so.

### 2.    Claims 1-20 of the '445 Patent Are Not Invalid For Obviousness

656.    For at least the reasons here, a POSA would not have been motivated to combine the formulations of the '152 patent with Airomir, or with any other piece of prior art cited by Defendants, to arrive at the combination of the suspension aerosol formulations and an actuator with a spray orifice aperture as claimed in claims 1-20 of the '445 patent with a reasonable expectation of success. To the contrary, Defendants' positions rely on hindsight and ignore copious teachings away in the art. For the preceding reasons, claims 1-20 of the '445 patent are not invalid for obviousness.

657.    Defendants have failed to meet their burden of establishing, by clear and convincing evidence, that claims 1-20 of the '445 patent are obvious over the prior art.

EXTERNAL COUNSEL ONLY

## XV.    Objective Indicia of Non-Obviousness Demonstrate the Validity of the '445 Patent

### A.    Findings of Fact

658.    Consistent with the objective indicia of non-obviousness supporting the validity of the '152 patent (*supra* Section IX), the inventions described in claims 1-20 of the '445 patent have objective indicia of nonobviousness supporting the validity of the '445 patent.

659.    The inventions described in claims 1-20 of the '445 patent have unexpected properties compared to the state of the prior art.  Prior to the filing of the '445 patent, if a POSA were developing a suspension formulation product, a POSA would have been motivated to use the conventional MDI components, which included larger orifice sizes for suspension formulations.  A POSA would have understood that larger orifice sizes were used with suspension products, because of the potential for clogging the orifice.  See PTX 484 at TEV_0921200 ("Reduction of the orifice's diameter . . . promotes obstruction of the orifice as a result of clogging the aerosol particles."); PTX 644 at PER(Albu)007987 (10:30-33) ("larger particles may clog the metering valve or orifice of the container"); PTX 374 at TEV_0920840; PTX 646 at TEV_0920210 (12:21-23) (stating that "suspension systems" utilize "a large orifice diameter, in order to prevent clogging").  Thus, the inventions described in claims 1-20 of the '445 patent were unexpected in light of the prior art.  A POSA would not have expected to be able to use a stable suspension formulation of 0.4% albuterol sulfate by weight, 11.4% ethanol by weight and 88.2% HFA-134a by weight without surfactant in combination with an actuator that had a smaller spray actuator orifice of 100-300 or 150-250 μm.

660.    Further, a POSA would have been skeptical about using a smaller orifice actuator with suspension aerosol formulations.  For the reasons discussed above, larger spray orifices are used with suspension aerosol formulations because they would be expected to clog less than smaller orifices.  *See* PTX 374 at TEV_0920840.  Accordingly, a POSA would have been

EXTERNAL COUNSEL ONLY

skeptical about using the smaller orifices claimed in the '445 patent with the formulations
claimed in the '445 patent.

> **B.     Conclusions of Law**

661.    Because ProAir® HFA embodies and is coextensive with the asserted claims of
the '445 patent, a nexus between the asserted secondary considerations and the patented
invention is presumed.  *See Brown & Williamson*, 229 F.3d at 1130.

662.    For at least the reasons stated above, secondary considerations support a finding
of nonobviousness of the '445 patent.

> **XVI.  The Asserted Claims of the '445 Patent Are Not Invalid Under 35 U.S.C. § 112 For
> Failure to Satisfy the Written Description and Enablement Requirements**

663.    Defendants argue that dependent claims 3-10, 12-15 and 17-20 do not find written
description support in, and are not enabled by the '445 patent.  Defendants' arguments regarding
written description and enablement of the '445 patent are based generally on the notion that the
specification of the '445 patent does not disclose a specific preferred concentration of albuterol
sulfate or propellant.  As set forth below, Defendants' arguments fail to prove by clear and
convincing evidence that a POSA would not recognize that the inventor was in possession of the
claimed invention and that a POSA would not be able to practice the claimed invention without
undue experimentation.

> **A.     Findings of Fact**

> **1.      Written Description**

664.    The inventions that are both described and claimed in the '445 patent relates to a
pharmaceutical suspension aerosol formulation product with albuterol sulfate, ethanol in a
specific concentration range, and HFA-134a, wherein the formulation is substantially free of

surfactant and the MDI has a specific spray orifice aperture size.  JTX 3 at PER(Albu)012711-12 (3:65-6:11).

665.    The '445 patent specification adequately describes the claimed invention.  First, the specification states that the invention is directed to "a medicinal aerosol formulation comprising a particulate medicament, a fluorocarbon propellant and 6% to 25% w/w of the total formulation of a polar co-solvent, such formulation being substantially free of surfactant." JTX 3 at PER(Albu)012710 (1:52-55).  The specification next describes an unexpected aspect of the invention:

> It has now been surprisingly found that higher levels of alcohol have beneficial results.  Levels of 6% or more of ethanol produce satisfactory suspensions, which do no agglomerate on standing, and on reshaking produce finely dispersed medicament.  It is believed that the higher levels of alcohol reduce the degree of deposition on the inside of the can.  This is a very desirable feature.  In addition, the use of these larger percentages of ethanol enables a much cheaper production process.

*Id*. at 2:3-11.

666.    The specification then goes on to describe albuterol sulfate as the especially preferred medicament, *id*. at 711 (3:9-12), and ethanol as the preferred co-solvent, *id.* at 3:13-17. Levels of co-solvent will be between 6% and 25% by weight of the total canister content, or preferably between 10-15% by weight.  *Id*.

667.    Next, the specification states that the product can be prepared by weighing the active medicament and suspending it in the co-solvent, followed by the addition of an appropriate amount of this suspension into the canister, and followed by a second dose of propellant.  *Id*. at 3:22-27.

668.    The specification then proceeds to provide an example of the invention:

EXTERNAL COUNSEL ONLY

The invention is further described by means of example but not in any limitative sense.

## EXAMPLE

| | |
|---|---|
| Salbutamol Sulphate | 0.03 g |
| Ethanol | 0.97 g |
| Tetrafluoroethane (P134a) | 7.5 g |

The salbutamol sulphate previously micronised to give over 90% of particles below 10 microns was weighed out and added to the ethanol. The suspension was mixed until is was smooth and uniform and then filled into the aerosol canister. The metering valve assembly was crimped (preferably vacuum crimped) on the canister and then the P134a was filled through the valve. The valve capacity is such as to deliver 100 micrograms of salbutamol, as salbutamol sulphate per actuation.

*Id.* at 3:39-59. The concentration of the ingredients in ProAir® HFA and the ANDA Product are almost identical to the disclosed example.

669.    This example is also described in U.S. Patent Application No. 08/999,752 ("the '752 application"), which issued as the '445 patent. Applicant's November 28, 2008 amendment added the dependent claims at issue here. JTX 4 at PER(Albu)010944-57. Applicants expressly informed the examiner where support could be found for these claims:

> support for which may be found throughout the specification, *e.g.*, the example in p. 5. With regards to new claims 40 and 42-44, the percent amounts of concentration in mixture by weight (w/w) were calculated using the weights of the ingredients in the example in p. 5 and rounding to the nearest tenth for consistency. For example the recitation in claim 40 of '0.4%' salbutamol sulfate was derived by dividing the weight of salbutamol sulfate (0.03g) by the total weight of the ingredients, *i.e.*, 0.03g/(0.03g + 0.97g + 7.5g) to arrive at 0.35%, which was rounded to 0.4%.

*Id.* at 949. In the Office Action responding to these statements, the examiner did not disagree with the applicant's statement that the new claims were supported by the specification. *Id* at 12302-310.

EXTERNAL COUNSEL ONLY

670.    Thus, the specification of the '445 patent reasonably conveys to a POSA that the

inventors had possession of the inventions claimed in dependent claims 3-10, 12-15 and 17-20 of

the '445 patent.

### 2.    Enablement

671.    Defendants argue that dependent claims 3-5, 7-9, 12-14 and 17-19 of the '445

patent are not enabled by the specification of the '445 patent.  Defendants do not argue that

dependent claims 6, 10, 15 and 20 are not enabled.

672.    Defendants' position appears to be that the specification must disclose, in

numerical terms, every single concentration, and possible combinations of concentrations, of

albuterol sulfate, HFA-134a and ethanol used in the suspension formulations of the invention.

673.    Contrary to Defendants' position, claims 3-5, 7-9, 12-14 and 17-19 of the '445

patent are enabled, because as of the filing date of the '445 patent (August 1, 1996), a POSA

would have been able to practice them without undue experimentation.

674.    As discussed above (*supra* ¶¶ 655-670), the specification adequately describes the

claimed invention and provides adequate guidance to a POSA.  Based on this information, a

POSA would have been able to practice the claimed invention without undue experimentation.

Moreover, the relative skill of those in the art was relatively high.

675.    For example, a POSA would have recognized from the specification that the

example contained a suspension formulation with 0.35% albuterol sulfate, 11.41% ethanol and

88.24% HFA-134a (which were all rounded "to the nearest tenth for consistency" in the claims at

issue).  Thus, a POSA who wished to practice claims 3-5, 7-9, 12-14 and 17 19 of the '445 patent

would start with these concentrations.  And, a POSA would find that these concentrations

worked, which is evidenced by the fact that the FDA-approved product, ProAir® HFA, contains

these concentrations.

EXTERNAL COUNSEL ONLY

676. Thus, to the extent that any experimentation would be required, it would not be

undue experimentation, and a POSA would be able to practice claims 3-5, 7-9, 12-14 and 17-19

of the '445 patent with other concentrations of the same ingredients as well.

**B.    Conclusions of Law**

**1.    Written Description**

677. Defendants assert that dependent claims 3-10, 12-15 and 17-20 of the '445 patent

do not satisfy the written description requirement under 35 U.S.C. § 112.  Defendants' experts,

however, do not address the *Wands* factors.

678. The gravamen of Defendants' written description challenge is that the

specification of the '445 patent allegedly does not disclose a specific preferred concentration of

albuterol sulfate or propellant.  This argument is without merit.  All that is required is that the

specification describes the invention "in a definite way [that] identifies the claimed invention."

*Ariad*, 598 F.3d at 1352.  That is, a POSA must be able to understand what the invention is and

see what the inventor claimed corresponds to what the specification describes.  *Id.*; *Koito*, 381

F.3d at 1154.

679. As discussed above, the inventions that are both described and claimed in the '445

patent specification relate to a pharmaceutical suspension aerosol formulation product with

albuterol sulfate, ethanol in a specific concentration range, and HFA-134a, wherein the

formulation is substantially free of surfactant and the MDI has a specific spray orifice aperture

size.

680. The specification describes albuterol sulfate as the especially preferred

medicament and ethanol as the preferred co-solvent.  JTX 3 at PER(Albu)012711 (3:9-17).  The

specification further states that levels of co-solvent will be between 6 and 25% by weight of the

total canister content, or preferably between 10 to 15% by weight.  *Id.*

681.    The specification also provides a detailed example that uses 0.03 grams albuterol sulfate, 0.97 grams ethanol and 7.5 grams HFA-134a.  *Id.* at 3:39-59.  A POSA would recognize this example as teaching a formulation with about 0.4% albuterol sulfate, 11.4% ethanol and 88.2% HFA 134a by weight.

682.    Defendants concede that the '445 patent provides written description support for at least the following:  (1) a pharmaceutical suspension aerosol formulation consisting of, or consisting essentially of, 6 to 25% w/w of a polar co-solvent, an active agent and a propellant (and optionally additional components, if the composition 'consists essentially of' a co solvent, an active agent, and a propellant); and (2) a pharmaceutical suspension aerosol formulation consisting of 0.35% albuterol sulfate, 11.41% ethanol and 88.24% 1,1,1,2 tetrafluoroethane.  By agreeing that the inventor of the '445 patent was in possession of a formulation consisting of, or consisting essentially of, 6 to 25% w/w of a polar co-solvent, an active agent and a propellant, Defendants admits that the inventor was in possession of the subject matter of claims 3-10, 12-15, and 17-20 of the '445 patent because these claims are directed to formulations that consist of, or consist essentially of 6 to 25% w/w of a polar co-solvent (11.4% w/w ethanol), an active agent (0.4% w/w albuterol sulfate), and a propellant (88.2% w/w HFA-134a).  JTX 3 at PER(Albu)012711-12 (4:23-44, 57-67; 6:1-11).

683.    To the extent Defendants argue that the inventor was in possession of the ingredients of the formulations of claims 3-10, 12-15 and 17-20 of the '445 patent, but not the concentrations of those ingredients, Defendants are incorrect.  As noted above, an example in the specification of the '445 patent discloses a formulation that contains 11.4% w/w ethanol, 0.4% w/w albuterol sulfate and 88.2% w/w HFA-134a.  Defendants concede that the inventor was in possession of a formulation that contained "a pharmaceutical suspension aerosol formulation

**EXTERNAL COUNSEL ONLY**

consisting of 0.35% albuterol sulphate, 11.41% ethanol, and 88.24% 1,1,1,2 tetrafluoroethane."
The claimed amounts are simply the amounts that Defendants' expert Dr. Dalby admits the
inventor was in possession of, rounded.

684.    Defendants have failed to prove by clear and convincing evidence that the
specification of the '445 patent does not reasonable convey to those skilled in the art that the
inventors had possession of the claimed subject matter of claims 3-10, 12-15 and 17-20.

## 2.    Enablement

685.    Defendants assert that dependent claims 3-5, 7-9, 12-14 and 17-19 of the '445
patent do not satisfy the enablement requirement under 35 U.S.C. § 112.  Defendants' experts,
however, fail to address the *Wands* factors.

686.    Defendants do not argue that independent claims 1, 2, 16 and 20 or dependent
claims 6, 10, 15 and 20 are not enabled under 35 U.S.C. § 112.

687.    Under 35 U.S.C. § 112, ¶ 1, a patent is enabled if a POSA is able to make and use
the invention without "undue experimentation." *See Cephalon, Inc. v. Watson Pharm., Inc*., 707
F.3d 1330, 1336 (Fed. Cir. 2013).  While the enablement requirement is often fulfilled by
disclosing in the patent specification how to make and use the invention, that is not required; a
POSA is permitted also to rely on what is known in the art. *See Falkner*, 448 F.3d at 1365 (Fed.
Cir. 2006).  Moreover, a reasonable amount of experimentation is permissible without running
afoul of the enablement requirement.  *PPG Indus., Inc. v. Guardian Indus. Corp*., 75 F.3d 1558,
1564 (Fed. Cir. 1996); *Wands*, 858 F.2d at 737 ("[The] experimentation needed to practice the
invention must not be undue experimentation.  The key word is undue, not experimentation."
(internal quotation marks and footnote omitted)).

688.    As discussed above, Defendants' position appears to be that the specification must
disclose, in numerical terms, every single concentration, and possible combinations of

EXTERNAL COUNSEL ONLY

concentrations, of albuterol sulfate, HFA-134a and ethanol used in the suspension formulations of the invention.  Defendants are wrong on both the law and the facts.

689.    A POSA would have recognized from the specification that the example contained a suspension formulation with 0.35% albuterol sulfate, 11.41% ethanol, and 88.24% HFA-134a (which were all rounded "to the nearest tenth for consistency" in the claims at issue).

690.    A POSA who wished to practice claims 3-5, 7-9, 12-14 and 17-19 of the '445 patent would start with these concentrations disclosed in the example of the '445 patent.

691.    Furthermore, the POSA would find that these concentrations worked, which is evidenced by the fact that the FDA-approved product, ProAir® HFA, contains these concentrations.

692.    To the extent that any experimentation would be required, it would not be undue experimentation, and a POSA would be able to practice claims 3-5, 7-9, 12-14 and 17-19 of the '445 patent with other concentrations of the same ingredients as well.

693.    Claims 4, 8, 13 and 18 (salbutamol sulfate in the amount 0.4% w/w).  For example, with respect to claims that specify albuterol sulfate in the amount of 0.4% w/w, a POSA would recognize that the '445 patent teaches that 10 to 15% w/w is the preferable concentration of ethanol used.  JTX 3 at PER(Albu)012711 (3:13-17).  A POSA would understand that the propellant would make up the balance of this formulation.

694.    Claims 3, 7, 12, and 17 (ethanol in the amount of 11.4% w/w).  For example, with respect to claims that specify ethanol in the amount of 11.4% w/w, a POSA would recognize that the specification discusses a suitable manufacturing process and states that a POSA will understand how to select an "appropriate amount" of medicament and co-solvent to dose in the canister followed by a second dose of propellant to prepare a medicinal aerosol.  JTX 3 at

**EXTERNAL COUNSEL ONLY**

PER(Albu)012711 (3:22-25).  Moreover, as of August 1, 1996, a POSA would have understood what ranges of albuterol sulfate could be used in suspension formulations.  A POSA would understand that the propellant would make up the balance of this formulation.  JTX 1 at PER(Albu)012699 (5:29-32) ("[p]referably micronized albuterol sulfate constitutes about 0.2 to about 0.5 percent by weight").

695.    Claims 5, 9, 14, and 19 (1,1,1,2-tetrafluoraethane in an amount of 88.2% w/w). For example, with respect to claims that specify HFA-134a in the amount of 88.2% w/w, a POSA would recognize that the '445 patent teaches that 10 to 15% w/w is the preferable concentration of ethanol used.  JTX 3 at PER(Albu)012711 (3:13-17).  Moreover, as of August 1, 1996, a POSA would have understood what ranges of albuterol sulfate could be used in suspension formulations.  JTX 1 at PER(Albu)012699 ("[p]referably micronized albuterol sulfate constitutes about 0.2 to about 0.5 percent by weight").

696.    In addition, the claims of the '445 patent are narrow in that the claims are limited to a particular drug (albuterol sulfate); particular propellant (HFA-134a), and particular co-solvent (ethanol).  Also, the specification provides a significant amount of detail, including details on how to commercially manufacture the claimed product.  The inventor also included a detailed example of the invention.  JTX 3 at PER(Albu)012711 (3:39-59).  Thus, based on a POSA's understanding as of August 1, 1996, and using the disclosures of the specification including the disclosed concentrations of albuterol sulfate, ethanol and HFA-134a, and the claimed ranges of those ingredients, a POSA would be able to select the appropriate concentration of each ingredient to deliver a pharmaceutical aerosol formulation without undue experimentation.

EXTERNAL COUNSEL ONLY

697.    Finally, to the extent Defendants are arguing that a POSA, when presented with the disclosures of the '445 patent, would not be able to make a formulation containing 11.4% w/w ethanol, 0.4% w/w albuterol sulfate and 88.2% w/w HFA-134a, they are incorrect. Defendants admit that the inventors were in possession of a formulation that contained "0.35% albuterol sulphate, 11.41% ethanol, and 88.24% 1,1,1,2-tetrafluoroethane." Defendants have failed to offer any reason why a POSA, who could make a formulation containing "0.35% albuterol sulphate, 11.41% ethanol, and 88.24% 1,1,1,2-tetrafluoroethane," could not alter these concentrations slightly to make the claimed invention without undue experimentation.

698.    Defendants have failed to prove by clear and convincing evidence that a POSA would not understand how to make and use claims 3-5, 7-9, 12-14 and 17-19 of the '445 patent without undue experimentation.

## XVII. The Asserted Claims of the '445 Patent Are Not Invalid for Indefiniteness

### A.    Legal Principles – Definiteness

699.    "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, No. 13-269, 572 U.S. __, slip op. at 1 (June 2, 2014). Thus, to establish indefiniteness, Defendants must prove by clear and convincing evidence that the term "substantially completely insoluble," read in light of the specification and prosecution history of the '445 patent, fails to informs, with reasonable certainty, persons of ordinary skill in the art about the scope of the invention. *See id.*

700.    The determination of whether a claim term is indefinite is a matter of law. *See, e.g.*, *Hoffer v. Microsoft Corp.*, 405 F.3d 1326, 1328 (Fed. Cir. 2005).

**EXTERNAL COUNSEL ONLY**

### B.    Findings of Fact

701.    This Court has already ruled that the term "substantially completely insoluble"

has a plain and ordinary meaning that a POSA would understand in view of the '445 patent and

prosecution history.  Specifically, this Court concluded that "a POSA reading 'substantially

completely insoluble' in the context of the '445 patent, and with the benefit of the subject matter

that such person is presumed to possess, would understand what 'substantially completely

insoluble' means."  D.I. 164 at 8.

702.    Each of the claims of the '445 patent in which the term "substantially completely

insoluble" appears describes a "pharmaceutical suspension aerosol formulation" which "consists

of salbutamol sulfate, ethanol in an amount of 10% w/w to 15% w/w, and 1,1,1,2-

tetrafluoroethane, wherein salbutamol sulfate is substantially completely insoluble in the 1,1,1,2-

tetrafluoroethane."  JTX 3 at PER(Albu)012711-712 (4:1-8, 13-20, 47-54; 5:3-10).  This Court

found that "[t]his context suggests that the suspension is formed because of salbutamol sulfate's

substantial complete insolubility."  D.I. 164 at 7.

703.    This Court also found that "the '445 patent's file history connects the fact that

'the bronchodilator is substantially completely insoluble in the propellant' with the fact that 'the

aerosol formulation is in the form of a suspension as opposed to a solution.'" D.I. 164 at 7

(citations omitted).

704.    This Court also found that "the use of the same term in fields related to the '445

patent also supports the idea that 'substantially completely insoluble' means forming a

suspension, not a solution."  D.I. 164 at 7.

### C.    Conclusions of Law

705.    Defendants have failed to prove by clear and convincing evidence that the term

"substantially completely insoluble," read in light of the specification and prosecution history of

**EXTERNAL COUNSEL ONLY**

the '445 patent, fails to informs, with reasonable certainty, persons of ordinary skill in the art

about the scope of the invention.

## CONCLUSION

706.    The Defendants' ANDA Product infringes the asserted claims, and that none of

the asserted claims are invalid or unenforceable.

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

### Schedule I-2
### Defendants' Proposed Findings of Fact and Conclusions of Law

## I.    INTRODUCTION

1.    To the extent that any issue of fact is deemed to be an issue of law, it should be so considered and is incorporated therein by reference.

2.    To the extent that any issue of law is deemed an issue of fact, it should be so considered and is incorporated therein by reference.

3.    Defendants incorporate by reference the uncontested facts set forth in Schedule A, to the extent not otherwise set forth herein.

4.    Defendants further incorporate all of their expert reports, including supplemental reports, by reference, to the extent the substance of these reports is not included herein.

5.    Defendants further reserve the right to modify and supplement these proposed findings and conclusions at any time, including after trial.

## II.    FINDINGS OF FACT

### A.  The Parties

6.    Plaintiff Teva Branded Pharmaceutical Products R&D, Inc. is a Delaware corporation with its principal place of business at 425 Privet Road, Horsham, Pennsylvania 19044. (Schedule A, Statement of Uncontested Facts ("Sch. A") at ¶ 1).

7.    Teva Branded Pharmaceutical Products R&D, Inc. is an indirect wholly owned subsidiary of Teva Pharmaceutical Industries Ltd. ("Teva"), which is a publicly traded company.  (Civil Action No. 1:12-cv-01101-GMS, D.I. 5).

8.    Plaintiff Teva Respiratory, LLC is a Florida limited liability company with its principal place of business at 425 Privet Road, Horsham, Pennsylvania 19044.  (Sch. A at ¶ 2).

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

9.     Teva Respiratory LLC is an indirect wholly owned subsidiary of Teva, which is a publicly traded company.  (Civil Action No. 1:12-cv-01101-GMS, D.I. 5).

10.     Plaintiff Norton (Waterford) Ltd. is an indirect wholly owned subsidiary of Teva, and is a private limited company trading as Teva Pharmaceuticals Ireland (Company No. 100363) incorporated under the laws of the Republic of Ireland and having its registered office at Unit 301, IDA Industrial Park, Waterford, Republic of Ireland.  (*See* Sch. A at ¶ 3; Civil Action No. 1:12-cv-01101-GMS, D.I. 5).

11.     Plaintiff Norton Healthcare Ltd. is an indirect wholly owned subsidiary of Teva, and is a private limited company trading as Ivax Pharmaceuticals Ireland or Teva Pharmaceuticals Ireland (Company No. 0947980) incorporated under the laws of England and having its registered office at Ridings Point, Whistler Drive, Castleford, West Yorkshire, WF10 5HX.  (*See* Sch. A at ¶ 4; Civil Action No. 1:12-cv-01101-GMS, D.I. 5).

12.     Defendant Perrigo Co. is a Michigan corporation having its principal place of business at 515 Eastern Avenue, Allegan, Michigan 49010.  (Sch. A at ¶ 5).

13.     Defendant Perrigo Pharmaceuticals Co. is a Michigan corporation having its principal place of business at 515 Eastern Avenue, Allegan, Michigan 49010.  (Sch. A at ¶ 6).

14.     Defendant Catalent Pharma Solutions, LLC is a Delaware limited liability company with its principal place of business at 14 Schoolhouse Road, Somerset, New Jersey 08873.  (Sch. A at ¶ 7).

### B.  Background

15.     This action arises out of the submission of an Abbreviated New Drug Application ("ANDA") under § 505 of the Federal Food, Drug and Cosmetic Act to the United States Food

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

and Drug Administration ("FDA") seeking approval to market and sell albuterol sulfate inhalation aerosol, 0.09 mg per actuation.  (Sch. A at ¶ 8).

16.    This action is based upon the patent laws of the United States, 35 U.S.C. § 100 *et seq.*, including 35 U.S.C. § 271(e)(2)(A) and the Hatch-Waxman Act, 21 U.S.C. § 355, and the jurisdiction of the Court is involved under 28 U.S.C. §§ 1331, 1338(a), 2201 and 2202.  (Sch. A at ¶ 30).

17.    Defendants dispute subject matter jurisdiction exists for plaintiffs' purported infringement claims against Perrigo Pharmaceuticals, Inc. under 35 U.S.C. § 271(a), (b) or (c) and against Perrigo Co. and Catalent Pharma Solutions, LLC under any provision of 35 U.S.C. § 271.  (Civil Action No. 1:12-cv-01101-GMS, D.I. 9).

18.    No party contests personal jurisdiction solely for the limited purposes of this action. (Sch. A at ¶ 32).

19.    No party contests venue solely for the limited purposes of this action.  (Sch. A at ¶ 33).

20.    Teva Branded Pharmaceutical Products R&D, Inc. is the holder of approved NDA No. 21-457 for ProAir HFA (albuterol sulfate) Inhalation Aerosol ("ProAir HFA").  (Sch. A at ¶ 9).

21.    FDA approved NDA No. 21-457 on October 29, 2004.  (Sch. A at ¶ 10).

22.    ProAir HFA is indicated in patients four years of age and older for the treatment or prevention of bronchospasm with reversible obstructive airway disease and for the prevention of exercise-induced bronchospasm.  (Sch. A at ¶ 11).

### C.  Patents-in-Suit

23.    According to the 152 Patent cover page, the 152 Patent, entitled "Suspension Aerosol Formulations," issued on September 12, 2006 and is related to U.S. Patent Application No. 08/455,490, which was filed on May 31, 1995 and which was a divisional of U.S. Patent

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

Application No. 07/878,039, which was filed on May 4, 1992, and which was a continuation-in-part of U.S. Patent Application Nos. 07/810,401 (which was filed December 18, 1991) and 07/809,791 (which was filed on December 18, 1991). (Sch. A at ¶ 12).

24. The 152 Patent was assigned, at issuance, to 3M Innovative Properties Corp. (Sch. A at ¶ 12).

25. The named inventors on the 152 Patent are Robert K. Schultz, David W. Schultz and Robert A. Moris. (Sch. A at ¶ 12).

26. Norton (Waterford) Ltd. claims to be the owner of the 152 Patent. (Sch. A at ¶ 13).

27. Teva Branded Pharmaceutical Products R&D, Inc. and Teva Respiratory, LLC are co-exclusive licensees of the 152 Patent and have the right to enforce the 152 Patent against defendants. (Sch. A at ¶ 13).

28. According to the 445 Patent cover page, the 445 Patent, entitled "Medicinal Aerosols and Methods of Delivery Thereof," issued on July 28, 2009 and is related to U.S. Patent Application No. 08/999,752, which was filed on June 4, 1997, and which claims priority to Great Britain Patent Application No. 9616237.5 (which was filed on August 1, 1996). (Sch. A at ¶ 14).

29. The named inventor on the 445 Patent is Fiona Catherine Miller. (Sch. A at ¶ 14).

30. Norton Healthcare Ltd. claims to be the owner of the 445 Patent. (Sch. A at ¶ 15).

31. Teva Branded Pharmaceutical Products R&D, Inc., Teva Respiratory, LLC and Norton (Waterford) Ltd. are co-exclusive licensees of the 445 Patent and have the right to enforce the 445 Patent against Defendants. (Sch. A at ¶ 15).

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

### i. The Asserted Claims

#### 1. The 152 Patent

32.    Claims 1-4 and 8-9 of the 152 Patent read:

> 1. A pharmaceutical suspension aerosol formulation consisting essentially of: (i) particulate drug; (ii) 1,1,1,2-tetrafluoroethane as propellant; and (iii) ethanol in an amount of 5 to about 15 percent by weight, wherein the formulation is further characterized in that it contains no surfactant.

> 2. The pharmaceutical suspension aerosol formulation of claim 1, wherein the drug is micronized.

> 3. An aerosol canister equipped with a metering valve, containing a formulation according to claim 1 in an amount sufficient to provide a plurality of therapeutically effective doses of the drug.

> 4. The pharmaceutical suspension aerosol formulation of claim 1, wherein the particulate drug is selected from the group consisting of formoterol, salmeterol, beclomethasone dipropionate, cromolyn, pirbuterol, albuterol, and pharmaceutically acceptable salts or solvates thereof.

> 8. The pharmaceutical suspension aerosol formulation of claim 4, wherein the particulate drug is albuterol or a pharmaceutically acceptable salt or solvate thereof.

> 9. The pharmaceutical suspension aerosol formulation of claim 8, wherein the particulate drug is albuterol sulfate.

(Sch. A at ¶ 16).

#### 2. The 445 Patent

33.    Claims 1-20 of the 445 Patent read:

> 1. A product suitable for delivering a pharmaceutical aerosol formulation comprising, (a) an aerosol canister comprising a container closed with a metering valve, said container comprising a pharmaceutical suspension aerosol formulation substantially free of surfactant, and which consists of salbutamol sulphate, ethanol in an amount of 10% w/w to 15% w/w, and 1,1,1,2-tetrafluoroethane, wherein salbutamol sulphate is substantially completely insoluble in the 1,1,1,2-tetrafluoroethane, and (b) an actuator with a spray orifice aperture of from 100 to 300 microns.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

2. A product suitable for delivering a pharmaceutical aerosol formulation comprising, (a) an aerosol canister comprising a container closed with a metering valve, said container comprising a pharmaceutical suspension aerosol formulation substantially free of surfactant, and which consists essentially of salbutamol sulphate, ethanol in an amount of 10% w/w to 15% w/w, and 1,1,1,2-tetrafluoroethane, wherein the salbutamol sulphate is substantially completely insoluble in the 1,1,1,2-tetrafluoroethane, and (b) an actuator with a spray orifice aperture of from 100 to 300 microns.

3. The product of claim 1, wherein the aerosol formulation contains ethanol in the amount of 11.4% w/w.

4. The product of claim 1, wherein the aerosol formulation contains salbutamol sulfate in the amount of 0.4% w/w.

5. The product of claim 1, wherein the aerosol formulation contains 1,1,1,2-tetrafluoroethane in the amount of 88.2% w/w.

6. The product of claim 1, wherein the aerosol formulation contains salbutamol sulphate in the amount of 0.4% w/w, ethanol in the amount of 11.4% w/w, and 1,1,1,2-tetrafluoroethane in the amount of 88.2% w/w.

7. The product of claim 2, wherein the aerosol formulation contains ethanol in the amount of 11.4% w/w.

8. The product of claim 2, wherein the aerosol formulation contains salbutamol sulfate in the amount of 0.4% w/w.

9. The product of claim 2, wherein the aerosol formulation contains 1,1,1,2-tetrafluoroethane in the amount of 88.2% w/w.

10. The product of claim 2, wherein the aerosol formulation contains salbutamol sulphate in the amount of 0.4% w/w, ethanol in the amount of 11.4% w/w, and 1,1,1,2-tetrafluoroethane in the amount of 88.2% w/w.

11. A product suitable for delivering a pharmaceutical aerosol formulation comprising, (a) an aerosol canister comprising a container closed with a metering valve, said container comprising a pharmaceutical suspension aerosol formulation substantially free of surfactant, and which consists of salbutamol sulphate, ethanol in an amount of 10% w/w to 15% w/w, and 1,1,1,2-tetrafluoroethane, wherein salbutamol sulphate is substantially completely insoluble in the 1,1,1,2-tetrafluoroethane, and (b) an actuator with a spray orifice aperture of from 150 to 250 microns.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

12. The product of claim 11, wherein the aerosol formulation contains ethanol in the amount of 11.4% w/w.

13. The product of claim 11, wherein the aerosol formulation contains salbutamol sulfate in the amount of 0.4% w/w.

14. The product of claim 11, wherein the aerosol formulation contains 1,1,1,2-tetrafluoroethane in the amount of 88.2% w/w.

15. The product of claim 11, wherein the aerosol formulation contains salbutamol sulphate in the amount of 0.4% w/w, ethanol in the amount of 11.4% w/w, and 1,1,1,2-tetrafluoroethane in the amount of 88.2% w/w.

16. A product suitable for delivering a pharmaceutical aerosol formulation comprising, (a) an aerosol canister comprising a container closed with a metering valve, said container comprising a pharmaceutical suspension aerosol formulation substantially free of surfactant, and which consists essentially of salbutamol sulphate, ethanol in an amount of 10% w/w to 15% w/w, and 1,1,1,2-tetrafluoroethane, wherein the salbutamol sulphate is substantially completely insoluble in the 1,1,1,2-tetrafluoroethane, and (b) an actuator with a spray orifice aperture of from 150 to 250 microns.

17. The product of claim 16, wherein the aerosol formulation contains ethanol in the amount of 11.4% w/w.

18. The product of claim 16, wherein the aerosol formulation contains salbutamol sulfate in the amount of 0.4% w/w.

19. The product of claim 16, wherein the aerosol formulation contains 1,1,1,2-tetrafluoroethane in the amount of 88.2% w/w.

20. The product of claim 16, wherein the aerosol formulation contains salbutamol sulphate in the amount of 0.4% w/w, ethanol in the amount of 11.4% w/w, and 1,1,1,2-tetrafluoroethane in the amount of 88.2% w/w.

(Sch. A at ¶ 17).

### D. The ANDA Product

34.    ██████████████, under 21 U.S.C. § 355(j), Perrigo Pharmaceuticals Co. filed

ANDA No. 203760 with FDA seeking approval to engage in the commercial manufacture, use,

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

offer for sale or sale within the United States, or importation into the United States, of a generic albuterol sulfate inhalation aerosol, 0.09 mg per actuation ("ANDA Product").  (Sch. A at ¶ 18).

35.     ANDA No. 203760 contains a certification pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV) (a "Paragraph IV certification") alleging that the claims of the 445 and 152 Patents are invalid, unenforceable and/or would not be infringed by the manufacture, use, importation, sale or offer for sale of the ANDA Product.  (Sch. A at ¶ 19).

36.     By letter dated July 24, 2012, Perrigo Pharmaceuticals Co. sent notice to plaintiffs of ANDA No. 203760.  (Sch. A at ¶ 20).

### E.  Procedural History

37.     On September 5, 2012, plaintiffs filed suit against defendants (Civil Action No. 1:12-cv-01101-GMS, D.I. 1) asserting infringement of the 152 and 445 Patents.  (Sch. A at ¶ 21).

38.     Defendants answered the complaint on November 5, 2012, pleading affirmative defenses of non-infringement, invalidity and expiration/unenforceability and declaratory judgment counterclaims of non-infringement, invalidity and expiration/unenforceability (Civil Action No. 1:12-cv-01101-GMS, D.I. 9).  (Sch. A at ¶ 22).

39.     Plaintiffs answered those counterclaims on November 29, 2012 (Civil Action No. 1:12-cv-01101-GMS, D.I. 12).  (Sch. A at ¶ 23).

40.     On August 16, 2013, plaintiffs filed suit against defendants (Civil Action No. 1:13-cv-01441-GMS, D.I. 1) asserting infringement of the 152 Patent, the 445 Patent, U.S. Patent No. 6,446,627 ("627 Patent") and U.S. Patent No. 8,132,712 ("712 Patent").  (Sch. A at ¶ 24).

41.     Defendants answered the complaint on August 21, 2013, pleading affirmative defenses of non-infringement, invalidity and expiration/unenforceability and asserting declaratory judgment

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

counterclaims of non-infringement, invalidity and expiration/unenforceability (Civil Action No. 1:13-cv-01441-GMS, D.I. 8).  (Sch. A at ¶ 25).

42.    Plaintiffs answered those counterclaims on September 16, 2013 (Civil Action No. 1:12-cv-01101-GMS, D.I. 63).  (Sch. A at ¶ 26).

43.    On September 12, 2013, the Court granted defendants' Motion to Consolidate Civil Action No. 1:12-cv-01101-GMS with Civil Action No. 1:13-cv-01441-GMS (Civil Action No. 1:12-cv-01101-GMS, D.I. 56).  (Sch. A at ¶ 27).

44.    On February 26, 2014, the parties stipulated to the dismissal of the 627 Patent from this litigation (Civil Action No. 1:12-cv-01101-GMS, D.I. 140).  The Court ordered dismissal of all claims and counterclaims regarding the 627 Patent, without prejudice, on March 12, 2014 (Civil Action No. 1:12-cv-01101-GMS, D.I. 144).  (Sch. A at ¶ 28).

45.    On May 28, 2014, the parties stipulated to judgment of non-infringement of the '712 patent under the Court's claim construction, while reserving all rights to challenge such constructions on appeal (Civil Action No. 1:12-cv-01101-GMS, D.I. 172), which was entered by the Court on June 2, 2014 (Civil Action No. 1:12-cv-01101-GMS, D.I. 173).  (*See* Sch. A at ¶ 29).

## III.    DISCUSSION AND CONCLUSIONS OF LAW

### A.  Non-Infringement

46.    Plaintiffs allege that the ANDA Product infringe Claims 1-4, 8-9 of the 152 Patent, and Claims 1-20 of the 445 Patent.  (DTX 1669_4).

47.    Defendants contend that plaintiffs have failed to prove any of the asserted claims is or would be infringed by the ANDA Product.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

48. 

49.

50.

51.    For at least the reasons that follow, the Court finds and concludes that the ANDA Product does not and would not infringe any asserted claims of the 152 and 445 Patents, either literally or under the doctrine of equivalents.

### i.  The Legal Standard

52.    The application of a patent claim to an accused product is a fact-specific inquiry. *See Kustom Signals, Inc. v. Applied Concepts, Inc.*, 264 F.3d 1326, 1332 (Fed. Cir. 2001).

53.    The determination of whether an accused product infringes a claim in a patent has two steps: (1) construction of the claim to determine its meaning and scope; and (2) comparison of the properly construed claim to the product at issue.  *See Tanabe Seiyaku Co. v. U.S. Int'l Trade Comm'n,* 109 F.3d 726, 731 (Fed. Cir. 1997) (citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd* 517 U.S. 370 (1996)).

54.    The patent owner has the burden of proving by a preponderance of the evidence that "every limitation of the patent claim asserted to be infringed is found in the accused device, either literally or by equivalent."  *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1988).

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

55.    "The doctrine of equivalents prohibits one from avoiding infringement liability by making only 'insubstantial changes and substitutions … which, though adding nothing, would be enough to take the copied matter outside the claim, and hence outside the reach of law.'" *Siemens Med. Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1279 (Fed. Cir. 2011) (quoting *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 607 (1950)).

56.    The doctrine of equivalents "must be applied to the individual elements of the claim, not to the invention as a whole." *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997).

57.    "An element of an accused [product] is equivalent to an element of the patented invention if the differences between them are insubstantial." *Martek Biosciences Corp. v. Nutrinova, Inc.*, 520 F. Supp. 2d 537, 547 (D. Del. 2007) (quoting *Warner-Jenkinson*, 520 U.S. at 39), *aff'd in part, rev'd in part on other grounds*, 579 F.3d 1363 (Fed. Cir. 2009).

58.    Alternatively, the accused product infringes under the doctrine of equivalents "if the element in the accused device performs substantially the same function in substantially the same way to obtain the same result as the claim limitation." *Martek*, 520 F. Supp. 2d at 547-48.

59.    Regardless of whether the "insubstantial differences test" or the "function test" is used, the patentee must provide "particularized testimony and linking argument" for each limitation invoking the doctrine of limitation. *See Texas Instruments v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1567 (Fed. Cir. 1996).

60.    The doctrine of equivalents is limited in scope and application. *See Warner-Jenkinson*, 520 U.S. at 29 (1997) ("It is important to ensure that the application of the doctrine, even as to an

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

individual element, is not allowed such broad play as to effectively eliminate that element in its entirety.").

61.    "[T]he concept of equivalency cannot embrace a structure that is specifically excluded from the scope of the claims."  *Dolly, Inc. v. Spalding & Evenflo Cos.*, 16 F.3d 394, 400 (Fed. Cir. 1994).

62.    In addition, the scope of permissible equivalents cannot encompass or ensnare what is already in the prior art.  *See Marquip, Inc. v. Fosber Am., Inc.*, 198 F.3d 1363, 1367 (Fed. Cir. 1999).

63.    In the ANDA context, 35 U.S.C. § 271(e)(2)(A) provides that it shall be an act of infringement to submit an ANDA "if the purpose of such submission is to obtain approval … to engage in the commercial manufacture, use, or sale of a drug … claimed in a patent or the use of which is claimed in a patent before the expiration of such patent." 35 U.S.C. § 271(e)(2)(A).

64.    The infringement analysis in an ANDA case brought under 35 U.S.C. § 271(e)(2) requires comparing the asserted claims against the product that is likely to be sold should the FDA approve the application.  *Bayer AG v. Elan Pharm. Res. Corp.,* 212 F.3d 1241, 1248-49 (Fed. Cir. 2000).

### ii.   The Parties' Contentions and Discussion

65.    ██████████████████████████████████████████████
██████████████████████████████████████████

66.    ██████████████████████████████████████████████
██████████████████████

67.    ██████████████████████████████████████████████
████████████████████████████████████

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

68. ███████████████████████████████████████████

███████████████████████████████████

69. ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████

70. ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████

71. ███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████

72. ███████████████████████████████████████

73. ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████

74. ███████████████████████████████████████████

███████████████████████████████████████████

█████████████████

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER



EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

83. 

84.

85.

86.

87.

88.

89.

90.

91.

92.

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**



EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

105.

106.

107.

108.

109.

110.

111.

112.

113.

114.

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**



115.

116.

117.

118.

119.

120.

121.

122.

123.

124.

125.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

126. ████████████████████████████████████████

████████████████████████████████████████

████████

127. ████████████████████████████████████████

███████████████████████████████

128. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

129. ███████████████████████

130. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████

131. ████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████

132. ████████████████████████████████████████

██████████████████████████████████

133. ████████████████████████████████████████

████████████████████████████████████████

█████████████████

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**



EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER



**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

█████████████████████████████████████████████

████████████████████████████

149. ████████████████████████████████████████

█████████████████████████████████████

150. ████████████████████████████████████████

████████████████████

151. ████████████████████████████████████████

████████████████████████████████

152. ████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████

153. ██████████████████████

154. ████████████████████████████████

155. ████████████████████████████████████████

█████████████████████████████████████████████

████████████████████

156. ████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████

157. ████████████████████████████████████████

██████████████████████

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER



**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**



**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

176. ███████████████████████████████████████

███████████████████████

177. ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████

178. ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████

179. ███████████████████████████████████████

███████████████████████

180. ███████████████████████████████████████

██████████████████████████████

181. ███████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**



**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

193. ████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

194. ████████████████████████████████████████████████

███████████████████████████████████

195. ████████████████████████████████████████████████

█████████████████████████

196. ████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

197. ████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████

198. ████████████████████████████████████████████████

███████████████████████████████████████████

199. ████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

200. ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**



201.

202.

203.

204.

205.

206.

207.

208.

209.

210.

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**



211.

212.

213.

214.

215.

216.

217.

218.

219.

220.

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**



221.

222.

223.

224.

225.

226.

227.

228.

229.

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**



230.

231.

232.

233.

234.

235.

236.

237.

238.

239.

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

240. 

241.

242.

243.

244.

245.

246.

247.

248.

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

249. █████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

| ███████████ | ████████████ | | | | ███████████████ | |
| | ███████████ | | | | ██████████ | |
| | █████ | █████ | █████ | █████ | █████ | █████ |
| █████████████ | ██ | ██ | ██ | ██ | ██ | ██ |
| █████████████ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██████████████ | ██ | ██ | ██ | ██ | ██ | ██ |
| █████████ | ██ | ██ | ██ | ██ | ██ | ██ |
| █████████████ | ██ | ██ | ██ | ██ | ██ | ██ |
| █████████ | ██ | ██ | ██ | ██ | ██ | ██ |
| ████████████ | ██ | ██ | ██ | ██ | ██ | ██ |
| █████████████ | ██ | ██ | ██ | ██ | ██ | ██ |
| ████████ | ██ | ██ | ██ | ██ | ██ | ██ |

250. █████████████████████████████████████████

██████████████████

251. █████████████████████

252. █████████████████████████████████████████

████████████████████████████████████████████

████

253. █████████████████████████████████████████

████

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**



254.

255.

256.

257.

258.

259.

260.

261.

262.

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**



263.

264.

265.

266.

267.

268.

269.

270.

271.

272.

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**



**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**



282.

283.

284.

285.

286.

287.

288.

289.

290.

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**



291.

292.

293.

294.

295.

296.

297.

298.

299.

300.

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**



301.

302.

303.

304.

305.

306.

307.

308.

309.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER



**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

318.



**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**



323.

**i.**

324.

325.

326.

327.

328.

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**



**ii.** ███████████████

329. ████████████████████████████████

████████████████████████████

330. ████████████████████████████████

███████████████████

331. ████████████████████████████████

█████████████████

332. ████████████████████████████████

███████████████████████████████████

███████████████████████████████

333. ████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████[1]

334. ████████████████████████████████

███████████████████████████████████

---

[1] Defendants proposed, during the *Markman* hearing, that their proposed construction of "in the amount of 0.4% w/w" (and the other specific weight percentage elements) could be modified to include the example provided in the specification of the 445 Patent (*i.e.*, the range would be from the number that was rounded in the example, 0.35, to the claimed number, 0.4); however, plaintiffs rejected that proposed modified construction (D.I. 126 at 61), and the Court declined to adopt it.  (*See* D.I. 164, at 8-9).

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**



335.

336.

iii.

337.

338.

339.

340.

341.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER



342.

343.

344.

b.

345.

346.

347.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

348. 

349.

350.

351.

352.

353.

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**



**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

### B.  Priority

360.    Defendants contend that plaintiffs have failed to meet their burden of proving that the 152 Patent is entitled to the December 18, 1991 filing date of the 791 and the 401 Applications, and are therefore only entitled, at the earliest, to the May 4, 1992 filing date of the 039 Application.[2]

361.    Defendants contend that the 152 Patent is not entitled to the December 18, 1991 filing date of the 791 and the 409 Applications, because the 791 Application only described albuterol formulations in propellant HFA-227 and the 401 Application was drawn to pirbuterol formulations in propellant HFA-227.

### i.  The Legal Standard

362.    To establish that an asserted claim of a patent-in-suit is entitled to the priority filing date of an earlier parent application, the patentee has the burden of proving that the written description in that earlier application supports the later-filed claim.  *See Tech Licensing Corp. v. VideoTek,* 545 F.3d 1316, 1327 (Fed. Cir. 2008).

363.    Continuation-in-part patent applications are entitled to the priority date of the parent application only for those claims that have an adequate written description in that parent application.  *See Go Med. Indus. Pty, Ltd. v. Inmed Corp.,* 471 F.3d 1264, 1270 (Fed. Cir. 2006).

364.    To comply with the written description requirement of 35 U.S.C. § 112, the patent disclosure must convey with reasonable clarity to a person of ordinary skill in the art that the inventor was in possession of the claimed invention at the time of the earlier application.  *See Ariad Pharms., Inc. v. Eli Lilly & Co.,* 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc).

---

[2] As set forth in more detail below, defendants do not agree that the May 4, 1992 application, or the specification of the 152 Patent itself, provides § 112 support for the asserted claims of the 152 Patent.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

365.    One shows that one is "in possession" of the invention by describing the invention, with all its claimed limitations, and not by disclosing merely that which makes the invention obvious.

366.    One does that by such descriptive means as words, structures, figures, diagrams, formulas, etc., that fully set forth the claimed invention.  *Lockwood v. Am. Airlines,* 107 F.3d 1565, 1571 (Fed. Cir. 1997).

367.    To this end, "a description that merely renders the invention obvious does not satisfy the requirement," and support in the written description must be based on what actually is disclosed, not on an "obvious variant" of what is disclosed.  *See Ariad Pharms, Inc.,* 598 F.3d at 1352; *Lockwood,* 107 F.3d at 1571.

368.    The written description must "actually or inherently disclose each element of the claim." *Power Oasis, Inc. L.L.C. v. T-Mobile USA, Inc.,* 522 F.3d 1299, 1307 (Fed. Cir. 2008).

369.    "Put another way, one skilled in the art, reading the original disclosure, must 'immediately discern the limitation at issue' in the claims."  *Purdue Pharma L.P. v. Faulding Inc.,* 230 F.3d 1320, 1323 (Fed. Cir. 2000).

### ii.    Whether the Priority Date of the Asserted Claims of the 152 Patent is May 4, 1992

370.    Plaintiffs contend that the asserted claims of the 152 Patent are entitled to the December 18, 1991 filing date of the 791 and 401 Applications.

371.    Neither of plaintiffs' experts conducted a comparative analysis between the 152 Patent specification and the 791 and 401 Applications.

372.    Defendants, on the other hand, contend that the earliest priority date to which the 152 Patent is entitled is the May 4, 1992 filing date of the 039 Application.[3]

---

[3] See n.2.

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

373.    Defendants contend that the asserted claims of the 152 Patent do not find support in the

December 18, 1991 Applications because a person of ordinary skill in the art reading the 791 and

401 Applications in 1991 would not have found disclosed therein each limitation of the claims of

the 152 Patent or would not have believed that the applicants were in possession of the alleged

invention of claims 1-4, 8 and 9 of the 152 Patent.

374.    The Court agrees with defendants, and finds that the asserted claims of the 152 Patent are

not entitled to a priority date any earlier than May 4, 1992.

375.    Application No. 07/809,791 ("791 Application") was filed on December 18, 1991 and

listed Martin Oliver and Robert Moris as purported inventors.  (JTX 34_1-2).

376.    Only Robert Moris is included as one of the three purported inventors listed on the 152

Patent.

377.    The 791 Application describes the invention disclosed therein as "suspension aerosol

formulations comprising a therapeutically effective amount of micronized albuterol sulfate and

1,1,1,2,3,3,3-heptafluoropropane."  (JTX 34_7).

378.    Plaintiffs have not cited to any passage in the 791 Application that would provide written

description support for the propellant HFA-134a claimed in the 152 Patent claims and plaintiffs'

expert, Dr. Peter Byron, has also testified that he did not review the 791 specification to

determine whether it provided support for the claims of the 152 Patent.

379.    Likewise, neither of plaintiffs' experts, Dr. Byron nor Dr. Paul Myrdal, substantively

address the issue in their testimony.

380.    The 791 Application does not mention the propellant 1,1,1,4-tetrafluoroethane anywhere

in the application and the application contains only three examples, each of which contain

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

1,1,1,2,3,3,3-heptafluoropropane as the only propellant and none of which include formulations containing albuterol sulfate, propellant, ethanol and no surfactant.[4]

381.    In addition, the claims submitted with the original 791 Application contain a single independent claim, claim 1, which recites "[a] suspension aerosol formulation comprising a therapeutically effective amount of micronized albuterol sulfate and 1,1,1,2,3,3,3-heptafluoropropane as substantially the only propellant." (JTX 34_12).

382.    Application No. 07/810,401 ("401 Application") was filed on December 18, 1991, entitled "Pirbuterol Suspension Aerosol Formulations," and listed Robert Schultz and Robert Moris as purported inventors.  (JTX 35_1-2).

383.    Robert Schultz and Robert Moris are two of the three persons included as purported inventors on the 152 Patent.

384.    The 401 Application describes the invention disclosed therein as "suspension aerosol formulations comprising a therapeutically effective amount of micronized pirbuterol acetate and a propellant comprising 1,1,1,2,3,3,3-heptafluoropropane, the formulation further characterized in that it is substantially free of perfluorinated surfactant."  (JTX 35_6).

385.    Plaintiffs have not cited to any passage in the 401 Application that would provide written description support for the claims of the 152 Patent and plaintiffs' expert, Dr. Peter Byron, has also testified that he did not review the 401 Application to determine whether it provided support for the claims of the 152 Patent.

---

[4] The 791 Application contains three examples:  Example 1, which is a formulation containing albuterol sulfate and 1,1,1,2,3,3,3-heptafluoropropane; Example 2, which is a formulation containing albuterol sulfate, oleic acid, ethanol and 1,1,1,2,3,3,3-heptafluoropropane; and Example 3, which is a formulation containing albuterol sulfate, sorbitan trioleate, ethanol and 1,1,1,2,3,3,3-heptafluoropropane.  (JTX 34_10-11).

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

386.    Likewise, neither of plaintiffs' experts, Dr. Byron nor Dr. Paul Myrdal, substantively address the issue in their testimony.

387.    Dr. Myrdal indirectly addresses the issue when attempting to rebut defendants' § 112 arguments by citing to various sections of the 152 Patent specification that he believes shows support for the issued claims.

388.    Dr. Myrdal pointed to the lone mention of HFA-134a in the portion of the 152 Patent specification that derives from the 401 Application, a passage which reads: "The propellant comprises 1,1,1,2,3,3,3-heptafluoropropane, preferably as substantially the only propellant. However, one or more other propellants such as propellant 142b (1-chloro-1,1-difluoroathone), HFA-134a, and the like can be used, preferably in formulations of the invention containing ethanol." (JTX 1_7 (5:14-20)).

389.    This passage is the only mention of the propellant HFA-134a in the detailed description of the invention section of the 401 Application. (*See* JTX 35_8).

390.    Furthermore, pirbuterol acetate is the only medicament disclosed in the 401 Application. (JTX 35).

391.    The other drugs listed in the asserted claims of the 152 Patent—albuterol, formoterol, salmeterol, beclomethasone dipropionate and cromolyn—are not disclosed anywhere in the 401 Application.

392.    In addition, the 401 Application contains only five examples, each of which discloses only pirbuterol acetate as the drug and 1,1,1,2,3,3,3-heptafluoropropane as the only propellant—and none of which include albuterol or 1,1,1,2-tetrafluoroethane.[5]

---

[5] The 401 Application contains five examples:  Example 1, which is a formulation containing pirbuterol acetate, ethanol and 1,1,1,2,3,3,3-heptafluoropropane; Example 2, which is a formulation containing pirbuterol acetate and 1,1,1,2,3,3,3-heptafluoropropane; Example 3,

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

393.    In addition, the claims submitted with the original 401 Application contain a single independent claim, claim 1, which recites "[a[ suspension aerosol formulation comprising a therapeutically effective amount of micronized pirbuterol acetate and a propellant comprising 1,1,1,2,3,3,3-heptafluoropropane as substantially the only propellant, the formulation being further characterized in that it is substantially free of perfluorinated surfactants." (JTX 35_13).

394.    Defendants note that perfluorinated surfactants are a sub-class of surfactants that contain substituted fluorine atoms in place of hydrogen atoms and are distinct from the conventional surfactants such as oleic acid, sorbitan trioleate and lecithin.

395.    Thus, the 401 Application also fails to disclose formulations of the 152 Patent which are characterized in that they contain "no surfactant," a broad class that includes both conventional surfactants and perfluorinated surfactants.

396.    Both the 791 and the 401 Applications were eventually abandoned.

397.    Application No. 07/878,039 ("039 Application") was filed May 4, 1992 and listed Robert K. Schultz, David W. Schultz, Martin J. Oliver, Robert A. Moris and Philip A. Jinks as purported inventors. (JTX 36_1-6).

398.    The 039 Application was filed as a continuation-in-part ("CIP") of the 791 and 401 Applications. (JTX 36_3-4).

399.    The 039 Application's status as a continuation-in-part is significant, in that it indicates that new matter was added. *See, e.g.*, *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1304 (Fed. Cir. 2008) ("A 'CIP' application is a continuation-in-part application containing a portion or all of the disclosure of an earlier application together with added matter not present in

---

which is a formulation containing pirbuterol acetate, oleic acid, ethanol and 1,1,1,2,3,3,3-heptafluoropropane; Example 4, which is a formulation containing pirbuterol acetate and 1,1,1,2,3,3,3-heptafluoropropane; and Example 5, which is a formulation containing pirbuterol acetate, ethanol and 1,1,1,2,3,3,3-heptafluoropropane. (JTX 35_9-12).

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

that earlier application … the quintessential difference between a continuation and a continuation-in-part is the addition of new matter … [g]enerally, a CIP adds new matter on which at least one claim relies for support.")

400.     In the case of the 039 Application, a substantial amount of new matter was added.

401.     The specification of the 039 Application as filed spans 39 pages, compared to just 9 pages for the 791 Application and just 11 pages for the 401 Application.  (JTX 36; JTX 34; JTX 35).

402.     The 039 Application also incorporated a total of 17 examples, compared to just three in the 791 Application and just five in the 401 Application.  (JTX 36_18-36; JTX 34_5-6; JTX 35_5-8).

403.     Moreover, the 039 Application disclosed the use of HFA-134a in formulations containing the drugs listed in claim 4 of the 152 Patent and, unlike the 791 and 401 Applications, included some examples in which 1,1,1,2-tetrafluoroethane was used with various medicaments.  (JTX 36).

404.     Furthermore, when presented with the opportunity to argue for a December 18, 1991 priority date during the prosecution that led to the 152 Patent, 3M declined, opting instead to argue for the May 4, 1992 priority date.

405.     In requesting that a patent interference be declared with certain Glaxo patents, 3M argued to the USPTO that May 4, 1992 was the effective filing date of the claims that were pending as of November 1998; claims which were substantially similar to those that eventually issued.  (JTX 2_438 ("…[b]ecause pending claims 78-83 are fully supported by the disclosure in U.S. Application No. 07/878,039, filed May 4, 1992, and in this application, *the effective filing date of this application is May 1992*.") (emphasis added)).

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

406.   The 039 Application was eventually abandoned.

407.   Application No. 08/455,490 ("490 Application"), the application listed on the cover page of the 152 Patent, was filed on May 31, 1995 as a continuation of the 039 Application, and incorporated therein substantially the same specification as that found in the 039 Application. (JTX 2_7-45).

### iii.  Conclusion

408.   The Court finds that plaintiffs have failed to prove that claims 1-4, 8 and 9 of the 152 Patent are entitled to the December 18, 1991 filing date of the 791 and 401 Applications.

409.   Though neither of plaintiffs' experts directly addressed the issue, Dr. Myrdal indirectly addressed the support issue when attempting to rebut defendants' § 112 arguments by citing to various sections of the 152 Patent specification that he believes shows support for the issued claims.

410.   Dr. Myrdal pointed to the lone mention of HFA-134a in the portion of the 152 Patent which derives from the 401 Application, and which reads: "The propellant comprises 1,1,1,2,3,3,3-heptafluoropropane, preferably as substantially the only propellant.  However, one or more other propellants such as propellant 142b (1-chloro-1,1-difluoroathone), HFA-134a, and the like can be used, preferably in formulations of the invention containing ethanol."

411.   However, the Court finds that this sole reference to HFA-134a with pirbuterol acetate in the December 1991 application is insufficient to provide written description support for the asserted claims of the 152 Patent.

412.   First, the Court notes that Claims 8 and 9 of the 152 Patent are restricted to albuterol formulations and not pirbuterol formulations, and the 401 Application fails to mention albuterol anywhere in the specification.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

413.    Second, the Court notes that Claims 1-4 of the 152 Patent are drawn to formulations containing a genus of medicaments, of which pirbuterol is just one non-representative species, the 401 Application fails to disclose the other medicaments claimed in claims 1-4 of the 152 Patent.

414.    Thus, the lone, narrow disclosure of HFA-134a with pirbuterol acetate identified by Dr. Myrdal in the 401 Application is insufficient to provide written description support for each limitation of the asserted claims of the 152 Patent. *See Tronzo v. Biomet, Inc.*, 156 F.3d 1154 (Fed. Cir. 1998) (holding that patentees were not entitled to the benefit of their earlier filing date where the earlier application disclosed only one species of the later-claimed generic subject matter).

415.    The Court thus concludes that, for the reasons stated above, claims 1-4, 8 and 9 of the 152 Patent are not entitled to the December 18, 1991 filing date of the 791 and 401 Applications because the 791 and 401 specifications would not have reasonably conveyed to a person of ordinary skill in the art that the applicants were in possession of the claimed invention.

416.    Consequently, the Court will evaluate the parties' obviousness and anticipation arguments based on the relevant prior art date of May 4, 1992.[6]

### C. Anticipation

417.    Defendants contend that the asserted claims of the 152 Patent are invalid as anticipated by the Purewal 777 Application, at least according to plaintiffs' interpretation of the "surfactant" term present in each of the asserted claims of the 152 Patent. (*See* JTX 1_12 (each asserted

---

[6] As stated above, and as set forth in more detail below, defendants do not agree that the May 4, 1992 application, or the specification of the 152 Patent itself, provides § 112 support for the asserted claims of the 152 Patent.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

claim contains the term "surfactant" in the element "wherein the formulation is further characterized in that it contains no surfactant")).

418.    Specifically, defendants contend that each and every element of the asserted claims of the 152 Patent is present expressly in the Purewal 777 Application.

419.    Defendants presented a detailed analysis of the elements of the asserted claims of the 152 Patent.

420.    In summary, in the order they appear in the asserted claims, the elements of the 152 Patent are: (a) "A pharmaceutical suspension aerosol formulation consisting essentially of"; (b) "particulate drug"; (c) HFA-134a "as propellant"; (d) "ethanol in an amount of 5 to about 15 percent by weight"; (e) "wherein the formulation is further characterized in that it contains no surfactant"; (f) "wherein the drug is micronized"; (g) "an aerosol canister equipped with a metering valve"; (h) "containing a formulation … in an amount to provide a plurality of therapeutically effective doses of the drug"; (i) "wherein the particulate drug is … albuterol"; (j) "wherein the particulate drug is albuterol or a pharmaceutically acceptable salt or solvate thereof"'; (k) "wherein the particulate drug is albuterol sulfate."  (DTX 1_12).

421.    In addition, defendants contend that Example 24 of the Purewal 777 Application also anticipates the asserted claims of the 152 Patent, either expressly or inherently.

### i.  The Legal Standard

422.    Under 35 U.S.C. § 102, a patent is anticipated if "the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent," 35 U.S.C. § 102(a), or "the invention was patented or described in a printed publication in this or a foreign country … more

than one year prior to the date of the application for patent in the United States," 35 U.S.C. § 102(b).

423.    A patent claim is anticipated (*i.e.*, not novel) if comparison of the claim with a prior art reference reveals that every element of the claim is described in the prior art reference.  *See Schering Corp. v. Geneva Pharm., Inc.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003); *Rockwell Int'l Corp. v. United States*, 147 F.3d 1358, 1363 (Fed. Cir. 1998).

424.    "[I]nvalidity by anticipation requires that the four corners of a single[] prior art document describe every element of the claimed invention, either expressly or inherently, such that a person of ordinary skill in the art could practice the invention without undue experimentation." *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000).

425.    With respect to inherent anticipation, "a prior art reference may anticipate without disclosing a feature of the claimed invention if that missing characteristic is necessarily present, or inherent, in the single anticipating reference." *Verizon Servs. Corp. v. Cox Fibernet Virginia, Inc.*, 602 F.3d 1325, 1337 (Fed. Cir. 2010).

426.    Inherent anticipation "requires that the missing descriptive material is 'necessarily present,' not merely probably or possibly present, in the prior art." *Trintec Indus., Inc. v. Top-U.S.A. Corp.*, 295 F.3d 1292, 1295 (Fed. Cir. 2002) (citation omitted).

427.    "Under the principles of inherency, if the prior art necessarily functions in accordance with, or includes, the claimed limitations, it anticipates."  *MEHL/Biophile Int'l Corp. v. Milgraum*, 192 F.3d 1362, 1365 (Fed. Cir. 1999).

428.    The Federal Circuit has held that a teaching that a step is optional anticipates a claim that specifically excludes the step.  *See Upsher-Smith Labs., Inc. v. Pamlab*, 412 F.3d 1319, 1322 (Fed. Cir. 2005).

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

429.    In *Upsher-Smith*, the Federal Circuit determined that a prior art "European Application's 'optional inclusion' of antioxidants teaches vitamin supplement compositions that both do and do not contain antioxidants." *Id*.

430.    The court reasoned that "because compositions made according to the European Application that do not contain antioxidants would infringe the asserted claims of the [patents-in-suit], those compositions anticipate the asserted claims despite no express teaching to exclude the antioxidants in the European Application." *Id*.

431.    Whether a prior art reference anticipates a patent claim is a question of fact and must be proven by clear and convincing evidence. *See Advanced Display Sys*., 212 F.3d at 1281.

432.    "Clear and convincing evidence is evidence that places in the fact finder 'an abiding conviction that the truth of [the] factual contentions are highly probable.'" *Alza Corp. v. Andrx Pharms., LLC*, 607 F. Supp. 2d 614, 631 (D. Del. 2009) (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)).

### ii.   The Level of Ordinary Skill in the Art

433.    A person of ordinary skill in the art of the 152 Patent would have a bachelor's degree in the chemical, physical or pharmaceutical arts plus at least several years of experience in the fields of pharmaceutical formulation, pharmaceutical development, or product development, or an advanced degree in these arts, and typically would be a member of a product development team composed of persons with a range of education and experience in these areas, with many years of combined experience in the MDI industry.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

### iii.  The Parties' Contentions and Discussion

434.    Defendants contend that, if the Court accepts plaintiffs' interpretation of the term "surfactant" in the asserted claims of the 152 Patent, then each and every element of the asserted claims is present expressly in the Purewal 777 Application.

435.    As discussed above, for purposes of plaintiffs' infringement analysis, plaintiffs' expert, Dr. Myrdal, offered several definitions and requirements for a compound purportedly to be considered a "surfactant" according to the asserted claims of the 152 Patent.

436.    For example, Dr. Myrdal opined that: "A person of ordinary skill in the art would recognize that only some of these molecules were *commonly used* in aerosol suspension MDI formulations."[7]  (emphasis added).

437.    Dr. Myrdal also opined that: "Ethyl palmitate was not and is *not used as a surfactant in pharmaceutical aerosol formulations*."  (emphasis added).

438.    Dr. Myrdal also opined that: "Even 'known' surfactants only show a *stabilizing effect* at higher concentrations.  Accordingly, the person of ordinary skill in the art would understand that, for a molecule to *function as a surfactant* in a suspension aerosol formulation, the molecule would need to be present at a *threshold level*, which the person of skill in the art would be able to *determine by evaluating the stability* of a pharmaceutical suspension aerosol formulation." (emphases added).

439.    Dr. Myrdal also opined that: "[A] person of ordinary skill in the art would understand that in the context of suspension aerosol formulations, a molecule, even if it were *traditionally considered* a surfactant, would need to be *present in an amount sufficient to stabilize a*

---

[7] By "molecules," Dr. Myrdal was referring to compounds listed as "surfactants" in various publications.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

*formulation in order to be considered a surfactant that is part of the formulation*." (emphases added).

440.     Essentially, Dr. Myrdal opined that, for a person of ordinary skill in the art to consider a compound a "surfactant" for purposes of the asserted claims of the 152 Patent, the compound must have been "commonly used" or "traditionally considered" a surfactant in aerosol suspension formulations, and must also be present at a "threshold level" shown "sufficient to stabilize" such a formulation.

441.     Defendants contend that, according to Dr. Myrdal's interpretation of "surfactant" in the asserted claims of the 152 Patent, there are no differences between the Purewal 777 Application and the asserted claims of the 152 Patent because at least two compounds listed as a "surface active agent" or "surfactant" in the Purewal 777 Application do not meet any of Dr. Myrdal's criteria for a "surfactant" in the asserted claims of the 152 Patent.

442.     In addition, defendants contend that at least two of the example formulations in Example 24 of the Purewal 777 Application anticipate the asserted claims of the 152 Patent because they do not contain a compound that Dr. Myrdal would consider a "surfactant" according to his interpretation of the asserted claims of the 152 Patent.

443.     Therefore, according to defendants, each and every element of the asserted claims of the 152 Patent is present in the Purewal 777 Application, and at least two example formulations in the Purewal 777 Application fall within the asserted claims of the 152 Patent.

444.     In response, plaintiffs contend that, because the Purewal 777 Application lists the compounds as "surfactants," the Court should simply assume these compounds are "surfactants" for purposes of evaluating anticipation by the Purewal 777 Application.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

445.    In addition, plaintiffs contend that a person of ordinary skill in the art would not have understood the Example 24 formulations in the Purewal 777 Application to fall within the asserted claims of the 152 Patent without consulting other references because the amount of ethanol in Example 24 initially would appear to be about 1%, which is outside the range of 5 to about 15% in the asserted claims of the 152 Patent.

446.    In reply, defendants contend that plaintiffs have taken inconsistent positions regarding the meaning of the term "surfactant" in the asserted claims of the 152 Patent.

447.    Defendants contend that, at least for purposes of plaintiffs' infringement and commercial embodiment arguments,[8] plaintiffs adopt Dr. Myrdal's interpretation of "surfactant."

448.    In contrast, for plaintiffs' validity arguments, plaintiffs disregard Dr. Myrdal's interpretation of "surfactant," and simply assume that any compound listed as a "surfactant" in the Purewal 777 Application is a "surfactant" regardless of whether persons of ordinary skill in the art actually would: (1) consider the compound a surfactant; and (2) believe that the compound is capable of stabilizing the example formulations, at least according to Dr. Myrdal's requirements for a "surfactant."

449.    Regarding the amount of ethanol in Example 24 of the Purewal 777 Application, Defendants contend that there is a typographical error that would have been recognized and corrected by a person of ordinary skill in the art, either based on the expressly stated amounts in Example 24, or upon reproduction of any of the example formulations within Example 24, including those containing oleic acid.

---

[8] As discussed further below, defendants contend that plaintiffs have used Dr. Myrdal's interpretation of "surfactant" in the asserted claims of the 152 Patent to argue that ProAir HFA is a commercial embodiment of the 152 Patent despite the presence of a "common" and "traditional" surfactant, oleic acid, in the marketed ProAir HFA formulation. (*See, e.g.,* DTX 293 ██████████████████████████████████████████████████████).

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

450.    The Court agrees with defendants, and rejects plaintiffs' attempts to interpret and apply the claims differently for infringement than for validity.

451.    For at least the reasons that follow, under plaintiffs' interpretation of the asserted claims of the 152 Patent, these asserted claims are anticipated by the Purewal 777 Application, by clear and convincing evidence, and thus are invalid.

### 1.    Whether the Purewal 777 Application Anticipates the Asserted Claims of the 152 Patent

452.    The Purewal 777 Application is directed to "medicinal aerosol formulations," and was published on June 13, 1990.  (DTX 120_1).

453.    The parties agree that the Purewal 777 Application is prior art to the asserted claims of the 152 Patent, and several experts presented detailed testimony concerning the Purewal 777 Application at trial, as discussed further in Section III(D)(iii).

454.    For present purposes, the Court finds that the primary issue between the parties with respect to anticipation is whether the Purewal 777 Application both describes and claims a formulation with "no surfactant" according to the asserted claims of the 152 Patent.

455.    The Court previously decided that the "no surfactant" term in the asserted claims of the 152 Patent should be given its plain and ordinary meaning—*i.e.*, "no surfactant" means no surfactant.  (D.I. 164 at 1-2).

456.    However, the Court's claim construction decision did not address the types or amounts of compounds that would constitute a "surfactant" for purposes of the asserted claims of the 152 Patent.  (*See* D.I. 164).

457.    In addition, because plaintiffs did not offer Dr. Myrdal's interpretation of "surfactant" in connection with the claim construction proceedings, the Court had not previously addressed any aspect of Dr. Myrdal's interpretation of "surfactant" in the asserted claims of the 152 Patent.

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

458.    At trial, defendants' expert, Dr. Richard Dalby (whom the found Court credible, and whose testimony is consistent with the totality of record evidence), presented a thorough analysis of the Purewal 777 Application demonstrating that each and every element of the asserted claims of the 152 Patent is present expressly in the Purewal 777 Application, with the exception of the last element in claim 1 of the 152 Patent: "wherein the formulation is further characterized in that it contains no surfactant."

459.    Dr. Dalby provided the following summary of this analysis:

| Purewal 777 Application | 152 Patent |
|---|---|
| describes, exemplifies, and claims pharmaceutical "suspension" formulations<br><br>(DTX 120_3 (line 16); DTX 120_6 (line 50); DTX 120_8 (lines 43-54 (Ex. 24); line 57; DTX 120_9 (claim 2)). | "A pharmaceutical suspension aerosol formulation consisting essentially of:" |
| "drug particles"<br><br>(DTX 120_5 (line 41); DTX 120_8 (lines 43-54 (Ex. 24)); DTX 120_9 (claim 2)). | "particulate drug" |
| "propellant 134a"<br><br>(DTX 120_2 (line 39); DTX 120_8 (lines 43-54 (Ex. 24)); DTX 120_9 (claim 1)). | HFA-134a "as propellant" |
| "weight ratio" of ethanol to HFA-134a "in the range" 5:95 to 15:85<br><br>(DTX 120_4 (line 41); DTX 120_8 (lines 43-54 (Ex. 24)); DTX 120_9 (claim 9)). | "ethanol in an amount of 5 to about 15 percent by weight" |
| "surfactant," including "oleic acid"<br><br>(DTX 120_1 (abstract); DTX 120_2 (line 34); DTX 120_8 (lines 43-54 (Ex. 24)); DTX 120_9 (claim 1)). | "wherein the formulation is further characterized in that it contains no surfactant" |

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

| Purewal 777 Application | 152 Patent |
|---|---|
| micronized<br><br>(DTX 120_5 (line 41 line 57); DTX 120_8 (lines 43-54 (Ex. 24)) ; DTX 120_9 (claim 2)). | "wherein the drug is micronized" |
| "aerosol containers equipped with metering valves"<br><br>(DTX 120_5 (line 53)). | "an aerosol canister equipped with a metering valve" |
| "conventional aerosol containers"<br><br>(*See, e.g.*, DTX 120_5 (lines 53-54 ("The formulation of the invention may be filled into conventional aerosol containers equipped with metering valves and dispensed in an identical manner to formulations employing CFC's.")); DTX 120_8 (lines 43-54 (Ex. 24)).<br><br>"formulation … suitable for administration to a patient by oral or nasal inhalation"<br><br>(DTX 120_8 (lines 43-54 (Ex. 24)); DTX 120_9 (claim 2)). | "containing a formulation … in an amount to provide a plurality of therapeutically effective doses of the drug" |
| "drug particles"<br><br>(DTX 120_5 (line 41); DTX 120_8 (lines 43-54 (Ex. 24)); DTX 120_9 (claim 2)).<br><br>albuterol base and sulfate<br><br>(DTX 120_5 (line 24; line 57); DTX 120_8 (lines 43-54 (Ex. 24)). | "wherein the particulate drug is … albuterol" |
| "drug particles"<br><br>(DTX 120_5 (line 41); DTX 120_8 (lines 43-54 (Ex. 24)); DTX 120_9 (claim 2)).<br><br>albuterol base and sulfate<br><br>(DTX 120_5 (line 24; line 57); DTX 120_8 (lines 43-54 (Ex. 24)). | "wherein the particulate drug is albuterol or a pharmaceutically acceptable salt or solvate thereof" |

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

| Purewal 777 Application | 152 Patent |
|---|---|
| "drug particles"<br><br>(DTX 120_5 (line 41); DTX 120_8 (lines 43-54 (Ex. 24)); DTX 120_9 (claim 2)).<br><br>albuterol sulfate<br><br>(DTX 120_5 (line 24; line 57); DTX 120_8 (lines 43-54 (Ex. 24)). | "wherein the particulate drug is albuterol sulfate" |

460.    For the last element in claim 1 of the 152 Patent, "wherein the formulation is further characterized in that it contains no surfactant," Dr. Dalby assumed that Dr. Myrdal's interpretation of the term "surfactant" in the asserted claims of the 152 Patent was correct, and then applied it to the analysis of the Purewal 777 Application.

461.    Dr. Dalby testified that, although the Purewal 777 Application lists many compounds as "surface active agents" or "surfactants" (*see, e.g.*, DTX 120_4 (lines 45-58), 5 (lines 1-7), 8-9 (Example 24), 9-10 (claim 10)), only three of these compounds were "common" or "traditional" surfactants used in aerosol suspension formulations in the 1990-1992 timeframe: oleic acid, lecithin, and sorbitan trioleate.[9]  (*See, e.g.*, DTX 120_6 (lines 3-5) (listing only these three "common" or "traditional" surfactants used in aerosol suspension formulations)).

462.    Dr. Dalby also testified that the Purewal 777 Application lists compounds as "surfactants" that were not considered surfactants in aerosol suspension formulations, and were not believed to "stabilize" aerosol suspension formulations, at least according to Dr. Myrdal's interpretation of "surfactant" in the asserted claims of the 152 Patent.

---

[9] Dr. Dalby assumed that Dr. Myrdal's interpretation of the term "surfactant" in the asserted claims of the 152 Patent applied throughout the relevant period for anticipation, between the June 1990 publication date of the Purewal 777 Application and the asserted May 1992 priority date of the 152 Patent.  Although an earlier priority date for the 152 Patent would not change the Court's anticipation analysis, as set forth in Section III(B), the Court concludes that the asserted claims of the 152 Patent have a priority date of May 4, 1992.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

463.    For example, although the Purewal 777 Application lists "corn oil" and "isopropyl myristate" as "surfactant" compounds (*see, e.g.*, DTX 120_4 (line 49), 5 (line 6), 9 (lines 15, 31)), neither compound would have been considered a "surfactant" in aerosol suspension formulations by persons of ordinary skill in the art, and neither compound was believed to "stabilize" aerosol suspension formulations by persons of ordinary skill in the art.

464.    To further illustrate this point, Dr. Dalby noted that the Purewal 777 Application identifies "isopropyl myristate" as both a "surfactant" and a "compound of higher polarity"—*i.e.*, an "adjuvant."  (*See, e.g.*, DTX 120_5 (line 6), 8 (line 34), 9 (lines 15, 49), and 10 (line 5)).

465.    Yet, as Dr. Dalby testified, a person of ordinary skill in the art at the time would have considered isopropyl myristate a solvent (or, more broadly, an "adjuvant"), not a "surfactant."

466.    Based on this testimony and evidence, and having accepted Dr. Myrdal's interpretation of the term "surfactant" in the asserted claims of the 152 Patent for other purposes, the Court must apply the same interpretation for purposes of anticipation.  *See, e.g.*, *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1330 (Fed. Cir. 2003) ("It is axiomatic that claims are construed the same way for both invalidity and infringement."); *Upsher-Smith Labs., Inc. v. Pamlab, L.L.C.*, 412 F.3d 1319, 1322 (Fed. Cir. 2005) ("A century-old axiom of patent law holds that a product 'which would literally infringe if later in time anticipates if earlier.'" (quoting *Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373, 1379 (Fed. Cir. 2003))).

467.    Because the Purewal 777 Application lists at least one compound as a "surfactant" that a person of ordinary skill in the art would not consider a "surfactant," the Court concludes that defendants have proven, by clear and convincing evidence, that each and every element of the asserted claims of the 152 Patent is present in the Purewal 777 Application, at least based on the

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

Purewal 777 Application formulations described and claimed as containing "corn oil" or "isopropyl myristate."

468.    For example, at least the aerosol suspension formulations described and covered by claim 10 of the Purewal 777 Application containing "corn oil" and "isopropyl myristate" are also covered by the asserted claims of the 152 Patent, as shown by Dr. Dalby.  (DTX 120_9-10).

469.    Although plaintiffs argue that these formulations are described in the Purewal 777 Application as containing "corn oil" or "isopropyl myristate" as a "surface active agent," neither of these types of formulations would be considered to actually contain a "surfactant" according to Dr. Myrdal's interpretation of this term in the asserted claims of the 152 Patent, for the reasons set forth above.

470.    This conclusion is consistent with the understanding that "corn oil" and "isopropyl myristate" are listed in the Purewal 777 Application as "surfactants" because these compounds were considered potentially useful in lubricating the valve stem in a metering valve, but were not considered by persons of ordinary skill in the art to "stabilize" an aerosol suspension formulation.  (See, e.g., DTX 1133_6 (claim 1) ("a surface active agent in an amount sufficient (i) to stabilize the formulation *or* (ii) lubricate a valve stem in a metering valve" (emphasis added)).

471.    At least according to Dr. Myrdal's interpretation of "surfactant" in the asserted claims of the 152 Patent, the latter function alone ("lubricate a valve stem in a metering valve") would not be sufficient for a person of ordinary skill in the art to consider a compound a "surfactant" for purposes of the asserted claims of the 152 Patent because it does not serve the separate or additional purpose of "stabilizing" the aerosol suspension formulation.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

472.    In addition, according to Dr. Myrdal's most limited interpretation of the term "surfactant" in the asserted claims of the 152 Patent, only the Purewal 777 Application formulations containing the three "common" and "traditional" surfactants in aerosol suspension formulations (oleic acid, lecithin, sorbitan trioleate) actually would be considered to contain a "surfactant" according to the asserted claims of the 152 Patent.

473.    Therefore, the remaining "surfactants" listed and claimed in the Purewal 777 Application would not be considered surfactants for purposes of the asserted claims of the 152 Patent, and the Purewal 777 Application formulations containing these compounds would have been considered to contain "no surfactant" according to Dr. Myrdal's interpretation of this term in the asserted claims of the 152 Patent.

474.    Dr. Dalby also testified that, according to Dr. Myrdal's interpretation of "surfactant" in the asserted claims of the 152 Patent, at least two of the Example 24 formulations in the Purewal 777 application—those containing "corn oil" and "isopropyl myristate"—are covered by the asserted claims of the 152 Patent, for the same reasons set forth above.

475.    Specifically, these Example 24 formulations would be, by weight, about 0.2% albuterol sulfate, about 10% ethanol, and about 90% HFA-134a, with either about 0.1% or 0.2% by weight of "corn oil" or "isopropyl myristate."  (DTX 120_8 (lines 45-54), 9 (lines 15, 31)).

476.    In calculating these weight percentages, Dr. Dalby noted that the Purewal 777 Application contains what appears to be a typographical error in the amount of ethanol in Example 24—*i.e.*, the decimal is shifted to the left (0.058g instead of 0.58g ethanol).  (DTX 120_8 (line 49)).

477.    Dr. Dalby testified that the correction would have been obvious to a person of ordinary skill in the art simply based on the context of the preceding Examples 19 to 23 alone, and

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

certainly would have been obvious immediately upon reproduction of any of the Example 24 formulations, at least because the volume of the formulation would have been less than the "5 ml" volume required by Example 24.  (DTX 120_8).

478.    In further support of this opinion, Dr. Dalby relied upon the patent applicants' statements to the European Patent Office and USPTO seeking correction of the application during prosecution.  (*See, e.g.*, DTX 2130; DTX 337; DTX 1336, DTX 299).

479.    In requesting correction, the patent applicants stated: "It is submitted a person reproducing the example would appreciate the formulation was in error in view of the reduced volume obtained.  A review of the previous Examples, particularly Examples 19 to 23 which employed a 5ml volume, would reveal the ethanol content was in error and the ***obvious*** correction would be to remove the decimal point increasing the amount ten fold. … In summary, it is submitted the error in the formulation would have been ***readily apparent*** to a person reproducing the Example and a review of the previous Examples would have ***immediately revealed*** the ethanol content was in error and should have been 0.58g."  (DTX 2130_5; DTX 337_6 (emphases added)).

480.    Plaintiffs argue that, because the amount of ethanol in Example 24 requires a correction to fall within the "ethanol in an amount of 5 to about 15 percent by weight" element of the asserted claims of the 152 Patent, the Example 24 formulations cannot anticipate any of the asserted claims of the 152 Patent.

481.    The Court concludes that at least the Example 24 formulations containing "corn oil" or "isopropyl myristate" anticipate the asserted claims of the 152 Patent for the same reasons set forth above, either expressly or inherently.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

482.    Although these example formulations are described as containing "corn oil" or "isopropyl myristate" as a "surfactant," neither of these formulations would be considered to contain a "surfactant" according to Dr. Myrdal's interpretation of "surfactant" in the asserted claims of the 152 Patent.[10]

483.    In addition, to the extent that the correction to the amount of ethanol (from 0.058g to 0.58g) would have been obvious to a person of ordinary skill in the art based on the preceding Examples 19 to 23 of the Purewal 777 Application, the Court finds that the corrected amount of ethanol (about 10% by weight of the formulation) still is considered an express, and therefore anticipating, disclosure. *See, e.g.*, *In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009).

484.    To the extent that a person of ordinary skill in the art would not have recognized the correction without reproducing one of the example formulations of Example 24, the Court concludes, consistent with the applicant's own statements regarding Example 24, that the correction would not have required undue experimentation. *See, e.g.*, *MEHL/Biophile Int'l Corp. v. Milgraum*, 192 F.3d 1362, 1365 (Fed. Cir. 1999) ("Under the principles of inherency, if the prior art necessarily functions in accordance with, or includes, the claimed limitations, it anticipates." (internal citation omitted)); *Iovate Health Sciences, Inc. v. Bio-Engineered Supplements & Nutrition, Inc.*, 586 F.3d 1376, 1380 (Fed. Cir. 2009) ("To be anticipatory, the [prior art] must also describe, either expressly or inherently, each and every claim limitation and enable one of skill in the art to practice an embodiment of the claimed invention without undue experimentation." (citing *In re Gleave*, 560 F.3d at 1334)).

485.    Instead, as the applicants stated, the Court finds that the correction would have been "obvious." (*See, e.g.*, DTX 2130_5; DTX 337_6).

---

[10] The same is true of the remaining formulations in Example 24, with the exception of those containing oleic acid, lecithin and sorbitan trioleate, for the same reasons set forth above.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

486.    As discussed further in Section III(D)(iii), Dr. Dalby testified that reproduction of the formulations in the Example is routine, at least through the use of simple "bottle studies."

487.    For at least these reasons, the asserted claims of the 152 Patent are invalid as anticipated.

### iv.   Conclusion

488.    In view of the foregoing, the Court concludes that the defendants have proven anticipation of the asserted claims of the 152 Patent by clear and convincing evidence, both expressly and inherently.

489.    According to plaintiffs' interpretation of "surfactant" in the asserted claims of the 152 Patent, the Purewal 777 Applications describes, claims and exemplifies formulations that contain a variety of compounds listed as "surfactants" that would not have been considered "surfactants" by persons of ordinary skill in the art of the 152 Patent in the 1990-1992 timeframe, including, without limitation, both "corn oil" and "isopropyl myristate."

490.    The Court concludes that, as detailed in the chart above, the only apparent difference between the Purewal 777 Application and the 152 Patent is the described, exemplified and claimed "surfactants" in the Purewal 777 Application versus the last element of claim 1 of the 152 Patent: "wherein the formulation is further characterized in that it contains no surfactant."

491.    However, at least with respect to "corn oil" and "isopropyl myristate," there is actually no difference between the Purewal 777 Application and the 152 Patent.

492.    For example, claim 10 of the Purewal 777 Application expressly covers a pharmaceutical suspension aerosol formulation containing albuterol sulfate, HFA-134a, ethanol in the range of about 5 to 15% by weight, and a "surface active agent selected from" a list of compounds including "isopropyl myristate" and "corn oil."  (DTX 120_9-10).

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

493.    Because "isopropyl myristate" and "corn oil" are not actually considered "surfactant" compounds in the context of the asserted claims of the 152 Patent, each and every element of the asserted claims of the 152 Patent, including the "no surfactant" element, is present expressly in the claim 10 of the Purewal 777 Application.

494.    Claim 12 of the Purewal 777 Application also expressly covers a pharmaceutical suspension aerosol formulation containing albuterol sulfate, HFA-134a, ethanol in the range of about 5 to 15% by weight, and a "surface active agent selected from" the claim 10 list of compounds including "isopropyl myristate" and "corn oil." (DTX 120_9-10).

495.    Because "isopropyl myristate" and "corn oil" are not actually considered "surfactant" compounds in the context of the asserted claims of the 152 Patent, each and every element of the asserted claims of the 152 Patent, including the "no surfactant" element, is present expressly in the claim 12 of the Purewal 777 Application.

496.    In addition, Example 24 expressly, or at least inherently, includes exemplary pharmaceutical suspension aerosol formulations containing albuterol sulfate, HFA-134a, ethanol in the amount of about 10% by weight, and "surfactants" including "isopropyl myristate" and "corn oil." (DTX 120_9-10).

497.    Because "isopropyl myristate" and "corn oil" are not actually considered "surfactant" compounds in the context of the asserted claims of the 152 Patent, each and every element of the asserted claims of the 152 Patent, including the "no surfactant" element, is present expressly, or at least inherently, in Example 24 of the Purewal 777 Application.

498.    Finally, the Court notes that, although the Purewal 777 Application is cited on the face of the patent, there is no evidence that the USPTO considered the analysis set forth above, particularly the question of whether "corn oil" or "isopropyl myristate" were considered

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

"surfactants" by persons of ordinary skill in the art at the time, or whether "corn oil" or "isopropyl myristate" were believed to "stabilize" aerosol suspension MDI formulations by persons of ordinary skill in the art.

### D.  Obviousness

499.    Defendants contend that all of the asserted claims of the 152 Patent and 445 Patent are obvious in light of prior art.

500.    Specifically, defendants contend that claims 1-4, 8 and 9 of the 152 Patent and claims 1-20 of the 445 Patent are invalid for obviousness under 35 U.S.C. § 103.

501.    The Court finds, for at least the reasons that follow, that defendants have established, by clear and convincing evidence, that the asserted claims of the 152 Patent and 445 Patent are, in fact, obvious.

### i.  The Legal Standard

502.    35 U.S.C. § 103(a) provides that "a patent may not be obtained . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103(a).

503.    A party seeking to challenge the validity of a patent based on obviousness must demonstrate by "clear and convincing evidence" that the invention described in the patent would have been obvious to a person of ordinary skill in the art at the time the invention was made. *See Richardson-Vicks v. Upjohn Co*., 122 F.3d 1476, 1479 (Fed. Cir. 1997).

504.    Obviousness is a question of law that is predicated on several factual inquiries. *See id*. at 1479.

505.    Specifically, the trier of fact is directed to assess four considerations: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed subject matter and the prior art; and (4) secondary considerations of nonobviousness, to the extent relevant and provided there is sufficient nexus to the novel claimed features that are not already disclosed the prior art, such as commercial success, long felt but unsolved need, failure of others, acquiescence of others in the industry that the patent is valid, and unexpected results. *See Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966); *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 406 (2007).

506.    The state of the art at the time of the claimed invention should be examined for an obviousness analysis. *Allergan, Inc. v. Apotex Inc.*, No. 2013-1249, 2014 WL 2579287, at *9 (Fed. Cir. June 10, 2014).

507.    In *KSR*, the Supreme Court rejected the rigid application of the principle that there should be an explicit "teaching, suggestion, or motivation" in the prior art, the nature of the problem, or the knowledge of a person having ordinary skill in the art, in order to find obviousness.  550 U.S. at 415.

508.    The *KSR* Court however, "acknowledged the importance of identifying 'a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in a way the claimed new invention does' in an obviousness determination." *Takeda Chem. Indus. v. Alphapharm Pty. Ltd.*, 492 F.3d 1350, 1356-57 (Fed. Cir. 2007) (quoting *KSR*, 550 U.S. at 418).

509.    "Obviousness does not require absolute predictability of success," but, rather, requires "a reasonable expectation of success." *See Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed. Cir. 2006) (quoting *In re O'Farrell*, 853 F.2d 894, 903-04 (Fed. Cir. 1988)).

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

510.    To this end, obviousness "cannot be avoided simply by a showing of some degree of unpredictability in the art so long as there was a reasonable probability of success." *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1364 (Fed. Cir. 2007).

## 1.    Obvious to Try

511.    In *KSR*, the Court explained that a patent claim may be proved obvious by showing that the combination of elements was obvious to try:

> When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill in the art has good reason to pursue the known options within his or her technical grasp.  If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense.  In that instance the fact that a combination was obvious to try might show that it was obvious under § 103.
> . . .
> Rigid preventative rules that deny recourse to common sense are neither necessary under, nor consistent with, this Court's case law.

*KSR, 550 U.S. at 421*; *see also Hoffman-La Roche Inc. v. Apotex Inc.*, No. 07-4417 (SRC) (MAS) *et seq.*, 2012 WL 1637736, at *15 (D.N.J. May 7, 2012) (Chesler, J.) (concluding that the "demonstrati[on] that it was obvious to try once-monthly oral administration of ibandronate at doses of 75 mg and 150 mg [was] legally sufficient to prove obviousness"), *aff'd*, No. 2013-1164, 2014 WL 1394948 (Fed. Cir. Apr. 11, 2014).

512.    Since *KSR*, the Federal Circuit has described an "expansive and flexible approach" to the obviousness analysis that "not only permits, but requires, consideration of common knowledge and common sense."  *See Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013) (internal quotations omitted) (reversing finding of nonobviousness where court "narrowly focus[ed] on the four prior-art references" and ignored record evidence of "the knowledge and perspective of one of ordinary skill in the art" to explain motivation to combine or modify references).

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

513.    Thus, while the Federal Circuit has noted that pharmaceuticals can be an "unpredictable art," it also has recognized that, per *KSR*, evidence of a "finite number of identified, predictable solutions" or alternatives "might support an inference of obviousness."  *See Eisai Co. Ltd. v. Dr. Reddy's Labs. Ltd*., 533 F.3d 1353, 1359 (Fed. Cir. 2008) (internal quotations omitted); *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.,* 520 F.3d 1358, 1364 (Fed. Cir. 2008) (indicating that an obvious to try path should "present a finite (and small in the context of the art) number of options easily traversed to show obviousness"); *see also Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 737-38 (Fed. Cir. 2013) (concluding when the prior art offers a range of options to try, they are presumptively obvious absent clear teaching away or outweighed by other secondary considerations).

514.    The Federal Circuit has indicated, however, that it would not be "obvious to try" if one "would have had to try all possibilities in a field unreduced by direction of the prior art."  *In Bayer Schering Pharma AG v. Barr Labs., Inc*., 575 F.3d 1341, 1347 (Fed. Cir. 2009) (citing *In re O'Farrell*, 853 F.2d 894, 903 (Fed. Cir. 1988)).

## 2.  Design Around

515.    In *KSR*, the Court indicated that the obviousness analysis should not be evaluated "too narrowly" by asking whether it would have been obvious to a person of ordinary skill in the art "writing on a blank slate" to have chosen a particular prior art combination.  550 U.S. at 424.

516.    Rather, the Court considered the marketplace incentive in the context of the prior art, acknowledging that the "marketplace created a strong incentive to convert mechanical pedals to electronic pedals, and the prior art taught a number of methods for doing so."  *Id.*

517.    In addition, the desire to design around a prior art reference and to avoid infringement may be a proper motivation that would support a finding of obviousness.  *See Pfizer Inc. v. Teva*

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

*Pharm. USA, Inc*., 482 F. Supp. 2d 390, 442-43 (D.N.J. 2007), *aff'd in part, rev'd in part on other grounds*, 518 F.3d 1353 (Fed. Cir. 2008).

518.    For example, in a case in which Teva was a defendant, Teva argued that a person of ordinary skill would select a particular molecule, not in order to obtain a patent, but to avoid infringing other patents. *See id*. at 442.

519.    Teva further argued that the desire to avoid patent infringement is a proper motivation to combine prior art references that render obvious the patent-in-suit. *See id*.

520.    The *Pfizer* court, assuming that Teva's argument was true, agreed that a person of ordinary skill in the art could be motivated by a desire to design around the prior art and to avoid infringement:

> In the absence of binding authority on the issue, the Court is inclined to believe that there may be circumstances wherein a desire to design around the prior art and avoid infringing other patents is a valid motivation for the person of ordinary skill to pursue a specific course of action.

*Id*. at 443.

521.    Furthermore, this Court, in *Kao Corp. v. Unilever U.S., Inc.*, 334 F. Supp. 2d 527, 557-58 (D. Del. 2004) (Robinson, J.), *aff'd*, 441 F.3d 963 (Fed. Cir. 2006), determined that the desire of a person of ordinary skill in the art to design around a particular prior art reference was relevant to the Court's obviousness analysis.

522.    The *Kao* Court agreed with defendants that the prior art references themselves and the nature of the problem to be solved provided the motivation to combine two prior art references:

> The court finds that a person of ordinary skill in the cosmetic field as of the filing date of the application that led to the [patent-in-suit] would have sought to invent an improved keratotic plug remover after reviewing the [first prior art] patent*.  **In seeking to design around the [first prior art] patent**, a person of ordinary skill in the cosmetic field would have sought to use a water-soluble polymer distinct from those mentioned in the [first prior art]

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

patent. ***Pursuant to the teaching of the [second prior art] patent***, a person of ordinary skill in the cosmetic field reasonably would have selected to use methylvinyl ether/maleic acid, since this polymer was disclosed to be one of the most preferred polymer embodiments.

*Id.* (emphases added).

523.    Thus, the desire of a person of ordinary skill in the art to design around a prior art reference may provide a motivation to combine prior art references. *See Pfizer*, 482 F. Supp. 2d at 442-43; *Kao*, 333 F. Supp. 2d at 557-58.

### 3.  Prior Art Ranges

524.    The Federal Circuit has held that a "straightforward and potent" obviousness case exists where a claimed invention falls within a range disclosed in the prior art. *Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 736 (Fed. Cir. 2013); *see Tyco Healthcare Grp. LP v. Mutual Pharm. Co.*, 642 F.3d 1370, 1372-73 (Fed. Cir. 2011); *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1322 (Fed. Cir. 2004).

525.    It is often enough to show obviousness when a patent reciting a narrower range reads on the prior art disclosing a broader range—after all, "[i]f the claim extends to what is obvious, it is invalid under § 103." *KSR*, 550 U.S. at 419.

526.    Yet a more narrow range disclosed in the prior art may be nonobvious if "the prior art taught away from the invention or by a showing of new and unexpected results relative to the prior art." *Tyco*, 642 F.3d at 1373.

527.    Thus, the absence of any teaching away, new and unexpected result, or other secondary considerations demonstrates obviousness. *Galderma*, 737 F.3d at 738 (explaining that while the defendant always retains "[t]he ultimate burden of proving obviousness," there must be evidence of a teaching away, unexpected result, or secondary considerations for the patent to be nonobvious); *see In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*,

676 F.3d 1063, 1077 (Fed. Cir. 2012) (noting that in *Iron Grip*, 392 F.3d at 1323-25, the fact finder "consider[ed] *all* evidence of obviousness and nonobviousness before reaching a determination"), *cert. denied*, 133 S. Ct. 933 (2013).

528.  Applying these principles, the Federal Circuit has invalidated as obvious patents that recite purportedly inventive subject matter falling within a range previously disclosed by the prior art.  *See Iron Grip*, 392 F.3d at 1322.

529.  In *Iron Grip*, for instance, the Court held invalid as obvious a patent that claimed a "range [that was] disclosed in multiple prior art patents."  *Id.*

530.  There, the asserted patent recited a weight plate with three hand grips, and the prior art disclosed barbell weight plates with one, two, and four hand grips.  *See id.*

531.  Similarly, in *Tyco*, the Court held invalid a claim that recited a pharmaceutical compound to treat insomnia with a range of "6 to 8 milligrams of crystalline temazepam" when the prior art disclosed "the use of temazepam at a dosage between 5 and 15 mg."  642 F.3d at 1371.

532.  In both *Iron Grip* and *Tyco*, the more narrow range recited in the asserted patents was proven obvious by the absence of any teaching away, new or unexpected results, or objective indicia of nonobviousness.  *Iron Grip*, 392 F.3d at 1322-25; *Tyco*, 642 F.3d at 1374-77.

533.  The Federal Circuit reaffirmed these principles in *Galderma*.  737 F.3d at 736-38.

534.  There, the asserted patents included formulation and method claims reciting the composition adapalene 0.3%, which was a reformulation of a prior art composition adapalene 0.1% formulation.  *Id.* at 736.

535.  A prior art patent claimed a range of adapalene concentrations from 0.01% to 1%.  *Id.*

536.  Notwithstanding the fact that the claimed adapalene 0.3% formulation squarely fell within the range recited in the prior art patent, the district court held that the claims were

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

nonobvious because the defendant showed no motivation to modify the prior art adapalene 0.1% by tripling the concentration of adapalene. *Id.* at 737.

537.    The Federal Circuit reversed, stating that "[t]he district court framed the obviousness inquiry as requiring [the defendant] to provide motivation in the prior art to triple the concentration of adapalene from 0.1% to 0.3%." *Id.*

538.    The court held that the defendant "carried no such burden," because there is no requirement "to prove obviousness by starting with a prior art commercial embodiment and then providing motivation to alter that commercial embodiment." *Id.*

539.    Rather, "the dispute is whether there was motivation to select the claimed 0.3% adapalene composition in the disclosed range." *Id.* at 737-38.

540.    Because the claimed invention fell within a range disclosed in the prior art, that motivation exists unless there is evidence "that (1) the prior art taught away from the claimed invention; (2) there were new and unexpected results relative to the prior art; or (3) there are other pertinent secondary considerations." *Id.* at 738.

541.    Therefore, according to *Galderma*, when a prior art reference discloses a range encompassing the claimed invention, the ANDA applicant will have demonstrated a straightforward and potent case of obviousness. *See id.* at 736-38.

542.    As such, whether the asserted claims nevertheless could be held nonobvious depends only on whether the prior art teaches away, there is a new or unexpected result, or other relevant objective indicia of nonobviousness. *See id.*

## ii.    The Level of Ordinary Skill in the Art

### 1.    The 152 Patent

543.    As noted above, a person of ordinary skill in the art of the 152 Patent would have a bachelor's degree in the chemical, physical or pharmaceutical arts plus at least several years of

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

experience in the fields of pharmaceutical formulation, pharmaceutical development, or product development, or an advanced degree in these arts, and typically would be a member of a product development team composed of persons with a range of education and experience in these areas, with many years of combined experience in the MDI industry.

### 2.  The 445 Patent

544.    A person of ordinary skill in the art of the 445 Patent essentially would have the same education and experience.

545.    Specifically, a person of ordinary skill in the art of the 445 Patent would have a bachelor's degree in the chemical, physical or pharmaceutical arts plus at least several years of experience in the fields of pharmaceutical formulation, pharmaceutical development, or product development, or an advanced degree in these arts, and typically would be a member of a product development team composed of persons with a range of education and experience in these areas, with many years of combined experience in the MDI industry.

### iii.  The 152 Patent: The Scope and Content of the Prior Art and the Differences Between the Claimed Subject Matter and the Prior Art

546.    As a threshold matter, it is important to identify what the asserted claims of the 152 Patent cover.

547.    The elements of the asserted claims of the 152 Patent are set forth in Section III(C).

548.    Although plaintiffs contend that the asserted claims of the 152 Patent are limited to suspension aerosol formulation with a variety of specific suspension formulation characteristics ("stable," "homogenous," "reproducible dosing," etc.), none of these asserted specific characteristics are stated in the asserted claims.

549.    The Court concludes that the asserted claims of the 152 Patent are not so limited, for at least two reasons.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

550.    First, the specification discusses various characteristics of suspension formulations, but none of these specific suspension formulation characteristics appear in the asserted claims of the 152 Patent.  (*See, e.g.*, JTX 1_2 (col. 2, line 40) ("said formulation being ***further characterized*** in that it exhibits ***substantially no growth in particle size*** or ***change in crystal morphology*** of the drug ***over a prolonged period***, is ***substantially and readily redispersible***, and upon redispersion ***does not flocculate*** so quickly as to prevent ***reproducible dosing*** of the drug" (emphases added)); (col. 5, line 54) ("***Preferred*** albuterol sulfate formulations of the invention exhibit substantially no growth in particle size or change in crystal morphology of the albuterol sulfate over a prolonged period, are substantially and readily redispersible, and upon redispersion do not flocculate so quickly as to prevent reproducible dosing of albuterol sulfate." (emphasis added)).

551.    Plaintiffs have provided no reason or justification for importing such limitations from the specification into the claims.

552.    Nor have plaintiffs provided the Court with any reason to deviate from Federal Circuit precedent that prohibits such importation.  *See, e.g.*, *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1354 (Fed. Cir. 2012) ("While claims are understood in light of the specification, a claim construction must not import limitations from the specification into the claims."); *Sanofi-Aventis U.S. LLC v. Sandoz, Inc.*, 345 F. App'x 594, 597-98 (Fed. Cir. 2009) (examples in the patent specification do not justify reading limitations into composition claims); *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1432-33 (Fed. Cir. 1988).

553.    Second, the original claims in the 039 continuation-in-part application (relied upon by plaintiffs to support the asserted claims of the 152 Patent) included similar specific suspension formulation characteristics as express claim limitations.  (*See, e.g.*, JTX 36_37 (independent

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

claim 1: "the formulation being *further characterized* in that it exhibits *substantially no growth in particle size* or *change in crystal morphology* of the drug *over a prolonged period*, is *substantially and readily redispersible*, and upon redispersion *does not flocculate* so quickly as to prevent *reproducible* dosing" (emphases added))).

554.    The asserted claims of the 152 Patent contain no such limitations.

555.    Because the asserted claims of the 152 Patent do not contain any of these specific suspension formulation characteristics—or any other similar suspension formulation characteristics—as limitations, the Court concludes that the asserted claims of the 152 Patent are not so limited.

### 1. The Purewal 777 Application and Proventil/Ventolin CFC

556.    The Purewal 777 Application is a European patent application entitled "Medicinal Aerosol Formulations."  (DTX 120_1).

557.    The Purewal 777 Application was filed in November 1989, published in June 1990, and has an earliest application date of December 1988.  (DTX 120_1).

558.    The Purewal 777 Application identifies Riker Laboratories as the applicant, and names Tarlochan Purewal and David Greenleaf as inventors.  (DTX 120_1).

559.    At the time, a person of ordinary skill in the art understood Riker Laboratories to be owned by 3M.

560.    Defendants' experts provided a detailed review and analysis of the Purewal 777 Application, including the following statements.

561.    The abstract of the Purewal 777 Application is: "A self-propelling aerosol formulation which may be free from CFC's which comprises a medicament, [HFA-134a], a surface active agent and at least one compound have a higher polarity than [HFA-134a]."  (DTX 120_1).

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

562.    The term "CFC" in the Purewal 777 Application is an abbreviation for chlorofluorocarbon.

563.    The Purewal 777 Application states: "This invention relates to medicinal aerosol formulations and in particular to formulations suitable for pulmonary, nasal, buccal or topical administration which are at least substantially free of chlorofluorcarbons." (DTX 120_2).

564.    The Purewal 777 Application states: "Since the metered dose pressurised inhaler was introduced in the mid 1950's, inhalation has become the most widely used route for delivering bronchodilator drugs and steroids to the airways of asthmatic patients." (DTX 120_2).

565.    The Purewal 777 Application states: "Compared with oral administration of bronchodilators, inhalation offers a rapid onset of action and a low instance of systemic side effects." (DTX 120_2).

566.    The Purewal 777 Application states: "The metered dose inhaler is dependent upon the propulsive force of a propellant system used in its manufacture." (DTX 120_2).

567.    The Purewal 777 Application states: "The propellant generally comprises a mixture of liquid chlorofluorocarbons (CFC's) which are selected to provide the desired vapor pressure and stability of the formulation." (DTX 120_2).

568.    The Purewal 777 Application states: "Propellants 11, 12 and 114 are the most widely used propellants in aerosol formulations for inhalation administration." (DTX 120_2).

569.    The Purewal 777 Application states: "In recent years, it has been established that CFC's react with the ozone layer around the earth and contribute toward its depletion." (DTX 120_2).

570.    The Purewal 777 Application states: "There has been considerable pressure around the world to reduce substantially the use of CFC's, and various Governments have banned 'non-essential' use of CFC's." (DTX 120_2).

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

571.    The Purewal 777 Application states: "Such 'non-essential' uses include the use of CFC's as refrigerants and blowing agents, but heretofore the use of CFC's in medicines, which contributes less than 1% of the total use of CFC's, has not been restricted.  Nevertheless, in view of the adverse effect of CFC's on the ozone layer it is desirable to seek alternative propellant systems which are suitable for use in inhalation aerosols."  (DTX 120_2).

572.    The Purewal 777 Application states: "It has now been found that [HFA-134a] has particularly suitable properties for use as a propellant for medicinal aerosol formulations when used in combination with a surface active agent and an adjuvant having a higher polarity than [HFA-134a]."  (DTX 120_2).

573.    The Purewal 777 Application states: "According to the present invention there is provided an aerosol formulation comprising a medicament, a surfactant, [HFA-134a] and at least one compound having a higher polarity than [HFA-134a]."  (DTX 120_2).

574.    The Purewal 777 Application states: "It has been found that [HFA-134a] … may be employed as a propellant for aerosol formulations suitable for inhalation therapy when used in combination with a compound (hereinafter an 'adjuvant') having a higher polarity than [HFA-134a]."  (DTX 120_2).

575.    The Purewal 777 Application states: "Suitable adjuvants include alcohols such as ethyl alcohol [ethanol]…."  (DTX 120_2).

576.    The Purewal 777 Application states: "The combination of one or more such adjuvants with [HFA-134a] provides a propellant system which has comparable properties to those of propellant systems based on CFC's, allowing use of known surfactants and additives in the pharmaceutical formulation and conventional valve components.  This is particularly

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

advantageous since the toxicity and use of such compounds in metered dose inhalers for drug delivery to the human lung is well established." (DTX 120_2).

577.    The Purewal 777 Application states: "The particular adjuvant(s) used and the concentration of the adjuvant(s) is selected according to the particular medicament used and the desired physical properties of the formulation." (DTX 120_3).

578.    The Purewal 777 Application states: "It has been found that the use of [HFA-134a] and drug as a binary mixture or in combination with a conventional surfactant such as sorbitan trioleate does not provide formulations have suitable properties for use with pressurised inhalers." (DTX 120_3).

579.    The Purewal 777 Application states: "The addition of a compound of higher polarity than [HFA-134a] to [HFA-134a] provides a mixture in which increased amounts of surfactant may be dissolved compared to their solubility in [HFA-134a] alone.  The presence of increased amounts of solubilised surfactant allows the preparation of stable, homogenous suspensions of drug particles." (DTX 120_3).

580.    The Purewal 777 Application states: "[HFA-134a] and the component of higher polarity are generally employed in the weight ratio 50:50 to 99:1 [HFA-134a]:high polarity component, preferably in the weight ratio 70:30 to 98:2 and more preferably in the weight ratio 85:15 to 95:5 [HFA-134a]:high polarity component." (DTX 120_4).

581.    The Purewal 777 Application states: "Preferred compounds of higher polarity than [HFA-134a] include ethanol…." (DTX 120_4).

582.    The Purewal 777 Application states: "The aerosol formulations comprise a surface active agent to stabilise the formulation and lubricate the valve components.  Suitable surface active agents include both non-fluorinated surfactants and fluorinated surfactants known in the art and

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

disclosed, for example, in British Patent Nos. 837465 and 994734 and U.S. Patent No. 4,352,789.  Examples of suitable surfactants include: oils derived from natural sources, such as, corn oil, olive oil, cotton seed oil and sunflower seed oil.  Sorbitan trioleate … [list continues]" (DTX 120_4-5).

583.    The Purewal 777 Application states: "The surface active agents are generally present in amounts not exceeding 5 percent by weight of the total formulation.  They will usually be present in the weight ratio 1:100 to 10:1 surface active agent:drug(s), but the surface active agent may exceed this weight ratio in cases where the drug concentration in the formulation is low." (DTX 120_5).

584.    The Purewal 777 Application states: "Examples of medicaments which may be employed are: … salbutamol…."  (DTX 120_5).

585.    The Purewal 777 Application states: "The drugs exemplified above may be used as either the free base or as one or more salts known to the art.  The choice of free base or salt will be influenced by the physical stability of the drug in the formulation.  For example, it has been shown that the free base of salbutamol exhibits a greater dispersion stability than salbutamol sulphate in the formulations of the invention."  (DTX 120_5).

586.    The Purewal 777 Application states: "For pharmaceutical purposes the particle size of the powder should desirably be no greater than 100 microns diameter, since larger particles may clog the valve or orifice of the container.  Preferably the particle size should be less than 25 microns in diameter.  Desirably the particle size of the finely-divided solid powder should for physiological reasons be less than 25 microns and preferably less than about 10 microns in diameter.  The particle size of the powder for inhalation therapy should preferably be in the range 2 to 10 microns."  (DTX 120_5).

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

587.    The Purewal 777 Application states: "The concentration of medicament depends upon the desired dosage but is generally in the range 0.01 to 5% by weight."  (DTX 120_5).

588.    The Purewal 777 Application states: "The formulation of the invention may be filled into conventional aerosol containers equipped with metering valves and dispensed in an identical manner to formulations employing CFC's."  (DTX 120_5).

589.    The Purewal 777 Application includes twenty-four examples using the following components:  (a) albuterol sulfate, beclomethasone dipropionate, isopropylalcohol solvate, sodium cromoglycate; (b) sorbitan triolate, lecithin (Lipoid S100), oleic acid; (c) HFA-134a; (d) ethanol and n-pentane.  (DTX 120_5-6).

590.    The Purewal 777 Application states: "The formulations in the Examples were prepared by the following techniques.  Each drug and surfactant combination was weighed into a small beaker.  The required quantity of the higher boiling point component of the propellant system e.g. ethanol was added and the mixture homogenized using a Silverson mixer.  The required quantity was dispensed into a P.E.T. bottle and aerosol valve crimped in place.  [HFA-134a] was added to the required weight by pressure."  (DTX 120_6).

591.    Examples 1 through 6 of the Purewal 777 Application contain albuterol sulfate, and Example 5 contains albuterol sulfate, oleic acid, ethanol, and HFA-134a.  (DTX 120_6).

592.    The Purewal 777 Application states: "All formulations [Examples 1 through 6] comprised a suspension of [albuterol sulfate].  Examples 4 to 6 containing ethanol appeared to be more stable than Examples 1 to 3 containing n-pentane, exhibiting a decreased tendency to settling."  (DTX 120_6).

593.    Examples 19 through 23 of the Purewal 777 Application contain albuterol sulfate, and Example 21 contains isopropyl myristate as an "adjuvant."  (DTX 120_8).

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

594.    Example 24 of the Purewal 777 Application includes at least 35 examples, all of which contain albuterol sulfate, ethanol, HFA-134a, and "surfactant."  (DTX 120_8).

595.    Example 24 of the Purewal 777 Application states: "The following surfactants were employed to form stable suspensions in the concentrations specified … [list of 31 compounds]."  (DTX 120_8).

596.    Claim 1 of the Purewal 777 Application states: "An aerosol formulation comprising a medicament, [HFA-134a], a surface active agent and at least one compound having a higher polarity than [HFA-134a]."  (DTX 120_9).

597.    Claim 2 of the Purewal 777 Application states: "An aerosol formulation as claimed in Claim 1 suitable for administration to a patient by oral or nasal inhalation, the formulation being in the form of a solution or a suspension of medicament particles having a median particle size of less than 10 microns."  (DTX 120_9).

598.    Claim 5 of the Purewal 777 Application states: "An aerosol formulation as claimed in any preceding claim in which the compound have a higher polarity than [HFA-134a] is selected from alcohols, saturated hydrocarbons, and mixtures thereof."  (DTX 120_9).

599.    Claim 6 of the Purewal 777 Application states: "An aerosol formulation as claimed in Claim 5 in which the compound is selected from ethyl alcohol [ethanol], isopropyl alcohol, n-pentane, isopentane, neopentane, isopropyl myristate and mixtures thereof."  (DTX 120_9).

600.    Claim 7 of the Purewal 777 Application states: "An aerosol formulation as claimed in any preceding claim in which [HFA-134a] is present in an amount of at least 50% by weight of the formulation and the weight ratio of [HFA-134a]:compound of higher polarity is in the range of 50:50 to 99:1."  (DTX 120_9).

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

601.    Claim 8 of the Purewal 777 Application states: "An aerosol formulation as claimed in Claim 7 in which the [HFA-134a] is present in an amount in the range of 60 to 95% by weight of the formulation and the weight ratio of [HFA-134a]:compound of higher polarity is in the range 70:30 to 98:2." (DTX 120_9).

602.    Claim 9 of the Purewal 777 Application states: "An aerosol formulation as claimed in Claim 7 or 8 in which the weight ratio of [HFA-134a]:compound of higher polarity is in the range 85:15 to 95:5." (DTX 120_9).

603.    Claim 10 of the Purewal 777 Application states: "An aerosol formulation as claimed in any preceding claim in which the surface active agent is selected from sorbitan trioleate … [list continues]." (DTX 120_9-10).

604.    Claim 11 of the Purewal 777 Application states: "An aerosol formulation as claimed in any preceding claim in which the weight ratio of surface active agent:medicament is in the range 1:100 to 10:1." (DTX 120_10).

605.    Claim 12 of the Purewal 777 Application states: "An aerosol formulation as claimed in any preceding claim in which the medicament is selected from salbutamol.…" (DTX 120_10).

606.    Claim 13 of the Purewal 777 Application states: "An aerosol formulation as claimed in any preceding claim in which the medicament is present in an amount in the range 0.01 to 5% by weight of the formulation." (DTX 120_10).

607.    The publication of the Purewal 777 Application in June 1990 was a highly significant event in the MDI industry.  (*See, e.g.*, DTX 304_24).

608.    The entire MDI industry, including those of ordinary skill in the art, was well aware of the Purewal 777 Application shortly after it published in June 1990.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

609.    The publication of the Purewal 777 Application was news throughout the entire pharmaceutical industry, particularly the MDI industry.

610.    At the time, as described in the Purewal 777 Application, and well known to those of ordinary skill in the art, the MDI industry was engaged in reformulation efforts for existing CFC MDI products in response to the Montreal Protocol on Substances that Deplete the Ozone Layer. (*See, e.g.*, DTX 120_2; DTX 1074_2; DTX 304).

611.    By the mid-1980s, the most attractive alternative to CFCs as an MDI propellant was HFA-134a, which had desirable chemical properties.  (*See, e.g.*, DTX 304_19).

612.    Unlike CFCs, HFA-134a was not believed to adversely affect the ozone layer.  (DTX 304_19).

613.    At least plaintiff Norton Healthcare Ltd. previously has acknowledged these facts.

614.    Several corporate entities now owned by Teva, including Norton Healthcare, Ltd., filed an antitrust complaint against 3M in the United States District Court for the Southern District of Florida in August 2000 ("*Norton v. 3M Complaint*").  (DTX 304).

615.    The *Norton v. 3M Complaint* describes additional background and events surrounding the publication of the Purewal 777 Application that are consistent with common industry knowledge and reaction to the publication of the Purewal 777 Application.  (DTX 304).

616.    At least paragraphs 63 and 68 of the *Norton v. 3M Complaint* refers to the Purewal 777 Application.  (DTX 304_24).

617.    In the *Norton v. 3M Complaint*, plaintiff Norton Healthcare Ltd. stated: "MDIs have no comparative substitutes.  MDIs are unique because they have a high degree of safety, reliability, portability, efficiency and effectiveness."  (DTX 304_10).

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

618.    In the *Norton v. 3M Complaint*, plaintiff Norton Healthcare Ltd. stated: "The MDI gained rapid acceptance among physicians and their patients as a superior means of asthma and respiratory drug delivery.  It delivers the drug directly to the afflicted organ which decreases the total dose delivered to the body and the systemic side effects of these drugs.  It has proven safe, effective and reliable for virtually all patients and is the mainstay of asthma therapy worldwide. MDIs dominate therapeutic inhalation and are used by 80 percent of asthma patients around the world.  More than 500 million MDIs are used annually."  (DTX 304_11).

619.    In the *Norton v. 3M Complaint*, plaintiff Norton Healthcare Ltd. stated: "The essential components of an MDI are: a storage canister; a medicinal formulation, including at least the propellant and the active ingredient(s); a metering valve to control the discharge of precise doses of formulation; and, an actuator."  (DTX 304_11).

620.    In the *Norton v. 3M Complaint*, plaintiff Norton Healthcare Ltd. stated: "Inside the canister is a drug formulation developed specifically for use in an MDI.  The formulation may consist of several ingredients in either solution or suspension form including: (1) one or more active ingredients; (2) one or more propellants; and, in some cases, (3) a co-solvent and/or surfactant."  (DTX 304_11).

621.    In the *Norton v. 3M Complaint*, plaintiff Norton Healthcare Ltd. stated: "In the 1950s, 3M's Riker Laboratories developed the first MDI for inhalation therapy and received patents for this technology.  As a result of these patents, 3M became a monopoly provider of ADMDIs.[11] This monopoly lasted for nearly two decades until its patents expired and Glaxo-Welcome introduced its proprietary asthma medication known as Ventolin."  (DTX 304_12).

---

[11] Plaintiff Norton Healthcare Ltd. used "ADMDI" as an abbreviation for asthma drug MDI. (DTX 304_2).

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

622.    In the *Norton v. 3M Complaint*, plaintiff Norton Healthcare Ltd. stated: "Even through 3M's original MDI patents expired, 3M remains the largest supplier of MDIs.  According to 3M's literature, 'no other company offers 3M's combined knowledge in metered-dose drug delivery components and formulation techniques, which has helped 3M to become a world leader in the production of inhaled drugs.'"  (DTX 304_12).

623.    In the *Norton v. 3M Complaint*, plaintiff Norton Healthcare Ltd. stated: "ADMDIs have no substitutes.  ADMDIs are unique because they have a high degree of safety, reliability, portability, efficiency and cost-effectiveness."  (DTX 304_13).

624.    In the *Norton v. 3M Complaint*, plaintiff Norton Healthcare Ltd. stated: "Asthma medicines delivered via tablets, capsules and other oral delivery forms, such as liquids, are not effective substitutes for ADMDIs.  Nebulizer solutions are not substitutes because they require large and cumbersome propulsion systems which render them only practical for use in hospitals….  Dry powder inhalers are not substitutes because many of them administer doses inconsistently, are significantly affected by environmental humidity and can cause some patients to have gag reflexes."  (DTX 304_13).

625.    In the *Norton v. 3M Complaint*, plaintiff Norton Healthcare Ltd. stated: "Of the HFA propellants under consideration, the first to be identified in the 1960s/1970s was 1,1,1,2 Tetrafluoroethane, otherwise known as HFA-134a.  Imperial Chemical Industries, Ltd. ("ICI"), a British company, was among the first companies offering to supply HFA-134a to 3M and others in and around 1988.  Other suppliers of HFA-134a at that time included AlliedSignal (now Honeywell) and du Pont."  (DTX 304_14).

626.    In the *Norton v. 3M Complaint*, plaintiff Norton Healthcare Ltd. stated: "Subsequently, another propellant, P227, has also been tested.  Although a number of other potential propellants

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

have been proposed, these [HFA-134a and P227] are the only two considered suitably non-depleting of ozone, non-flammable and of the appropriate density, pressure and other factors. Further, these are the only two on which toxicology consortia have been established.  P227, however, is approximately twice the price of HFA-134a.  Consequently, any attempt by Plaintiffs to use it as a substitute for HFA-134a for competitively priced ADMDIs, such as Albuterol formulations, would be futile and render plaintiffs' products non-competitive." (DTX 304_14-15).

627.    In the *Norton v. 3M Complaint*, plaintiff Norton Healthcare Ltd. stated: "Short acting bronchodilators are used to treat patients having an active asthma attack.   There are no substitutes for short acting bronchodilators, which include … the most widely used short acting asthma medicine, Albuterol (known internationally as "Salbutanol").   Schering-Plough is the dominant supplier of short acting bronchodilators in the relevant market.   Its market share exceeds 65 percent.  Schering-Plough's short acting bronchodilator ADMDIs include Proventil, Proventil HFA (produced in conjunction with 3M) and its generic Albuterol product marketed by its subsidiary, Warrick Pharmaceuticals."  (DTX 304_16).

628.    In the *Norton v. 3M Complaint*, plaintiff Norton Healthcare Ltd. stated: "After the Montreal Protocol was signed, chemical, pharmaceutical and MDI manufacturers recognized the need to develop a CFC-free propellant.  By the mid-1980s, the most attractive alternative to CFCs as an MDI propellant was HFA-134a, which had desirable chemical properties.  Unlike CFCs, HFA-134a did not adversely affect the ozone layer."  (DTX 304_19).

629.    In the *Norton v. 3M Complaint*, plaintiff Norton Healthcare Ltd. stated that, by May 1990, HFA-134a was not patentable based on the "widespread recognition that its use as a propellant in ADMDIs was considered obvious by the industry."  (DTX 304_21).

630.    In the *Norton v. 3M Complaint*, plaintiff Norton Healthcare Ltd. described HFA-134a as "the only economical and environmentally acceptable propellant available for use in MDIs." (DTX 304_21).

631.    In the *Norton v. 3M Complaint*, plaintiff Norton Healthcare Ltd. stated: "IVAX and Baker Norton were aware that 3M's subsidiary, Riker, had applied for a European patent for a specific ADMDI formulation containing HFA-134a.  IVAX and Baker Norton concluded that if such a patent issued, it would be invalid and unenforceable.  They also concluded that the specific formulation claimed in the Riker patent application was different from their formulations and, therefore, the Riker European patent, if it issued, would not prevent in any way IVAX and Baker Norton from selling their ADMDIs in the United States."  (DTX 304_22-23).

632.    In the *Norton v. 3M Complaint*, plaintiff Norton Healthcare Ltd. stated: "In 1988, 3M's Riker division (which was then a 3M subsidiary) filed a U.K. patent application naming Purewal et al. as the inventors and seeking patent coverage for a specific aerosol formulation in an MDI product containing HFA-134a."  (DTX 304_24).

633.    In the *Norton v. 3M Complaint*, plaintiff Norton Healthcare Ltd. stated: "Except for the substitution of HFA-134a, 3M knew that the formulations were old and using HFA-134a in place of CFC propellants was well known and obvious.  The 3M inventors were not the first to conceive the idea of using HFA-134a as a propellant for medical aerosols.  HFA-134a was well recognized as the obvious choice by the industry before the 3M inventors decide to use HFA-134a.  The 3M inventors, however, knowingly attempt to misappropriate that substitution of HFA-134a for CFC in MDIs as their proprietary and exclusive idea."  (DTX 304_25).

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

634.    In the *Norton v. 3M Complaint*, plaintiff Norton Healthcare Ltd. referred to 3M's U.S. patents as "simply directed to the use of known medicaments and HFA-134a in an aerosol formulation which was clearly well known and obvious."  (DTX 304_25).

635.    In the *Norton v. 3M Complaint*, plaintiff Norton Healthcare Ltd. stated: "By the late 1980s, ICI was primarily concentrating on HFA-134a as an alternative and substitute MDI propellant because HFA-134a was ozone-friendly and had physical properties similar to CFC-12."  (DTX 304_27).

636.    In the *Norton v. 3M Complaint*, plaintiff Norton Healthcare Ltd. stated that it attempted to design around 3M's HFA-134a patents.  (DTX 304_42-43).

637.    In the *Norton v. 3M Complaint*, plaintiff Norton Healthcare Ltd. stated that it filed an opposition to—and petition against—the patent that issued from the Purewal 777 Application.  (DTX 304_31-32).

638.    In the *Norton v. 3M Complaint*, plaintiff Norton Healthcare Ltd. stated that, "[o]n June 30, 1997, the British High Court of Justice issued a final opinion and order revoking" a patent that issued from the Purewal 777 Application ("777 Judgment").  (DTX 304_30-31).

639.    This 777 Judgment revoking the patent that issued from the Purewal 777 Application contains findings and conclusions relevant here, particularly because one of the plaintiffs here, Norton Healthcare Ltd., instituted the proceedings that led to the revocation of a patent that issued from the Purewal 777 Application ("777 Revocation Proceeding").  (DTX 305).

640.    Plaintiff Norton Healthcare Ltd. was the petitioner in the 777 Revocation Proceeding.  (DTX 305_1).

641.    The 777 Judgment states that the priority date of the Purewal 777 Application is December 6, 1988.  (DTX 305_1).

642.    The 777 Judgment states: "The formulations within the MDI could take the form of solutions or suspensions.  In the early years of MDIs (the 1950's) solutions were favoured.  One tried to dissolve the drug in the propellant.  If it was not readily soluble, then a co-solvent would be used, the most common of which was ethanol (ethyl alcohol)….  Ethanol was the only co-solvent which had regulatory approval."  (DTX 305_3).

643.    The 777 Judgment states: "By the late 1980's suspension formulations had evolved and were the preferred form.  The drug is inherently more stable in solid form."  (DTX 305_3).

644.    The 777 Judgment states: "The established surfactants were three in number—sorbitan esters, oleic acid and lecithin ('the 3 surfactants')."  (DTX 305_3).

645.    The 777 Judgment states: "There was also a general (and fairly self-evident) principle which formulators went by: not to use a component at all if it was found not to be necessary, and, if it was necessary, to use the minimum amount which was necessary."  (DTX 305_5).

646.    The 777 Judgment states: "CFCs were originally developed in the 1930's.  By the early 1970's their use was widespread for a whole variety of uses.  In particular they were used as refrigerants, as blowing agents for foams, as propellants for aerosol dispensers and so on."  (DTX 305_5).

647.    The 777 Judgment states: "Before the priority date … I think it is fair to say that anyone interested in propellants would know that ICI (and others) were planning large scale manufacture of P134a and that this propellant was seen as a substitute for CFC P12 in general terms … I have no doubt that any competent MDI man (or, as is accepted here, research team) would know of P134a and that its physical properties as a propellant (i.e. its boiling point) made it very close to P12.  No-one called by either side was unaware of P134a by the priority date of the patent."  (DTX 305_7).

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

648.    The 777 Judgment states: "Norton contends that it was obvious to an MDI team in late 1988 to consider formulation of any drug using P134a as the main propellant." (DTX 305_11).

649.    The 777 Judgment states: "So far as suspension forms are concerned, it is said that the skilled man would know that he could use P11 as a co-solvent (as he had done with P12) but would much prefer to use something else because the whole point of reformulation was to do away with CFCs entirely. The self-evident co-solvent was ethanol." (DTX 305_11).

650.    The 777 Judgment states: "I think there was every reason for the skilled man to pick ethanol as a co-solvent for experimental work with P134a. It was the only potential non-CFC co-solvent which had regulatory approval." (DTX 305_15).

651.    The 777 Judgment states: "Norton's case is very simple: the skilled man would always try simple experiments to see what the effect of various levels of surfactant were. He would be aiming to use the minimum quantity necessary. One would see how much was necessary—if none then none would be used. I think the evidence bears this case out." (DTX 305_23).

652.    Consistent with these statements, upon review of the Purewal 777 Application, plaintiffs' expert, Dr. Byron, concluded that the Purewal 777 Application "largely describes the state of the art," and that the patent applicants were "trying to patent the obvious." (DTX 288_2).

653.    Among other things, as detailed above, the Purewal 777 Application describes the history of MDI use for delivering bronchodilator drugs and steroids to the airways of asthmatic patients, typical CFC MDI propellant systems (using CFC 11, CFC 12, and CFC 114), and the use of a claimed novel propellant system combining (a) HFA-134a; (b) a compound having a higher polarity than HFA-134a (defined as an "adjuvant"); and (c) various compounds listed as "surfactants." (DTX 120).

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

654.    Consistent with Dr. Byron's assessment of the "state of the art" described in the Purewal 777 Application, and two weeks before the Purewal 777 Application was published, both Dr. Byron and defendants' expert, Dr. Dalby, were aware that industry reformulation efforts for albuterol CFC MDI products were directed to HFA-134a, including with ethanol.  (*See, e.g.*, DTX 287 (dated May 29, 1990) ("In order to 'keep up with the competition' we will investigate a formulation of albuterol containing 100% P-134a and P-134a in the presence of a small amount of ethanol.")).

655.    The broad claims of the Purewal 777 Application provided strong motivation and heavy market pressure for a person of ordinary skill in the art to design around the claimed formulations.  (*See, e.g.*, DTX 288_1-2; DTX 304_42-43).

656.    The MDI industry, including persons of ordinary skill in the art, considered the claims of the Purewal 777 Application to be extremely broad.

657.    The potential patent claims of the Purewal 777 Application created a heavy competitive pressure and market incentive to evaluate and design around the formulations claimed in the Purewal 777 Application.

658.    A person of ordinary skill in the art would have accepted the description of the state of the art set forth in the Purewal 777 Application, including the statements that ethanol was considered a "dispersing agent" and "solvent," and that the use of a known "adjuvant" such as ethanol and known surfactants (including "oleic acid") was considered "particularly advantageous since the toxicity and use of such compounds in metered dose inhalers for drug delivery to the human lung is well established."  (*See, e.g.*, DTX 120_2).

659.    A person of ordinary skill in the art not only would have carefully considered the Purewal 777 Application, but also would have studied every aspect of it rigorously, with at least

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

scientific, competitive and marketing interests in mind, along with their knowledge of the then-available albuterol CFC MDI aerosol products, including Proventil CFC and Ventolin CFC.

660.    A person of ordinary skill in the art would have been familiar with both Proventil CFC and Ventolin CFC as of June 1990, including through common industry knowledge and the information available through publications like the Physicians' Desk Reference.  (*See, e.g.*, DTX 1062; DTX 1081).

661.    A person of ordinary skill in the art, tasked with formulating an albuterol MDI aerosol product in the 1990 time period, would have considered the goal to be reformulation of then-available albuterol CFC MDI aerosol products with what was considered the only reasonably available and commercially viable alternative propellant, HFA-134a.  (*See, e.g.*, DTX 304_21, 28; DTX 171_19-20).

662.    By the June 1990 timeframe, a person of ordinary skill in the art would have considered at least the then-marketed Proventil CFC and Ventolin CFC MDI albuterol products, along with the Purewal 777 Application, in formulating (or, more appropriately, reformulating) an albuterol CFC MDI aerosol product using HFA-134a.

663.    Upon comparison of Proventil CFC and Ventolin CFC to the contents of the Purewal 777 Application, a person of ordinary skill in the art would have recognized that the Purewal 777 Application described and broadly claimed a proposed reformulation of several then-existing CFC MDI aerosol products, including Proventil CFC and Ventolin CFC.

664.    Proventil CFC and Ventolin CFC both included a pharmaceutical suspension aerosol formulation, micronized particulate albuterol, CFC 11 and 12 as propellants, oleic acid, an aerosol canister with a metering valve, and formulations in an amount to provide a plurality of therapeutically effective doses of the drug.  (*See, e.g.*, DTX 1062; DTX 1081).

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

665.    The Purewal 777 Application describes and claims pharmaceutical suspension formulations, micronized particulate drug (including albuterol), HFA-134a as propellant, ethanol in the amount of about 5 to 15% by weight, listed surfactants (including oleic acid), aerosol containers equipped with metering valves, and formulations suitable for administration by oral or nasal inhalation.  (DTX 120).

666.    Accordingly, the Purewal 777 Application would have been read and understood by persons of ordinary skill in the art as describing and claiming a reformulation of Proventil CFC and Ventolin CFC using HFA-134a in place of CFC 12, ethanol in place of CFC 11, and albuterol sulfate in place of albuterol base.

667.    By June 1990, a person of ordinary skill in the art would have recognized that HFA-134a was, by far, the leading candidate to replace CFC 12 in MDI aerosol formulations.  (*See, e.g.*, DTX 1074; DTX 1083; DTX 1091; DTX 304; DTX 171_19-20).

668.    In addition, the other possible HFA propellant for MDI aerosol use, HFA-227, was not reasonably available at the time, and was not expected to be available on a commercial scale for at least several years, if ever.  (*See, e.g.*, DTX 304).

669.    Thus, it would have been clear to a person of ordinary skill in the art that the Purewal 777 Application was claiming HFA-134a as a replacement for CFC 12 in then-existing CFC MDI aerosol formulations, including Proventil CFC and Ventolin CFC.  (*See, e.g.*, DTX 304).

670.    It would have been equally clear, to a person of ordinary skill in the art, that the Purewal 777 Application was claiming ethanol as a replacement for the CFC 11 component in existing CFC MDI aerosol products like Proventil CFC and Ventolin CFC.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

671. Like CFC 11, ethanol would have been considered a low-volatility diluent and dispersing agent that could be used for more efficient and cost-effective manufacturing, with the additional benefit of reducing the vapor pressure of HFA-134a in the ranges described.

672. In addition, one of ordinary skill in the art would have recognized ethanol as the lead candidate for reformulation of an albuterol CFC MDI aerosol product for these purposes, in large part because of its long history of approved and accepted use in MDI aerosol formulations. (*See, e.g.*, DTX 1067; DTX 171_19-20).

673. One of ordinary skill in the art also would have recognized that the Purewal 777 Application described replacing the albuterol base in Proventil CFC and Ventolin CFC with albuterol sulfate in the claimed formulations containing ethanol.

674. By June 1990, it was well known to persons of ordinary skill in the art that albuterol base was "soluble in ethanol," while albuterol sulfate was only "slightly soluble in ethanol." (*See, e.g.*, DTX 1061; DTX 1062; DTX 171_19-20).

675. Thus, one of ordinary skill in the art would have recognized that albuterol sulfate would be required in a suspension MDI aerosol product reformulated with HFA-134a and ethanol primarily because albuterol sulfate already was known to be only "slightly soluble in ethanol" (as required for a suspension MDI aerosol formulation), and because the sulfate salt form of albuterol was already approved and accepted in other then-marketed Proventil and Ventolin products such as tablets and syrups, as well as in Ventolin dry powder inhaler capsules. (*See, e.g.*, DTX 1081; DTX 171_19-20).

676. Finally, one of ordinary skill in the art would have noted that the Purewal 777 Application includes oleic acid, the same surfactant used in the then-marketed Proventil CFC and Ventolin CFC MDI products.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

677.    Consistent with typical reformulation practices at the time, a person of ordinary skill in the art would have recognized that the Purewal 777 Application described and claimed formulations that include components that are as similar as possible to the previously-approved and existing formulations, for a variety of reasons, including those stated in the Purewal 777 Application (including use of conventional valve components, as well as stability and homogeneity of the suspension), plus the benefits of previous regulatory approval and market acceptance.

678.    In addition, a person of ordinary skill in the art also would have studied closely the examples provided in the Purewal 777 Application, particularly those directed to what would have appeared to include exemplary reformulations of Proventil CFC and Ventolin CFC—*i.e.*, Examples 5 and 24.

679.    Example 5 is reported as 0.010g albuterol sulfate, 0.012g oleic acid, 1.350g ethanol, and 4.040g HFA-134a.  (DTX 120_6).

680.    By weight, therefore, Example 5 is about 0.2% albuterol sulfate, about 0.2% oleic acid, about 25% ethanol, and about 75% HFA-134a.

681.    Example 24 is reported as 0.012g albuterol sulfate, 0.58g ethanol,[12] 5.220g HFA-134a and **(A)** 0.005g and **(B)** 0.012g of surfactant, including oleic acid.  (DTX 120_8).

682.    By weight, therefore, Example 24 includes about **(A)** 0.2% albuterol sulfate, 10% ethanol, 90% HFA-134a, and 0.1% oleic acid and about **(B)** 0.2% albuterol sulfate, 10% ethanol, 90% HFA-134a, and 0.2% oleic acid.

---

[12] As explained in Section III(D)(iii)(1), Example 24 contains a typographical error that would have been corrected by the person of ordinary skill in the art from "0.058g" of ethanol to "0.58g" of ethanol, consistent with Examples 19 to 23 above.  (DTX 120_8).

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

683.    A person of ordinary skill in the art also would have noted that the Purewal 777 Application only describes Example 5 relative to a formulation containing "n-pentane" as "more stable than Examples 1 to 3 containing n-pentane, exhibiting a decreased tendency to settling." (DTX 120_6).

684.    In contrast, the Purewal 777 Application described Examples 24(A) and (B) using oleic acid as "stable suspensions," and as one of only four example surfactants that were part of "stable suspensions" at both concentrations (0.005 and 0.012g of surfactant).  (DTX 120_8-9).

685.    Finally, one of ordinary skill in the art would have recognized that, although the Purewal 777 Application covers practically the entire range of ethanol possible in an MDI aerosol suspension formulation (from about 1 to about 50% ethanol), the Purewal 777 Application identified ethanol in the amount of about 5 to 15% to be most preferred.  (*See, e.g.*, DTX 120_4, 9).

686.    Based on these conclusions regarding how a person of ordinary skill in the art would read and understand the Purewal 777 Application, Dr. Dalby compared in detail a combination of the Purewal 777 Application and the Proventil/Ventolin CFC products, and testified that a person of ordinary skill in the art would have combined the Purewal 777 Application and Proventil/Ventolin CFC products with a reasonable expectation of success in arriving at the subject matter of the asserted claims of the 152 Patent for at least several reasons.

687.    First, in formulating (or, more appropriately, reformulating) an albuterol CFC MDI aerosol product, one of ordinary skill in the art would have started with the approved, marketed and accepted albuterol CFC MDI aerosol formulations, including Proventil CFC and Ventolin CFC.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

688.    As discussed above, those of ordinary skill in the art were highly motivated by the Montreal Protocol to reformulate existing successful MDI aerosol products, such as Proventil CFC and Ventolin CFC, at least by the late 1980s.  (DTX 171_19-20).

689.    Second, for the reasons explained above, a person of ordinary skill in the art would have studied the Purewal 777 Application, and concluded that it described and claimed reformulations of then-existing CFC MDI aerosol formulations, particularly Proventil CFC and Ventolin CFC.

690.    Third, a person of ordinary skill in the art would have compared the Proventil CFC and Ventolin CFC formulations to the corresponding formulations described and claimed in the Purewal 777 Application, and concluded that the claims of the Purewal 777 Application claims were extremely broad, covering practically every suspension aerosol composition containing HFA-134a in combination with ethanol and previously-approved surfactants.

691.    This recognition would have motivated the person of ordinary skill in the art to evaluate the claimed invention through routine studies (such as "bottle studies"), as well as consider any unclaimed territory.

692.    The propellant, HFA-134a, was a necessary component, with at least the entire practical range of about 50 to 99% described and claimed in the Purewal 777 Application.  (*See, e.g.*, DTX 120_4, 9 (claim 7)).

693.    The "dispersing agent" or "adjuvant" with the longest history of use in MDI aerosol formulations and the broadest regulatory approval and market acceptance—ethanol—also was described and claimed in at least its entire practical range of about 1 to 50% in the Purewal 777 Application, as well as additional, more preferred ranges.  (*See, e.g.*, DTX 120_4, 9 (claims 6-9)).

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

694.    And, finally, the Purewal 777 Application described and claimed practically every conventional and approved surfactant—including the three most widely-known and approved surfactants in MDI aerosol formulations (sorbitan trioleate, lecithin and oleic acid)—in at least the broadest practical ratios of surfactant to medicament, from 1:100 (surfactant : medicament) to 10:1 (surfactant : medicament), in connection with the claimed formulations.  (*See, e.g.*, DTX 120_4-6, 8-10).

695.    The broad description and claims of the Purewal 777 Application created both competitive pressure and a strong market and scientific incentive to evaluate and design around these published claims of the Purewal 777 Application.

696.    A person of ordinary skill in the art would have had a strong motivation to both evaluate and design around the subject matter of the Purewal 777 Application, with the obvious choice being elimination of the only component that could be removed—the surfactant—consistent with the general formulation principle that every component that can be removed, should be removed.[13]  (DTX 171_19-20).

697.    Based on these conclusions, Dr. Dalby further compared, in detail, (1) the combination of Proventil/Ventolin CFC and the Purewal 777 Application; and (2) the asserted claims of the 152 Patent.

698.    This comparison demonstrated essentially one difference: both Proventil/Ventolin CFC and the formulations of the Purewal 777 Application contain a listed "surfactant," whereas the formulations claimed in the 152 Patent contain "no surfactant."

---

[13] Plaintiffs argued that a person of ordinary skill in the art also could have removed the ethanol, but the Purewal 777 Application states: "It has been found that the use Propellant 134a and drug as a binary mixture or in combination with a conventional surfactant such as sorbitan trioleate does not provide formulations having suitable properties for use with pressurized inhalers." (DTX 120_3 (line 7)).

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

699.    Based on the description and claims in the Purewal 777 Application, including particularly the identification of ethanol as a "dispersing agent" and "adjuvant," as well as the reported "stable suspensions" of Examples 24(A) and (B) containing about 10% ethanol and different amounts of oleic acid, a person of ordinary skill in the art reasonably would have expected that similar suspensions also would be relatively "stable" without surfactant throughout the most preferred range of ethanol identified in the Purewal 777 Application, including from about 10 to about 15% based on Example 24.

700.    At the time the Purewal 777 Application was published, and in the 1990-1991 timeframe, and even thereafter, one of ordinary skill in the art of the 152 Patent would have had a strong motivation to evaluate the state of the art of reformulation of albuterol CFC MDI products, particularly in light of the urgency created within the MDI industry by the Montreal Protocol and later events.

701.    As discussed in Section III(D)(iii), one of ordinary skill in the art would have reproduced Example 24 of the Purewal 777 Application, using the then-marketed surfactant in both Proventil CFC and Ventolin CFC, oleic acid, to further evaluate the claimed invention using the same type of "bottle studies" that would have appeared to be the basis of Example 24.

702.    These types of bottle studies were routine at the time, required very little time and effort, and would have provided an immediate basis for comparison relative to a "control" formulation—*i.e.*, a "no surfactant" control formulation versus the Example 24 formulations containing 0.005 and 0.012g oleic acid.

703.    In conducting such a routine bottle study, a person of ordinary skill in the art would have confirmed their reasonable expectation that the "control" or "no surfactant" formulation also

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

formed an acceptably "stable suspension" as described in the Purewal 777 Application and Example 24.

704.    Plaintiffs argue that the Purewal 777 Application teaches away from "no surfactant" formulations because it should be read as requiring the use of a "surface active agent," including the compounds listed in the Purewal 777 Application as "surface active agents" or "surfactants."

705.    As the Federal Circuit recently explained: "A reference may be said to teach away when a person of ordinary skill, upon reading the reference, would be discouraged from the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant." *Galderma*, 737 F.3d at 738.

706.    The Federal Circuit also explained: "A reference does not teach away, however, if it merely expresses a general preference for an alternative invention but does not criticize, discredit, or otherwise discourage investigation into the invention claimed." *Galderma*, 737 F.3d at 738.

707.    The Purewal 777 Application does not teach away from the subject matter of the asserted claims of the 152 Patent.[14]

708.    Nothing in the Purewal 777 Application criticizes, discredits or otherwise discourages investigation into the subject matter of the asserted claims of the 152 Patent.

709.    To the contrary, as explained above, a person of ordinary skill in the art would be strongly encouraged and highly motivated to investigate the Example 24 formulations of the Purewal 777 Application against a "no surfactant" control formulation using routine bottle studies.

---

[14] In fact, as explained in Section III(C) above, according to Dr. Myrdal's interpretation of the term "surfactant" in the asserted claims of the 152 Patent, the Purewal 777 Application literally teaches the subject matter of the asserted claims of the 152 Patent.

710.   In addition, nothing in the Purewal 777 Application would have suggested to one of ordinary skill in the art that a reformulation of, for example, the Proventil CFC and Ventolin CFC MDI products absolutely would require the presence of a surfactant given the presence of ethanol.

711.   Instead, the Purewal 777 Application states that the applicants investigated "Propellant 134a and drug as a binary mixture"—*i.e.*, without surfactant—and found that it "does not provide formulations having suitable properties for use with pressurised inhalers."   (DTX 120_3).

712.   This portion of the Purewal 777 Application does not teach away from the subject matter of the asserted claims of the 152 Patent.

713.   To the contrary, this portion of the Purewal 777 Application encourages the use of a compound of higher polarity (*i.e.*, ethanol), and shows that the applicants themselves did not consider a surfactant to be required in formulations containing HFA-134a.

714.   Moreover, as explained above, a person of ordinary skill in the art would have recognized that the Purewal 777 Application was intended to cover a basic reformulation of then-available CFC MDI aerosol products, including particularly Proventil CFC and Ventolin CFC, through replacement of components, as described above.

715.   The fact that the Purewal 777 Application includes oleic acid in reformulations containing ethanol would not suggest to one of ordinary skill in the art that a surfactant is "required" or "necessary" for a "stable suspension" comparable to, for example, those described in Example 24(A) and (B), and within the most preferred range of about 5 to 15% ethanol described and claimed in the Purewal 777 Application.

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

716.    In summary, the Court concludes that a person of ordinary skill in the art would have considered the Proventil CFC and Ventolin CFC products, together with the Purewal 777 Application, with a strong motivation to both evaluate and design around the very broad claims of the Purewal 777 Application.

717.    Given the breadth of the description and claims in the Purewal 777 application, the obvious and practical design around would have been elimination of the claimed surfactants, including particularly oleic acid.

718.    As detailed in Section III(C), once surfactant was eliminated from the formulations of the Purewal 777 Application, the resulting formulation would fall within all of the asserted claims of the 152 Patent.

719.    Defendants' experts provided a thorough comparison of Proventil/Ventolin CFC, the Purewal 777 Application, and the 152 Patent to support this conclusion.

720.    A summary of this comparison follows:

| Proventil/Ventolin CFC | Purewal 777 Application | 152 Patent |
|---|---|---|
| contain a pharmaceutical suspension aerosol formulation | describes, claims and exemplifies pharmaceutical "suspension" formulations | "A pharmaceutical suspension aerosol formulation consisting essentially of:" |
| particulate drug | "drug particles" | "particulate drug" |
| CFC 11 and 12 as propellants | "propellant 134a" | HFA-134a "as propellant" |
| [neither included ethanol] | "weight ratio" of ethanol to HFA-134a "in the range" 5:95 to 15:85 | "ethanol in an amount of 5 to about 15 percent by weight" |

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

| Proventil/Ventolin CFC | Purewal 777 Application | 152 Patent |
|---|---|---|
| oleic acid | surface active agent, including "oleic acid" | "wherein the formulation is further characterized in that it contains no surfactant" |
| micronized | micronized | "wherein the drug is micronized" |
| aerosol canisters equipped with metering valves | "aerosol containers equipped with metering valves" | "an aerosol canister equipped with a metering valve" |
| contain formulations in an amount to provide a plurality of therapeutically effective doses of the drug | "conventional aerosol containers" "formulation … suitable for administration to a patient by oral or nasal inhalation" | "containing a formulation … in an amount to provide a plurality of therapeutically effective doses of the drug" |
| the particulate drug was albuterol base | "drug particles" albuterol base and sulfate | "wherein the particulate drug is … albuterol" |
| the particulate drug was albuterol base | "drug particles" albuterol base and sulfate | "wherein the particulate drug is albuterol or a pharmaceutically acceptable salt or solvate thereof" |
| [neither included albuterol sulfate] | "drug particles" albuterol sulfate | "wherein the particulate drug is albuterol sulfate" |

721.    In other words, the only substantial difference between the description and claims of the Purewal 777 Application and the subject matter of the asserted claims of the 152 Patent, from the perspective of one of ordinary skill in the art, would have been the elimination of surfactant.

722.    Accordingly, the Court concludes that the subject matter of the asserted claims of the 152 Patent would have been obvious to one of ordinary skill in the art in light of the content of the art

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

as of June 1990, or shortly thereafter, at least upon routine reproduction of the formulations of Example 24 of the Purewal 777 Application.

723.    At a minimum, the reproduction of the Example 24 formulations containing oleic acid using routine bottle studies immediately would have confirmed the reasonable expectation that the control formulation (*i.e.*, a formulation without any listed surfactant) also is "stable," at least relative to the Example 24 formulations containing oleic acid.

724.    The Court concludes that, because such a control (or "no surfactant") formulation falls within each of the asserted claims of the 152 Patent, Defendants have proven, by clear and convincing evidence, that the subject matter of the asserted claims of the 152 Patent would have been obvious to a person of ordinary skill in the art, at least based on a routine reproduction of the Example 24 formulations, including particularly the Example 24 formulations containing the same surfactant in the then-marked Proventil CFC and Ventolin CFC product, oleic acid.

725.    This conclusion is further supported by the common sense principle advanced by plaintiff Norton Healthcare Ltd. in the European proceedings: "the skilled man would always try simple experiments to see what the effect of various levels of surfactant were.  He would be aiming to use the minimum quantity necessary.  One would see how much was necessary—if none then none would be used.  I think the evidence bears this case out."  (DTX 305_23).

### 2.  The Greenleaf Declaration

726.    The Greenleaf Declaration is the Declaration of David J. Greenleaf, dated May 20, 1991.  (DTX 2130_26-35; DTX 337_7-16; DTX 1336_2-11; DTX 299_1-10).

727.    David J. Greenleaf is one of the two named inventors on the Purewal 777 Application.  (DTX 2130_26; DTX 337_7; DTX 120).

728.    According to the date stamp on the face of the document, the Greenleaf Declaration was first received by the USPTO on May 28, 1991.  (DTX 1336).

729.    The Greenleaf Declaration was received by the USPTO on May 28, 1991 in connection with an application that led to the Purewal 183 Patent.  (DTX 2030_1-286; DTX 1113_2-9).

730.    The Greenleaf Declaration also was received by the European Patent Office ("EPO") on February 12, 1992 in connection with the Purewal 777 Application.  (*See, e.g.*, DTX 2130_2; DTX 337_3).

731.    In the copy of the Greenleaf Declaration submitted to the EPO, the caption reflecting submission to the USPTO was redacted.  (DTX 2130_26; DTX 337_7).

732.    In all other respects, the Greenleaf Declaration (EPO) is a duplicate of the Greenleaf Declaration submitted to the USPTO ("Greenleaf Declaration USPTO") in connection with the Purewal 183 Patent.

733.    The Greenleaf Declaration (EPO) was publicly available to persons of ordinary skill in the art shortly after it was received by the European Patent Office on February 12, 1992 in connection with the Purewal 777 Application.  *See, e.g.*, EPC of 1973, Art. 128(4), *available at* http://www.epo.org/lawpractice/legal-texts/html/epc/1973/e/ar128.html; *see also* Article 128 E - Travaux Preparatoires (describing history of Article 128) ("Subsequent to the publication of the European patent application, the files relating to such application and the resulting European patent may be inspected on request….").

734.    Based on the May 4, 1992 priority date for the asserted claims of the 152 Patent (*see* Section III(B)), the Greenleaf Declaration (EPO) is prior art to the asserted claims of the 152 Patent because it was publicly available by February 1992.  *See generally In re Wyer*, 655 F.2d 221, 226 (C.C.P.A. 1981); *Bruckelmyer v. Ground Heaters, Inc.*, 445 F.3d 1374, 1379 (Fed. Cir. 2006).

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

735.    The Greenleaf Declaration (EPO) is attached to the applicants' request for correction of Example 24 discussed in Section III(D)(iii).

736.    Both versions of the Greenleaf Declaration attach laboratory notebook pages underlying Example 24 of the Purewal 777 Application.  (DTX 2130_26-33; DTX 337_7-14; DTX 1336_2-9).

737.    Defendants rely on the Greenleaf Declaration (EPO) for various purposes, and in the alternative.

738.    First, defendants contend that both versions of the Greenleaf Declaration, regardless of whether they are considered prior art, provide independent evidence supporting Dr. Dalby's opinions regarding routine bottle studies and the reasonable expectation of success by persons of ordinary skill in the art set forth above, under any interpretation of the term "surfactant" in the asserted claims of the 152 Patent.

739.    Even if the Court were to find that "surfactant" in the asserted claims of the 152 Patent includes *any* compound that would be considered to have a surfactant chemical structure by a person of ordinary skill in the art, the Greenleaf Declaration still confirms the reasonable expectation that a "no surfactant" control formulation in the bottle studies underlying Example 24 produces a relatively stable formulation, at least compared to formulations with the "surfactants" listed in Example 24, including those containing oleic acid, regardless of whether a person of ordinary skill in the art would consider all of the listed "surfactant" compounds in the Purewal 777 Application to be actual surfactants.

740.    Specifically, the Greenleaf Declaration attaches laboratory notebook pages showing the results of bottle studies underlying Example 24, and reports: "All surfactants used produced *similarly stable suspensions*, some were slightly better than others but none were outstanding.

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

The formulation with ***no surfactant*** was as good as the better surfactants if not better in that it had a slightly slower sedimentation rate."  (DTX 2130_26, 31; DTX 337_7, 12 (emphases added)).

741.    The Greenleaf Declaration describes this "no surfactant" formulation as a control formulation in the reported bottle studies, both as a "[p]lacebo (no surfactant)" formulation and as a "[n]o surfactant" formulation.  (DTX 2130_31, 34; DTX 337_12, 15).

742.    Therefore, even under an interpretation of "surfactant" in the asserted claims of the 152 Patent that includes all compounds listed as "surfactants" in the Purewal 777 Application, the Court concludes that the Greenleaf Declaration: (a) shows the results of routine bottle studies like those that would have been performed to reproduce the formulations of Example 24; and (b) provides independent evidence supporting Dr. Dalby's opinions that, upon routine reproduction of the Example 24 formulations, including particularly the formulations containing oleic acid, a person of ordinary skill in the art would confirm their reasonable expectation that a "no surfactant" control formulation would be similarly stable to various example "surfactant" formulations, including the example formulations containing oleic acid.

743.    Alternatively, if the Court adopts Dr. Myrdal's interpretation of "surfactant" in the asserted claims of the 152 Patent, the conclusion would be the same.

744.    A person of ordinary skill in the art would read and understand the Greenleaf Declaration to show that the compounds listed as "surfactants" are not, in fact, functioning as surfactants according to Dr. Myrdal's interpretation of "surfactant" in the asserted claims of the 152 Patent, at least because the listed surfactants are not "stabilizing" the example formulations compared to the "no surfactant" control formulation.  (DTX 2130_28-34; DTX 337_9-15).

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

745.    Therefore, the Court concludes that, according to Dr. Myrdal's interpretation of "surfactant" in the asserted claims of the 152 Patent, many of the example formulations would be considered by a person of ordinary skill in the art "no surfactant" formulations covered by the asserted claims of the 152 Patent.

746.    Defendants also contend that, as an additional prior art reference, the Greenleaf Declaration (EPO) in combination with Proventil/Ventolin CFC and the Purewal 777 Application further prove the subject matter of the asserted claims of the 152 Patent obvious, at least because the Greenleaf Declaration (EPO) confirms the correction to Example 24, and states that a "no surfactant" control formulation according to Example 24 was "as good as the better surfactants if not better in that it had a slightly slower sedimentation rate," as explained above. (DTX 2130_26, 31; DTX 337_7, 12 (emphasis added)).

747.    The Court concludes that any uncertainty regarding how a person of ordinary skill in the art would read, understand and correct Example 24 of the Purewal 777 Application is resolved by the Greenleaf Declaration (EPO).

748.    The Court also concludes that any uncertainty regarding whether a person of ordinary skill in the art would reasonably expect to succeed in producing the subject matter of the asserted claims of the 152 Patent by removing surfactant, particularly oleic acid, is resolved by the Greenleaf Declaration (EPO).

749.    The Court further concludes that any uncertainty regarding whether a person of ordinary skill in the art would have confirmed their reasonable expectation of success in producing a "no surfactant" formulation falling within the scope of the asserted claims of the 152 Patent is resolved by the Greenleaf Declaration (EPO).

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

750.    In summary, the Court concludes that, to the extent there is any uncertainty that the subject matter of the asserted claims of the 152 Patent would have been obvious in view of a combination of Proventil/Ventolin CFC and the Purewal 777 Application, the Greenleaf Declaration (EPO) resolves the uncertainty.

751.    Defendants have proven, by clear and convincing evidence, that the asserted claims of the 152 Patent would have been obvious, and thus invalid, in view of a combination of Proventil/Ventolin CFC, the Purewal 777 Application, and the Greenleaf Declaration (EPO).

752.    Defendants also have proven, by clear and convincing evidence, that the Greenleaf Declaration includes independent evidence confirming that a person of ordinary skill would confirm their reasonable expectation of success of producing the subject matter of the asserted claims of the 152 Patent through routine bottle studies like those described in the Greenleaf Declaration.

### 3.  The Marecki 539 Patent

753.    The Marecki 539 Patent is a U.S. patent entitled "Device for Delivery an Aerosol." (DTX 300_1).

754.    The Marecki 539 Patent was filed on December 18, 1991 as a continuation-in-part of an application filed December 21, 1990.  (DTX 300_1).

755.    The Marecki 539 Patent issued on March 1, 1994.  (DTX 300_1).

756.    Plaintiffs' expert, Dr. Byron, acknowledged that the Marecki 539 Patent is within the scope of the prior art to the asserted claims of the 152 Patent.

757.    In addition, based on the Court's decision that the asserted claims of the 152 Patent have a priority date of May 4, 1992 (*see* Section III(B)), the Court concludes that the Marecki 539 Patent is prior art to the 152 Patent according to 35 U.S.C. § 102(e).  *See Purdue Pharma Prods. L.P. v. Par Pharmaceutical, Inc.*, 642 F. Supp. 2d 329, 369 & n.55 (D. Del. 2009), *dismissed*,

370 F. App'x 80 (Fed. Cir. 2009) *and aff'd*, 377 F. App'x 978 (Fed. Cir. 2010) ("The Oshlack and Kaiko patents are prior art under § 102(e) because they were granted on patent applications that were filed before the [1993] effective filing date of the patents-in-suit…. *See* 35 U.S.C. § 102(e)(2) (defining prior art to include 'a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent')."); *see also Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1326 (Fed. Cir. 2008) ("Although the '219 patent did not issue until after the '099 patent was filed, it is prior art to the '099 patent under 35 U.S.C. § 102(e)(2)—'a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent.'").

758.    According to § 102(e), the Marecki 539 Patent is considered available to the person of ordinary skill in the art at least at the time of the December 18, 1991 filing date stated on the face of the Marecki 539 Patent.  *See Purdue*, 642 F. Supp. 2d at 369 & n.55; *see also Muniauction*, 532 F.3d at 1326.

759.    Defendants contend that the Marecki 539 Patent also confirms the reasonable expectation that the formulations of the Purewal 777 Application would be relatively "stable" without surfactant in the presence of the most preferred amounts of about 5 to about 15% ethanol as a dispersing agent and adjuvant.

760.    A person of ordinary skill in the art would have studied the Marecki 539 Patent with particular interest, at least because, like the Purewal 777 Application, it was assigned to a 3M entity, and directed to the same MDI aerosol formulation art.  (DTX 300).

761.    The Marecki 539 Patent states: "The continuing use of aerosol formulations comprising conventional chlorofluorocarbon propellants is being debated due to the suspected role of such propellants in atmospheric ozone depletion.  Accordingly, alternative propellants such as [HFA-

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

134a and HFA-227] are being developed to replace those conventional propellants thought to contribute to atmospheric ozone depletion." (DTX 300_3).

762.    The Marecki 539 Patent states: "The illustrated embodiment is a device for use with pharmaceutical formulations." (DTX 300_5).

763.    The Marecki 539 Patent states: "Preferred pharmaceutical formulations generally comprise [HFA-134a,] [HFA-227,] or a mixture thereof in the amount effective to function as an aerosol propellant, a drug having a local or systemic action and suitable for use by inhalation, and any optional formulation excipients.  Exemplary drugs having local effect in the lung include bronchodilators such as albuterol…." (DTX 300_5).

764.    The Marecki 539 Patent states: "The drug is present in the formulation in an amount sufficient to provide a predetermined number of therapeutically effective doses by inhalation, which can be easily determined by those skilled in the art considering the particular drug in the formulation.  Optional excipients include cosolvents (e.g., ethanol, water) and surfactants (e.g., oleic acid, sorbitan esters, polyoxyethylenes, glycols) and others known to those skilled in the art.  A particularly preferred formulation comprises, by weight, 0.40% albuterol sulfate, 0.48% oleic acid, 14.26% absolute ethanol, and 84.86% [HFA-134a].  " (DTX 300_5).

765.    The Marecki 539 Patent includes "formulations … to demonstrate the invention," including six example formulations containing albuterol sulfate, oleic acid, about 14-15% ethanol by weight, and about 83-85% HFA-134a by weight.  (DTX 300_6).

766.    Upon close review of the Marecki 539 Patent, a person of ordinary skill in the art would have concluded that, although the Marecki 539 Patent is directed to a "device" for delivering an aerosol formulation containing HFA-134a, and although it did not contain a specific example of an albuterol sulfate HFA-134a formulation with ethanol and without surfactant, claims 19, 20,

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

22, 25 and 26, when read together, would have appeared intended to cover an HFA-134a suspension formulation containing albuterol sulfate, ethanol, and, ***optionally***, oleic acid.

767.    Claim 19 of the Marecki 539 Patent states: "A device according to claim 18, wherein the formulation chamber contains an aerosol formulation comprising [HFA-134a,] [HFA-227,] or a mixture thereof, in an amount effective to function as a propellant.  (DTX 300_20).

768.    Claim 20 of the Marecki 539 Patent states: "A device according to claim 19, wherein the formulation is a pharmaceutical formulation comprising [HFA-134a,] [HFA-227,] or a mixture thereof, in an amount effective to function as an aerosol propellant, and a drug in an amount sufficient to provide a predetermined number of therapeutically effective doses for inhalation." (DTX 300_20).

769.    Claim 22 of the Marecki 539 Patent states: "A device according to claim 20, wherein the drug is albuterol sulfate."  (DTX 300_20).

770.    Claim 25 of the Marecki 539 Patent states: "A device according to claim 19, wherein the formulation further comprises ethanol."  (DTX 300_2).

771.    Claim 26 of the Marecki 539 Patent states: "A device according to claim 25, wherein the formulation further comprises oleic acid."  (DTX 300_2).

772.    Thus, instead of suggesting that a known surfactant such as oleic acid would be a necessary component for any such albuterol sulfate HFA-134a formulations, these claims of the Marecki 539 Patent would reinforce the reasonable expectation of the person of ordinary skill in the art that at least the albuterol sulfate formulations containing about 5 to about 15% ethanol identified in the Purewal 777 application would have comparable properties without the presence of oleic acid.

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

773.    Lastly, 3M represented to the USPTO that the chain of Marecki applications descending from the 133 Application, which includes the Marecki 539 Patent, disclose surfactant-free suspensions.

774.    In attempting to provoke a patent interference with certain Glaxo patents, 3M filed with the USPTO a Supplemental Preliminary Amendment and Request That an Interference Be Declared Under 37 C.F.R. § 1.607 ("Request for Interference"), dated May 9, 2000.  (DTX 10_654; DTX 15; DTX 1996_16-52).

775.    Therein, in attempting to obtain the benefit of the filing date of the Marecki chain of applications for 3M's pending Schultz claims to surfactant-free formulations, they argued to the USPTO that "disclosure of such surfactant-free formulations in the chain of Marecki applications is in fact a disclosure of the formulations of applicants Schultz et al., including surfactant-free suspensions, and applicants claim the benefit of the disclosure of the formulations in these earlier applications back to the December 21 1990 filing date of the earliest Marecki application in the chain." (DTX 15_40).

776.    This provides additional support for the view that the Marecki 539 Patent discloses formulations in which "[o]ptional excipients include cosolvents (e.g., ethanol, water) and *surfactants*…" (DTX 300_5 (6:52-54) (emphasis added).

### 4.  Other References

777.    Defendants also contend that two additional references would have further supported a reasonable expectation of success, particularly for a pharmaceutical suspension aerosol formulation containing ethanol without surfactant.

778.    The first reference, Azmacort, is a previously marketed MDI product described as containing a suspension formulation of drug, CFC 12 and ethanol (1% by weight).  (DTX 806_4).

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

779.    The description of the Azmacort product does not include identification of any surfactant. (DTX 806_4).

780.    Plaintiffs' expert, Dr. Byron, acknowledged that the Azmacort product is within the scope of the prior art to the asserted claims of the 152 Patent.

781.    The second reference, the Mullins 533 Patent, is a U.S. patent entitled "Aerosol Solid Medicament in Propellant and Low-Level Ethanol Dispersed-Solid Reflocculation." (DTX 805_2).

782.    Plaintiffs' expert, Dr. Byron, acknowledged that the Mullins 533 Patent is within the scope of the prior art to the asserted claims of the 152 Patent.

783.    The examples in the Mullins 533 Patent are directed to pharmaceutical suspension aerosol compositions containing CFC 12, CFC 114 and ethanol. (DTX 805_4-5).

784.    The Mullins 533 Patent states: "The presence of ethanol as a constituent of the liquid carrier is critically essential for the preparation of satisfactory self-propelling medicated compositions contemplated by the present invention.  The ethanol, while also serving as additional diluent for the suspended medicated particles, is absolutely essential to prevent agglomeration or settling out of the medicated particles.  The discovery that ethanol can be utilized for the prevention of agglomeration or settling out of the medicated particles permits the preparation of stable self-propelling medicated compositions without the necessity of employing other agents, such as surfactants, for this purpose." (DTX 805_3).

785.    The Court concludes that both of these references, the Azmacort product and the Mullins 533 Patent, provide further support for Dr. Dalby's opinions regarding reasonable expectation of success, particularly for a pharmaceutical suspension aerosol formulation containing ethanol without surfactant.

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

786.    Although these references involve the prior art CFC propellants, each reference demonstrates that a person of ordinary skill in the art would be aware that a surfactant was not "required" or "necessary" for a pharmaceutical suspension aerosol formulation, at least where the formulation contained ethanol.

787.    In addition, the Court concludes that, considered together, the Purewal 777 Application, the Greenleaf Declaration, the Azmacort product, and the Mullins 533 Patent provide clear and convincing evidence that a person of ordinary skill in the art would have had a reasonable expectation of success in arriving at the subject matter of the asserted claims of the 152 Patent by simply removing any "surfactant" from the formulations of the Purewal 777 Application, particularly given the presence of ethanol in the preferred range of about 5 to 15% in the formulations claimed by the Purewal 777 Application.

#### iv.  The 152 Patent: Secondary Considerations

788.    In addition to the findings outlined above, the Court also finds that the plaintiffs have failed to present evidence of secondary considerations sufficient to rebut the *prima facie* case of obviousness.

789.    The Court examines these secondary considerations—namely failure of others, copying, long felt need, unexpected properties, skepticism, and commercial success—separately below.

790.    Secondary considerations of nonobviousness cannot overcome a strong *prima facie* case of obviousness.  *Sundance, Inc.* v. *DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1368 (Fed. Cir. 2008).

791.    Even if the Court finds there to be evidence of secondary considerations, this does not require a finding of nonobviousness.  *Richardson-Vicks Inc. v. Upjohn Co.*, 122 F.3d 1476, 1483 (Fed. Cir. 1997).

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

### 1. Nexus

792.    The patentee bears the initial burden of coming forth with a nexus between the evidence presented and the merits of the claimed invention.  *W. Union Co. v. MoneyGram Payment Sys., Inc.*, 626 F.3d 1361, 1372 (Fed. Cir. 2010); *In re GPAC*, 57 F.3d 1573, 1580; *In re Paulsen*, 30 F.3d 1475, 1482 (Fed. Cir. 1994); *see also Apple, Inc. v. Samsung Elec. Co.*, No. 11-cv-01846-LHK, 2012 WL 2571719, at *22 (N.D. Cal. June 30, 2012).

793.    This nexus must also connect the secondary consideration to "the patentably distinct feature of the invention."  *Rolls-Royce, PLC v. United Techs. Corp.*, 603 F.3d 1325, 1340 (Fed. Cir. 2010); *see, also, In Re Huai-Hung Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011) ("Where the offered secondary consideration actually results from something other than what is both claimed and *novel* in the claim, there is no nexus to the merits of the claimed invention.")(emphasis in original); *Institut Pasteur & Universite Pierre Et Marie Curie v. Focarino* 738 F.3d 1337, 1347 (Fed. Cir. 2013) ("To be afforded substantial weight, the objective indicia of non-obviousness must be tied to the novel elements of the claims at issue."); *Tokai Corp. v. Easton Enters., Inc.*, 632 F.3d 1358, 1369-70 (Fed. Cir. 2011) (declining to find nonobviousness based on secondary considerations when success of the invention was attributable to a known prior art element).

794.    Every asserted claim of the 152 Patent includes the claim element, "wherein the formulation is further characterized in that it contains no surfactant."  (JTX 1_12).

795.    Plaintiffs' experts have assumed that ProAir HFA is an embodiment of the 152 Patent.

796.    However, plaintiffs have offered no testing or proof that demonstrates that plaintiffs' product "contains no surfactant."

797.    ███████████████████████████████████████████████████

███████████████████████████████████████

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

798.  

799.

800.  For this reason alone, all the evidence on secondary considerations proffered by plaintiffs is based on a false assumption, and is irrelevant to the patent obviousness inquiry.

801.  Therefore is no nexus between any of the evidence plaintiffs proffered and any asserted claim of the 152 Patent.

802.  In addition, as discussed in more detail below, plaintiffs' experts have asserted that ProAir HFA's plume properties, including aspects such as plume temperature, plume velocity, as well as its "stability" and its manufacturing process are properties of ProAir HFA that give rise to secondary considerations.

803.  Plume properties, including but not limited to plume temperature and plume velocity, are not claimed in the 152 Patent.

804.  Further, plaintiffs have failed to show that plume properties are related to any claimed, novel feature of the 152 Patent claims.  (JTX 1_12).

805.  Therefore, there is no nexus between any "plume properties" and the 152 Patent.

806.  Stability is not a claimed feature of the 152 Patent.  (JTX 1_12).

807.  Further, plaintiffs have failed to show that formulation stability is related to any claimed, novel feature of the 152 Patent.

808.  Therefore, there is no nexus between any "stability" of the formulation and the 152 Patent.

809.  There are no manufacturing processes claimed in the 152 Patent.  (JTX 1_12).

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

810.    Further, plaintiffs have failed to show that any manufacturing process is related to any claimed, novel feature of the 152 Patent.

811.    Therefore there is no nexus between any "manufacturing process" and the 152 Patent.

812.    Further, none of plaintiffs' experts have analyzed the six patents besides the 152 Patent and the 445 Patent that have been listed in the Orange Book by plaintiffs for ProAir HFA to determine what portion of any alleged asserted secondary consideration derives from the claims of these patents. (DTX 163; DTX 164; DTX 284; DTX 285; DTX 291; DTX 292; DTX 714; DTX 814; DTX 1149).

813.    For this additional reason, plaintiffs have failed to prove that a nexus exists between their asserted secondary considerations and the 152 Patent.

814.    Arguments concerning nexus to each secondary consideration are further addressed below.

## 2.   Failure of Others / Copying

815.    Failure of others is only probative if "prior attempts failed because the devices lacked the claimed features." *Ormco Corp. v. Align Tech., Inc.,* 463 F.3d 1299, 1313 (Fed. Cir. 2006).

816.    "Absent a showing of long-felt need or the failure of others, the mere passage of time without the claimed invention is not evidence of nonobviousness." *Iron Grip Barbell Co., Inc. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004).

817.    "Copying" is not "compelling" evidence of nonobviousness "in the ANDA context where a showing of bioequivalency is a prerequisite for FDA approval." *Purdue Pharma Products L.P. v. Par Pharm., Inc.*, 377 F. App'x 978, 983 (Fed. Cir. 2010). *See also Bristol-Myers Squibb Co. v. Teva Pharm. USA, Inc.*, 923 F. Supp. 2d 602, 676-77 (D. Del. 2013).

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

818.    In their supplemental interrogatory answers, plaintiffs asserted "secondary considerations" for the 152 Patent that included "succeeded despite the failure of others" and "were copied by others."  (DTX 1735_06).

819.    None of plaintiffs' experts addressed failure of others or copying.

820.    Plaintiffs have not cited any evidence to support the existence of "failure of others" or "copying."

821.    Dr. Dalby has opined that he is unaware of the existence of any "failure of others" or "copying" concerning the 152 Patent or ProAir HFA.

822.    Dr. Dalby opined that, to the contrary, others at Glaxo and Schering succeeded in developing the formulation claimed in the 152 Patent nearly simultaneously with 3M.  (JTX 2_429; DTX 1119; DTX 1157; DTX 1160).

823.    In addition, at least by 1989, an albuterol sulfate formulation covered by the asserted claims of the 152 Patent had been produced by employees of 3M not listed as named inventors on the 152 Patent.  (DTX 299_1-2, 6).

824.    Accordingly, the Court finds no evidence of failure of others or copying that would be probative of nonobviousness.

### 3.  Long Felt Need

825.    To be a long felt, unsolved need, a need must be: (1) persistent and recognized by those of ordinary skill in the art; (2) not satisfied by another before the alleged invention; and (3) the claimed invention itself must satisfy the long felt need.  *In re Gershon*, 372 F.2d 535, 538 (C.C.P.A. 1967); *Newell Cos. v. Kenney Mfg. Co.*, 864 F.2d 757, 768 (Fed. Cir. 1988*)*; *In re Cavanagh*, 436 F.2d 491, 496 (C.C.P.A. 1971).

826.    "Where the differences between the prior art and the claimed invention are . . . minimal . . . it cannot be said that any long-felt need was unsolved." *Geo. M. Martin Co. v. Alliance Mach. Sys. Int'l. LLC*, 618 F.3d 1294, 1304 (Fed. Cir. 2010).

827.    "We look to the filing date of the challenged invention to assess the presence of a long-felt and unmet need." *Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 998 (Fed. Cir. 2009).

828.    "Long-felt need is analyzed as of the date of an articulated identified problem and evidence of efforts to solve that problem." *Texas Instruments Inc. v. U.S. Int'l. Trade Comm'n*, 988 F.2d 1165, 1178 (Fed. Cir. 1993).

829.    "Absent a showing of long-felt need or the failure of others, the mere passage of time without the claimed invention is not evidence of nonobviousness." *Iron Grip Barbell Co., Inc. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004).

830.    Any claim of a long felt but unresolved need must be grounded in a careful analysis of the many alternatives in development and in the marketplace. *Hoffmann-La Roche Inc. v. Apotex Inc.*, CIV.A. 07-4417 SRC, 2012 WL 1637736 at *19 (D.N.J. May 7, 2012) *reconsideration denied*, CIV.A. 07-4417 SRC, 2013 WL 323335 (D.N.J. Jan. 25, 2013).

831.    Plaintiffs' expert Dr. Berger argued that a long felt need for replacement or improvement of albuterol CFC MDI's existed, and was satisfied by ProAir HFA.

832.    However, Dr. Berger did not tie satisfaction of any alleged "long felt need" to any claimed, novel feature of the 152 Patent.

833.    Dr. Berger also failed to tie any long felt need to the lack of surfactant or the presence of a particular percentage of ethanol in the formulation.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

834.    To the extent any "need" existed, plaintiffs did not demonstrate any nexus between any novel, claimed features of the 152 Patent and the alleged "need" satisfied by ProAir HFA.

835.    As discussed above, ProAir HFA is not a commercial embodiment of the 152 Patent.

836.    To the extent Dr. Berger claims there was a "long felt need" for a propellant to replace CFCs, the Purewal 777 Application had disclosed an HFA formulation with the exact same range of ethanol claimed in the 152 Patent.  (DTX 120_8-9).

837.    Therefore, there is no nexus between any alleged "long felt need" and a claimed novel feature of the 152 Patent.

838.    To the extent Dr. Berger and plaintiffs claim there was a long felt need for ProAir HFA's plume properties, as an initial matter, plaintiffs have failed to show any nexus between ProAir HFA's plume properties and claimed, novel features of the 152 Patent.

839.    Dr. Berger did not identify which claimed features of the 152 Patent are novel.

840.    Dr. Berger has not explained which claims of the 152 Patent or which elements of ProAir HFA's formulation relate to ProAir HFA's plume features, including plume temperature or plume velocity.

841.    Dr. Berger has not made any attempt to determine whether any of ProAir HFA's properties derive from unasserted patents which are or were listed in the Orange Book for ProAir HFA.  (DTX 163; DTX 164; DTX 284; DTX 285; DTX 291; DTX 292; DTX 714; DTX 814; DTX 1149).

842.    Plaintiffs have also failed to show any nexus between ProAir HFA's particle size, lung distribution, or use of spacers and the claimed, novel features of the 152 Patent for the same reasons discussed for plume properties.

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

843.    Dr. Berger has not explained which claims of the 152 Patent or which elements of ProAir HFA's formulation relate to ProAir HFA's particle size, lung distribution, or use of spacers.

844.    Therefore, as an initial matter, plaintiffs have failed to show any nexus between any alleged "long felt need" and any novel, claimed features of the 152 Patent.

845.    Dr. Berger conceded that he did not conduct any analysis in order to determine whether any other HFA products or formulations satisfied the long felt need for a CFC replacement before the 152 Patent or ProAir HFA.

846.    Plaintiffs have failed to analyze the closest prior art to the 152 Patent in order to determine whether any alleged "need" was already addressed by that art.

847.    Plaintiffs have failed to analyze whether there were significant differences between the 152 Patent and its closest prior art that would give rise to a purported "need."

848.    Therefore Dr. Berger failed to conduct the analysis necessary to determine whether any long felt need existed.

849.    Regardless, defendants' expert Dr. Raoul Wolf (whom the Court finds credible, and whose testimony is consistent with the evidence of record) opined that there was no long felt need that was satisfied by the 152 Patent, and/or ProAir HFA.

850.    Dr. Berger admitted that any alleged "need" did not exist before the enactment of the Montreal Protocol in 1989.

851.    According to both Dr. Wolf and Dr. Berger, before the Montreal Protocol, CFCs were well accepted medications.

852.    There was concern in the industry about switching patients from the "reliable and effective" CFC medications.  (DTX 709_3).

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

853.    There was no recognized physician or patient driven clinical "need" to improve CFCs. (*See* JTX 39_10).

854.    While Dr. Berger has argued that patients did not like the old CFC plume and some refused to take it, he has provided no evidence to demonstrate this, besides review articles describing the CFC plume as cold and hard.

855.    Dr. Wolf opined that many patients were unhappy with the taste and feel of the HFAs during the transition from CFCs, and many preferred the taste of the CFCs.

856.    Dr. Wolf has opined that many patients felt CFCs met their needs.

857.    Many patients specifically had complaints about ProAir HFA.  (DTX 1309; DTX 2039).

858.    While Dr. Berger claimed that physicians were worried that CFCs would be removed from the market, he presented no documentation demonstrating this fear.

859.    The Court is persuaded by Dr. Wolf that no such fear existed.

860.    In fact, albuterol CFC MDI inhalers were exempt from the initial phase out of the Montreal Protocol.

861.    Physicians expected that CFCs would remain on the market until a clinically suitable alternative was developed.

862.    In fact, CFCs did remain on the market until a clinically suitable alternative was developed.

863.    CFCs were not phased out until sufficient replacements were identified, this happened 20 years after the Montreal Protocol was enacted.  (*See, e.g*., DTX 25).

864.    Therefore, there was never any urgent clinically based "need" to replace CFCs.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

865.    Dr. Berger and Dr. Wolf agree that the primary clinical "need" in the pharmaceutical industry is for patients to take their rescue inhalers and reduce their use of albuterol MDIs, including ProAir HFA.  (*See* JTX 40; DTX 1305; DTX 1306).

866.    The development and increased use of inhaled corticosteroids satisfied a real, clinically driven "need."

867.    ProAir HFA has done nothing to solve this need.

868.    Dr. Berger conceded that in the pharmaceutical industry, development of a new product typically takes 5-10 years.

869.    In this case, Dr. Berger stated that the Montreal Protocol first went into effect in 1989. The Purewal 777 Application was published in 1990.  (DTX 120_1).

870.    Airomir HFA entered the market in 1995.  (DTX 818_9).

871.    Therefore, to the extent there even was a "need" for an HFA replacement formulation, this need was not "long felt," based on the publication of the Purewal 777 Application, and the introduction of Airomir HFA to the market.

872.    ProAir HFA is not a clinically significant advancement in the treatment of asthma, COPD, or EIB, and therefore does not satisfy any long felt need.

873.    While Dr. Berger cites studies he claims demonstrated differences in features such as plume temperature, plume velocity, lung deposition, and particle size between CFC and HFA MDIs, none of these studies were conducted in human patients.

874.    Dr. Wolf opines that studies in human patients are much more reliable.

875.    Dr. Wolf further opines that *in vitro* studies are a poor substitute to measure properties of Albuterol MDIs.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

876.    A review article cited by Dr. Berger discussed *in vitro* plume differences between CFC and HFA products, then stated "[t]he differences in drug delivery between albuterol HFA MDI and albuterol CFC MDI . . . are small, probably not clinically relevant."  (DTX 212_4).

877.    The only available data in patients comparing albuterol HFA formulations and albuterol CFC formulations indicate that HFA formulations do not have safety or efficacy advantages, regardless of the *in vitro* results concerning plume properties.  (JTX 37_5-6; DTX 1994_1-4; DTX 705_1-2).

878.    In fact, Albuterol HFA MDIs may have slightly increased toxicity over the Albuterol CFC MDIs.  (JTX 37_5-6).

879.    Clinical studies in patients provide no evidence of any "need" to replace CFCs based on clinical safety or efficacy.

880.    The only comparison in patients between ProAir HFA and another HFA Product was the ProAir HFA and Proventil HFA comparison in the ProAir HFA NDA.

881.    IVAX reported to FDA and physicians that the two products were equivalent in terms of both safety and efficacy.  (DTX 20_16-18; DTX 2042_6).

882.    Therefore, there could be no clinical need for ProAir HFA that Proventil HFA did not already solve.

883.    Proventil HFA has the same ingredients as Airomir HFA, including ethanol, HFA-134a, and oleic acid.  (S*ee. e.g.*, DTX 208_1; DTX 818_12).

884.    152 Patent inventor and 3M corporate representative witness Dr. David Schultz testified that Proventil HFA and Airomir HFA are the "same product."

885.    The formulation ingredients in Proventil HFA also fall within the range of options described in Purewal 777 Application.  (DTX 120).

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

886.    Plaintiffs rely on the Jacquelyn Cruz McCabe et al., ProAir® HFA Delivers Warmer, Lower-Impact, Longer-Duration Plumes Containing Higher Fine Particle Dose Than Ventolin® HFA, 25 J. AEROSOL MED. & PULMONARY DRUG DELIVERY 104 (2011) ("McCabe") and Julia Hautmann et al., Effect of Time Between Actuation on the Dose Variability for Three Metered Dose Inhalers, RESPIRATORY DRUG DELIVERY EUROPE (2013) ("Hautmann"). (DTX 181; DTX 697).

887.    However, Dr. Wolf opines these papers merely contain *in vitro* data and, therefore, do not demonstrate any results which are meaningful for patients.

888.    Any conclusions about patient experience or efficacy in patients from these papers is mere speculation.

889.    Dr. Wolf opines that there has been no demonstration that properties such as plume temperature, plume velocity, or any particle size differences among HFAs result in any meaningful clinical difference in patients.

890.    With respect to the comparison between albuterol CFC and albuterol HFA products concerning those properties, *in vitro* differences did not translate to differences in patients.

891.    Further, there are no meaningful differences, even using *in vitro* measurements measuring plume properties and particle size, demonstrated by McCabe or Hautmann.

892.    McCabe only compares ProAir HFA and Ventolin HFA.  (DTX 181)

893.    Therefore McCabe provides no information regarding comparisons between ProAir HFA and Proventil HFA.

894.    Hautmann shows that ProAir HFA has similar plume temperatures with Ventolin HFA and Proventil HFA, contradicting the results of McCabe.  (DTX 697_4).

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

895.    Hautmann shows only a minimal difference in plume velocity between ProAir HFA and Proventil HFA.  (DTX 697_4-5).

896.    

897.    Dr. Berger conceded that Proventil HFA increased lung deposition over the CFCs.

898.    To the extent there was a long felt need for increased lung deposition, it was solved by Proventil HFA.

899.    The discussion concerning ProAir HFA's plume characteristics and lung deposition below in Section (III)(D)(vii)(4) is incorporated by reference.

900.    In addition to the clinical evidence, physicians and patients do not perceive that ProAir HFA has any clinical benefits over other HFA MDIs, such as Ventolin HFA and Proventil HFA.

901.    

902.    

903.    Not one of Dr. Wolf's thousands of patients has ever requested ProAir HFA over Proventil HFA or Ventolin HFA because of its plume properties.

904.    In the eyes of physicians and patients, plume properties of ProAir HFA are simply not relevant to clinical safety or efficacy.

905.    In the eyes of physicians and patients, plume properties of ProAir HFA are simply not relevant to patient experience.

906.    There is no actual evidence that patients prefer the plume of ProAir HFA over Ventolin HFA, Proventil HFA, or any previously-marketed CFC.

907.    No survey or study comparing patient preferences among these products has ever been conducted.

908.    In fact, there are a high number of complaints concerning ProAir HFA.  (DTX 26; 28_2-3).

909.    The Court finds that physicians own lack of preference for ProAir HFA over Proventil HFA indicates that there was no "need" for the 152 Patent, the 445 Patent, or ProAir HFA that was not already solved by Proventil HFA (or similar formulations such as Airomir HFA or the Purewal 777 Application) and other competitors.

910.    Physicians believe that ProAir HFA is clinically interchangeable with its albuterol HFA competitors, including Proventil HFA and Ventolin HFA.

911.    Dr. Wolf writes prescriptions generically unless there are cost or formulary reasons.

912.    Therefore, there was no long felt "need" for ProAir HFA's plume characteristics that were not also satisfied by Proventil HFA and Ventolin HFA.

913.    Plaintiffs' own advertising fails to tout any safety or efficacy differences between ProAir HFA and other compounds that would be attractive to a physician.  (*See, e.g.*, DTX 719).

914.    The only advertising comparing the safety and efficacy of ProAir HFA that plaintiffs' have produced highlights that it is comparable to Proventil HFA.  (DTX 20_16-18; DTX 2042_6).

915.    Plaintiffs themselves realize that ProAir HFA has no safety or efficacy advantages over its HFA competitors.  (DTX 19_3; DTX 21_2-3).

916.    Dr. Berger and plaintiffs made no attempt to demonstrate, even if physicians had a preference for ProAir HFA over other HFA products, that any preferences were not derived from one of the many other features touted in plaintiffs' advertisements.  (DTX 719).

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

917.    While Dr. Berger claimed that ProAir HFA eliminated the use for spacers, he provided no evidence to prove this.

918.    Dr. Wolf still prescribes spacers to the majority of his patients.

919.    Spacers still improve penetration into the lung with HFA products.  (DTX 1310).

920.    Spacers are used to correct poor technique in using albuterol MDIs.

921.    Technique is still an issue with HFAs including ProAir HFA.

922.    Dr. Berger testified at deposition that Proventil HFA also eliminated the need for spacers.

923.    Dr. Dalby opined that he is unaware of any long felt need related to the 152 Patent or the 445 Patent.

924.    Accordingly, for at least these reasons, the Court finds no evidence of long felt need that would support any claim of nonobviousness.

### 4.  Unexpected Properties

925.    Unexpected properties require a nexus with a feature of the claimed invention not found in the prior art.  *In Re Huai-Hung Kao*, 639 F.3d 1057, 1068, 1069 (Fed. Cir. 2011).

926.    "Unexpected results that are probative of nonobviousness are those that are 'different in kind and not merely in degree from the results of the prior art.'"  *Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 739 (Fed. Cir. 2013).

927.    Results must be both superior and unexpected over the closest prior art.  P*fizer, Inc. v. Apotex Inc.*, 480 F.3d 1348, 1369-71 (Fed. Cir. 2007).

928.    "[W]hen unexpected results are used as evidence of nonobviousness, the results must be shown to be unexpected compared with the closest prior art."  *In re Baxter Travenol Labs.*, 952 F.2d 388, 392 (Fed. Cir. 1991).

929.    Dr. Byron and Dr. Myrdal opined that the claims of the 152 Patent were "unexpected," because a person of ordinary skill would not have expected the formulations to be "stable."

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

930.    As an initial matter, as discussed above, stability is not a claimed feature of the 152 Patent.  (JTX 1_12).

931.    Further, plaintiffs have failed to show that formulation stability is related to any claimed, novel feature of the 152 Patent.

932.    Therefore, there is no nexus between any "stability" and the 152 Patent.

933.    Even if a nexus between "stability" and the 152 Patent could be demonstrated, Dr. Byron and Dr. Myrdal did not compare the claimed invention to the closest prior art, the Purewal 777 Application, to determine if it had superior stability.

934.    Dr. Byron and Dr. Myrdal do not compare formulations of the claimed invention with any prior art in order to show that the claimed formulations have "superior" stability to any prior art formulations.

935.    Routine bottle studies using a surfactant free formulation as a control would have, and did, reveal that the formulations without a surfactant were stable.  (*See, e.g.,* DTX 54_114-115; DTX 56_49-50; DTX 299_1-2, 6).

936.    Others had already succeeded in developing formulations without a surfactant.  (DTX 10_429; DTX 1119; DTX 1157; DTX 1160; DTX 299_1-2, 6).

937.    Dr. Dalby opined that the 152 Patent formulations would not be expected to be "poor suspensions" because of Ostwald ripening due to ethanol content.

938.    The formulations of the Purewal 777 Application have similar amounts of ethanol to the 152 Patent formulations, plus a surfactant (DTX 120_8-9).

939.    Dr. Dalby opined that one of ordinary skill would expect the 152 Patent formulations to be less susceptible to Oswald ripening than those in Purewal 777 Application.

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

940.    Dr. Dalby has opined that the Norton document cited by Dr. Myrdal would not support a conclusion that it was unexpected for a suspension aerosol formulation without a surfactant to be stable.  (DTX 1297).

941.    To the extent plaintiffs' argue that there is a nexus between the 152 Patent and any plume or lung deposition properties, *see* Section (III)(D)(vii)(4).

942.    Dr. Dalby opined that he is unaware of any unexpected properties related to the 152 Patent.

943.    Accordingly, for at least these reasons, the Court finds no evidence of unexpected properties that would support any claim of nonobviousness.

### 5.  Skepticism

944.    Skepticism must have the requisite nexus to the claimed invention.  *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1328 (Fed. Cir. 2008).

945.    As an initial matter, as discussed above, stability is not a claimed feature of the 152 Patent.  (JTX 1_12).

946.    Further, plaintiffs have failed to show that formulation stability is related to any claimed, novel feature of the 152 Patent.

947.    Therefore there is no nexus between any "stability" and the 152 Patent, to the extent plaintiffs assert there was "skepticism" that the 152 Patent formulations would be stable.

948.    Dr. Myrdal stated that a person of ordinary skill in the art "would have been skeptical" that the 152 Patent formulations would be stable.

949.    However, neither Dr. Byron nor Dr. Myrdal identified any actual, real world skepticism in the field regarding the 152 Patent.

950.    Neither Dr. Byron nor Dr. Myrdal discuss the closest prior art to the 152 Patent with respect to skepticism.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

951.    Others had already developed surfactant-free formulations as well as formulations with ethanol.  (DTX 120; DTX 1119; DTX 1157; DTX 1160).

952.    In addition, routine bottle studies using no-surfactant formulations as a control would have been and were conducted.  (*See, e.g.,* JTX 2_429; DTX 54_114-115; DTX 56_49-50; DTX 120; DTX 299_1-2, 6).

953.    The surfactant free formulations and routine bottle studies would have eliminated any hypothetical skepticism.

954.    Dr. Dalby opined that he is unaware of any skepticism related to the 152 Patent.

955.    Accordingly, for at least these reasons, the Court finds no evidence of skepticism that would support any claim of nonobviousness.

### 6.  Commercial Success

956.    Commercial success is "only significant if there is a nexus between the claimed invention" and the commercial success at issue."  *See, e.g., Ormco Corp v. align Tech., Inc*., 463 F.3d 1299, 1311-12 (Fed. Cir. 2006).

957.    "If the commercial success is due to an unclaimed feature of the device, the commercial success is irrelevant.  So too if the feature that creates the commercial success was known in the prior art, the success is not pertinent."  (*Id*. at 1312); see, also, *Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 740 (Fed. Cir. 2013).

958.    Moreover, "the asserted commercial success of the product must be due to the merits of the claimed invention beyond what was readily available in the prior art."  *See J. T Eaton & Co. v .Atlantic Paste & Glue Co.*, 106 F.3d 1563, 571 (Fed. Cir. 1997).

959.    Where a product has many features—both patented and unpatented—a patentee "must … show that the infringing feature drives consumer demand" to establish "nexus."  *See Apple, Inc. v. Samsung Elecs. Co.*, 695 F.3d 1370, 1375 (Fed. Cir. 2012).

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

960.    The mere fact that generic pharmaceutical companies seek approval to market a generic version of a drug, without more, is not evidence of commercial success that speaks to the nonobviousness of patent claims. *Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 740 (Fed. Cir. 2013).

961.    Commercial success due to preexisting market advantage or success "carries little weight." *Geo. M. Martin Co. v. Alliance Mach. Sys. Int'l. LLC*, 618 F.3d 1294, 1304 (Fed. Cir. 2010).

962.    Dr. Hausman claims that a nexus exists between ProAir HFA's alleged success and its plume properties.

963.    As an initial matter, however, plaintiffs have failed to show any nexus between ProAir HFA's plume properties and claimed, novel features of the 152 Patent.

964.    Dr. Hausman did not identify which claimed features of the 152 Patent are novel.

965.    Dr. Hausman has not explained which claims of the 152 Patent, or which elements of ProAir HFA's formulation or orifice size, relate to ProAir HFA's plume features.

966.    As discussed above, ProAir HFA is not a commercial embodiment of the 152 Patent.

967.    Dr. Hausman has not made any attempt to determine which portion of ProAir HFA's market performance derives from the 152 Patent, and which derives from the purported inventions of unasserted patents which are or were listed in the Orange Book for ProAir HFA. (DTX 163; DTX 164; DTX 284; DTX 285; DTX 291; DTX 292; DTX 714; DTX 814; DTX 1149).

968.    Even if plaintiffs could show a nexus between the plume properties and novel claims of the 152 Patent, Dr. Hausman and plaintiffs have failed to show any nexus between ProAir HFA's sales and its plume properties.

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

969.    Plaintiffs' advertising touts many product features besides ProAir HFA's plume, some of these include the dose counter, storage orientation, 24-month expiration, no need for repriming after dropping, and no need to store in a moisture resistant pouch.  (DTX 95_19; DTX 719_1).

970.    Dr. Hausman has not made any attempt to determine, to the extent patients demand ProAir HFA because of its product features, whether patients demand ProAir HFA for any of the other listed product features.  (DTX 95_19; DTX 719_1).

971.    None of these touted features are claimed features, and thus they have no nexus to the claimed invention (DTX 95_19; DTX 719_1).

972.    ProAir HFA's sales are due to many things other than its product features, including its marketing efforts, managed care access, and patient education programs.  (*See, e.g.,* DTX 95_19).

973.    Defendants' expert, Dr. Joel Hay (whom the Court finds credible, and whose testimony is consistent with the evidence of record), opined that ProAir HFA's plume advertising has no nexus to its sales.

974.    Dr. Hausman presented no evidence to show that Teva's plume advertising began before 2010.  (DTX 95_19).

975.    Dr. Hausman cited a 2007 document to show that plume advertising to differentiate HFAs began in 2007; however, this is incorrect.

976.    That document was only discussing ProAir HFA's plume properties in comparison to CFC products, all of which were phased out and are no longer on the market.  (DTX 90_57).

977.    ProAir HFA's SABA category share peaked in 2009.  (DTX 258; DTX 2044).

978.    Therefore, Dr. Hay has opined that there is no evidence that the plume advertising impacted market share.

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

979.    Dr. Hausman has cited no market research to show that physicians or patients are interested in, much less prefer, ProAir HFA's plume properties.

980.    Indeed, as discussed below, the evidence shows that neither physicians nor patients cared about ProAir HFA's plume properties.

981.    While Dr. Hausman cites a 2010 memo to indicate that its sales force should stress that ProAir HFA's plume properties are related to the presence of ethanol, this document was "not for promotion," and it also does not indicate that the plume properties are related to the ethanol percentages claimed in the 445 Patent and the 152 Patent.  (DTX 724_3-4).

982.    Dr. Hausman, Dr. Byron, and Dr. Myrdal have argued that a two-step filling process is made possible by the presence of ethanol in ProAir HFA's formulation and in the formulations claimed by the 152 Patent and the 445 Patent.

983.    However, two-step filling is not a claimed feature.

984.    Nor have any of plaintiffs' experts shown that the particular percentages of ethanol claimed in the 152 Patent are required for the two-step filling process.

985.    Dr. Hausman has further argued that this two-step filling process has allowed ProAir HFA to be manufactured more cheaply and contributed to its sales.

986.    However, Dr. Hausman has provided no evidence that plaintiffs' competitors cannot use the two-step filling process.

987.    Dr. Hausman has provided no evidence regarding the manufacturing cost of ProAir HFA or its competitors.

988.    Therefore, the Court finds that plaintiffs have not provided any evidence that plaintiffs' two-step filling process has contributed to its sales.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

989.    Dr. Dalby opined that ethanol was known and used extensively before the 152 Patent, and the Purewal 777 Application was equally amenable to two-step filling.

990.    Dr. Hay has demonstrated that ProAir HFA's commercial performance is not due to any product features but instead to generic confusion, early price advantage, and favorable formulary status in a market where the product features are undifferentiated in fact and in perception.

991.    If any alleged commercial success is unrelated to product features, there cannot be a nexus to the 152 Patent.

992.    The SABA therapeutic category was well established before ProAir HFA entered the market; sales by units sold have remained relatively flat between 1996 and 2012.  (DTX 2044).

993.    Dr. Hay opined that ProAir HFA entered an already established SABA therapeutic category before the CFC to HFA switchover.  (DTX 95; DTX 2044).

994.    Therefore, ProAir HFA was in position to take advantage of this already established market.  (DTX 95; DTX 2044).

995.    ProAir HFA did not have a brand name when it was launched in 2004, and did not have a brand name until 2006.  (DTX 90_14; DTX 20).

996.    The product that would become ProAir HFA was advertised as "the first alternative to the brand name albuterol sulfate HFAs."  (DTX 20_37).

997.    Many physicians and patients incorrectly believed that ProAir HFA was in fact a generic medication; Dr. Wolf recalled this confusion and was confused himself.  (DTX 92_3-4; DTX 104_1).

998.    ████████████████████████████████████████████████████
████████████████████████

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

999.  

1000.  Dr. Hay opined that IVAX used this confusion to achieve a leading market position among HFAs by 2006, just as the CFC to HFA switchover began.  (DTX 258; DTX 2044).

1001.

1002.  Dr. Hay opined that ProAir HFA's lower price contributed to its sales and its market share among the HFAs.

1003.

1004.  By 2008 and 2009, ProAir HFA had a large formulary advantage over Ventolin HFA, Proventil HFA and Xopenex HFA, with greater preferred status.  (DTX 95_19, 22; DTX 105_19).

1005.  Dr. Hay opined that this superior formulary status contributed to ProAir HFA's sales.

1006.

1007.  None of these are attributes of ProAir HFA, much less related to novel claimed features of the 152 Patent or the 445 Patent.

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

1008.    ██████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████

1009.    If ProAir HFA's formulary status is not related to its product features, it cannot be related to any novel, claimed features of the 152 Patent or the 445 Patent.

1010.    ██████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████

1011.    ██████████████████████████████████████████████████

██████████████████████████████

1012.    Regardless of whether formularies usually give preferred status based on safety and efficacy, in the SABA therapeutic category products are undifferentiated on clinical properties.

1013.    Therefore price, rebates and market share alone dictate formulary status.

1014.    Dr. Hay opined that once formularies bestow preferred status, there is inertia to this status being removed, and products often maintain status absent a significant event in the market.

1015.    Dr. Hay and Dr. Wolf opined that physicians consider ProAir HFA to be interchangeable with its SABA therapeutic category competitors.

1016.    ██████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████

1017.    ██████████████████████████████████████████████████

████████████████████████████

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**



1018.

1019.

1020.

1021.

1022.

1023.  Dr. Wolf has also opined that there was no differentiation based on features between ProAir HFA and its SABA therapeutic category share competitors, either based on physician perception or based on actual clinical evidence.  (DTX 19; DTX 20; DTX 21; DTX 26; DTX 28; DTX 90).

1024.

1025.  Dr. Hay opined that ProAir HFA's sales are due to generic confusion, an early price advantage, formulary advantage, and lack of product differentiation.

1026.  Because there is no evidence that consumers demand ProAir HFA over Proventil HFA due to product characteristics, there is no evidence that consumer demand is impacted in any way either by the presence of oleic acid in Airomir HFA or Proventil HFA, or the presence of "no surfactant," or "substantially free of surfactant."

1027.  Because there is no evidence that consumers demand ProAir HFA over Ventolin HFA because of any product characteristics, there is no evidence that consumer demand is impacted by the presence of absence of ethanol.

1028.  ███████████████████████████████████████████████
███████████████████████████████████████

1029.  Dr. Dalby opined that he is unaware of any commercial success related to the 152 Patent and the 445 Patent.

1030.  There is no evidence that consumers choose ProAir HFA because it clogs less.

1031.  Plaintiffs' expert Dr. Hausman opined that ProAir HFA is a commercial success.

1032.  However, even if a nexus between the claims of the 152 Patent and ProAir HFA's commercial performance could be demonstrated, Dr. Hausman has not demonstrated that ProAir HFA is a commercial success.

1033.  Dr. Hausman has not conducted his own analysis concerning what market ProAir HFA competes in.

1034.  Instead, Dr. Hausman cited plaintiffs' documents defining the market in which ProAir HFA competes as the SABA market.

1035.  Dr. Hay opined that many additional products treat the same conditions as SABAs.

1036.  The treatment guidelines for asthma and COPD recommend inhaled corticosteroids should be used preferentially rather than SABAs.  (JTX 40).

1037.  Dr. Hausman has cited ProAir HFA revenues as evidence of ProAir HFA's commercial success, however, these numbers do not take into account ██████████████████████████
███████████████████████████████.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

1038.   Dr. Hausman has also listed something called "gross profits" as evidence of commercial success.

1039.   Gross profit is not an industry term.

1040.   Dr. Hausman did not demonstrate whether gross profits factor in the cost of rebates.

1041.   In any case, the gross profit numbers are not indicative of commercial success.

1042.   For at least these reasons, the Court finds no evidence of commercial success that bears on nonobviousness.

### v.   The 152 Patent: Conclusion

1043.   The Court concludes, for all of the reasons stated above, that defendants have proven, by clear and convincing evidence, that the subject matter of the asserted claims of the 152 Patent would have been obvious.

1044.   Defendants have proven, by clear and convincing evidence, that the Purewal 777 Application created a design need and market pressure to solve the problem of reformulating the existing albuterol CFC MDI products, and that there were a finite number of identified, predictable solutions.

1045.   Defendants have proven, by clear and convincing evidence, that the obvious and practical design around the Purewal 777 Application required evaluation of the exemplified and claimed formulations, particularly those of Example 24, and that, through simple and routine bottle studies like those described in the Purewal 777 Application, a person of ordinary skill in the art would have confirmed their reasonable expectation that the Example 24 formulations were relatively "stable" without any of the listed surfactants—*i.e.*, in a "no surfactant" control formulation.

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

1046.   Although plaintiffs contend that the relative stability of these formulations without surfactant was unexpected, the record evidence as a whole demonstrates the opposite.

1047.   The Court concludes that the Greenleaf Declaration and Marecki 539 Patent, both individually and together, further confirm the reasonable expectation that a "no surfactant" formulation would be comparably stable to those described, claimed and exemplified in the Purewal 777 Application.

1048.   Plaintiffs also contend that the asserted secondary considerations are sufficient to overcome prima facie obviousness.

1049.   The Court disagrees.

1050.   As detailed above, the only possible difference between the subject matter of the asserted claims of the 152 Patent and the prior art is the absence of surfactant.

1051.   Yet plaintiffs offered no evidence linking the absence of surfactant to any of the asserted secondary considerations, and no evidence that the claimed "no surfactant" formulations were an improvement in any respect, including relative to the prior art.

1052.   Even if plaintiffs had proven the required nexus and the Court accepted the evidence of secondary considerations, it would not have been sufficient to overcome the strong prima facie showing of obviousness, particularly in light of the evidence that others independently produced the subject matter of the asserted claims of the 152 Patent.

1053.   Accordingly, the Court concludes that plaintiffs have not proven any secondary consideration sufficient to overcome the clear and convincing evidence of the obviousness of the subject matter of the asserted claims of the 152 Patent.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

### vi. The 445 Patent: The Scope and Content of the Prior Art and the Differences Between the Claimed Subject Matter and the Prior Art

1054.   As a threshold matter, it is important to identify what the 445 Patent covers.[15]

1055.   Essentially, the 445 Patent claims a combination of formulations and spray orifice diameters in a "product."

1056.   Each independent claim requires that the "product" be "suitable for delivering a pharmaceutical formulation."

1057.   The 445 Patent does not provide any standard to measure or evaluate "suitable for delivering," and, therefore, a person of ordinary skill in the art would have understood the 445 Patent to require only that the claimed product be functional.

1058.   Thus, the "suitable for delivering" claim elements in the 445 Patent are a minimum standard, requiring only that the claimed "product" be functional.

### 1. The 152 Patent

1059.   The 152 Patent is the 152 Patent-in-Suit.

1060.   According to the face of the patent, the 152 Patent was filed May 31, 1995 and issued September 12, 2006.  (DTX 2).

1061.   According to 35 U.S.C. § 102(e), the 152 Patent is considered available to the person of ordinary skill in the art at least at the time of the May 31, 1995 filing date stated on the face of the 152 Patent.  (DTX 2).

1062.   As detailed in the chart below, the disclosures of the 152 Patent include: (a) a "method of treating a mammal" by "administering by inhalation a formulation" in an "aerosol canister"; (b) an "aerosol canister equipped with a metering valve, containing" the formulation; (c) a "pharmaceutical suspension aerosol formulation"; (d) "substantially free of surfactant" and "no

---

[15] Plaintiffs have asserted every claim of the 445 Patent.  The Court, therefore, will refer to the asserted claims collectively as "the 445 Patent" where appropriate.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

surfactant"; (e) "albuterol sulfate," "more preferably from about 0.35 to about 0.42 percent by weight of the aerosol formulation"; (f) "the drug is … substantially insoluble in the propellant"; (g) "ethanol," including in the amount of "5 to about 15 percent by weight"; (h) HFA-134a, including in the amount of about 85 to 95% by weight; and (i) an "actuator."  (DTX 2).

1063.   The 152 Patent is within the scope of the prior art to the 445 Patent.

## 2.  Airomir HFA

1064.   Airomir HFA was an HFA MDI aerosol product first marketed in the United Kingdom in March 1995.

1065.   Like the publication of the EP 777 Application, 3M's introduction of Airomir HFA was another landmark event in the MDI aerosol industry, especially because it was the first commercially-available HFA MDI product, as well as the first reformulated MDI product.

1066.   3M's introduction of Airomir HFA also was a major event in the inhalation industry because it was the first marketed MDI aerosol product containing HFA-134a.

1067.   At the time of 3M's introduction of Airomir HFA, the MDI industry evaluated and characterized every aspect of the marketed Airomir HFA product, including analysis of formulation composition and measurement of spray orifice diameter.

1068.   Consistent with industry practice at the time for all new or reformulated MDI products, those in the MDI aerosol industry quickly obtained samples of Airomir HFA for competitive and business planning purposes, including for full product characterization.

1069.   Competing product development teams and others in industry would have attempted to characterize and evaluate every aspect of available Airomir HFA product samples, including through review of literature, quantification of metered volume, analysis of formulation composition, physical determination of particle size, evaluation of container-closure system components, measurement of spray orifice diameter, and other testing and evaluation.

I-2-153

1070.   With respect to formulation composition, a person of ordinary skill in the art would have determined at least through analytical testing that Airomir HFA contained, by weight, about 14% ethanol, about 85% HFA-134a, and about 0.4% albuterol sulfate.

1071.   A person of ordinary skill in the art also would have concluded that Airomir HFA contained less than 1% oleic acid through characterization of the other components.

1072.   Within a couple months of 3M's introduction of Airomir HFA, defendants' MDI expert, Mr. Howlett, personally was involved in evaluation of the Airomir HFA product, including measurement of the spray orifice diameter, using well-known and routine techniques.

1073.   Mr. Howlett testified at length regarding his education, experience, and qualifications.

1074.   Mr. Howlett attended Norfolk College of Arts and Technology at King's Lynn, Norfolk, UK beginning in 1976.

1075.   Mr. Howlett took courses in mathematics, mechanics, electrical engineering, mechanical technology, properties of materials, manufacturing technology, and engineering design, and obtained a Higher National Certificate in Engineering.

1076.   During this time period, Mr. Howlett was enrolled in an indentured Technician Engineering Apprenticeship at Pye Electro Devices Ltd., at Kings Lynn, Norfolk, UK, comprising offsite training at Norfolk College of Arts and Technology in areas like quality, testing, logistics, planning and accounts, and also independent engineering projects.

1077.   Mr. Howlett continued to work full time in 1980 as a production engineer at Pye Electro Devices after the conclusion of his indentured apprenticeship.

1078.   Mr. Howlett was one of the first eight apprentices used to pioneer and refine the Engineering Industries Training Board (EITB) Technician apprenticeship program.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

1079.  Mr. Howlett began work at an MDI products supplier, Bespak, in 1980 as a consumer products development engineer.

1080.  At that time, Mr. Howlett was responsible for the design of new products, development of new and improved devices, testing of products, and customer liaison.

1081.  Initially, Mr. Howlett worked on products such as cosmetic packages, aerosol valves, and fire extinguisher products.

1082.  In 1983, Mr. Howlett continued his work at Bespak as a pharmaceutical products development engineer.

1083.  In this capacity, Mr. Howlett was responsible for the design of new products, development of new and improved devices, testing of products, and customer liaison.

1084.  During this time, Mr. Howlett worked on BK 356 metering valves, metered dose inhaler actuators, including modification of standard actuators (valve fitting, orifice size, color, etc.), and development of client-exclusive products, pharmaceutical pumps, and nasal insulin delivery systems.

1085.  In the same period, while working at Bespak, Mr. Howlett enrolled in the Open University in Milton Keynes, UK.

1086.  In 1985, Mr. Howlett received a Bachelor of Arts (Tech) in Engineering, which is roughly comparable to an undergraduate degree in the United States.

1087.  The coursework underlying this degree included thermo-fluid mechanics, design technology, mathematical modeling, and engineering mechanics of solids and material properties.

1088.  In 1987, Mr. Howlett obtained a Bachelor of Arts (Tech) Honors 1st Class in Engineering, also from Open University.

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

1089.   This degree was equivalent to a two-year post-graduate degree in the United States.

1090.   The coursework underlying this degree included engineering mechanics of solids, materials processing, failure of stressed materials, and engineering product design.

1091.   In 1990, Mr. Howlett was promoted to project manager at Bespak.

1092.   As a project manager, Mr. Howlett was responsible for technical and commercial liaison on Bespak's portfolio of inhalation projects.

1093.   Mr. Howlett had a primary focus on new business development, with both existing and new clients.

1094.   This role involved external promotion, client visits and networking with academia, with a global reach.

1095.   Key product areas included BK357 HFA metering valves, MDI actuators, including modification of standard actuators (valve fitting, orifice size, color, etc.), development of client-exclusive products, bidding for new DPI projects (Glaxo Smith Kline Diskus and Rhone Poulenc Rhorer Ultrahaler), and program coordination of the GSK Diskus Program.

1096.   Major established client programs (typically where a "steering committee" approach was established) were not part of this role (*e.g.*, Glaxo MDI, Norton Waterford, Fisons MDI).

1097.   For both HFA valves and actuators, Mr. Howlett's role would often include the following elements, as required: needs identification (what was the client looking to achieve?), provision of materials, selection of materials, evaluation of client generated data, conducting supportive testing, comparison to published data, problem solving (product and or test methods), and provision of technical data.

1098.   In 1993, Mr. Howlett began work as the manager of the inhalation group at Bespak, which was an expansion of his role as project manager.

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

1099.  Mr. Howlett was responsible for the coordination of the technical capabilities within the pulmonary market.

1100.  In addition to responsibility for development staff in the respiratory field, Mr. Howlett's role comprised new business development, lead identification and development, new client program support, publications and presentations, co-ordination of new equipment investment planning, identification of product line extensions, and technical (troubleshooting) support, as required.

1101.  The technologies Mr. Howlett worked with in this role included MDI valve technology for HFAs, actuator technology for non-CFC propellants, added value actuator technologies, dry powder inhalers, and novel aerosol generation technologies.

1102.  Mr. Howlett continued to handle the technical support elements previously developed as product manager, *i.e.*, needs identification (what was the client looking to achieve?), provision of materials, selection of materials (compatibility, metering volume, container type, orifice geometry, etc.), evaluation of client-generated data (suggesting improvements/optimizations), conducting supportive testing, comparison to published data, problem solving (product and or test methods), and provision of technical data.

1103.  In 1996, Mr. Howlett began work as a technical manager at Bespak.

1104.  This role combined both the technical and commercial elements of the previous roles.

1105.  As technical manager, Mr. Howlett was responsible for the provision of an informed, internal technical consultancy to the technical and commercial operations, covering new business development, techno-commercial negotiations, troubleshooting, PR, and new technology evaluation.

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

1106.  In addition, Mr. Howlett's role focused on improving the technical standing of Bespak within the industry through internal research, publications, presentations, and collaboration and support of external research groups.

1107.  In 2000, Mr. Howlett became the principal research manager pulmonary/manager technology partnering at Bespak.

1108.  Mr. Howlett was responsible for the identification, due diligence, evaluation and progression of new technology opportunities within the field of drug delivery through the following processes: collaborative research projects, technology licensing, acquisitions, mergers, Bespak representative on EPAG, and Bespak contact with ITFG (extractables).

1109.  In 2003, Mr. Howlett founded PharmaDelivery Solutions Ltd.

1110.  Mr. Howlett established PharmaDelivery Solutions Ltd. as a highly specialised consultancy service in the field of drug delivery (especially respiratory) device technology.

1111.  Mr. Howlett is involved in projects involving pulmonary, nasal, and other delivery routes, with an international client base.

1112.  Much of the activity of PharmaDelivery Solutions Ltd. is focused in the area of development program support, regulatory GAP analysis, and generation of development and test programmes, together with data review and contingency evaluation.

1113.  As a result of Mr. Howlett's activities in the field of inhalation drug delivery and device technology, he has held an appointment as Honorary Teaching Fellow in the School of Pharmacy and Pharmaceutical Sciences at the University of Manchester, and as a tutor on the MSc module on inhalation dosage forms.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

1114.  Mr. Howlett has worked with UNIDO and UNDP as an International Technical Expert for assistance in plans to phase out ozone-depleting substances associated with MDIs in support of the Multilateral Fund for the implementation of the Montreal Protocol.

1115.  Mr. Howlett was the nominated UK country expert operating on behalf of the British Standards Institute, assigned to the ISO Technical Committee 84 supporting the development of a new ISO standard (20072) for the design verification of inhalation devices, which is now published as an approved standard.

1116.  Finally, Mr. Howlett has been an invited speaker to a number international conferences presenting on aspects of technology and regulation of inhalation devices, including the Respiratory Drug Delivery conference.

1117.  As noted above, Mr. Howlett personally was involved in evaluation of the Airomir HFA product in 1995, including measurement of the spray orifice diameter, using well-known and routine techniques.

1118.  At Mr. Howlett's direction, using an optical microscope with a traveling micrometer bed, an employee of Bespak, an MDI product supplier, determined that the Airomir HFA spray orifice diameter was approximately 250 microns.

1119.  In addition, for purposes of this case, Mr. Howlett reviewed Airomir HFA documents that plaintiff Norton Healthcare Ltd. submitted to the USPTO in connection with the 445 Patent.

1120.  These Airomir HFA documents corroborate Mr. Howlett's recollections regarding Airomir HFA.  (DTX 818_13).

1121.  In particular, the spray orifice diameter specification document for Airomir HFA states that the "diameter of the spray exit orifice … is within the range 0.2 to 0.3mm."

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

1122.  Mr. Howlett testified credibly that this Airomir HFA specification document further confirmed his recollection that he had determined the Airomir HFA spray orifice to be approximately 250 microns at the time Airomir HFA was introduced.

1123.  Mr. Howlett also testified that, given a specification of 200 to 300 microns, an observed diameter of approximately 250 microns, and expected variability among actual spray orifice diameter from product sample to product sample, a person of ordinary skill in the art would have concluded that Airomir HFA likely had a target specification of about 250 microns, but the actual marketed product would contain a range of spray orifice diameters within the 200 to 300 micron specification, including above and below 250 microns.

1124.  In addition, a person of ordinary skill in the art would have known that the Airomir HFA spray orifice diameter had a manufacturing variance of about plus/minus 10%.

1125.  Accordingly, the Court finds that Airomir HFA was a product: (a) suitable for delivering a pharmaceutical formulation; (b) including an aerosol canister comprising a container closed with a metering valve; (c) containing a pharmaceutical suspension aerosol formulation; (d) containing oleic acid; (e) containing about 0.4% albuterol sulfate by weight, wherein the albuterol sulfate was substantially insoluble in the propellant, HFA-134a;[16] (f) ethanol, in the amount of about 14%; (g) HFA-134a, in the amount of about 85%; (h) an actuator, with a spray orifice of about 250 microns, within a specification of 200 to 300 microns.

1126.  Airomir HFA is within the scope of the prior art to the 445 Patent.

### 3.  Combination of the 152 Patent and Airomir HFA

1127.  As discussed in Section III(D)(iii), a person of ordinary skill in the art would have had a strong motivation to produce the subject matter of the asserted claims of the 152 Patent.

---

[16] The Court finds that the solubility of albuterol sulfate in HFA-134a, in this context, is merely a property of albuterol sulfate.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

1128.   Defendants contend that a person of ordinary skill in the art would have an equally strong motivation to combine the 152 Patent and Airomir HFA to produce the subject matter of the asserted claims of the 445 Patent.

1129.   The Court agrees.

1130.   By the time Airomir HFA was introduced in March 1995, Mr. Howlett's employer at the time, Bespak, offered a range of spray orifice sizes, including a readily available actuator product having a spray orifice diameter of 220 microns, as well as a readily available actuator product having a spray orifice diameter of 250 microns.

1131.   A person of ordinary skill in the art would select an actuator product (and spray orifice diameter) from those readily available from a commercial supplier such as Bespak.

1132.   Within both Bespak and the industry, the smaller spray orifice product options were not limited to solution formulations.

1133.   A person of ordinary skill in the art would have known that narrower spray orifice diameters were used with at least some suspension MDI formulations, and certainly were considered by those of ordinary skill in the art for use with suspension MDI formulations.

1134.   For example, Mr. Howlett personally was involved in marketing the full range of MDI actuator spray orifice sizes (including 220 and 250 microns) for both suspension and solution formulation MDI products, particularly where the formulation contained ethanol.

1135.  Even before Airomir HFA was introduced to the market, at least some of those of ordinary skill in the industry believed that a smaller orifice diameter was considered beneficial and even required for any type of formulation containing ethanol.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

1136.  Mr. Howlett testified that he personally presented these minimum spray orifice diameter products (220 microns) to the MDI aerosol industry for use in both suspension and solutions formulation products, both before and after the introduction of Airomir HFA.

1137.  In addition, at least by 1995, Bespak marketed an MDI actuator with a spray orifice diameter of 250 microns.

1138.  At least by the time Airomir HFA was introduced in March 1995, typical industry practice was to test a range of MDI actuator spray orifice sizes for a new product (or a reformulated product) for the purpose of identifying the smallest spray orifice diameter that did not clog, for both suspension and solution products.

1139.  The development goal was to identify the smallest spray orifice diameter for a given formulation and product that did not result in clogging of the spray orifice.

1140.  This fundamental goal—to prevent clogging—was balanced against the desire to deliver as much drug as possible to the lungs.

1141.  A related consideration was manufacturing capability; it was difficult, at the time, to manufacture actuators with orifice sizes below 200 microns.

1142.  Also at the time, and again in very basic terms, it was believed that a smaller spray orifice diameter resulted in better delivery of the drug to the lungs.

1143.  Consistent with these principles, Mr. Howlett testified that he personally provided a range of actuators to existing and potential Bespak clients with MDI products in development during this 1995-1996 period (and earlier), including the minimum diameter spray orifice actuators (220 microns) for both suspension and solution MDI products.

1144.  These existing and potential Bespak clients would conduct routine clogging tests in which a range of actuators were tested (by periodic actuation), then evaluated for clogging.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

1145.  In the 1995-1996 timeframe, a person of ordinary skill in the art interested in designing an HFA product would have followed this typical practice for a new or reformulated HFA MDI, for the reasons explained above.

1146.  It was believed that, very simply, the smaller the spray orifice diameter, the better the delivery of drug to the lung.

1147.  A person of ordinary skill in the art would not rule out the smallest available spray orifice actuator products simply because a new or reformulated product was a suspension, especially if the suspension contained ethanol.

1148.  Particularly with a new or reformulated product, it was typical industry practice to evaluate and test a range of spray orifice diameters, and select the smallest spray orifice that did not clog during routine clogging tests.

1149.  However, the process for selecting spray orifice diameters for products designed to give similar performance to a reference product already on the market may be somewhat different, as the goal likely would be to provide equivalent performance, rather than to optimize performance without reference to a competitive product.

1150.  In these circumstances, the first priority would be the same specification as a reference product, if available.

1151.  Especially after Airomir HFA was introduced with a spray orifice in the range of 200 to 300 microns, there was an additional strong motivation to minimize spray orifice diameter for a new or reformulated albuterol suspension MDI product.

1152.  A person of ordinary skill in the art involved in development of a new or reformulated HFA MDI albuterol suspension product would select the same size orifice diameter as Airomir

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

HFA—*i.e.*, a spray orifice of about 250 microns based on measurement of sample Airomir HFA product.

1153.  This would be particularly true for HFA products with similar formulations to Airomir HFA, including formulations containing ethanol.

1154.  Persons of ordinary skill in the art would have been motivated to select the same size spray orifice as Airomir HFA, and also to conduct routine clogging tests to evaluate even smaller spray orifices, to compete with and market against Airomir HFA.

1155.  Because spray orifice diameter was believed to be correlated to the amount of drug delivered to the lungs, a person of ordinary skill in the art would be motivated at least by competitive and marketing concerns to develop a product that had the same drug delivery profile as Airomir HFA.

1156.  A person of ordinary skill in the art also would be motivated to conduct routine clogging tests on smaller orifice diameter actuators, especially if they were aware of 3M's spray orifice specification for Airomir HFA allowing a spray orifice diameter between 200 and 300 microns.

1157.  For both competitive and marketing reasons, a person of ordinary skill in the art would have a strong motivation to meet or exceed the specifications of Airomir HFA, particularly for a product with a similar formulation composition.

1158.  Even if a person of ordinary skill in the art concluded that Airomir HFA had a target spray orifice diameter of about 250 microns, they still would have a strong motivation to conduct routine testing of actuator products with smaller diameters, such as Bespak's commercially-available actuator with a 220 micron spray orifice diameter.

1159.  Based on these motivations to combine the 152 Patent and Airomir HFA, defendants' experts compared these references to the subject matter of the 445 Patent.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

1160.  This comparison demonstrates no substantial differences.

1161.  Essentially, from the perspective of a person of ordinary skill in the art, the subject matter claimed in the 445 Patent is a combination of known formulations with known spray orifice diameters.

1162.  Although there are other elements in the claims of the 445 Patent, one of ordinary skill in the art would have recognized that each of these other elements is secondary to the claimed invention—which, very simply, would have been considered by one of ordinary skill to be a combination of known albuterol sulfate HFA MDI compositions at least "substantially free of surfactant" with known minimum size spray orifice actuator products.

1163.  A person of ordinary skill in the art would have been motivated to combine the known formulations described and claimed in the 152 Patent with known minimum spray orifice diameter products, particularly after the introduction of Airomir HFA.

1164.  Although one of ordinary skill in the art would have considered the subject matter of the 445 Patent to be essentially a combination of two primary elements (known compositions and known spray orifices), defendants' experts also compared in detail each element of the combination of the 152 Patent and Airomir HFA against each element of the 445 Patent, from the perspective of one of ordinary skill in the art, to evaluate any arguable differences.

1165.  A person of ordinary skill in the art would have concluded that there is no substantial difference between the contents of the 152 Patent and Airomir HFA and the "product suitable for delivering a pharmaceutical aerosol formulation" claimed in the 445 Patent.

1166.  Although one of ordinary skill in the art would have recognized that the 152 Patent does not expressly specify a "product" including the "aerosol canister" described and claimed in the 152 Patent, one of ordinary skill in the art also would have recognized that the "aerosol canister"

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

of the 152 Patent was intended to be used in the described "method of treating" by inhalation, which necessarily would have required a "product."

1167. In addition, although the 152 Patent does not expressly specify that the "aerosol canister" containing the described and claimed formulations was "suitable for delivering" the claimed formulations, one of ordinary skill in the art would have understood this "aerosol canister" to be at least "suitable" for this purpose, based on claim 3 of the 152 Patent, among other things. (*See, e.g.*, JTX 1_12 (claim 3) ("An aerosol canister equipped with a metering valve, containing a formulation according to claim 1 in an amount sufficient to provide a plurality of therapeutically effective doses of the drug.").

1168. Regarding Airomir HFA, because it was an approved and marketed product, one of ordinary skill in the art would have considered it, at the very least, "suitable for delivering a pharmaceutical aerosol formulation."

1169. A person of ordinary skill in the art also would have concluded that there is no substantial difference between the contents of the next two elements claimed in the 445 Patent, "aerosol canister comprising a container closed with a metering valve" and "pharmaceutical suspension aerosol formulation," and the contents of either the 152 Patent or Airomir HFA.

1170. For the next element claimed in the 445 Patent, "substantially free of surfactant," one of ordinary skill in the art would have concluded that there is no substantial difference in the content of the 152 Patent, at least because a person of ordinary skill in the art would read and understand the term "substantially free of surfactant" to include "no surfactant" under any reasonable interpretation of both terms.

1171. In contrast, one of ordinary skill in the art would have concluded that there is a difference in the content of Airomir HFA—namely, Airomir HFA contains oleic acid, while the 445 Patent claims a composition "substantially free of surfactant."

1172. However, a person of ordinary skill in the art would have considered the compositions as a whole to be substantially similar, within the context of the subject matter claimed in the 445 Patent, particularly with respect to selection of minimum spray orifice diameters, as explained below.

1173. For the remaining composition elements ("salbutamol sulphate," "0.4% w/w," salbutamol sulphate substantially insoluble in HFA-134a, "ethanol," "10% w/w to 15% w/w," "11.4%," HFA-134a, and "88.2%"), one of ordinary skill in the art would have concluded that there are no substantial differences between the compositions claimed in the 445 Patent and the content of either the 152 Patent or Airomir HFA.

1174. The 152 Patent and Airomir HFA both include albuterol sulfate.

1175. A person of ordinary skill in the art either would have known that Airomir HFA contained 0.4% albuterol sulfate by weight, or measured it at 0.4% by weight using routine analytical techniques available at the time.

1176. In addition, the 152 Patent includes a range of albuterol sulfate of "about 0.35 to about 0.42 percent by weight of the aerosol formulation."

1177. Finally, a person of ordinary skill in the art would have recognized that the albuterol sulfate in the compositions of the 152 Patent and Airomir HFA was substantially insoluble in HFA-134a.

1178. For the ethanol component, a person of ordinary skill in the art would have recognized the substantial overlap between known amounts of ethanol in similar compositions ("5 to about

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

15 percent by weight" in the 152 Patent, and about 14% in Airomir HFA) and those claimed in the 445 Patent ("10% w/w to 15% w/w" and "11.4% w/w").

1179.   A person of ordinary skill would not have considered any particular percentage within the claimed range of "10% w/w to 15% w/w" in the 445 Patent to be more or less "suitable for delivering" the claimed formulations—instead, one of ordinary skill in the art reasonably would have assumed that at least every composition containing 10 to 15% ethanol by weight would be "suitable for delivery" in the claimed product, at least based on the 152 Patent alone, and especially in combination with Airomir HFA.

1180.   This conclusion is supported further by both the 445 Patent and prosecution history as a whole, as well as the sole example provided in the 445 Patent, which includes ethanol in the amount of 11.41% w/w, and states that the "invention is further described by means of example but not in any limitative sense."  (JTX 3_5).

1181.   Thus, at least based on the 152 Patent and Airomir HFA, one of ordinary skill in the art would have considered any amount of ethanol in the range of about 10 to 15% by weight of the composition to be comparably "suitable for delivering" the compositions claimed in the 445 Patent, especially because there is no data or evidence in the 445 Patent that the more specifically claimed amount of "11.4% w/w" would have been considered superior to any other amount in the range for purposes of the claimed subject matter.

1182.   For the HFA-134a component, the same analysis and reasoning applies.

1183.   The 152 Patent provided a range of about 85 to 95% HFA-134a by weight, and Airomir HFA would have been known to contain about 85% HFA-134a by weight.

1184.   A person of ordinary skill in the art would have considered any of the amounts in the range of about 85 to 90% HFA-134a by weight to be substantially the same for purposes of the

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

subject matter claimed in the 445 Patent, including the more specifically claimed amount of 88.2% w/w HFA-134a, especially because there is no data or evidence in the 445 Patent that the more specifically claimed amount of "88.2% w/w" would have been considered superior to any other amount in the range.[17]

1185.  For the last element, an "actuator" with a "spray orifice aperture" of "from 100 to 300 microns" or "150 to 250 microns," one of ordinary skill in the art would have concluded that both the 152 Patent and Airomir HFA describe actuators, all of which include a spray orifice.

1186.  In addition, actuator products with spray orifice diameters in this range were known to those of ordinary skill in the art at the time, as detailed above.

1187.  For the specific claimed ranges of spray orifice diameters, a person of ordinary skill in the art would have concluded that there are no substantial differences between the Airomir HFA actuator spray orifice diameter and the spray orifice diameter ranges claimed in the 445 Patent, at least based on the 220 and 250 micron products sold by Bespak, and the known or measured spray orifice diameter of Airomir HFA, at about 250 microns.

1188.  In light of these comparisons, a person of ordinary skill in the art would have had a strong motivation to combine the 152 Patent and Airomir HFA with a reasonable expectation of producing the subject matter claimed in the 445 Patent.

1189.  One of ordinary skill in the art would have known of the compositions of the 152 Patent and Airomir HFA, the substantial similarity of these compositions, and the combination of the Airomir HFA composition with a smaller spray orifice diameter of about 250 microns.

---

[17] The sole example in the 445 Patent includes HFA-134a in the amount of 88.24%.  (JTX 3_5).

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

1190.  This knowledge, along with a strong competitive motivation to at least match the spray orifice diameter of Airomir HFA, would have been sufficient to provide a reasonable expectation of success in combining the compositions of the 152 Patent with the spray orifice diameter of Airomir HFA to arrive at the subject matter claimed in the 445 Patent.

1191.  In addition, a person of ordinary skill in the art would have considered the Airomir HFA formulation and the formulations claimed in the 445 Patent to be substantially the same, particularly with respect to the percentage weights of active ingredient, ethanol and HFA-134a.

1192.  Although a person of ordinary skill in the art would have considered the difference between the oleic acid in Airomir HFA and the claimed "substantially free of surfactant" formulations, this difference would have reinforced their reasonable expectation that at least the same size spray orifice would be suitable for delivering the claimed formulation.

1193.  By 1996, a person of ordinary skill in the art would have known that the presence of a surfactant can both increase droplet size and reduce spray orifice diameter over time (through deposition within the orifice), among other things.

1194.  At least with respect to droplet size, a person of ordinary skill in the art would be aware that "both the rate of evaporation, change of size with distance, and the residual droplet diameter depend quite dramatically on surfactant concentration."  (DTX 1183_11).

1195.  Thus, because the formulation claimed in the 445 Patent is "substantially free of surfactant" but Airomir HFA was not, a person of ordinary skill in the art would have expected that at least the same size spray orifice (between .2 to .3mm, or about 250 microns) would be suitable, and, further, would reasonably expect that an even narrower spray orifice would be suitable.

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

1196.   In summary, a person of ordinary skill in the art would select a spray orifice of about 250 microns for the formulations claimed in the 445 Patent—and at least the next smaller spray orifice—with a reasonable expectation that they would have been suitable for delivering the claimed formulations based on either the characteristics of the Airomir HFA product alone, or the information contained in the Airomir HFA specifications, which allowed a spray orifice of .2 to .3 mm (or at least 200 to 300 microns), or both.

1197.   In further support of this conclusion, defendants' experts provided a thorough comparison of the elements of the 152 Patent, Airomir HFA and the 445 Patent, summarized below:

| 152 Patent | Airomir HFA | 445 Patent |
|---|---|---|
| "method of treating a mammal" by "administering by inhalation a formulation" in an "aerosol canister" <br><br> (*See, e.g.*, JTX 1_5 (2:46-60)). | [product known by one of ordinary skill in the art] | "product suitable for delivering a pharmaceutical aerosol formulation" |
| "aerosol canister equipped with a metering valve, containing" the claimed formulation <br><br> (*See, e.g.*, JTX 1_12 (16:24)). | [components known by one of ordinary skill in the art] | "aerosol canister comprising a container closed with a metering valve" |
| "pharmaceutical suspension aerosol formulation" <br><br> (*See, e.g.*, JTX 1_12 (16:15)). | [composition known by one of ordinary skill in the art] | "pharmaceutical suspension aerosol formulation" |
| "substantially free of surfactant" "no surfactant" <br><br> (*See, e.g.*, JTX 1_6 (3:40); JTX 1_12 (16:21)). | oleic acid <br><br> (*See, e.g.*, DTX 818_12, 52-53). | "substantially free of surfactant" |

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

| 152 Patent | Airomir HFA | 445 Patent |
|---|---|---|
| "albuterol sulfate" "more preferably from about 0.35 to about 0.42 percent by weight of the aerosol formulation" <br><br> (*See, e.g.*, JTX 1_12 (16:45); JTX 1_7 (5:29)). | salbutamol sulphate about 0.4% <br><br> (*See, e.g.*, DTX 818_11, 46; DTX 818_12, 52-53). | "salbutamol sulphate" "0.4% w/w" |
| "the drug is . . . substantially insoluble in the propellant" <br><br> (*See, e.g.*, JTX 1_5 (1:20); JTX 1_6 (3:30); JTX 1_7 (6:14)). | [known by one of ordinary skill in the art] | "salbutamol sulphate is substantially completely insoluble in the [HFA-134a]" |
| "ethanol" "5 to about 15 percent by weight" <br><br> (*See, e.g.*, JTX 1_12 (16:19)). | ethanol about 14% <br><br> (*See, e.g.*, DTX 818_52; DTX 818_11, 46; DTX 818_12, 52-53). | "ethanol" "10% w/w to 15% w/w" "11.4% w/w" |
| [HFA-134a] about 85 to 95% by weight <br><br> (*See, e.g.*, JTX 1_12 (16:18); JTX 1_7 (5:13); JTX 1_12 (16:19)). | HFA-134a about 85% <br><br> (*See, e.g.*, DTX 818_52; DTX 818_11, 46; DTX 818_12, 52-53). | [HFA-134a] "88.2% w/w" |
| "actuator" <br><br> (*See, e.g.*, JTX 1_11 (13:42)). | actuator spray orifice 0.2 to 0.3mm about 250 microns <br><br> (*See, e.g.*, DTX 818_13; DTX 818_11, 46; DTX 818_12, 52-53). | "actuator" "spray orifice aperture" "from 100 to 300 microns" "from 150 to 250 microns" |

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

1198.   Accordingly, in light of the insubstantial differences between the subject matter of the 445 Patent and the content of a combination of the 152 Patent and Airomir HFA, the Court concludes that defendants have proven, by clear and convincing evidence, that the claimed subject matter would have been obvious to a person of ordinary skill in the art no later than March 1995, when Airomir HFA was first introduced, or shortly thereafter, at least upon analysis and characterization of Airomir HFA product samples.

### 4.   The R. Schultz 201 Patent

1199.   The R. Schultz 201 patent is a U.S. patent entitled "Aerosol Actuator."  (DTX 820).

1200.   According to the face of the patent, the R. Schultz 201 Patent was filed May 26, 1993 and issued May 4, 1999.  (DTX 820).

1201.   According to 35 U.S.C. § 102(e), the R. Schultz 201 Patent is considered available to the person of ordinary skill in the art at least at the time of the May 26, 1993 filing date stated on the face of the R. Schultz 201 Patent.  (DTX 820).

1202.   The R. Schultz 201 Patent states:

> Exit orifice **26** can be any size and shape provided that the minimum diameter is suitable for passing the medicinal aerosol formulation into chamber **24**.  ***Common*** minimum diameters range from ***about 0.25 mm*** to about 0.64 mm.   With conventional actuators wider diameters commonly are used in connection with suspension aerosol formulations.  ***Narrower diameters commonly*** are used in connection with solution aerosol formulations and with ***suspension aerosol formulations*** that are particularly difficult to deliver in the form of an aerosol containing high respirable mass. Exit orifices with narrow diameters, however, can cause undue backpressure in the nozzle block resulting in undesired blowback of some of the formulation when the aerosol canister is actuated.  It has been found that an actuator of the invention obviates the need for the use of narrow exit orifices.

(DTX 820_5) (emphasis added).

1203.  A person of ordinary skill in the art also would have considered the R. Schultz 201 Patent in evaluating spray orifice diameters, including these statements regarding "common" spray orifice diameters for suspension and solution formulations, the minimum "common" spray orifice diameter of "0.25 mm," and the example suggesting that the narrower spray orifice diameter ("0.254mm") increased respirable fraction and decreased throat deposition.[18]

1204.  The R. Schultz 201 Patent also reflects the knowledge of a person of ordinary skill in the art of "common" spray orifice diameters as narrow as about 254 microns, and further suggests the benefits of selecting a minimum spray orifice diameter, particularly for a formulation containing about 12% ethanol and about 88% HFA-134a.

1205.  The R. Schultz 201 Patent provides actuator test results for a "solution aerosol formulation containing 0.43 parts by weight beclomethasone diproprionate, 12 parts by weight ethanol, and 87.57 parts by weight 1,1,1,2-tetrafluoroethane."

1206.  A person of ordinary skill in the art would recognize the similarity of this formulation to Airomir HFA, and that claimed in the 152 Patent, most notably the composition is described as 12% ethanol and 87.57% HFA-134a.

1207.  A person of ordinary skill in the art also would recognize that the data in Table 2 of the R. Schultz 201 Patent suggests that, consistent with a basic understanding of spray orifice dynamics by the 1996 timeframe, and at least for the same formulation, a narrower spray orifice in a conventional actuator with a spray orifice of 254 microns is expected to decrease throat deposition and increase respirable fraction.

---

[18] At least by 1992, spray orifice diameters as small as 200 and 250 microns were known to persons of ordinary skill in the art.  (*See, e.g.*, DTX 1184_6, 17).

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

1208.  Specifically, a conventional actuator with a 254 micron spray orifice (M3756) increased respirable fraction compared to a conventional actuator with a 560 micron spray orifice (M3710)—*i.e.*, 62% for a 254 micron orifice versus 46% for a 560 micron orifice.

1209.  A conventional actuator with a 254 micron spray orifice (M3756) decreased throat deposition compared to a conventional actuator with a 560 micron spray orifice (M3710)—*i.e.*, 34% deposition for a 254 micron orifice versus 50% for a 560 micron orifice.

1210.  The R. Schultz 201 Patent does not criticize, discredit or otherwise discourage the use of smaller spray orifice diameters with the suspension formulations claimed in the 445 Patent.

1211.  To the contrary, it would have encouraged a person of ordinary skill in the art to select a narrower spray orifice, at least for the purposes of minimizing throat deposition and increasing the respirable fraction delivered downstream of the throat, as discussed above.

1212.  In addition, Table 2 of the R. Schultz 201 Patent shows that a narrower spray orifice (described as 254 microns) in a conventional actuator increases respirable fraction and decreases throat deposition for a formulation containing 12% ethanol and 87.57% HFA-134a.

1213.  Although this data is reported for a "solution" formulation, this description would not discourage a person of ordinary skill from selecting the same narrow spray orifice for a comparable suspension formulation containing similar amounts of ethanol and HFA-134a.

1214.  Instead, for a formulation with similar amounts of ethanol and HFA-134a, the R. Schultz 201 Patent would encourage (not discourage) a person of ordinary skill in the art to select a minimum spray orifice, including at about 250 microns, to increase respirable fraction and decrease throat deposition, as suggested in Table 2.

1215.  The R. Schultz 201 Patent is within the scope of the prior art to the 445 Patent.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

1216.  Defendants contend that the R. Schultz Patent provides further support for the conclusion that it was obvious to select a spray orifice in the ranges claimed by the 445 Patent for the formulations of the 152 Patent.

1217.  A person of ordinary skill in the art would have considered the similarities between the "solution" example in the R. Schultz 201 Patent described above and the "suspension" claim in the 152 Patent in evaluating a formulation like that claimed in the 445 Patent.

1218.  Given the overlap or similarity of these formulations, a person of ordinary skill in the art would have had a reasonable expectation that, at least for the higher concentrations of ethanol, the spray orifice diameter in the R. Schultz 201 Patent (254 microns) would have been suitable for delivering the formulations claimed in the 152 Patent.

1219.  In this regard, a person of ordinary skill in the art would have concluded that the formulations claimed in the 152 Patent include formulations claimed in the 445 Patent.

1220.  For the reasons set forth above (minimizing spray orifice diameter, decreasing throat deposition, increasing respirable fraction, etc.), therefore, a person of ordinary skill in the art also would have combined the R. Schultz 201 and 152 Patents with a reasonable expectation that at least the narrower spray orifice identified in the R. Schultz 201 patent, at 254 microns, would have been suitable for delivering the formulations claimed in the 445 Patent.

1221.  Accordingly, in light of the insubstantial differences between the subject matter of the 445 Patent and the content of a combination of the 152 Patent, Airomir HFA and the R. Schultz 201 Patent, the Court concludes that defendants have proven, by clear and convincing evidence, that the claimed subject matter would have been obvious to a person of ordinary skill in the art no later than March 1995, when Airomir HFA was first introduced, or shortly thereafter, at least upon analysis and characterization of Airomir HFA product samples.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

### 5.  The Sioutas 803 Patent

1222.  The Sioutas 803 Patent is a U.S. patent entitled "Aerosol Actuator Providing Increased Respirable Fraction."  (DTX 821).

1223.  The Sioutas 803 Patent was filed in August 1990, assigned to 3M, and issued in May 1992.  (DTX 821_2).

1224.  Defendants contend that the Sioutas 803 Patent would have further supported a reasonable expectation of success.

1225.  The Sioutas 803 Patent states that the "actuator of this invention finds particular use in improving the respirable fraction of drug in an aerosol formulation, particularly in aerosol formulations that involve propellants, drugs, adjuvants, or excipients that do not yield optimal suspensions for aerosol delivery."  (DTX 821_4).

1226.  The Sioutas 803 Patent also states:

> As illustrated in FIGS. 2 and 3, valve stem receptacle **16** further comprises socket **20** for receiving hollow valve stem **22** of metered-dose aerosol canister 12.  Socket **20** has walls defining orifice **24** through which the discharge from the aerosol canister passes.  Orifice **24** is preferably smaller in diameter than the bore of the hollow valve stem in order to increase the velocity of the aerosol stream as it passes through the orifice.  ***Preferred diameters*** are in the range of ***about 0.20 mm to about 0.36 mm***, and most preferably about 0.25 mm to about 0.30 mm.

(DTX 821_5 (emphasis added)).

1227.  A person of ordinary skill in the art would consider the Sioutas 803 Patent in evaluating spray orifice diameter, including the statements that "preferred diameters" are "in the range of about 0.20 mm to about 0.36 mm," and "most preferably about 0.25 mm to about 0.30 mm."

1228.  Therefore, consistent with the knowledge of a person of ordinary skill in the art in the 1995-1996 timeframe described above, the Sioutas 803 Patent confirms that persons of ordinary skill in the art would have been aware of spray orifice diameters in these minimum ranges, and

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

would have selected a minimum spray orifice diameter product, at least for the purpose of increasing respirable fraction, particularly in light of the Airomir HFA product or specifications, or both.

1229.    The Court concludes that the Sioutas 803 Patent provides further support for Defendants' expert opinions regarding the knowledge of persons of ordinary skill in the art and reasonable expectation of success.

1230.    In addition, the Court concludes that, considered together, the 152 Patent, Airomir HFA, the R. Schultz 201 Patent, and the Sioutas 803 Patent provide clear and convincing evidence that a person of ordinary skill in the art would have had a reasonable expectation of success of producing the claimed subject matter of the 445 Patent by simply combining the formulations of the 152 Patent with a known and commercially-available minimum spray orifice actuator product, at least as small as the spray orifice diameter in the Airomir HFA product or the R. Schultz 201 Patent.

### vii.  The 445 Patent: Secondary Considerations

1231.    In addition to the findings outlined above, the Court also finds that the plaintiffs have failed to present evidence of secondary considerations sufficient to rebut the *prima facie* case of obviousness.

1232.    The Court examines these secondary considerations—namely, failure of others, copying, long felt need, unexpected properties, skepticism, and commercial success—separately below.

### 1.  Nexus

1233.    Every asserted claim of the 445 Patent includes the claim element, "substantially free of surfactant."  (JTX 3_5-6).

1234.    Plaintiffs' experts have assumed that ProAir HFA is an embodiment of the 445 Patent.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

1235.  However, plaintiffs have offered no testing or proof that demonstrates that plaintiffs' product is "substantially free of surfactant."



1239.  Therefore, all the evidence on secondary considerations proffered by plaintiffs is based on a false assumption, and is irrelevant to the patent obviousness inquiry.

1240.  Therefore, there is no nexus between any of the evidence plaintiffs proffered and any asserted claim of the 445 Patent.

1241.  Further, plaintiffs have offered no testing or proof that ProAir HFA meets the specific percentage claim elements found in Claims 3-10, 12-15, and 17-20 of the 445 Patent.  (JTX 3_5-6).

1242.  In addition, as discussed in more detail below, plaintiffs' experts have asserted that ProAir HFA's plume properties, including aspects such as plume temperature, plume velocity, as well as its "stability" and its manufacturing process are properties of ProAir HFA that give rise to secondary considerations.

1243.  Plume properties, including but not limited to plume temperature, plume velocity, are not claimed in the 152 Patent.

1244.  Further, plaintiffs have failed to show that plume properties are related to any claimed, novel feature of the 445 Patent claims.  (JTX 3_5-6).

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

1245.   Therefore there is no nexus between any "plume properties" and the 445 Patent.

1246.   Stability is not a claimed feature of the 445 Patent.  (JTX 3_5-6).

1247.   Further, plaintiffs have failed to show that formulation stability is related to any claimed, novel feature of the 152 Patent.

1248.   Therefore there is no nexus between any "stability" of the formulation and the 152 Patent.

1249.   There are no manufacturing processes claimed in the 445 Patent.  (JTX 3_5-6).

1250.   Further, plaintiffs have failed to show that any manufacturing process is related to any claimed, novel feature of the 445 Patent.

1251.   Therefore there is no nexus between any "manufacturing process" and the 445 Patent.

1252.   Further, none of plaintiffs' experts have analyzed the six patents besides the 152 Patent and the 445 Patent that have been listed in the Orange Book by plaintiffs for ProAir HFA to determine what portion of any alleged asserted secondary consideration derives from the claims of these patents. (DTX 163; DTX 164; DTX 284; DTX 285; DTX 291; DTX 292; DTX 714; DTX 814; DTX 1149).

1253.   For this additional reason, plaintiffs have failed to prove that a nexus exists between their asserted secondary considerations and the 445 Patent.

1254.   Arguments concerning nexus to each secondary consideration are further addressed below.

## 2.  Failure of Others / Copying

1255.   In their supplemental interrogatory answers, plaintiffs asserted "secondary considerations" for the 445 Patent that included, "succeeded despite the failure of others," and "were copied by others."  (DTX 1735_8).

1256.   None of plaintiffs' experts addressed failure of others or copying, and plaintiffs have not cited any evidence to support the existence of "failure of others" or "copying."

1257.   Dr. Dalby has opined that he is unaware of the existence of any failure of others or copying concerning the 445 Patent or ProAir HFA.

1258.   To the contrary, others had already succeeded.

1259.   Indeed, a formulation "containing no surfactant" and "5-15% ethanol" had already been developed by 3M by 1991.  (JTX 1_12).

1260.   In addition, an orifice size of between 200 and 300 microns had already been used in an albuterol HFA MDI inhaler developed and marketed publically by 1995.  (DTX 818_9, 13.  *See also* DTX 820).

1261.   Accordingly, the Court finds no evidence of failure of others or copying that would be probative of nonobviousness.

### 3.  Long Felt Need

1262.   Plaintiffs' expert Dr. Berger argued that a long felt need for replacement or improvement of albuterol CFC MDIs existed, and was satisfied by ProAir HFA.

1263.   However, Dr. Berger did not tie satisfaction of any alleged "long felt need" to any claimed, novel feature of the 445 Patent in his report.

1264.   Dr. Berger also failed to tie any long felt need to the lack of surfactant or the presence of a particular percentage of ethanol in the formulation.

1265.   To the extent any "need" existed, plaintiffs did not demonstrate any nexus between any novel, claimed features of the 445 Patent and the alleged "need" satisfied by ProAir HFA.

1266.   To the extent Dr. Berger claims there was a "long felt need" for a propellant to replace CFCs, the Purewal 777 Application had disclosed an HFA formulation with ethanol as a possible solvent.  (DTX 120_8-9).

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

1267.   In addition, Airomir HFA was already publically available before the application that led to the 445 Patent was submitted, and the 152 Patent application was already filed.  (JTX 1_1; DTX 818_9).

1268.   Therefore there is no nexus between any alleged "long felt need" and a claimed, <u>novel</u> feature of the 445 Patent.

1269.   To the extent Dr. Berger and plaintiffs claim there was a long felt need for ProAir HFA's plume properties, as an initial matter, plaintiffs have failed to show any nexus between ProAir HFA's plume properties and claimed, novel features of the 445 Patent.

1270.   Dr. Berger did not identify which claimed features of the 445 Patent are novel.

1271.   Dr. Berger has not explained which claims of the 445 Patent, or which elements of ProAir HFA's formulation or orifice size, relate to ProAir HFA's plume features, including plume temperature or plume velocity.

1272.   As discussed above, ProAir HFA is not a commercial embodiment of the 445 Patent.

1273.   Dr. Berger has not made any attempt to determine whether ProAir HFA's plume properties, including its plume temperature or plume velocity, derive from unasserted patents which are or were listed in the Orange Book for ProAir HFA.  (DTX 163; DTX 164; DTX 284; DTX 285; DTX 291; DTX 292; DTX 714; DTX 814; DTX 1149).

1274.   Plaintiffs have also failed to show any nexus between ProAir HFA's particle size, lung distribution, or use of spacers and the claimed, novel features of the 445 Patent for the same reasons.

1275.   Dr. Berger has not explained which claims of the 445 Patent, or which elements of ProAir HFA's formulation or orifice size, relate to ProAir HFA's particle size, its lung distribution, or the use of spacers.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

1276.  Therefore, as an initial matter, plaintiffs have failed to show any nexus between any alleged "long felt need" and any novel, claimed features of the 445 Patent.

1277.  Dr. Berger conceded that he did not conduct any analysis in order to determine whether any other HFA products or formulations satisfied the long felt need for a CFC replacement before the 445 Patent or ProAir HFA.

1278.  Plaintiffs have failed to analyze the closest prior art to the 445 Patent in order to determine whether any alleged "need" was already addressed by that art.

1279.  Plaintiffs have failed to analyze the closest prior art to determine whether there were significant differences between the 445 Patent and its closest prior art that would give rise to a purported "need."

1280.  Therefore Dr. Berger failed to conduct the analysis necessary to determine whether any long felt need existed.

1281.  Regardless, Dr. Wolf has opined that there was no long felt need that was satisfied by the 445 Patent, and/or ProAir HFA.  (*See* Section (III)(D)(iv)(3)).

1282.  Accordingly, for at least these reasons, the Court finds no evidence of long felt need that would support any claim of nonobviousness.

### 4.  Unexpected Properties

1283.  Dr. Myrdal argues that the 445 Patent unexpectedly provides patients with a warmer, softer plume capable of delivering more drug to the lungs.

1284.  As an initial matter, neither the 445 Patent nor the 152 Patent claim any aspects of plume properties or lung delivery, and Dr. Myrdal fails, to the extent he has even tried, to tie any plume or lung delivery properties to specific features of the patented claims.

1285.  Therefore, there is no nexus between the plume properties or lung delivery properties and the claims of the 152 Patent or the 445 Patent.

1286.  Dr. Dalby opines that there is no evidence that the absence of surfactant resulted in an unexpectedly superior "warmer" or "softer" plume.

1287.  Dr. Dalby opines that there is no evidence that a spray orifice diameter of 220 microns produces an unexpectedly superior "warmer" or "softer" plume.

1288.  Even if a nexus between plume properties or lung deposition could be demonstrated with the claims of the 152 Patent or the 445 Patent, Dr. Myrdal did not compare the claims of the 152 Patent with the formulations of the Purewal 777 Application, and did not compare the claims of the 445 Patent to the 152 Patent and Airomir HFA to determine whether the 152 Patent or the 445 Patent possess any superior plume or lung deposition properties.

1289.  Dr. Dalby opines that the Hautmann paper does not demonstrate that ProAir HFA has "better plume characteristics."

1290.  Hautmann is not a clinical study, and the conclusions in Hautmann concerning differences between ProAir HFA, Proventil HFA and Ventolin HFA are speculation.  (DTX 697_4).

1291.  Hautmann is a study of the effect of interval between actuation, not a comparison of plume characteristics.  (DTX 697).

1292.  Dr. Finlay opines that several references cited by Dr. Myrdal actually teach that Proventil HFA had a soft, warm plume and reduced the cold, Freon effect.  (DTX 701_1; DTX 1944_2; DTX 1963_5).

1293.  As discussed above, Proventil HFA has the same ingredients as Airomir HFA, including ethanol, HFA-134a, and oleic acid.  (*See. e.g.*, DTX 208_1; DTX 818_12).

1294.  ████████████████████████████████████████████████████████

████████████████████████████████████████████████

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

1295.  The formulation ingredients in Proventil HFA also fall within the range of options described in the Purewal 777 Application.  (DTX 120).

1296.  ████████████████████████████████████████████████████████████

████████████████████████

1297.  Hautmann does not include data from the initial actuation of the three products.

1298.  For this reason alone, Dr. Finlay opined that it does not support a conclusion that ProAir HFA is different or superior to Proventil HFA, at least for a single actuation.

1299.  Hautmann does not include any data for fine particle mass or velocity after first actuation, and the FPM data provided suggests little or no FPM difference between ProAir HFA and Proventil HFA.  (DTX 697_3).

1300.  Interval velocity data shows little or no significant difference between ProAir HFA and Proventil HFA, and interval temperature data shows no significant difference between ProAir HFA and Proventil HFA or Ventolin HFA.  (DTX 697_4).

1301.  Regardless, as discussed in Section (III)(D)(iv)(3), there is no evidence that differences in plume properties or lung deposition provide any clinically meaningful benefit for ProAir HFA, either over Proventil HFA or even over CFC formulations of albuterol.

1302.  The discussion concerning plume properties and lung deposition in Section (III)(D)(iv)(3) is incorporated by reference.

1303.  Dr. Dalby opined that he is unaware of any unexpected properties related to the 445 Patent.

1304.  Dr. Myrdal opined that the stability of the combination of albuterol sulfate, ethanol, propellant and the spray orifice were "unexpected," and that a person of ordinary skill would not have expected the formulations to be "stable."

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

1305.  As an initial matter, as discussed above, stability is not a claimed feature of the 445 Patent.  (JTX 3_5-6).

1306.  Further, plaintiffs have failed to show that formulation stability is related to any claimed, novel feature of the 445 Patent.

1307.  Therefore, there is no nexus between any "stability" and the 445 Patent.

1308.  Even if a nexus between "stability" and the 445 Patent could be demonstrated, Dr. Myrdal does not compare the 445 Patent formulation to the closest prior art, including the 152 Patent and Airomir HFA, to determine if the 445 Patent formulation has superior stability.

1309.  Dr. Myrdal does not show that the particular claimed amounts of .5% albuterol sulfate, 11.4% ethanol, 88.2% HFA-134a by weight without surfactant are unexpectedly stable.

1310.  Dr. Myrdal also argues that it would "not be expected" to use .5% albuterol sulfate, 11.4% ethanol, 88.2% HFA-134a by weight without surfactant with an orifice size of between 100-300 microns.

1311.  Dr. Myrdal does not identify any unexpected property of this combination, and therefore, he cannot draw a nexus to novel claimed features of the 445 Patent.

1312.  Dr. Myrdal cannot demonstrate that this combination results in any properties which are superior to the closest prior art without identifying the unexpected property.

1313.  Dr. Dalby opines that none of the references cited by Dr. Myrdal support his conclusion that the "inventions" of the 445 Patent were unexpected, especially in light of the disclosed ethanol content of the 152 Patent and the ethanol content and spray orifice diameter of Airomir HFA.  (JTX 1_12; DTX 818_9, 13; DTX 1125; DTX 1806; DTX 1967; DTX 2010).

1314.  Plaintiffs' argument that Perrigo's proposed ANDA Product infringes the 445 Patent under the doctrine of equivalents contradicts Dr. Myrdal's argument that the specific formulation

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

percentages of 11.4% ethanol, 88.2% HFA-134a, and .4% albuterol sulfate produced unexpected results.

1315.  To the extent that plaintiffs assert that the two-step filling was an unexpected property, this is discussed in Sections (III)(D)(iv)(6) and (III)(D)(vii)(6).

1316.  To the extent that plaintiffs assert that surfactants produce clogging, and it was unexpected for a surfactant-free formulation to avoid clogging with an orifice size of 200-300 microns, plaintiffs have presented no evidence.

1317.  Plaintiffs have presented no clogging studies comparing ProAir HFA with Proventil HFA or any other product.

1318.  For at least these reasons, the Court finds no evidence of unexpected properties that bears on nonobviousness.

### 5.  Skepticism

1319.  As an initial matter, as discussed above, stability is not a claimed feature of the 445 Patent.  (JTX 3_5-6).

1320.  Further, plaintiffs have failed to show that formulation stability is related to any claimed, novel feature of the 445 Patent.

1321.  Therefore, there is no nexus between any "stability" and the 445 Patent, to the extent plaintiffs assert there was "skepticism" that the 445 Patent formulations would be stable.

1322.  Dr. Myrdal states that a person of ordinary skill "would have been skeptical" regarding stability.

1323.  However, neither Dr. Byron nor Dr. Myrdal identified any actual, real world skepticism concerning the claim elements of the 445 Patent.

1324.  Neither Dr. Byron nor Dr. Myrdal discuss the closest prior art to the 445 Patent with respect to skepticism.

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

1325.   In addition, Dr. Myrdal argues that a person of ordinary skill in the art would be skeptical about using spray orifices of 200 to 300 microns.

1326.   Neither Dr. Byron, nor Dr. Myrdal identifies any actual, real world skepticism concerning orifice size.

1327.   The introduction of Airomir HFA, along with the knowledge that surfactant-free formulations were stable, would have eliminated any hypothetical skepticism concerning the claims of the 445 Patent.  (JTX 1; DTX 818_9, 13; DTX 820; s*ee also* DTX 10_429; DTX 54_114-115; DTX 56_49-50; DTX 1119; DTX 1157; DTX 1160; DTX 299_1-2, 6).

1328.   Dr. Dalby opined that he is unaware of any skepticism related to the 445 Patent.

1329.   For at least these reasons, the Court finds no evidence of skepticism that bears on nonobviousness.

### 6.  Commercial Success

1330.   Dr. Hausman claims that a nexus exists between ProAir HFA's alleged commercial success and its plume properties.

1331.   As an initial matter, however, Dr. Hausman and plaintiffs have failed to show any nexus between ProAir HFA's plume properties and claimed, novel features of the 445 Patent.

1332.   Dr. Hausman did not identify which claimed features of the 445 Patent are novel.

1333.   Dr. Hausman has not explained which claims of the 445 Patent, or which elements of ProAir HFA's formulation or orifice size, relate to ProAir HFA's plume features.

1334.   As discussed above, ProAir HFA is not a commercial embodiment of the 445 Patent.

1335.   In addition, Dr. Hausman has not made any attempt to determine which portion of ProAir HFA's market performance derives from the 445 Patent, and which derives from unasserted patents which are, or were listed in the Orange Book for ProAir HFA.  (DTX 163; DTX 164; DTX 284; DTX 285; DTX 291; DTX 292; DTX 714; DTX 814; DTX 1149).

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

1336.  Even if plaintiffs could show a nexus between the plume properties and novel claims of the 445 Patent, Dr. Hausman and plaintiffs have failed to show any nexus between ProAir HFA's sales and its plume properties, as discussed above in Section (III)(D)(iv)(6).

1337.  Dr. Hausman, Dr. Byron, and Dr. Myrdal have argued that a two-step filling process is made possible by the presence of ethanol in ProAir HFA's formulation, and in the formulations claimed by the 445 Patent.

1338.  However, two-step filling is not a claimed feature.

1339.  Plaintiffs' experts not shown that the particular percentages of ethanol claimed in the 445 Patent are required for the two-step filling process.

1340.  ███████████████████████████████████████████████████████
███████████████████████████████████████

1341.  However, Dr. Hausman has provided no evidence that plaintiffs' competitors cannot use the two-step filling process.

1342.  Dr. Hausman has provided no evidence regarding the manufacturing cost of ProAir HFA or its competitors.

1343.  ███████████████████████████████████████████████████████
███████████████████████████████

1344.  Dr. Dalby opined that ethanol was known and used extensively before the 445 Patent, and for example, the Purewal 777 Application was equally amenable to two-step filling.

1345.  Ethanol percentages were also claimed in the 152 Patent, which is itself prior art to the 445 Patent.

1346.  Dr. Hay has demonstrated that ProAir HFA's commercial performance is not due to any product features, but instead, is due to generic confusion, early price advantage, and favorable

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

formulary status in a market where the product features are undifferentiated in fact and in perception. (*See* Section (III)(D)(iv)(6)).

1347.  If any alleged commercial success is unrelated to product features, there cannot be a nexus to the 445 Patent.

1348.  Plaintiffs' expert, Dr. Hausman, opines that ProAir HFA is a commercial success.

1349.  However, even if a nexus between the claims of the 445 Patent and ProAir HFA's commercial performance could be demonstrated, Dr. Hausman has not demonstrated that ProAir HFA is a commercial success. (*See* Section (III)(D)(iv)(6)).

1350.  For at least these reasons, the Court finds no evidence of commercial success that bears on nonobviousness.

### viii.   The 445 Patent: Conclusion

1351.  The Court concludes, for all of the reasons stated above, that defendants have proven, by clear and convincing evidence, that the subject matter of the asserted claims of the 445 Patent would have been obvious.

1352.  Essentially, the subject matter of the asserted claims of the 445 Patent is a combination of the prior art formulations described in detail in the 152 Patent with prior art minimum spray orifice diameters commonly used in formulations containing ethanol, including particularly Airomir HFA.

1353.  Plaintiffs contend that the prior art taught away from the combination of specific claimed amounts of ethanol and minimum spray orifice diameters, and that, in any event, the specific combinations claimed are superior to prior art formulations.

1354.  The Court disagrees.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

1355.  Defendants have proven, by clear and convincing evidence, that the claimed amounts of ethanol and spray orifice diameters were within the ranges disclosed in the prior art, including Airomir HFA and the R. Schultz 201 Patent, and that either or both of these references would have provided a strong motivation and reasonable expectation that a person of ordinary skill in the art could combine similar suspension formulations and at least the same size spray orifice diameter without surfactant to produce a functional product.

1356.  The Court agrees, and further concludes that there is no evidence that the prior art taught away from the combinations claimed in the 445 Patent.

1357.  To the contrary, both Airomir HFA and the R. Schultz 201 Patent directed a person of ordinary skill in the art to the subject matter claimed in the 445 Patent.

1358.  This conclusion is further supported by the absence of evidence of secondary considerations.

1359.  Even if plaintiffs had been able to establish nexus, the Court concludes that there is no evidence that the combination claimed in the 445 Patent was an improvement in any respect relative to essentially the same combination of elements present in Airomir HFA, or any other prior art.

1360.  Plaintiffs provided no evidence that, for example, removing oleic acid from Airomir HFA would have resulted in any improvement or superiority in any aspect of the product.

1361.  Similarly, plaintiffs offered no evidence that, head-to-head, the formulations claimed in the 445 Patent are in any substantial or meaningful way superior to those in the prior art, including either Airomir HFA or Proventil HFA.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

1362.  At least for these reasons, the Court concludes that plaintiffs have not proven any secondary consideration sufficient to overcome the clear and convincing evidence of the obviousness of the subject matter of the claims of the 445 Patent.

### E.  Double Patenting

1363.  Defendants contend that the asserted claims of the 152 Patent are invalid under the doctrine of obviousness-type double patenting because the asserted claims of the 152 Patent are anticipated by, or obvious variants of, and therefore, not patentably distinct from, claims of the 445 Patent, the R. Schultz 534 Patent, the R. Schultz 432 Patent, and the Purewal Patents.

1364.  The Court agrees, and finds that defendants have shown by clear and convincing evidence that the asserted claims of the 152 Patent are invalid for obviousness-type double patenting.

### i.  The Legal Standard

1365.  "Federal courts for over a century have applied the principles of the doctrine [of obviousness-type double patenting] as a means to preserve the public's right to use not only the exact invention claimed by an inventor when his patent expires, but also obvious modifications of that invention that are not patentably distinct improvements."  *Gilead Scis., Inc. v. Natco Pharma Ltd.*, No. 2013-1418, slip op. at 8 (Fed. Cir. Apr. 22, 2014);  s*ee also Perricone*, 432 F.3d at 1372-73; *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 967 (Fed. Cir. 2001) (citing *In re Longi*, 759 F.2d 887, 892 (Fed. Cir. 1985)).

1366.  "Effectively extending the patent term ... is precisely the result that the doctrine of obviousness-type double patenting was created to prevent."  *In re Berg*, 140 F.3d 1428, 1435 (Fed. Cir. 1998) (citing *In re Goodman*, 11 F.3d 1046, 1051 (Fed. Cir. 1993)).

1367.  "There are two justifications for obviousness-type double patenting. The first is to prevent unjustified timewise extension of the right to exclude granted by a patent no matter how

the extension is brought about.  The second rationale is to prevent multiple infringement suits by different assignees asserting essentially the same patented invention." *In re Hubbell*, 709 F.3d 1140, 1145 (Fed. Cir. 2013) (internal citations omitted).

1368.  The double patenting analysis compares the claims (as properly construed) and then evaluates whether differences, if any, are obvious or patentably distinct.  *Eli Lilly*, 251 F.3d at 968 ("A later claim that is not patentably distinct from an earlier claim in a commonly owned patent is invalid for obvious-type double patenting.") (citing *In re Berg*, 140 F.3d at 1431).

1369.  "A later patent claim is not patentably distinct from an earlier patent claim if the later claim is obvious over, or anticipated by, the earlier claim." *Id.*  (citing *In re Longi*, 759 F.2d at 896).

1370.  However, common ownership is not an absolute prerequisite for the application of the double patenting doctrine.

1371.  Rather, one of the relevant inquiries is whether there exists the threat of potential harassment by multiple assignees.  *See In re Hubbell*, 709 F.3d 1140, 1145 (Fed. Cir. 2013) (citing Chisum on Patents § 9.04[2][b][ii] ("The possibility of multiple suits against an infringer by assignees of related patents has long been recognized as one of the concerns behind the doctrine of double patenting.")).

1372.  In addition, where the claims of an earlier-expiring patent are drawn to subject matter that is an obvious variant of, and not patentably distinct from, a later-expiring patent, the earlier-expiring patent may be used as an obviousness-type double patenting reference.  *Gilead Sciences, Inc. v. Natco Pharma Ltd.*, No. 2013-1418, slip op. at 11, 13 (Fed. Cir. Apr. 22, 2014) (holding that "it is the comparison of … patent expiration dates that should control, not merely the issuance dates" and explaining that the "principle [behind the doctrine of obviousness-type

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

double patenting] is violated when a patent expires and the public is nevertheless barred from practicing obvious modifications of the invention claimed in that patent because the inventor holds another later-expiring patent with claims for obvious modifications of the invention.").

1373.  An earlier patent also renders a later, commonly owned patent invalid for obviousness-type double patenting when the second patent is "'the product not of innovation but of ordinary skill and common sense.'"  *In re Metoprolol Succinate Patent Litig*., 494 F.3d 1011, 1017 n.2 (Fed. Cir. 2007) (invalidating patent for obviousness-type double patenting where certain elements were omitted from a later patent that were disclosed in the earlier patent) (quoting *KSR*, 550 U.S. at 421).

1374.  It is long established that "[c]laims which are broad enough to read on obvious subject matter are unpatentable even though they also read on nonobvious subject matter."  *In re Lintner*, 458 F.2d 1013, 1015 (C.C.P.A. 1972).

1375.  Moreover, as held by the Federal Circuit and its predecessor court, the doctrine of obviousness-type double patenting precludes a patentee from obtaining a patent for both a method of using a compound and the compound itself.

1376.  The Court of Customs and Patent Appeals long ago recognized that:

> It would shock one's sense of justice if an inventor could receive a patent upon a composition of matter, setting out at length in the specification the useful purposes of such composition, manufacture and sell it to the public, and then prevent the public from making any beneficial use of such product by securing patents upon each of the uses to which it may be adapted.

> In the case at bar, appellant received a patent upon his composition of matter because he had invented something new and useful.  He could not have received such a patent unless he had disclosed its utility.  Such disclosure of usefulness did not constitute separate inventions, but an essential part of a single invention.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

*In re Byck*, 48 F.2d 665, 666-67 (C.C.P.A. 1931) (emphasis added). *See also In re Christmann*, 128 F.2d 596, 599 (C.C.P.A 1942).

1377.  The Federal Circuit confirmed this view in *Geneva Pharms., Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373 (Fed. Cir. 2003).

1378.  There, the earlier patent claimed a particular chemical compound and the patent's written description disclosed a single utility of the chemical compound as a β-lactamase inhibitor. *Geneva*, 349 F.3d at 1386.

1379.  The *Geneva* patentees then sought and were granted a patent claiming nothing more than the previously disclosed single utility—a method of using the particular chemical compound of the first patent. *Id*.

1380.  Applying the C.C.P.A.'s holding in *Byck*, the Federal Circuit affirmed the lower court's invalidity holding, noting that the two patents "did not constitute separate inventions, but an essential part of a single invention." *Id*.

## ii.  The Parties' Contentions and Discussion

1381.  Defendants contend that the asserted claims of the 152 Patent are invalid for obviousness-type double patenting because the asserted claims of the 152 Patent are anticipated by, or obvious variants of, at least claim 2 of the 445 Patent, which is also drawn to HFA-134a formulations containing ethanol, albuterol and no surfactant.

1382.  Defendants further contend that the asserted claims of the 152 Patent are invalid for obviousness-type double patenting because the asserted claims of the 152 Patent are anticipated by, or obvious variants of, claims from a set of patents referred to as the Purewal Patents—the Purewal 684 Patent, the Purewal 573 Patent and the Purewal 743 Patent.

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

1383.  Defendants contend the Purewal Patent claims are drawn to HFA-134a formulations containing ethanol and various medicaments, including albuterol, and include within their scope formulations that do not contain surfactant.

1384.  Defendants also contend that the asserted claims of the 152 Patent are invalid for obviousness-type double patenting because the asserted claims of the 152 Patent are obvious variants of certain claims of the R. Schultz 534 Patent, whose claims are substantially similar to the 152 Patent, with the exception that the R. Schultz 534 Patent claims are drawn to formulations containing propellant HFA-227.

1385.  Finally, defendants also contend that the asserted claims of the 152 Patent are invalid for obviousness-type double patenting because the asserted claims of the 152 Patent are obvious variants of certain claims of the R. Schultz 432 Patent, whose claims are substantially similar to the 152 Patent with the exception that the claims of the R. Schultz 432 Patent purport to be drawn to solution formulations rather than suspension formulations.

### 1.    The 445 Patent-in-Suit

1386.  According to the face of the patent, the 445 Patent issued on July 28, 2009 from application No. 08/999,752, filed June 4, 1997.  (JTX 3_2).

1387.  Like the 152 Patent, the 445 Patent is also listed in the Orange Book as purportedly being relevant to the ProAir HFA product.

1388.  Despite being filed after the 152 Patent, the 445 Patent will expire more than six years prior to the 152 Patent, based upon the June 4, 2017 expiration date of the 445 Patent asserted by plaintiffs.

1389.  Under *Gilead*, this makes the 445 Patent available as a double patenting prior art reference.

1390.  The 445 Patent and the 152 Patent are commonly owned.

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

1391.   The 445 Patent lists on its face Norton Healthcare Ltd. as the assignee.  (JTX 3_2).

1392.   The 152 Patent, though listing 3M Innovative Properties on its face as assignee (JTX 1_2), was assigned to Norton (Waterford) Ltd. on September 4, 2012, the day prior to the filing of the September 5, 2012 Complaint in this action.  (DTX 2110).

1393.   ███████████████████████████████████████████████████████████████████████████████████████ ███

1394.   ███████████████████████████████████████████████████████████████████████████████████████

1395.   ███████████████████████████████████████████████████████████████████████████████████████████

1396.   ███████████████████████████████████████████████████████

1397.   These September 4, 2012 agreements gave pervasive control of the respective patents to the "licensees."

1398.   ███████████████████████████████████████████████████████████████████████████████████████████████

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

1399.   In addition, Plaintiffs have identified both Norton Healthcare and Norton Waterford as being wholly owned subsidiaries of Teva.  (D.I. 5).

1400.   Defendants further contend that because claim 2 of the 445 Patent is drawn to suspension aerosol formulations substantially free of surfactant and consisting of salbutamol sulfate, ethanol and 1,1,1,2-tetrafluoroethane, this claim renders the asserted claims of the 152 Patent obvious or anticipated, and thus invalid under the doctrine of obviousness-type double patenting.

1401.   For at least the following reasons, the Court agrees with defendants.

1402.   Claim 2 of the 445 Patent reads:

> A product suitable for delivering a pharmaceutical aerosol formulation comprising, (a) an aerosol canister comprising a container closed with a metering valve, said container comprising a pharmaceutical suspension aerosol formulation substantially free of surfactant, and which consists essentially of salbutamol sulphate, ethanol in an amount of 10% w/w to 15% w/w, and 1,1,1,2-tetrafluoroethane, wherein the salbutamol sulphate is substantially completely insoluble in the 1,1,1,2-tetrafluoroethane and (b) an actuator with a spray orifice aperture of from 100 to 300 microns.[19]

(JTX 3_5).

1403.   Claim 2 is thus drawn to a suspension aerosol formulation consisting of albuterol (salbutamol), ethanol at 10-15% and propellant HFA-134a, and being substantially free of surfactant.

### a.  Claim 1

1404.   Claim 1 of the 152 Patent is drawn to a suspension aerosol formulation consisting essentially of particulate drug, propellant HFA-134a and ethanol at 5-15% w/w, wherein the formulation is characterized in that it contains no surfactant.

---

[19]  Salbutamol and albuterol are merely different terms used to describe the same drug. Salbutamol is the term typically used outside of the United States.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

1405.  Defendants contend that the salbutamol sulphate of the 445 Patent is described as being in suspension, and thus, inherently a drug in particulate form.

1406.  In addition, Plaintiffs' expert Dr. Myrdal testified that a person of ordinary skill in the art would have recognized that micronization was one of the major methods used to reduce particle size for MDI formulations between 1991 and 1996.

1407.  The Court agrees with defendants, and further notes that the specification of the 445 Patent discloses "salbutamol sulphate previously micronized to give over 90% of particles below 10 microns."  (JTX 3_5 (3:51-53)).

1408.  The Court thus concludes that claim 2 of the 445 Patent discloses "particulate drug."

1409.  During claim construction, the plaintiffs offered different constructions of the phrases "substantially free of surfactant" and "no surfactant."

1410.  However, the Court finds that the practical differences between the phrases, if any, are insufficient to render the claims of the 152 Patent patentably distinct from claim 2 of the 445 Patent.

1411.  Defendants also note the substantial overlap in ranges of percent w/w ethanol (10-15% in the 445 Patent; 5-15% in the 152 Patent) and contend that the different, but overlapping, ranges of ethanol are not sufficient to render the claims patentably distinct.

1412.  Finally, defendants contend that although claim 1 of the 152 Patent is drawn to a genus of particulate drug, because the salbutamol sulphate disclosed in claim 2 of the 445 Patent is a species within that genus, the narrower species claim anticipates the broader genus claim.

1413.  The Court agrees with defendants.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

1414.  It is well-recognized law that a species claim anticipating a later genus claim may render the later patent invalid for double patenting.  *See In re Metropol Succinate Lit.*, 494 F.3d 1011 (Fed. Cir. 2007).

1415.  The Court also agrees with defendants that the different phrasing regarding the surfactant and the different but substantially overlapping ranges of ethanol are not sufficient to render claim 1 of the 152 Patent patentably distinct from claim 2 of the 445 Patent.

### b.  Claim 2

1416.  Claim 2 of the 152 Patent depends from claim 1 and reads, "[t]he pharmaceutical suspension aerosol formulation of claim 1, wherein the drug is micronized."  (JTX 1_12).

1417.  For the reasons stated above, the Court concludes that the salbutamol sulphate recited in claim 2 of the 445 Patent is necessarily micronized, and thus claim 2 of the 152 Patent is not patentably distinct from claim 2 of the 445 Patent.

### c.  Claim 3

1418.  Claim 3 of the 152 Patent reads, "[a]n aerosol canister equipped with a metering valve, containing a formulation according to claim 1 in an amount sufficient to provide a plurality of therapeutically effective doses of the drug."  (JTX 1_12).

1419.  Claim 2 of the 445 Patent recites, in part, "an aerosol canister comprising a container closed with a metering valve…."  (JTX 3_5).

1420.  Claim 2 of the 445 Patent is also drawn to "a product suitable for delivering a pharmaceutical aerosol formulation."  (JTX 3_5).

1421.  Defendants contend that a product suitable for delivering a pharmaceutical aerosol formulation would necessarily include an amount of formulation sufficient to provide a plurality of therapeutically effective doses of the drug.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

1422.  The Court agrees with defendants, and concludes that claim 3 of the 152 Patent is not patentably distinct from claim 2 of the 445 Patent.

### d.  Claim 4

1423.  Claim 4 of the 152 Patent reads, "[t]he pharmaceutical suspension aerosol formulation of claim 1, wherein the particulate drug is selected from the group consisting of formoterol, salmeterol, beclomethasone dipropionate, cromolyn, pirbuterol, albuterol, and pharmaceutically acceptable salts or solvates thereof."  (JTX 1_12).

1424.  Claim 4 of the 152 Patent thus includes, within its short list of drugs, albuterol and pharmaceutically acceptable salts thereof.

1425.  Defendants contend that because claim 4 incorporates the elements from claim 1,  merely including a short list of particulate drugs that may be included within the scope of claim 1, claim 4 is not patentably distinct from claim 2 of the 445 Patent for the same reasons set forth above for claim 1 of the 152 Patent.

1426.  The Court agrees, and concludes that claim 4 of the 152 Patent is not patentably distinct from claim 2 of the 445 Patent.

### e.  Claims 8 & 9

1427.  Claims 8 and 9 of the 152 Patent depend from claim 4, and are drawn to formulations wherein the particulate drug is albuterol or albuterol sulfate.

1428.  Defendants contend that claims 8 and 9 merely narrow the scope of the claims of the 152 Patent such that they are closer in scope to claim 2 of the 445 Patent.

1429.  The Court agrees.

1430.  Because claims 8 and 9 of the 152 Patent and claim 2 of the 445 Patent are all drawn to albuterol, and because claims 8 and 9 incorporate the limitations of the claims previously

analyzed, the Court concludes that claims 8 and 9 of the 152 Patent are not patentably distinct from claim 2 of the 445 Patent.

1431.   Thus, the Court concludes that defendants have shown, by clear and convincing evidence, that the asserted claims of the 152 Patent are anticipated by, and are therefore not patentably distinct from, claim 2 of the 445 Patent.

1432.   The 152 Patent, with an expiration date 6 years beyond that of the 445 Patent, thus represents an unjustified timewise extension of the right to exclude.

1433.   Therefore, the Court finds that the asserted claims of the 152 Patent are invalid for obviousness-type double patenting over claim 2 of the 445 Patent.

### 2.   Purewal 684 Patent

1434.   Defendants also contend that the asserted claims of the 152 Patent are invalid for obviousness-type double patenting over claims of the Purewal 684 Patent.

1435.   Once again, the Court agrees.

1436.   U.S. Patent No. 6,352,684 ("Purewal 684 Patent") issued on March 5, 2002 from Application No. 09/067,346, filed on April 28, 1998.  (DTX 284_1).

1437.   Defendants also contend, and plaintiffs have not disputed, that because the application that led to the issuance of the Purewal 684 Patent was filed after June 8, 1995, it is subject to the twenty year patent term rather than the seventeen year patent term.

1438.   Because the Purewal 684 Patent lists its earliest effective filing date as November 28, 1989, the Purewal 684 Patent expired as of November 28, 2009.

1439.   The Court notes that this is 14 years earlier than the 152 Patent's purported expiration date of 2023 alleged by plaintiffs.

1440.   The face of the Purewal 684 Patent indicates that it was assigned to Riker Laboratories, Inc., and lists Tarlochan S. Purewal and David J. Greenleaf as inventors.

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

1441.   Defendants contend, and the plaintiffs have not disputed, and the Court also agrees, that the Purewal Patents, which include the Purewal 684 Patent, the Purewal 573 Patent and the Purewal 743 Patent, discussed below, have been under common ownership with the 152 Patent.

1442.   Proof of 3M's control over the Purewal Patents stems from several evidentiary sources.

1443.   For example, the defendants have correctly pointed out that 3M's own website lists Riker Laboratories as having been a subsidiary of 3M until 1991, at which point "it was integrated into 3M as the Pharmaceutical Division." (DTX 2029_1).

1444.   Norton, a plaintiff in the current litigation, has also stated in a prior litigation that "[i]n 1970, 3M acquired Riker laboratories, Inc. ("Riker"), which became a wholly owned subsidiary of 3M. Riker is now a division of 3M and is no longer a separate entity." (DTX 304_4).

1445.   ████████████████████████████████████████
████████████████████████████████████

1446.   ████████████████████████████████████████
████████████████████████████████████████
██████████

1447.   ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████

1448.   The Court also notes that according to the records of the United States Patent and Trademark Office, on September 5, 2008, Riker Laboratories, Inc. assigned the Purewal Patents,

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

including the Purewal 684 Patent, to 3M Innovative Properties Company, the same assignee listed on the face of the 152 Patent.  (DTX 2114_1).

1449.   Finally, the Court concludes that even if the ownership of the Purewal Patents were to be disputed by plaintiffs, common ownership is not an absolute prerequisite for the application of the double patenting doctrine.

1450.   Rather, one of the relevant inquiries is whether there exists the threat of potential harassment by multiple assignees.  *See In re Hubbell*, 709 F.3d 1140, 1145 (Fed. Cir. 2013) ("There are two justifications for obviousness-type double patenting. The first is 'to prevent unjustified timewise extension of the right to exclude granted by a patent no matter how the extension is brought about.' *The second rationale is to prevent multiple infringement suits by different assignees asserting essentially the same patented invention*.") (emphasis added, internal citations omitted).

1451.   Such a threat, the Court finds, certainly exists here.

### a.   Claim 1

1452.   Claim 1 of the 152 Patent is drawn to a suspension aerosol formulation consisting essentially of particulate drug, propellant HFA-134a and ethanol at 5-15%, wherein the formulation is characterized in that it contains no surfactant.

1453.   Claim 1 of the Purewal 684 Patent reads, "[a] medicinal aerosol formulation comprising 0.01-5% medicament by weight of the formulation, 1,1,1,2-tetrafluoroethane in an amount of at least 50% by weight of the formulation, less than 5% surface active agent by weight of the formulation, and at least one compound having a higher polarity than 1,1,1,2-tetrafluoroethane, and wherein said formulation is free of chlorofluorocarbons and free of propellants $CHClF_2$, $CH_2F_2$ and $CF_3CH_3$."  (DTX 284_8).

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

1454.   Thus claim 1 of the Purewal 684 Patent is drawn to medicinal aerosol formulations containing propellant HFA-134a, a compound of higher polarity than HFA-134a, a medicament and less than 5% surfactant by weight.

1455.   Defendants' expert Dr. Dalby has testified that "less than 5% surface active agent" includes a range that descends to zero, or as close to zero as one of ordinary skill in the art can practically achieve.

1456.   Plaintiffs, on the other hand, contend that "less than 5% surface active agent" means some added surfactant in the formulation in an amount less than 5% by weight.

1457.   The Court agrees with defendants.

1458.   When given the opportunity, patent applicants or their attorneys are free to provide end points for claimed ranges.

1459.   Where they decline to do so, a reasonable interpretation is that the lower end of an unspecified range includes zero or close to zero.  *See Application of Mochel*, 470 F.2d 638, 640 (C.C.P.A. 1972) ("the phrase 'up to' includes zero as the lower limit").

1460.   That, of course, applies here.

1461.   The Court is further persuaded by statements made by 3M, as well as statements made by the plaintiffs in this case with respect to the surfactant disclosure of the Purewal 684 Patent.

1462.   In 2001, Norton Healthcare Ltd., among others, filed suit against 3M alleging, among other things, anticompetitive behavior stemming from 3M's alleged attempts to monopolize the MDI market.  (DTX 304_1).

1463.   Therein, Norton alleged that "[t]hough 3M and Riker were fully aware that surfactant and cosolvent were essential components in their invention, 3M and Riker deliberately obtained the

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

Molecular Formulation Patents which lack these claim limitations and which broadly cover the use of any formulation with a drug and HFA-134a in MDIs." (DTX 304_35).

1464.  The Molecular Formulation Patents referred to by Norton were defined earlier in the Complaint to include the Purewal 573 Patent and the Purewal 743 Patent.

1465.  Because the Purewal 684 Patent had not yet issued in 2001, it was not included in this list.

1466.  However, the Purewal 684 Patent issued from the same family of parent applications as did the Purewal 573 and the Purewal 743 Patents, including the original Great Britain Application No. 88284773.

1467.  The Court thus finds that statements made by Norton regarding the Molecular Formulation Patents are relevant to the Purewal 684 Patent, despite it not being expressly included in the list.

1468.  ████████████████████████████████████████
████████████████████████████

1469.  ████████████████████████████████████████
████████████████████████████████████████████
██████

1470.  ████████████████████████████████████████
██████████████████

1471.  ████████████████████████████████████████
███████████████████████████████████

1472. 

1473. Teva, of course, maintains that such product does not contain a surfactant.

1474.

1475. Because Teva contends that ProAir does not contain surfactant, or at least does not contain surfactant at a level that materially affects the physical properties of the formulation, would have indicated to a person of ordinary skill in the art that the Purewal Patents, including the claims of the Purewal 684 Patent, included within their scope formulations that did not require the presence of surfactant.

1476. Plaintiffs contend that the statements made by 3M, Norton and Teva are not prior art, and therefore not relevant and do not need to be considered by their experts.

1477. The Court disagrees with plaintiffs.

1478. Though these statements were made after the filing date of the 152 Patent, and therefore, are not prior art, statements made by patentees or licensees are nevertheless relevant to a double patenting analysis. *See Eli Lilly and Co. v. Barr Labs., Inc.*, 251 F.3d 955, 969 (Fed. Cir. 2001) (considering post-filing date statements by the patentee in filings with the Securities and Exchange Commission and in a post-filing date journal article in reversing a district court's denial of defendants' obviousness-type double patenting summary judgment motion).

1479. The Court finds that the plain language of the claims of the Purewal 684 Patent as well as the evidence of statements about the scope of the claims of the Purewal 684 Patent made by the

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

patentees and the parties to the instant suit, weighs clearly and convincingly in favor of the defendants.

1480.   The Court finds that the public statements made by the plaintiffs, such as the Orange Book listing and the District Court Complaint, are particularly relevant, since these statements constitute evidence that the plaintiffs were representing to the public that, because the Purewal Patents were co-listed with the 152 Patent and the 445 Patent in the Orange Book, the Purewal Patent claims, including the Purewal 684 Patent claims, do not require surfactant.

1481.   Thus, the Court concludes that claim 1 of the Purewal 684 Patent includes formulations that do not require the presence of a surfactant.

1482.   Claim 3 of the Purewal 684 Patent reads, "[a]n aerosol formulation according to claim 2 comprising a suspension of medicament particles having a median particle size of less than 10 microns." (DTX 284_8).

1483.   Thus, claim 3 is drawn to suspension formulations with micronized medicaments.

1484.   The Court thus concludes that the "particulate drug" limitation in claim 1 of the 152 Patent is met by claim 3 of the Purewal 684 Patent.

1485.   Claim 5 of the Purewal 684 Patent reads, "[a]n aerosol formulation according to claim 1 wherein said compound having a higher polarity than 1,1,1,2-tetrafluoroethane is selected from the group consisting of alcohols, propane, butane, isobutane, pentane, isopentane, neopentane, and mixtures thereof." (DTX 284_8).

1486.   Claim 6 reads, "[a]n aerosol formulation as claimed in claim 5 wherein said compound is selected from the group consisting of ethyl alcohols isopropyl alcohol, n-pentane, isopentane, neopentane, isopropyl myristate and mixtures thereof." (DTX 284_8).

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

1487.   Thus, claims 5 and 6 further specify that the compound of higher polarity than HFA-134a may be ethyl alcohol (ethanol).

1488.   Claim 10 reads, "[a]n aerosol formulation according to claim 9 wherein the ratio of 1,1,1,2-tetrafluoroethane:compound of higher polarity is in the range 85:15 to 95:5." (DTX 284_8).

1489.   Defendants contend that a ratio of 85:15 to 95:5, considering the low levels of surfactant, if present, and drug present in the formulation, would effectively amount to approximately 5-15% ethanol in the formulation.

1490.   Thus, defendants contend that claim 10 of the Purewal 684 Patent further specifies that the ethanol may be present at a range of about 5-15% in the formulation.

1491.   The Court agrees with defendants, and concludes that claims 5, 6 and 10 of the Purewal 684 Patent clearly disclose at least a rough approximation of the 5-15% ethanol range limitation from claim 1 of the 152 Patent.

1492.   However, plaintiffs contend that the Purewal 684 Patent provides no motivation to select ethanol from among the other compounds disclosed in the class of compounds of higher polarity.

1493.   Defendants contend that motivation is irrelevant in the anticipation context.   *See, e.g.*, *Otsuka Pharm. Co. v. Sandoz, Inc*., 678 F.3d 1280, 1297 (Fed. Cir. 2012) ("For anticipation, of course, motivation in the prior art is unimportant.").

1494.   However, even under an obviousness analysis, defendants contend that there is ample motivation provided by the Purewal 684 Patent to choose ethanol, including ethanol's inclusion in at least 10 of the 24 examples disclosed in the Purewal 684 Patent specification and the identification of ethanol as one of the "[p]referred compounds of higher polarity than Propellant 134a." (DTX 284_5 (4:64-65)).

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

1495.  The Court agrees with defendants.

1496.  Ethanol is prominently featured in the formulations disclosed in the Purewal 684 Patent and Dr. Dalby testified that, practically speaking, ethanol was the only cosolvent approved for use in MDIs at the time.

1497.  Thus, claim 1 of the 152 Patent is not patentably distinct from the relevant claims of the Purewal 684 Patent.

### b. Claim 2

1498.  Claim 2 of the 152 Patent depends from claim 1 and reads, "[t]he pharmaceutical suspension aerosol formulation of claim 1, wherein the drug is micronized."  (JTX 1_12).

1499.  For the reasons stated above, the Court concludes that claim 3 of the Purewal 684 Patent discloses suspension formulations with micronized medicaments, and thus, claim 2 of the 152 Patent is not patentably distinct from claim 3 of the Purewal 684 Patent.

### c. Claim 3

1500.  Claim 3 of the 152 Patent reads, "[a]n aerosol canister equipped with a metering valve, containing a formulation according to claim 1 in an amount sufficient to provide a plurality of therapeutically effective doses of the drug."  (JTX 1_12).

1501.  Claim 1 of the Purewal 684 Patent recites, in part, "a medicinal aerosol formulation" and claim 2 of the Purewal 684 Patent further specifies that the formulations include those "suitable for administration to a patient by oral or nasal inhalation."  (DTX 284_8).

1502.  A review of the specification of the Purewal 684 Patent to ascertain the mode of administration contemplated by the patentees by the use of the claim language "suitable for administration to a patient by oral or nasal inhalation," reveals that the specification discloses that the "formulation of the invention may be filled into conventional aerosol containers equipped with metering valves."  (DTX  284_6 (6:40-42)).

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

1503.  The patentees of the Purewal 684 Patent thus contemplated the use of conventional aerosol canisters, and the inclusion of a metering valve for use with a formulation "suitable for administration to a patient" implies that the formulation will be delivered in a plurality of therapeutically effective doses.

1504.  Thus, the Court concludes that claim 3 of the 152 Patent is not patentably distinct from claims 1 and 2 of the Purewal 684 Patent.

### d.  Claim 4

1505.  Claim 4 of the 152 Patent reads, "[t]he pharmaceutical suspension aerosol formulation of claim 1, wherein the particulate drug is selected from the group consisting of formoterol, salmeterol, beclomethasone dipropionate, cromolyn, pirbuterol, albuterol, and pharmaceutically acceptable salts or solvates thereof."  (JTX 1_12).

1506.  Claim 1 of the Purewal 684 Patent is drawn to a "medicament."  (DTX 284_8).

1507.  Plaintiffs contend that the term "medicament" broadly encompasses the more than forty different drugs disclosed in the specification of the Purewal 684 Patent.

1508.  Defendants, on the other hand, contend that the examples of the Purewal 684 Patent described twenty-four formulations in which only three drugs were utilized—salbutamol, beclomethasone and cromoglycate.  (DTX 284_7-8).

1509.  These happen to be three of the drugs identified in the short list of particulate drugs included in claim 4 of the 152 Patent.

1510.  Defendants further contend that salbutamol is used as a medicament in 11 of the 24 examples of the Purewal 684 Patent, more than any other disclosed medicament, and the sulphate salt was used in each instance.

1511.  The Court agrees with defendants and thus concludes that, because the "medicament" of claim 1 of the Purewal 684 Patent includes salbutamol, which was prominently featured in the

examples of the specification, claim 4 of the 152 Patent is not patentably distinct from claim 1 of the Purewal 684 Patent.

### e.   Claims 8 & 9

1512.   Claims 8 and 9 of the 152 Patent depend from claim 4, and are drawn to formulations wherein the particulate drug is albuterol or albuterol sulfate.

1513.   Defendants contend, for the reasons stated above, that albuterol, and specifically the sulfate salt of albuterol, is the most prominently featured and exemplified drug from the class of medicaments claimed in claim 1 of the Purewal 684 Patent.

1514.   The Court agrees.

1515.   Because claim 1 of the Purewal 684 Patent includes within its scope albuterol and albuterol sulfate, and albuterol sulfate was prominently featured in the examples of the Purewal 684 Patent, the Court concludes that claims 8 and 9 of the 152 Patent are not patentably distinct from claim 1 of the Purewal 684 Patent.

1516.   Thus, the Court concludes that defendants have shown by clear and convincing evidence that the asserted claims of the 152 Patent are anticipated by, and obvious variants of claims 1, 2, 3, 5, 6 and 10 of the Purewal 684 Patent.

1517.   Therefore, the 152 Patent, with an expiration date 14 years beyond that of the Purewal 684 Patent, represents an unjustified timewise extension of the right to exclude, and further, potentially raises the threat of harassment by multiple assignees.

1518.   Therefore, this Court concludes that the 152 Patent is invalid for obviousness-type double patenting over the claims of the Purewal 684 Patent.

### 3.   Purewal 573 Patent

1519.   Defendants also contend that the asserted claims of the 152 Patent are invalid for obviousness-type double patenting over claims of the Purewal 573 Patent.

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

1520.   Once again, the Court agrees.

1521.   U.S. Patent No. 5,766,573 ("Purewal 573 Patent") issued on June 16, 1998 from Application No. 783,737, filed on January 16, 1997.  (DTX 814_2).

1522.   Defendants also contend, and plaintiffs have not disputed, and the Court also agrees, that because the application that led to the issuance of the Purewal 573 Patent was filed after June 8, 1995, it is subject to the twenty year patent term rather than the seventeen year patent term.

1523.   Because the Purewal 573 Patent lists its earliest effective filing date as November 28, 1989, the Purewal 573 Patent expired as of November 28, 2009.

1524.   The Court notes that this is 14 years earlier than the 152 Patent's purported expiration date of 2023 alleged by plaintiffs.

1525.   The face of the Purewal 573 Patent indicates that it was assigned to Riker Laboratories, Inc., and lists Tarlochan S. Purewal and David J. Greenleaf as inventors.  (DTX 814_2).

1526.   Defendants contend, and the plaintiffs have not disputed, and the Court also agrees, that the Purewal Patents, which include the Purewal 573 Patent, have been under common ownership with the 152 Patent.

1527.   Proof of 3M's control over the Purewal Patents, including the Purewal 573 Patent, stems from several evidentiary sources, all of which were discussed in detail above with respect to the Purewal 684 Patent.

1528.   The Court finds that evidence to be conclusive that the Purewal 573 Patent and the 152 Patent were under the control of 3M for a significant portion of their terms.

1529.   However, as stated previously, the Court notes that even if the ownership of the Purewal Patents were to be disputed by plaintiffs, common ownership is not an absolute prerequisite for the application of the double patenting doctrine.  *See In re Hubbell*, 709 F.3d at 1145 (Fed. Cir.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

2013) ("There are two justifications for obviousness-type double patenting. The first is 'to prevent unjustified timewise extension of the right to exclude granted by a patent no matter how the extension is brought about.' *The second rationale is to prevent multiple infringement suits by different assignees asserting essentially the same patented invention*.") (emphasis added, internal citations omitted).

1530.   It is not a prerequisite here.

### a.   Claim 1

1531.   Claim 1 of the 152 Patent is drawn to a suspension aerosol formulation consisting essentially of particulate drug, propellant HFA-134a and ethanol at 5-15%, wherein the formulation is characterized in that it contains no surfactant.

1532.   Claim 1 of the Purewal 573 Patent reads, "[i]n the method of delivering an aerosol formulation containing a medicament from an aerosol container equipped with a metering valve, said formulation being suitable for delivery to the lung by inhalation from said container, the improvement comprising using in said formulation a propellant essentially free of chlorofluorocarbons and comprising 1,1,1,2-tetrafluoroethane." (DTX 814_8).

1533.   Claim 1 of the Purewal 573 Patent is thus drawn to a method of delivering a formulation comprising a medicament and propellant HFA-134a.

1534.   Claim 1 of the Purewal 573 Patent further discloses a formulation in an "aerosol canister equipped with a metering valve." (DTX 814_8).

1535.   Claim 2 of the Purewal 573 Patent reads, "[a] method according to claim 1, wherein said improvement further comprises the use of a compound selected from the group consisting of ethyl alcohol, isopropyl alcohol, n-pentane, isopentane, neopentane, and isopropyl myristate." (DTX 814_8).

1536.  Claim 2 of the Purewal 573 Patent thus further specifies that the formulations of claim 1 may comprise ethyl alcohol (ethanol).

1537.  The claims of the Purewal 573 Patent do not further specify at what ranges the ethanol is contemplated for use in the claimed formulations.

1538.  To construe the scope of the ranges of ethanol contemplated by claim 2 of the Purewal 573 Patent, the Court looks to the specification.

1539.  Therein, the Court notes that the Purewal 573 Patent specifies that ethanol is a preferred compound of higher polarity than HFA-134a and specifies that the HFA-134a and the compounds of higher polarity are contemplated for use preferably at a ratio of 85:15 to 95:5. (DTX 814_5 (4:60-64)).

1540.  Defendants contend, as they did with the same ratio disclosure in the Purewal 684 Patent, that, considering the low levels of surfactant, if present, and drug present in the formulation, 85:15 to 95:5 would in practicality amount to approximately 5-15% ethanol in the formulation.

1541.  The Court notes that this is consistent with the disclosure of Example 24, which describes formulations containing HFA-134a and 10% w/w ethanol.  (DTX 814_7-8).

1542.  Thus, defendants contend, and the Court agrees, that claim 2 of the Purewal 573 Patent, read in light of the specification, further specifies that the ethanol may be present at a range of about 5-15% in the formulation.

1543.  As they did for the Purewal 684 Patent, plaintiffs contend that the Purewal 573 Patent does not provide motivation to select ethanol.

1544.  For the same reasons discussed above for the Purewal 684 Patent, the Court agrees with defendants.

1545.  Claim 3 of the Purewal 573 Patent reads, "[a] method according to claim 1, wherein said medicament is salbutamol, beclomethasone dipropionate, disodium cromoglycate, pirbuterol, isoprenaline, adrenaline, rimiterol, or ipratropium bromide."  (DTX 814_8).

1546.  Thus claim 3 further discloses, in a short list of potential medicaments, salbutamol (albuterol).

1547.  To ascertain the scope of the claim limitation "salbutamol" and whether that term includes salts of salbutamol, the Court looks to the specification.

1548.  Therein, the Court notes that the Purewal 573 Patent describes several examples using micronized salbutamol sulphate.  (DTX 814_6 (6:28-37, 54), 7-8 (7:10-9:20)).

1549.  Finally, Defendants contend that the claims of the Purewal 573 Patent are silent as to the inclusion or exclusion of surfactant, and thus, the claims may be read to include both variables.

1550.  Plaintiffs on the other hand contend that all of the examples in the Purewal 573 Patent specification list surfactant as an ingredient.

1551.  Plaintiffs further contend that the specification states, "[a]ccording to the present invention there is provided an aerosol formulation comprising a medicament, a surfactant, 1,1,1,2-tetrafluoroethane and at least one compound having a higher polarity than 1,1,1,2-tetrafluoroethane."  (DTX 814_4 (2:9-12)).

1552.  The Court, however, notes the passage from the Purewal 573 Patent specification, which states, "surface active agents are *generally* present in amounts not exceeding 5 percent by weight of the total formulation.  They will *usually* be present in the weight ratio 1:100 to 10:1 surface active agent:drug(s)."  (DTX 814_6 (5:37-39)) (emphasis added).

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

1553.  The Court finds that the words "generally" and "usually" indicate only a typical circumstance, and do not require the inclusion of surfactant in only those weight ratios, or in all circumstances.

1554.  Defendants further contend, as they did with the Purewal 684 Patent, that the patentees and the plaintiffs in the instant suit made numerous statements, some of them public, that they believed the Purewal Patents, including the claims of the Purewal 573 Patent, to not require the presence of surfactant, and/or to cover the ProAir product.  (*See* DTX 304; DTX 303; DTX 291; DTX 292; DTX 294).

1555.  The Court agrees with defendants.

1556.  The Court finds that the plain language of the claims of the Purewal 573 Patent, as well as the evidence of statements about the scope of the claims of the Purewal 573 Patent made by the patentees and the parties to the instant suit, clearly and convincingly weigh in favor of the defendants.

1557.  The Court concludes that claims 1 to 3 of the Purewal 573 Patent include formulations that do not require the presence of a surfactant.

1558.  Because the claims of the Purewal 573 Patent disclose the remaining elements of claim 1 of the 152 Patent, the Court concludes that claim 1 of the 152 Patent is not patentably distinct from claims 1 to 3 of the Purewal 573 Patent.

### b.  Claim 2

1559.  Claim 2 of the 152 Patent depends from claim 1 and reads, "[t]he pharmaceutical suspension aerosol formulation of claim 1, wherein the drug is micronized."  (JTX 1_12).

1560.  For the reasons stated above, the Court concludes that the claims of the Purewal 573 Patent are drawn to formulations in which the drug is micronized, and thus, claim 2 of the 152 Patent is not patentably distinct from the claims of the Purewal 573 Patent.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

### c.  Claim 3

1561.  Claim 3 of the 152 Patent reads, "[a]n aerosol canister equipped with a metering valve, containing a formulation according to claim 1 in an amount sufficient to provide a plurality of therapeutically effective doses of the drug."  (JTX 1_12).

1562.  Claim 1 of the Purewal 573 Patent is drawn to a method of delivering a formulation from an aerosol container equipped with a metering valve.  (DTX 814_8).

1563.  The claims of the Purewal 573 Patent thus contemplate the use of aerosol canisters, and the inclusion of a metering valve implies that the formulation will be delivered in a plurality of therapeutically effective doses.

1564.  The Court concludes that claim 3 of the 152 Patent is not patentably distinct from claims 1 to 3 of the Purewal 573 Patent.

### d.  Claim 4

1565.  Claim 4 of the 152 Patent reads, "[t]he pharmaceutical suspension aerosol formulation of claim 1, wherein the particulate drug is selected from the group consisting of formoterol, salmeterol, beclomethasone dipropionate, cromolyn, pirbuterol, albuterol, and pharmaceutically acceptable salts or solvates thereof."  (JTX 1_12).

1566.  Claim 1 of the Purewal 573 Patent discloses a formulation comprising a "medicament," and claim 3 of the Purewal 573 Patent discloses several of the medicaments that are claimed in claim 4 of the 152 Patent—salbutamol, beclomethasone, pirbuterol and cromolyn (cromoglycate).  (DTX 814_8).

1567.  Plaintiffs contend that the term medicament broadly encompasses the more than forty different drugs disclosed in the specification of the Purewal 573 Patent.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

1568.  Defendants, on the other hand, contend that the examples of the Purewal 573 Patent describe twenty-four formulations in which only three drugs were utilized—salbutamol, beclomethasone and cromoglycate.  (DTX 284_7-8).

1569.  These happen to be three of the drugs identified in the short list of particulate drugs included in claim 4 of the 152 Patent.

1570.  Defendants further contend that salbutamol is used as a medicament in 11 of the 24 examples, more than any other disclosed medicament, and the sulphate salt was used in each instance.

1571.  The Court agrees with defendants and thus concludes that claim 4 of the 152 Patent is not patentably distinct from claims 1 to 3 of the Purewal 573 Patent.

### e.  Claims 8 & 9

1572.  Claims 8 and 9 of the 152 Patent depend from claim 4 and are drawn to formulations wherein the particulate drug is albuterol or albuterol sulfate.  (JTX 1_12).

1573.  Plaintiffs contend, as above, that the Purewal 573 Patent specification lists over forty different drugs, and there would be no motivation to choose albuterol.

1574.  Defendants contend that motivation is irrelevant in the anticipation context.  *See, e.g.*, *Otsuka Pharm. Co. v. Sandoz, Inc*., 678 F.3d 1280, 1297 (Fed. Cir. 2012) ("For anticipation, of course, motivation in the prior art is unimportant.").

1575.  However, even under an obviousness analysis, defendants contend that there is ample motivation provided by the Purewal 573 Patent.

1576.  Defendants contend, for the reasons stated above, that albuterol, and specifically the sulfate salt of albuterol, is the most prominently featured and exemplified drug from the class of medicaments identified in the specification and claimed in claims 1 and 3 of the Purewal 573 Patent.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

1577.   The Court agrees with defendants.

1578.   Because claims 1 to 3 of the Purewal 573 Patent include medicaments which include albuterol and albuterol sulfate, the Court concludes that claims 8 and 9 of the 152 Patent are not patentably distinct from claims 1 to 3 of the Purewal 573 Patent.

1579.   Thus, the Court concludes that the defendants have shown by clear and convincing evidence, that the asserted claims of the 152 Patent are anticipated by, and obvious variants of, claims 1, 2 and 3 of the Purewal 573 Patent.

1580.   Therefore, the 152 Patent, with an expiration date 14 years beyond that of the Purewal 573 Patent, represents an unjustified timewise extension of the right to exclude, and further, potentially raises the threat of harassment by multiple assignees.

1581.   Therefore, this Court concludes that the 152 Patent is invalid for obviousness-type double patenting over the claims of the Purewal 573 Patent.

### 4.  Purewal 743 Patent

1582.   Defendants also contend that the asserted claims of the 152 Patent are invalid for obviousness-type double patenting over claims of the Purewal 743 Patent.

1583.   The Court agrees.

1584.   U.S. Patent No. 5,695,743 ("Purewal 743 Patent") issued on December 9, 1997 from Application No. 26,476, filed on March 4, 1993.  (DTX 285_1).

1585.   Defendants also contend, and plaintiffs have not disputed, and the Court also agrees, that because the application that led to the issuance of the Purewal 743 Patent was filed prior to June 8, 1995, it is subject to the seventeen year patent term rather than the twenty year patent term.

1586.   However, the Purewal 743 Patent lists on its face that it is subject to terminal disclaimer over U.S. Patent No. 5,225,183 ("Purewal 183 Patent").  (DTX 285_1).

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

1587.  Because the Purewal 183 Patent expired on July 6, 2010, the Purewal 743 Patent did as well.

1588.  The Court notes that this is 13 years earlier than the 152 Patent's purported expiration date of 2023 alleged by plaintiffs.

1589.  The face of the Purewal 743 Patent indicates that it was assigned to Riker Laboratories, Inc., and lists Tarlochan S. Purewal and David J. Greenleaf as inventors.  (DTX 285_1).

1590.  Defendants contend, and the plaintiffs have not disputed, that the Purewal Patents, which include the Purewal 743 Patent, have been under common ownership with the 152 Patent.

1591.  Proof of 3M's control over the Purewal Patents stems from several evidentiary sources, all of which were discussed in detail above with respect to the Purewal 684 and 573 Patents.

1592.  The Court finds the evidence conclusive that the Purewal 743 Patent and the 152 Patent were under the control of 3M for a significant portion of their terms.

1593.  However, as stated previously, the Court notes that even if the ownership of the Purewal Patents were to be disputed by plaintiffs, common ownership is not an absolute prerequisite for the application of the double patenting doctrine.  *See In re Hubbell*, 709 F.3d at 1145 (Fed. Cir. 2013) ("There are two justifications for obviousness-type double patenting. The first is 'to prevent unjustified timewise extension of the right to exclude granted by a patent no matter how the extension is brought about.' *The second rationale is to prevent multiple infringement suits by different assignees asserting essentially the same patented invention*.") (emphasis added, internal citations omitted).

1594.  It is not required here.

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

### a. Claim 1

1595. Claim 1 of the 152 Patent is drawn to a suspension aerosol formulation consisting essentially of particulate drug, propellant HFA-134a and ethanol at 5-15%, wherein the formulation is characterized in that it contains no surfactant. (JTX 1_12).

1596. Claim 1 of the Purewal 743 Patent reads, "[a]n aerosol formulation comprising: (a) a therapeutically effective amount of a medicament; and (b) a propellant substantially free of chlorofluorocarbons, said propellant comprising 1,1,1,2-tetrafluoroethane, said formulation being suitable for delivery to the lung by inhalation." (DTX 285_7).

1597. Claim 1 of the Purewal 743 Patent is thus drawn to an aerosol formulation comprising a medicament and propellant HFA-134a.

1598. Claim 1 of the Purewal 743 Patent further discloses a formulation that is suitable for delivery to the lung by inhalation.

1599. Claim 2 of the Purewal 743 Patent reads, "[t]he formulation of claim 1 wherein said medicament is a member selected from the group consisting of salbutamol, beclomethasone dipropionate, disodium cromoglycate, pirbuterol, isoprenaline, adrenaline, rimiterol, and ipratropium bromide…." (DTX 285_7).

1600. Claim 2 of the Purewal 743 Patent thus further specifies that the formulations of claim 1 may comprise salbutamol (albuterol), as well as a short list of additional medicaments. (DTX 285_7).

1601. Defendants contend that the claims of the Purewal 743 Patent do not expressly claim ethanol, but leave open the possibility by the use of the open-ended term "comprising."

1602. To ascertain whether the use of the term comprising contemplates the inclusion of ethanol and at what concentrations, the Court looks to the specification.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

1603.   Therein, the Court notes that the Purewal 743 Patent specifies that ethanol is a preferred compound of higher polarity for use in formulations with HFA-134a, and discloses at least 9 examples of HFA-134a formulations containing ethanol.  (DTX 285_4 (4:59-60), 6 (7:1-9:22)).

1604.   The specification further discloses that the HFA-134a and the compounds of higher polarity are contemplated for use preferably at a ratio of 85:15 to 95:5.  (DTX 285_4 (4:54-59)).

1605.   Defendants contend, as they did with the same ratio disclosure in the Purewal 684 and 573 Patents, that considering the low levels of surfactant, if present, and drug present in the formulation, 85:15 to 95:5 would in practicality amount to approximately 5-15% ethanol in the formulation.

1606.   This is consistent with the disclosure of Example 24, which describes formulations containing HFA-134a and 10% w/w ethanol.  (DTX 285_6-7).

1607.   Thus, defendants contend, and the Court agrees, that claims 1 and 2 of the Purewal 743 Patent, read in light of the specification, further specifies that the ethanol may be present at a range of about 5-15% in the formulation.

1608.   To ascertain the scope of the claim limitation "salbutamol" in claim 2 of the Purewal 743 Patent, and whether that term includes salts of salbutamol, the Court looks to the specification.

1609.   Therein, the Court notes that the Purewal 743 Patent describes several examples using micronized salbutamol sulphate.  (DTX 285_5 (6:20-29, 47), 6-7 (7:1-9:22)).

1610.   Finally, Defendants contend that the claims of the Purewal 743 Patent are silent as to the inclusion or exclusion of surfactant and thus the claims may be read to include both variables.

1611.   Plaintiffs on the other hand contend that all of the examples in the specification of the Purewal 743 Patent list surfactant as an ingredient.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

1612.  Plaintiffs further contend that the specification states that "[a]ccording to the present invention there is provided an aerosol formulation comprising a medicament, a surfactant, 1,1,1,2-tetrafluoroethane and at least one compound having a higher polarity than 1,1,1,2-tetrafluoroethane."  (DTX 285_3 (2:6-9)).

1613.  The Court notes the passage from the Purewal 743 Patent specification, which states "surface active agents are *generally* present in amounts not exceeding 5 percent by weight of the total formulation.  They will *usually* be present in the weight ratio 1:100 to 10:1 surface active agent:drug(s)."  (DTX 285_5 (5:31-34)) (emphasis added).

1614.  The Court finds that the words "generally" and "usually" indicate only a typical circumstance and do not require the inclusion of surfactant in only those weight ratios or in all circumstances.

1615.  Defendants further contend, as they did with the Purewal 684 and 573 Patents, that the patentees and the plaintiffs in the instant suit made numerous statements, some of them public, that they believed the Purewal Patents, including the claims of the Purewal 743 Patent, to not require the presence of surfactant, and/or to cover the ProAir product.  (*See* DTX 304; DTX 303; DTX 291; DTX 292; DTX 294).

1616.  The Court again agrees with defendants.

1617.  The Court finds that the plain language of the claims of the Purewal 743 Patent as well as the evidence of statements about the scope of the claims of the Purewal 743 Patent made by the patentees and the parties to the instant suit, weighs clearly and convincingly in favor of the defendants.

1618.  The Court thus concludes that claims 1 and 2 of the Purewal 743 Patent include formulations that do not require the presence of a surfactant.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

1619.  Because the claims of the Purewal 743 Patent disclose formulations of HFA-134a with medicaments including salbutamol, contemplate the optional inclusion of ethanol and the optional exclusion of surfactant, the, the Court concludes that claim 1 of the 152 Patent is not patentably distinct from claims 1 and 2 of the Purewal 743 Patent.

### b.  Claim 2

1620.  Claim 2 of the 152 Patent depends from claim 1 and reads, "[t]he pharmaceutical suspension aerosol formulation of claim 1, wherein the drug is micronized."  (JTX 1_12).

1621.  For the reasons stated above, the Court concludes that the claims of the Purewal 743 Patent are drawn to formulations in which the drug is micronized, and thus claim 2 of the 152 Patent is not patentably distinct from the claims of the Purewal 743 Patent.

### c.  Claim 3

1622.  Claim 3 of the 152 Patent reads, "[a]n aerosol canister equipped with a metering valve, containing a formulation according to claim 1 in an amount sufficient to provide a plurality of therapeutically effective doses of the drug."  (JTX 1_12).

1623.  Claim 1 of the Purewal 743 Patent is drawn to a "formulation being suitable for delivery to the lung by inhalation."  (DTX 285_7).

1624.  To determine the mode contemplated by the patentees for the delivery of the formulation to the lung by inhalation, the Court refers to the specification.

1625.  Therein, the Purewal 743 Patent specification discloses that the "formulation of the invention may be filled into conventional aerosol containers equipped with metering valves." (DTX 285_5 (6:40-42)).

1626.  The claims of the Purewal 743 Patent thus contemplate the use of aerosol canisters and the inclusion of a metering valve implies that the formulation will be delivered in a plurality of therapeutically effective doses.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

1627.  The Court thus concludes that claim 3 of the 152 Patent is not patentably distinct from claims 1 and 2 of the Purewal 743 Patent.

### d.  Claim 4

1628.  Claim 4 of the 152 Patent reads, "[t]he pharmaceutical suspension aerosol formulation of claim 1, wherein the particulate drug is selected from the group consisting of formoterol, salmeterol, beclomethasone dipropionate, cromolyn, pirbuterol, albuterol, and pharmaceutically acceptable salts or solvates thereof."  (JTX 1_12).

1629.  Claim 1 of the Purewal 743 Patent discloses a formulation comprising a "medicament," and claim 2 discloses several of the medicaments that are claimed in claim 4 of the 152 Patent—salbutamol, beclomethasone, pirbuterol and cromolyn (cromoglycate).  (DTX 285_7 (10:9-12)).

1630.  Plaintiffs contend that the term medicament broadly encompasses the more than forty different drugs disclosed in the specification of the Purewal 743 Patent.

1631.  Defendants, on the other hand, contend that the examples of the Purewal 743 Patent describe twenty-four formulations in which only three drugs were utilized—salbutamol, beclomethasone and cromoglycate.  (DTX 285_6-7).

1632.  These happen to be three of the drugs identified in the short list of particulate drugs included in claim 4 of the 152 Patent.

1633.  Defendants further contend that salbutamol is used as a medicament in 11 of the 24 examples of the Purewal 743 Patent, more than any other disclosed medicament, and the sulphate salt was used in each instance.

1634.  The Court agrees with defendants and thus concludes that claim 4 of the 152 Patent is not patentably distinct from claims 1 and 2 of the Purewal 743 Patent.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

### e. Claims 8 & 9

1635.  Claims 8 and 9 of the 152 Patent depend from claim 4 and are drawn to formulations wherein the particulate drug is albuterol or albuterol sulfate.  (JTX 1_12).

1636.  Plaintiffs contend, as above, that the Purewal 743 Patent specification lists over forty different drugs and there would be no motivation to choose albuterol.

1637.  Defendants contend that motivation is irrelevant in the anticipation context.  *See, e.g.*, *Otsuka Pharm. Co. v. Sandoz, Inc.*, 678 F.3d 1280, 1297 (Fed. Cir. 2012) ("For anticipation, of course, motivation in the prior art is unimportant.").

1638.  However, even under an obviousness analysis, defendants contend that there is ample motivation provided by the Purewal 743 Patent.

1639.  Defendants contend, for the reasons stated above, that albuterol, and specifically the sulfate salt of albuterol, is the most prominently featured and exemplified drug from the class of medicaments claimed in claims 1 and 2 of the Purewal 743 Patent.

1640.  The Court agrees.

1641.  Because claims 1 and 2 of the Purewal 743 Patent include medicaments which include albuterol and albuterol sulfate, the Court concludes that claims 8 and 9 of the 152 Patent are not patentably distinct from claims 1 and 2 of the Purewal 743 Patent.

1642.  The Court concludes that the defendants have shown by clear and convincing evidence, that the asserted claims of the 152 Patent are anticipated by, and obvious variants of, claims 1 and 2 of the Purewal 743 Patent.

1643.  Therefore, the 152 Patent, with an expiration date 13 years beyond that of the Purewal 743 Patent, represents an unjustified timewise extension of the right to exclude, and further, raises the threat of harassment by multiple assignees.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

1644.   Therefore, this Court concludes that the 152 Patent is invalid for obviousness-type double patenting over the claims of the Purewal 743 Patent.

### 5.  R. Schultz 534 Patent

1645.   Defendants also contend that the asserted claims of the 152 Patent are invalid for obviousness-type double patenting over claims of the R. Schultz 534 Patent.

1646.   Once again, the Court agrees.

1647.   According to the face of the patent, U.S. Patent No. 7,101,534 ("R. Schultz 534 Patent") issued on September 5, 2006 from application No. 08/455,874, filed May 31, 1995.  (DTX 67_1).

1648.   Defendants contend, and the Court agrees, that because of the notation that appears on the face of the R. Schultz 534 Patent,[20] it expired as of December 18, 2011, based upon the addition of twenty years to the earliest claimed priority date listed on the face of the R. Schultz 534 Patent.

1649.   This is 12 years earlier than the 152 Patent's purported expiration date of September 2023 alleged by Plaintiffs.

1650.   The face of the R. Schultz 534 Patent indicates that it is assigned to 3M Innovative Properties Company, the same assignee listed on the face of the 152 Patent, and lists the purported inventors as Robert K. Schultz, David W. Schultz and Robert A. Moris.  (DTX 67_1).

1651.   The relevant claims of the R. Schultz 534 patent read:

> 1. A pharmaceutical suspension aerosol formulation comprising: (i) particulate drug; (ii) 1,1,1,2,3,3,3-heptafluoropropane as propellant; and (iii) ethanol in an amount of 5 to about 15 percent by weight, wherein the formulation contains no surfactant.

---

[20] The R. Schultz 534 Patent states on its face that "[t]his patent issued on a continued prosecution application filed under 37 CFR 1.53(d), and is subject to the twenty year patent term provisions of 35 U.S.C. 154(a)(2)." (DTX 67_1).

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

2. The pharmaceutical suspension aerosol formulation of claim 1, wherein the particulate drug is micronized.

3. The pharmaceutical suspension aerosol formulation of claim 1, wherein the drug is albuterol sulfate.

5. The pharmaceutical suspension aerosol formulation of claim 1, wherein the particulate drug is selected from the group consisting of formoterol, salmeterol, beclomethasone dipropionate, cromolyn, pirbuterol, albuterol, and pharmaceutically acceptable salts or solvates thereof.

9. The pharmaceutical suspension aerosol formulation of claim 1, wherein the particulate drug is albuterol or a pharmaceutically acceptable salt or solvate thereof.

(DTX 67_11).

1652. The Court notes that the only difference between claims 1, 2, 3, 5 and 9 of the R. Schultz 534 Patent and claims 1, 2, 4, 8 and 9 of the 152 Patent is the propellant.

1653. Otherwise, the claims are nearly identical.

1654. The R. Schultz 534 Patent is drawn to formulations employing HFA-227 while the 152 Patent is drawn to formulations employing HFA-134a.

1655. Defendants contend that the claims to the HFA-227 formulations render obvious the HFA-134a formulations claimed in the 152 Patent.

1656. The Court agrees.

1657. Plaintiffs' expert, Dr. Byron, testified that the two propellants are different with different physical properties, including density and vapor pressure, and that defendants' expert, Dr. Dalby, failed to provide a motivation for why one of ordinary skill in the art would change from HFA-227 to HFA-134a.

1658. Defendants contend, and the Court agrees, that their expert, Dr. Dalby, has provided ample testimony regarding the motivation to choose HFA-134a in suspension aerosol

formulations, having testified that HFA-134a was by far the leading candidate, the "frontrunner," for replacing CFC propellants.

1659.   Dr. Dalby testified that an industrial consortium had begun toxicity testing on HFA-134a prior to doing the same for HFA-227, and that HFA-134a was more commercially available than HFA-227 in the early 1990s.

1660.   Furthermore, defendants contend, and the Court agrees, that plaintiffs' expert, Dr. Myrdal, testified regarding the alleged support in the specification for the claims of the 152 Patent, and in so doing pointed to numerous passages that refer only to HFA-227 formulations.

1661.   Lastly, defendants contend that statements made by 3M during proceedings before the U.S. Patent and Trademark Office further evidence the fact that there is no patentable distinction to be found between formulations containing HFA-227 and formulations containing HFA-134a.

1662.   The Court agrees.

1663.   During the prosecution of the application that led to the 152 Patent, 3M moved all claims pending in the 490 Application, as well as claims from related applications, into a single application ("296 Application") for the purpose of provoking an interference with certain Glaxo patents, which they did through a Supplemental Preliminary Amendment and Request That an Interference Be Declared Under 37 C.F.R. § 1.607 ("Request for Interference"), dated May 9, 2000.  (DTX 10_654; DTX 15; DTX 1996_16-52).

1664.   In 3M's Request for Interference, they proposed the following count: "A pharmaceutical suspension formulation suitable for aerosol administration comprising i) particulate drug; ii) propellant which comprises 1,1,1,2-tetrafluoroethane or 1,1,1,2,3,3,3-heptafluoropropane or mixtures thereof and optionally; iii) ethanol or other polar cosolvent wherein the formulation is

further characterized in that it contains no surfactant or less than 0.0001% w/w surfactant based on the weight of the drug." (DTX 10_654; DTX 15_2, 28; DTX 1996_17, 43).

1665.   3M further stated to the U.S. Patent and Trademark Office that "[t]he proposed count recites one invention, i.e., an essentially surfactant-free aerosol suspension formulation having the specified drug and propellant.   As explained below, the presence of ethanol in the formulation, *the specific types of drugs or propellants recited in the patents*, the methods of use and the canisters and metered dose inhalers containing the formulations claimed in the Glaxo patents *all fall within the scope of one invention*."   (DTX 15_29; DTX 1996_44) (emphasis added).

1666.   3M continued, explaining that "Claims in the Patents Reciting HFC 134a, HFC 227, or HFC 134a/227 Mixtures are not Patentably Distinct from Each Other" and further argued that "the claims in a number of Glaxo patents recite formulations containing 134a alone, 227 alone, or mixtures of l34a and 227.   *These differences between the claims do not make claims reciting one propellant patentably distinct over claims reciting another*." (DTX 15_31; DTX 1996_46) (emphasis added).

1667.   The Court agrees with defendants that these statements are relevant evidence of what 3M, the listed assignee of the 152 and 534 Patents, thought at the time about the differences between HFA-227 and HFA-134a.

1668.   In addition, defendants contend, and the Court agrees, that the differences in physical properties notwithstanding, 3M and their competitors often treated the two propellants as aspects of the same invention in their patent filings.   (*See, e.g*., JTX 1; DTX 10; DTX 1131; DTX 9; DTX 68; DTX 1143; DTX 1165; DTX 1167; DTX 1168; DTX 1169; DTX 1161; DTX 1163).

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

1669.   Finally, defendants note that claim 3 of the 152 Patent is the only claim that does not find a direct counterpart in the R. Schultz 534 Patent claims.

1670.   However, defendants contend that the "pharmaceutical suspension aerosol formulation" of the R. Schultz 534 Patent claims is intended for use in "aerosol canisters equipped with conventional valves, preferably metered dose valves" and that "the formulations of the invention can be prepared by combining (i) the drug in an amount sufficient to provide a plurality of therapeutically effective doses; and (ii) the propellant in an amount sufficient to propel a plurality of doses from an aerosol canister." (DTX 67_6 (5:54-58, 6:13-15)).

1671.   The Court agrees with defendants.

1672.   The Court finds that, although the propellants may be different and may exhibit different physical properties, in view of the statements made by 3M and the evidence presented by defendants, the defendants have shown by clear and convincing evidence that the asserted claims of the 152 Patent are obvious variants of the claims of the R. Schultz 534 Patent.

1673.   The Court concludes that for the asserted claims of the 152 Patent to expire 12 years beyond the expiration date of the R. Schultz 534 Patent represents an unjustified timewise extension of the right to exclude, and therefore the Court concludes that the asserted claims of the 152 Patent are not patentably distinct from, and are therefore invalid for obviousness-type double patenting over, claims 1, 2, 3, 5 and 9 of the R. Schultz 534 Patent.[21]

1674.   As a final point, defendants contend that the 152 Patent is not entitled to the safe harbor provisions of 35 U.S.C. § 121 with respect to the R. Schultz 534 Patent.

---

[21] Plaintiffs contend that the R. Schultz 534 Patent is entitled to the pre-URAA seventeen year patent term. However, the Court finds that even under the pre-URAA term, the 152 Patent would expire one week beyond the R. Schultz 534 Patent (the 152 Patent would purportedly expire Sept. 12, 2023 while the R. Schultz 534 Patent would purportedly expire Sept. 5, 2023). This, the Court finds, would still constitute an unjustified time-wise extension of the right to exclude.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

1675.  This analysis dovetails with defendants' expiration and unenforceability defenses set forth below.

1676.  After reviewing the evidence of the applicant's actions during the prosecution of the applications that led to the issuance of the 152 Patent and the R. Schultz 534 Patent (explained in greater depth below), the Court agrees with defendants, and concludes that because the applicants failed to maintain consonance in the 490 Application by improperly reclaiming the invention elected in the parent 039 Application—Group I and the propellant HFA-134a—the 152 Patent is not entitled to the safe harbor provisions of 35 U.S.C. § 121.

## 6.  R. Schultz 432 Patent

1677.  Defendants also contend that the asserted claims of the 152 Patent are invalid for obviousness-type double patenting over claims of the R. Schultz 432 Patent.

1678.  Again, the Court agrees.

1679.  U.S. Patent No. 5,776,432 ("R. Schultz 432 Patent") issued on July 7, 1998 from application No. 455,872, filed May 31, 1995.  (DTX 9_1).

1680.  The R. Schultz 432 Patent will expire on July 7, 2015.

1681.  The Court notes that this is eight years earlier than the 152 Patent's purported expiration date of September 2023 alleged by plaintiffs.

1682.  The face of the R. Schultz 432 Patent indicates that it is assigned to Minnesota Mining and Manufacturing Company, and lists the purported inventors as Robert K. Schultz and David W. Schultz, two of the three inventors also listed on the face of the 152 Patent.  (DTX 9_1).

1683.  The relevant claims of the R. Schultz 432 Patent read:

> 1. An aerosol formulation comprising a therapeutically effective amount of beclomethasone 17,21 dipropionate, a propellant comprising a hydrofluorocarbon selected from the group consisting of 1,1,1,2-tetrafluoroethane, 1,1,1,2,3,3,3-heptafluoropropane, and a mixture thereof, and ethanol in an amount effective to solubilize

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

> the beclomethasone 17,21 dipropionate in the propellant, the formulation being further characterized in that the beclomethasone 17,21 dipropionate is dissolved in the formulation, and that the formulation is free of any surfactant.

(DTX 9_5).

1684. Claim 1 of the R. Schultz 432 Patent is thus drawn to formulations containing beclomethasone, HFA-134a and ethanol, where the formulation is "free of any surfactant."

1685. Claims 2 and 4 of the R. Schultz 432 Patent further narrow the claimed ethanol ranges:

> 2. A solution aerosol formulation according to claim 1, comprising between 0.02 and about 0.6 percent by weight beclomethasone 17,21 dipropionate, between about 1 and about 20 percent by weight ethanol, and between about 80 and about 99 percent by weight of said propellant.

> 4. A solution aerosol formulation according to claim 1 wherein said ethanol is present in an amount of about 2 to about 12 percent by weight.

(DTX 9_5).

1686. Claims 2 and 4 thus narrow the ethanol range to 1 to 20% and 2 to 12% respectively.

1687. Defendants contend, and the Court agrees, that because beclomethasone is one of the drugs claimed in claim 4 of the 152 Patent, and claim 4 depends from claim 1, it is therefore incorporated into the scope of claim 1 as well.

1688. Defendants further contend, and the Court agrees, that micronization of drug, and the filling of aerosol formulations into canisters equipped with metering valves were well-known among those of ordinary skill in the art, and thus claims 2 and 3 of the 152 Patent disclose mere obvious variants of that which is disclosed in claims 1, 2 and 4 of the R. Schultz 432 Patent.

1689. Further, defendants' expert, Dr. Dalby, noted that examples 8 and 9 disclosed in the R. Schultz 432 Patent describe formulations containing beclomethasone, 8% by weight of ethanol and propellant HFA-134a.

1690.  Dr. Dalby testified that the claimed 2-12% range of ethanol in claim 4 of the R. Schultz 432 Patent substantially overlaps the 5-15% range of ethanol in the 152 Patent claims.

1691.  Dr. Dalby further testified that the 8% ethanol content disclosed in examples 8 and 9 of the R. Schultz 432 Patent specification, falls squarely within the 5-15% range claimed in the 152 Patent.

1692.  The Court agrees, and finds this testimony and evidence persuasive.

1693.  Plaintiffs attempt to distinguish the claims of the R. Schultz 432 and 152 Patents by contending that the R. Schultz 432 Patent is drawn to solutions, not suspensions as claimed in the 152 Patent.

1694.  However, as Dr. Dalby convincingly testified, solutions and suspensions are not so different as to rise to the level of being patentably distinct.

1695.  Dr. Dalby testified that a person of ordinary skill in the art does not set out to make a solution or suspension, but rather a formulation in general, and the properties of the drug determine whether a solution or suspension will form.

1696.  Dr. Dalby also convincingly testified that if one observed a drug going into solution or partially dissolving, a formulator would simply adjust the excipients to drive the formulation towards a solution formulation where the drugs would be completely dissolved.

1697.  Likewise, if the formulator observed that the drug was resistant to dissolution, then a suspension formulation would be pursued.

1698.  In any event, and as defendants point out, plaintiffs have failed to explain, considering the substantial overlap in claimed ethanol concentrations between the 152 Patent and the R. Schultz 432 Patent, and the use of the same propellant in the claims of both the 152 Patent and the R. Schultz 432 Patent, how beclomethasone can be claimed in both the R. Schultz 432 Patent

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

and the 152 Patent, where one patent is allegedly drawn to solutions and the other is allegedly drawn to suspensions.

1699.   The Court agrees with defendants.

1700.   The Court notes that claim 4 of the 152 Patent essentially includes beclomethasone, HFA-134a and 5-15% ethanol.

1701.   Claim 2 of the R. Schultz 432 Patent essentially includes beclomethasone, HFA-134a and 1-20% ethanol.

1702.   Claim 4 of the R. Schultz 432 Patent essentially includes beclomethasone, HFA-134a and 2-12% ethanol.

1703.   Because of the substantial overlap in the claimed ranges of ethanol, and thus necessarily the concentrations of other components, and because plaintiffs have failed to explain how beclomethasone can appear in both suspension claims and solution claims unless the two formulation types are patentably indistinct, the Court concludes that claim 1, 2, 3 and 4 of the 152 Patent are not patentably distinct from claims 1, 2 and 4 of the R. Schultz 432 Patent.

1704.   With respect to claims 8 and 9 of the 152 Patent, which are drawn to albuterol and albuterol sulfate, respectively, plaintiffs contend that a person of ordinary skill in the art would not have been motivated to choose albuterol or albuterol sulfate.

1705.   Defendants' experts have testified extensively about the reformulation that was occurring in the MDI industry and the desire to replace CFC-containing Proventil and Ventolin, which were albuterol-containing MDIs, with formulations containing the new propellant HFA-134a.

1706.   Indeed, Dr. Byron, expert for plaintiffs, testified that his laboratory was seeking to reformulate the Ventolin product in the early 1990s.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

1707.   Defendants also contend, and the Court agrees, that the recitation of different drugs is not sufficient to render the claims patentably distinct.

1708.   This is supported by the fact that both beclomethasone and albuterol are claimed together in claim 4 of the 152 Patent.

1709.   Defendants contend that further support for this point comes from statements made by 3M in the Request for Interference referred to above in the discussion devoted to the R. Schultz 534 Patent.

1710.   Therein, 3M proposed a count, set forth in detail above, which included the claim limitation "particulate drug."  (DTX 15_28; DTX 1996_43).

1711.   3M stated to the U.S. Patent and Trademark Office that "[t]he proposed count recites one invention, i.e., an essentially surfactant-free aerosol suspension formulation having the specified drug and propellant.  As explained below, the presence of ethanol in the formulation, *the specific types of drugs or propellants recited in the patents*, the methods of use and the canisters and metered dose inhalers containing the formulations claimed in the Glaxo patents *all fall within the scope of one invention*."  (DTX 15_29; DTX 1996_44) (emphasis added).

1712.   3M continued, explaining that "Claims in the Patents Reciting Specific Drugs are not Patentably Distinct from the Proposed Count" and further explained that "[a]t the interview of March 16 2000 the examiners agreed that the count should include drug or medicament broadly and that *the claims of the patents or applications directed to specific drugs are not separately patentable.*"  (DTX 15_31-34; DTX 1996_46-49) (emphases added).

1713.   3M further supported its point by noting the many terminal disclaimers that were filed by Glaxo to overcome double patenting rejections where the claims at issue were drawn to different specific drugs.  (DTX 15_33-34; DTX 1996_48-49) ("… [r]ejecting claims reciting ***salbutamol***

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

over claims reciting ***fluticasone propionate*** … [r]ejecting claims reciting ***salmeterol*** over claims reciting ***salbutamol*** … rejecting claims reciting ***salmeterol*** over claims reciting ***fluticasone propionate*** … rejecting claims reciting ***drugs "other than"*** a select few drugs over claims reciting either ***salbutamol*** or ***salmeterol***….") (emphasis in original).

1714.   Defendants contend, and the Court agrees, that these statements are relevant evidence of what 3M thought at the time about the relative patentability of claims drawn to HFA-134a and ethanol, wherein different drugs were claimed that were well-known as medicaments that were commonly delivered to the lung by inhalation from metered dose inhalers.

1715.   The Court agrees with defendants.

1716.   The Court finds that, although claims 8 and 9 of the 152 Patent are drawn to albuterol, and the claims of the R. Schultz 432 Patent are drawn to beclomethasone, the statements made by 3M and the evidence presented by defendants, persuades the Court to conclude that defendants have shown by clear and convincing evidence that claims 8 and 9 of the 152 Patent are obvious variants of claims 1, 2 and 4 of the R. Schultz 432 Patent.

1717.   The Court thus concludes that for the asserted claims of the 152 Patent to expire 8 years beyond the expiration date of the R. Schultz 432 Patent represents an unjustified timewise extension of the right to exclude, and therefore the Court concludes that the asserted claims of the 152 Patent are not patentably distinct from, and are therefore invalid for obviousness-type double patenting over, claims 1, 2 and 4 of the R. Schultz 432 Patent.

### F.  Patent Term & Expiration / Unenforceability

1718.   Defendants contend that the 152 Patent is expired and therefore unenforceable.

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

1719.  Specifically, defendants contend that the 152 Patent has a patent term of 20 years from the filing date of the earliest filed applications to which priority is claimed and thus expired on December 18, 2011.  (35 U.S.C. § 154(a)(2)).

1720.  Additionally, defendants contend that the November 4, 1998 submission in the 490 Application violated 37 C.F.R. § 1.129 and constituted a continuing prosecution application.  (*See* DTX 1196_1593 (37 C.F.R. § 1.145); DTX 654_2 (item 10: a submission under 37 CFR § 1.129 cannot switch inventions, but such amendments are permissible as continuing prosecution applications); *see also* DTX 1198_531-34 (same)).

1721.  For at least the following reasons, the Court agrees with defendants and finds, by clear and convincing evidence that the 152 Patent has expired, and thus, is unenforceable.

### i.  The Legal Standard

1722.  A party sued for infringement of a patent may seek a declaratory judgment that the asserted patent has in fact expired.  *Abbott Labs. v. Novopharm Ltd.*, C.A. No. 96-611, 1996 WL 131498 (N.D. Ill. Mar. 15, 1996) ("*Abbott 1*"), *aff'd* 104 F.3d 1305 (Fed. Cir. 1997) ("*Abbott 2*").

1723.  An expired patent is not enforceable and cannot be infringed.  *See, e.g.*, *id.* at *5.

1724.  Under 35 U.S.C. § 154(a)(2), the term of a patent is 20 years from the date on which the earliest related application was filed.  *Abbott 2*, 104 F.3d at 1308.

1725.  A divisional application is entitled to the benefits associated with the earlier filing date of its related application(s), which includes an earlier filing date.  *Id.* (citing 35 U.S.C. §§ 120, 121).

1726.  Patents in force or resulting from a patent application filed before June 8, 1995 may, in certain circumstances, be entitled to a patent term of the greater of the 20-year term or 17 years from grant.  35 U.S.C. § 154(c)(1).

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

### ii. The Parties' Contentions and Discussion

1727.  For present purposes, the primary issue between the parties with respect to the expiration of the 152 Patent is whether the 152 Patent term is 20 years from the earliest filing date, or is "the greater of the 20-year term as provided in subsection (a), or 17 years from grant."  35 U.S.C. §§ 154(a)(2), (c)(1).

1728.  Plaintiffs argue that the 152 Patent is entitled to the provisions of 35 U.S.C. § 154(c), and the patent term for the 152 Patent is the greater term of 17 years from grant.

1729.  Defendants contend that the 152 Patent has a 20 year term because it did not "result[] from an application filed before the date that is 6 months after the date of the enactment of the Uruguay Round Agreements Act [June 8, 1995]."  *See* 35 U.S.C. § 154(a)(2).

1730.  Defendants further contend that the prosecution of the 490 Application violated the "[t]ransitional procedures for further limited reexamination after final rejection" established by the USPTO pursuant to the Uruguay Round Agreements Act ("URAA").  37 C.F.R. § 1.129; URAA § 532(a)(1), Pub. L. No. 103-465, 108 Stat. 4809, 4983-85 (Dec. 8, 1994).

1731.  Specifically, defendants contend that the 490 Application's November 4, 1998 submission switched inventions, violating 37 C.F.R. § 1.129, and constitutes a continuing prosecution application, thereby assigning a patent term of 20-years from the earliest filing date pursuant to 35 U.S.C. § 154(a)(2).  *See, e.g.*, DTX 1196_1593 (37 C.F.R. § 1.145); DTX 654_2 (item 10); DTX 1207_1-2 (same); DTX 654_2 (same)).

1732.  The Court agrees with defendants for at least the reasons that follow.

### 1. Whether the 152 Patent Has Expired According to 35 U.S.C. § 154 and, Therefore, is Unenforceable

1733.  The term of a U.S. patent "shall be for a term beginning on the date on which the patent issues and ending 20 years from the date on which the application for the patent was filed in the

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

United States, or *if the application contains a specific reference to an earlier filed application, or applications under section 120, 121, or 365(c) of this titled, from the date on which the earliest such application was filed*." 35 U.S.C. § 154(a)(2) (emphasis added).

1734.  The 490 Application is related to several non-provisional applications, including: the 791 Application; the 401 Application; the 039 Application; 08/955,603 ("603 Application"); and 08/455,874 ("874 Application"), as depicted below. (*See* JTX 1_1; JTX 2_2).



1735.  Under 35 U.S.C. §§ 120 and 121, the 490 Application is entitled to the earliest filing date of the applications to which it claims priority:  December 18, 1991.  *See* 35 U.S.C. §§ 120, 121; DTX 2_2; DTX 10_1-2. *See also Abbott 2*, 104 F.3d at 1308.

1736.  Accordingly, 35 U.S.C. § 154(a)(2) mandates the 152 Patent expiration date is December 18, 2011—20 years from December 18, 1991. *See, e.g., Abbott 2*, 104 F.3d at 1308-9.

1737.  Plaintiffs argue that the 152 Patent is entitled to the provisions of 35 U.S.C. § 154(c), and the patent term for the 152 Patent is the greater term of 17 years from grant.

1738.  The URAA—arising from the Uruguay Round of the General Agreements on Tariffs and Trade—changed the term of patent from 17-years from the date-of-grant to 20-years from the filing date.  (*See, e.g.,* DTX 1196_1486-7 (35 U.S.C. § 154); DTX 1204_171-3 (URAA § 532(a)(1)); *see also* DTX 1209).

1739.   These changes were effective June 8, 1995.

1740.   Along with the transition to a 20-year patent term, the URAA delegated to the USPTO the establishment of transitional procedures for "further limited reexamination" of applications that had been pending for at least two years before June 8, 1995 to allow applicants the potential to preserve their option of a patent term of 17 years from issue.  (DTX 1204_171-3 (URAA § 532(a)(2))).

1741.   The transitional procedures established by the USPTO are set forth in 37 C.F.R. § 1.129 ("Rule 129"), entitled "Transitional procedures for limited examination after final rejection and restriction practice."  (*See, e.g.*, DTX 1196_1587-8).

1742.   In order for an applicant's filing to comply with the "submission" requirements of 37 C.F.R. § 1.129(a), the submission "must be fully responsive to the previous office action." (DTX 1196_426).

1743.   A Rule 129 submission "may not switch inventions (divisional equivalent) as a matter of right or add new matter (CIP equivalent)." (*See, e.g.*, DTX 1196_1592 (37 C.F.R. § 1.145), DTX 1198_531-4 (item 10); DTX 654 (same); DTX 1207 (same)).

1744.   "An amendment cancelling all claims and presenting only claims to a non-elected invention is not permissible and such an amendment is nonresponsive."  (DTX 1196_619 (MPEP § 821.04), 1592 (37 C.F.R. § 1.145)).

1745.  As explained in more detail below, the November 4, 1998 submission in the 490 Application violated the submission requirements of 37 C.F.R. § 1.129 by (1) filing a non-responsive amendment cancelling the claims to introduce the interfering claims; and (2) switching inventions from the originally elected claim set of the divisional 490 Application. (DTX 1196_619, 1592; DTX 1198_531-4; DTX 654; DTX 1207).

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

1746.  The Applicants' November 4, 1998 submission claim amendments were only permissible as if they were made through a voluntary divisional application or a continuing prosecution application ("CPA").  (*See, e.g.*, DTX 1196_1561-4 (37 C.F.R. §§ 1.53(b), (d)); *see also* DTX 654; DTX 1207).

1747.  A divisional application or CPA constitutes a new application. *See, e.g.*, DTX 1196_1561-4 (37 C.F.R. §§ 1.53(b), (d)(2)(v)); *see also* DTX 1207 (item 4); DTX 654 (same)).

1748.  The 152 Patent therefore does not "result[] from an application filed before [June 8, 1995]" and does not satisfy the date requirements of 35 U.S.C. § 154(c)(1).  (*See, e.g.*, DTX 186_1 (the R. Schultz 534 Patent "issued on a continued prosecution application … and is subject to the twenty year patent term provisions of 35 U.S.C. 154(a)(2)")).

### 2. Whether the November 4, 1998 Submission Violated 37 C.F.R. § 1.129 and Constituted a Continuing Prosecution Application

1749.  As explained above, the Court must decide whether the 490 Application's November 4, 1998 submission constitutes a CPA, and thus a new application.

1750.  The parties dispute the application of 35 U.S.C. § 154(c)(1) for determining the 152 Patent term.

1751.  It is undisputed that the authorities governing the examination of patent applications at the USPTO, in decreasing order of importance, are set forth in: (1) Title 35 of the United States Code (35 U.S.C.), (2) federal court and USPTO decisions, (3) the codified Patent Rules of Practice set forth in Title 37 of the Code of Federal Regulations (37 C.F.R.), and (4) the Manual of Patent Examining Procedure (MPEP).  (*See, e.g.*, DTX 1196_53 ("Foreword.").

1752.  USPTO examiners are required to follow 35 U.S.C., 37 C.F.R. and the MPEP.  (*See, e.g.*, *id.* at 1597 (37 CFR § 1.183), 673-4 (MPEP § 1002.02(b)).

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

1753.  Set forth below is a schematic timeline depicting certain relevant prosecution events in the 039 Application, the 603 Application and the 490 Application.



#### a.  Prosecution History of the 039 Application

1754.  The 039 Application was filed with 60 claims, including independent claims 1, 31 and 47.  (JTX 36_37-44).

1755.  On February 8, 1993, the USPTO Examiner issued a six-way Restriction Requirement for all 60 claims, asserting that the 039 Application contained "***independent and/or distinct***" inventions, numbered I through VI.  (*Id.* at 109-13; *see also* DTX 1189_878 (37 C.F.R. §§ 1.141, 1.142), 282-309 (MPEP Ch. 800)).

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

1756.   Inventions I and II, inventions III and IV, and inventions V and VI are (pair-wise) related as product and process of use.  (JTX 36_111-2).

1757.   The Examiner stated that "Inventions I, III, and V are independent and/or distinct in that they are three different formulations with specific requirements."  (*Id.* at 110; *see also* DTX 1189_878 (37 C.F.R. §§ 1.141, 1.142)).

1758.   The Examiner found a serious burden and issue because the inventions, though all in the same class and subclass, "have acquired a separate status in the art because of their recognized divergent subject matter."  (JTX 36_112; *see also* DTX 1189_283, 296-7 (MPEP §§ 803, 808.02); JTX 34; JTX 35 (the Examiner performed prior art searches in the same class and subclass in the 791 and 401 Applications)).

1759.   Defendants' expert Dr. Bernard Greenspan (whom the Court found credible, and whose testimony is consistent with the evidence of record) testified, unrebutted, that the Inventions of Groups I, III and V have the following properties:

**Properties of Groups I, III & V From the 039 Application Restriction Requirement**

| Group | Drug(s) | Propellant(s) | Ethanol | Surfactant |
|---|---|---|---|---|
| I | Albuterol, beclomethasone, cromolyn, pirbuterol, salmeterol, formoterol, cromoglycate | HFA-134a, HFA-227, mixture | Unspecified (Claims were originally "consisting essentially of"; later amended to "comprising") | Unspecified (Claims were originally "consisting essentially of"; later amended to "comprising") |
| III | Pirbuterol | HFA-227 | Ranges from unspecified, to substantially free to 5-12% | Ranges from unspecified to substantially free |
| V | Albuterol | HFA-227 | Ranges from unspecified to 5-15% | Ranges from unspecified to substantially free to 0.01%-0.5% |

(*See* JTX 36_37-44; *see also id.* at 170 (amending claim 1)).

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

1760.  The Examiner also required the Applicants make a species election of the specific propellant and drug.  (*Id.* at 112-3; *see also* DTX 1189_879 (37 C.F.R. § 1.146)).

1761.  The Examiner considered the different propellants—HFA-134a, HFA-227, and a mixture of HFA-134a and HFA-227—be patentably distinct species.  (JTX 36_110-3; *see also* DTX 1189_291-2((MPEP §§ 806.04(e), (h)), 296 (MPEP § 808.01(a)); 879 (37 C.F.R. § 1.146)).

1762.  The Examiner subsequently explicitly removed the requirement to elect a drug species.  (JTX 36_116).

1763.  No such explicit withdrawal of the restriction requirement or election of the propellant species was ever made in the 039 Application, 490 Application, or any other related patent applications.  (*See generally* JTX 2, JTX 36, JTX 33, DTX 14).

1764.  The Applicants elected, without traverse, Group I and HFA-134a (*i.e.*, 1,1,1,2-tetrafluoroethane) as the specific propellant in response to the Examiner's restriction requirement.  (JTX 36_114).

1765.  The Applicants, by not traversing the restriction requirement, acquiesced to the Examiner's description of the "different formulations" as "independent and/or distinct" inventions having a "separate status in the art because of their recognized divergent subject matter" and to the propellants as patentably distinct species by failing to traverse the requirement.  (*See* DTX 1189_304 (MPEP § 818.03(c)).

1766.  Consistent with the Applicants' election of Group I and HFA-134a, the Examiner withdrew from consideration dependent claims that were not directed to the invention of Group I and the elected species HFA-134a, for example, claims where the claimed propellant was HFA-227 or a mixture of HFA-134a and HFA-227.  (*See* JTX 36_115).

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

1767.  Following election of Group I and the propellant HFA-134a, the Applicants continued to prosecute the claims directed to Group I and the species HFA-134a in the 039 Application.  (*See, e.g.*, *id.* at 115, 133-9, 149-52, 170-6, 189-200, 245-50).

1768.  Dr. Greenspan testified unrebutted that a person of ordinary skill in the art would recognize that, throughout the prosecution of the 039 Application, the Applicants always prosecuted claims directed to the Group I invention and the propellant species HFA-134a.  (*See generally id.*).

1769.  The 039 Application was expressly abandoned on October 22, 1997, and a Notice of Abandonment issued on December 3, 1997. (*Id.* at 444, 448).

### b.  Prosecution History of the 603 Application

1770.  The 603 Application was filed on October 22, 1997, pursuant to 37 C.F.R. § 1.62, and is a "file wrapper continuation" of the 039 Application.  (JTX 33_3-4; *see also* DTX 1195_1422-3 (37 C.F.R. § 1.62)).

1771.  Plaintiffs do not dispute that any patent that would have issued from the 603 Application would have received a 20-year patent term since the 603 Application was filed *after* June 8, 1995, and would have expired December 18, 2011.  (*See* JTX 33_3-4; 35 U.S.C. § 154).

1772.  The Applicants continued to prosecute claims directed to Group I and the elected propellant species HFA-134a that were pending in the 039 Application before it was abandoned. (JTX 33_6-11; *see also* DTX 1195_1422-3 (37 C.F.R. § 1.62)).

1773.  The Applicants filed a CPA on August 18, 1998 including a preliminary amendment cancelling all pending claims and adding new claims 108-115.  (JTX 33_93, 240-6).

1774.  The Applicants stated that new claims 108-115 switched inventions from the elected Group I and propellant HFA-134a to claims "limited to formulations that use a mixture of HFC l34a and HFC 227 as the propellant," which are "distinct" from any patent applications related to

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

the 603 Application (*i.e.*, the 791 Application, 401 Application, 039 Application, 490 Application). (*Id.* at 241).

1775. New claims 108-115 switched inventions from the elected invention of Group I and the elected propellant species HFA-134a to "formulations that use a mixture of HFC l34a and HFC 227 as the propellant." (*See id.*).

1776. The 603 Application was abandoned on March 9, 2000 for failure to respond to the non-final office action. (*Id.* at 262).

1777. No continuing application claiming priority to the 603 Application was filed.

### c. The 490 Application: Election and Prosecution of the Group III Formulation and HFA-227

1778. The 490 Application was filed on May 31, 1995, and is a divisional of the 039 Application. (JTX 2_5-6).

1779. The 490 Application was filed with the same 60 claims as the 039 Application; the transmittal letter cancelled claims 1-30 and 47-60. (*See id.* at 5, 37-44).

1780. Plaintiffs argue that there was no restriction requirement issued in the 490 Application, and therefore there can be no switch in invention.

1781. The Court disagrees. Claims 31-46, which correspond to Groups III and IV in the 039 Application restriction requirement, were elected by ***original presentation*** in the 490 Application. (*Id.* at 5; *see also* DTX 1192_366-7 (§§ 818.02, 818.02(a))).

1782. As Dr. Greenspan testified unrebutted, claims 31-46 are directed to aerosol formulations including HFA-227 as the propellant, and, accordingly, the Applicants elected HFA-227 as the specific propellant to be examined in the 490 Application. (*See* JTX 2_40-42).

1783. As Dr. Greenspan also testified unrebutted, a person of ordinary skill in the art would recognize that the Applicants thus elected to prosecute the formulation of Group III and related

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

Group IV as the "distinct and/or independent" inventions and HFA-227 as the propellant species for examination in the 490 Application. (*See, e.g.*, JTX 2_40-42; JTX 36_109-13; DTX 1192_367 (§ 818.02(a)).

1784.   Claims directed to the formulations of Group III were prosecuted in the 490 Application prior to Applicants' alleged second submission under 37 C.F.R. § 1.129(a) on November 4, 1998.  (*See* JTX 2_199-206, 269-83, 292-6).

1785.   The plaintiffs argue that the Applicants switched inventions prior to the November 4, 1998 submission, in an April 12, 1996 office action response.  (*See id.* at 199-206).

1786.   The Court disagrees.

1787.   The Applicants' April 12, 1996 office action response added new genus claim 63, which is a "linking" claim that is examined with the elected invention—the Group III formulation and the propellant HFA-227.  (*See* DTX 1196_605, 608-9 (MPEP e7 §§ 809, 809.03).

1788.   There was never any rejoinder of the non-elected species (*i.e.*, HFA-134a as a propellant) in the 490 Application because no linking claim, such as claim 63, was ever allowed in the 490 Application prior to Applicants' November 4, 1998 submission.  (DTX 1196_605, 9 (MPEP §§ 809, 809.04), 1591-2 (37 C.F.R. § 1.141)).

1789.   New dependent claim 69, claiming the unelected propellant HFA-134a, should have been withdrawn by the Examiner as directed to a non-elected invention.  (*See id.* at 1592 (37 C.F.R. § 1.142); *see also id.* at 607-8, 618-9 (MPEP §§ 809.02(c), 821.03)).

### d. The 490 Application: November 4, 1998 Submission Violated 37 C.F.R. § 1.129

1790.   The November 4, 1998 submission cancelled *all* of the pending claims in the case (claims 31-35, 38-46, 61-63, and 65-77) and added new claims 78-83 in an effort to provoke an interference.  (JTX 2_428-52).

EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER

1791.  New claims 78-83 were directed to formulations including only the unelected propellant HFA-134a, which plaintiffs claim is patentably distinct from the elected propellant HFA-227.  (*Id.* at 428, 447-8; JTX 36_109-114; JTX 33_241).

1792.  New claims 78-83 were no longer readable on the originally elected invention and species.  (JTX 2_428-52).

1793.  Accordingly, the November 4, 1998 submission switched inventions from the pending claims directed to the elected formulations of Group III and HFA-227 as the propellant to new claims directed to non-elected Group I formulations and non-elected propellant HFA-134a.  (*Id.*).

1794.  Once an election is made, the claims within that particular application cannot be switched to an invention outside the elected restriction requirement group and the examiner has no discretion to act otherwise.  (DTX 1196_1592 (37 C.F.R. § 1.145), 618-9 (MPEP § 821.03)).

1795.  37 C.F.R. § 1.145 recites that the applicant "***will be required***" to restrict the claims to the invention previously claimed, and does not provide the USPTO examiner with any discretion to otherwise permit a switch of invention.  (*Id.* at 1592 (37 C.F.R. § 1.145), 618-9 (MPEP § 821.03)).

1796.  The Applicants therefore violated the submission requirements of 37 C.F.R. § 1.129 by (1) filing a non-responsive amendment cancelling the claims to introduce the interfering claims; and (2) switching inventions from the originally elected claim set of the divisional 490 Application.

1797.  As noted above, the November 4, 1998 submission and presentation of new claims to an unelected invention is only permissible in a voluntary divisional application or a continuing prosecution application ("CPA").  (*See, e.g.*, DTX 1196_1561-4 (37 C.F.R. §§ 1.53(b), (d)); *see also* DTX 1207; DTX 654; DTX 186_1).

**EXTERNAL COUNSEL ONLY – SUBJECT TO PROTECTIVE ORDER**

1798.  Additionally, as Dr. Greenspan credibly and persuasively testified, a person of ordinary skill in the art would recognize that further evidence that the November 4, 1998 submission switched inventions is that the Applicants moved claims presented in the post-URAA 603 Application, which would have had a 20 year patent term, to the 490 Application.

1799.  During the prosecution of the 603 Application, the Applicants presented new claims 89-90.  (JTX 33_15-28).

1800.  603 Application claims 89-90 are almost identical to the claims added in the 490 Application's November 4, 1998 submission:

| 603 App. Claims 89 & 90 | 490 App. Claim 78 |
| --- | --- |
| 89. A pharmaceutical suspension aerosol formulation consisting essentially of:<br><br>(i) a therapeutically effective amount of a drug;<br>(ii) 1,1,1,2-tetrafluoroethane as propellant; and<br>(iii) an excipient, wherein the formulation contains no surfactant.<br><br>90. The pharmaceutical suspension aerosol formulation of claim 89, wherein the excipient is ethanol. | --78. A pharmaceutical suspension aerosol formulation consisting essentially of:<br><br>(i) particulate drug;<br>(ii) 1,1,1,2-tetrafluoroethane as propellant; and<br>(iii) ethanol, wherein the formulation is further characterized in that it contains no surfactant. |
| A pharmaceutical suspension aerosol formulation | A pharmaceutical suspension aerosol formulation |
| consisting essentially of | consisting essentially of |
| a therapeutically effective amount of a drug | particulate drug |
| 1,1,1,2-tetrafluoroethane as propellant | 1,1,1,2-tetrafluoroethane as propellant |
| an excipient … wherein the excipient is ethanol | ethanol |
| wherein the formulation | wherein the formulation is further characterized in that it |
| contains no surfactant | contains no surfactant |

(*Id.*; JTX 2_447-8).